IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |  |
|---|---|---|
| NORTHEAST OHIO COALITION<br>    FOR THE HOMELESS, *et al.*, | : | |
| | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| JENNIFER BRUNNER, in her official | : | |
|    capacity as Secretary of State of Ohio, | : | |
| | : | |
| Defendant. | : | Case No. C2-06-896 |
| _____ | : | |
| | : | JUDGE ALGENON L. MARBLEY |
| NORTHEAST OHIO COALITION | : | Magistrate Judge Terence P. Kemp |
|    FOR THE HOMELESS, *et al.*, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| THE STATE OF OHIO, | : | |
| | : | |
| Intervenor-Defendant. | : | |

OPINION and ORDER

I. INTRODUCTION

This matter is before the Court on Plaintiffs Northeast Ohio Coalition for the Homeless'

("NEOCH") and Service Employees International Union, Local 1199's ("SEIU") (collectively

"Plaintiffs") Motion for Attorney's Fees and Costs (dkt. no. 96). Also before the Court is

Defendants Jennifer Brunner's, in her official capacity as Ohio Secretary of State, and

Intervenor-Defendant the State of Ohio's (collectively "Defendants") 12(B)(1) Motion to

Dismiss (dkt. no. 99) for lack of subject-matter jurisdiction. The Court will first address

Defendants' Motion to Dismiss and then turn to Plaintiffs' Motion. For the reasons set forth

below Defendants' Motion is **GRANTED in PART** and **DENIED in PART** and Plaintiffs'

Motion is **GRANTED**.

## II. FACTS

### A. Background

On January 31, 2006 the Ohio General Assembly passed House Bill 3 ("Voter ID Law"),

which amended Ohio's Election Code. Specifically, the bill amended Ohio's election law to

require that voters provide any of several types of identification in order to cast a regular ballot

in state and federal elections held in Ohio. The Voter ID Law went into effect in the summer of

2006.

Plaintiff NEOCH is a non-profit organization that seeks to empower homeless and at-risk

men, women, and children. One of NEOCH's goals is to work to assure that all homeless people

are registered to and actually do vote. Ten percent of NEOCH's members are homeless people.

Plaintiff SEIU is a Columbus, Ohio based affiliate of a national labor union. SEIU engages in

voter-registration activities on behalf of its members. Defendant Jennifer Brunner, like former

named defendant J. Kenneth Blackwell[1], is the Ohio Secretary of State ("Secretary"). The

Secretary is the chief election officer of Ohio and is charged with the duty of administering

Ohio's election laws, promulgating directives for the conduct of Ohio elections, and compelling

election officers to observe state and federal election laws. Ohio Rev. Code Ann. §§ 3501.04(B),

(M). The State of Ohio is an intervenor-defendant in this matter.

---

[1] Following the 2006 General Election, Ohio Secretary of State Jennifer Brunner replaced J. Kenneth Blackwell as the named Defendant in this action.

**B.  Procedural History**

On October 24, 2006, Plaintiffs filed a thirteen-count complaint under 42 U.S.C. § 1983

against then Ohio Secretary of State J. Kenneth Blackwell.  The complaint alleges that several

provisions of the Voter ID Law are unconstitutional and seeks to have the Law declared

unconstitutional and to obtain an order restraining its enforcement preliminarily and

permanently.  Specifically, Plaintiffs alleged that:

 (1) the Voter ID Law is confusing, vague, impossible to apply, and is being applied
differently by Ohio's Boards of election, causing the November 2006 election to be
conducted in a manner that is fundamentally unfair in violation of the Due Process
Clause and the Equal Protection Clause of the Fourteenth Amendment (Counts One and
Two);[2]

(2) the Voter ID Law imposes an undue and unequal burden on election day voters' right
to vote, in violation of their Fourteenth Amendment Rights and 42 U.S.C. § 1971
(a)(2)(A)-(B), because the Law requires voters who vote at polling places on election
day, but not absentee voters, to provide one of the required forms of identification
(Counts Three and Four);

(3) the Voter ID Law violates the Fourteenth Amendment Due Process and Equal
Protection Clause Rights of voters, and  42 U.S.C. § 1971 (a)(2)(A)-(B), because it
prevents voters, including Plaintiffs' members, who *do not* have the required
identification but who *do have* a Social Security number from casting regular or
provisional ballots on election day, while other voters, including those who *lack both* the
required forms of identification and a Social Security number are permitted to cast
provisional ballots on election day (Counts Five, Six, and Seven);

---

[2]   More specifically, the Complaint alleges that Ohio Boards of Elections were applying
different interpretations of what constitutes acceptable forms of identification as follows: (1) what
constitutes a *current* utility bill, bank statement, government check, paycheck, or other
government document under Ohio Rev. Code Ann. § 3505.18(A)(1); (2) what constitutes an
"other government document" under Ohio Rev. Code Ann. § 3505.18(A)(1); (3) which of the
two numbers on an Ohio driver's license may be provided by absentee voters under Ohio Rev.
Code Ann. § 3509.03(E); (4) whether military identification cards that do not show a current
address will be accepted under Ohio Rev. Code Ann. § 3505.18(A)(1); (5) whether photo
identification with a voter's *former* address will be accepted as a "current and valid photo
identification" under Ohio Rev. Code Ann. § 3505.18(A)(1); (5) whether early in-person
absentee voters will be required to produce one of the required forms of identification by their
Board of Elections.

(4) the Voter ID Law violates the Fourteenth Amendment Equal Protection Clause Rights of voters (both by treating classes of voters unequally and by unduly burdening the right to vote), and  42 U.S.C. § 1971 (a)(2)(A)-(B), with respect to voters, including Plaintiffs' members, who have certain identification with a *former* address but cannot provide proof of their *current* address because the Law requires that voters who use certain types of identification, (e.g. utility bills or bank statements), to provide proof of their current address, but does not require voters who use other types of identification (e.g. driver's licenses or state-identification cards) to provide such proof (Counts Eight, Nine, and Ten);

(5) the Voter ID Law constitutes a poll tax in violation of the Twenty-Fourth and Fourteenth Amendments, because it requires voters, including Plaintiffs' members, to purchase a state-identification card or birth certificate to exercise their right to vote (Count Eleven);

(6) the Voter ID Law violates voters' Fourteenth Amendment Due Process Clause and Equal Protection Clause Rights because the provisions governing the determination of whether provisional ballots are eligible to be counted, Ohio Rev. Code Ann. §§ 3505.181 (B)(4) and 3505.183 (B), are so vague that they cannot be applied uniformly by Ohio's Board of Elections and, consequently, will be applied non-uniformly across the state (Counts Twelve and Thirteen).

Just two days after Plaintiffs filed their Complaint, the Secretary of State issued Directive 2006-78 ("Directive").  The goal of the Directive was to ensure that the November 2006 election was  "conducted uniformly throughout the State."  In the Directive, the Secretary defined several terms used in the Voter ID Law that are relevant to this suit including the terms "current" as it relates to permissible forms of identification, "government document," and "driver's license number."  The Directive was addressed to "ALL COUNTY BOARDS OF ELECTIONS."

On October 26, 2006 Plaintiffs were granted a temporary restraining order ("TRO") related to provisions of the Voter ID Law dealing with absentee ballots.  On October 31, 2006, the Sixth Circuit stayed the majority of the TRO.  Although a hearing on Plaintiffs' motion for a preliminary injunction was scheduled, it never occurred.

Instead, on November 1, 2006, the Court entered a Consent Order negotiated by the parties that applied only to the 2006 election.  The Consent Order reiterated the requirements of certain provisions of the Voter ID Law, altered the Secretary of State's explanation of identification requirements for in-person absentee voters laid out in Directive 2006-78, and defined with minor alterations the terms previously defined by the Secretary in Directive 2006-78.

Following the 2006 election, Plaintiffs believed that Ohio Boards of Elections ("BOEs") were improperly counting provisional ballots.  Consequently, the parties negotiated an Agreed Enforcement Order, which the Court entered on November 15, 2007.  The Agreed Enforcement Order, reiterated the Voter ID Law requirements regarding counting of provisional ballots and the rights of observers to monitor BOEs under the Law.

After an October 2007 mediation conference, the Court granted Plaintiffs leave to request attorney's fees and costs expended through the November 15, 2006 Agreed Enforcement Order.  Plaintiffs' Motion for Attorney's Fees and Costs pursuant to 42 U.S.C. §1988(b) and 28 U.S.C. §§1821 and 1920 is now before the Court.  Defendants responded with their Motion to Dismiss for lack of subject matter jurisdiction, which is also before the Court.

### III.  LAW and ANALYSIS

#### A.  Defendants' Motion To Dismiss

##### 1.  Standard of Review

Where a defendant raises the issue of lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, the plaintiff has the burden of proving jurisdiction in order to survive the motion to dismiss. *DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir.2004); *Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir.1990).

"[M]otions to dismiss for lack of subject matter jurisdiction fall into two general categories: facial attacks and factual attacks." *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir.1994).  A facial attack challenges the sufficiency of a complaint, and, when considering the motion, the court must view the material allegations in the complaint as true and construe them in the light most favorable to the nonmoving party. *Id*. A factual attack is a challenge to the factual existence of subject matter jurisdiction. *Id*.  In a factual attack "the court may consider evidence outside the pleadings to resolve factual disputes concerning jurisdiction, and both parties are free to supplement the record by affidavits." *Nichols v. Muskingum College*, 318 F.3d 674, 677 (6th Cir. 2003).  As Defendants' Motion to Dismiss argues not only that Plaintiffs' Complaint fails to demonstrate standing, but also that Plaintiffs have never had standing as a matter of fact and, furthermore, challenges Plaintiff's factual showing in support of standing, the Court will treat Defendants' Motion as a factual attack.

## 2.  Standing

Defendants contend that Plaintiffs do not have standing to assert their claims.[3]  The Plaintiffs argue that they have standing in their own right and that they have organizational standing to assert the rights of their members.[4]

---

[3]  As a preliminary matter, Defendants contend in their Reply that the Supreme Court's decision in *Crawford v. Marion County Election Bd.*, 128 S.Ct.1610 (2008), makes clear that Plaintiffs' constitutional challenges to the Voter ID Law cannot prevail on their merits and, therefore, the Court should dismiss the Complaint.   While the Court agrees that *Crawford* casts considerable doubt on the substantive merits of Plaintiffs' claims, this argument is not properly raised in Defendants' Reply brief to a 12(B)(1) motion to dismiss for lack of standing and will not be considered by the Court at this time.  *Club Italia Soccer & Sports Organization, Inc. v. Charter Twp. Of Shelby, Mich.*, 470 F.3d 286, 292 (6th Cir. 2006) (standing inquiry must not be conflated with an evaluation of the merits of a claim).

[4]  Plaintiffs' discussion of standing was limited to evidence regarding Plaintiff NEOCH.  Thus, to the extent that facts relating to Plaintiff SEIU's standing would have altered the Court's ruling on standing, that information was not before the Court and could not be considered in its ruling.

To satisfy the standing requirements of Article III of the Constitution a plaintiff must show: "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged act of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). Standing is evaluated based on the facts as they existed at the time the complaint was filed. *Cleveland Branch, NAACP v. City of Parma, Ohio*, 263 F.3d 513, 524 (6th Cir. 2001). These three requirements come into play whether an organization claims standing based on its own injury or based on injury to its members. *See id.* at 526-530.

### i. Plaintiff NEOCH's Standing To Sue on its Own Behalf

An organization has standing to sue on its own behalf if "it has suffered a palpable injury as a result of the defendants' actions." *MX Group, Inc. v. City of Covington*, 293 F.3d 326, 333 (6th Cir. 2002). A mere interest in a problem, however, is insufficient to confer standing on an organization. *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972). An organization must establish that it has been injured beyond a mere "setback to the organization's abstract social interests." *Greater Cincinnati Coalition for the Homeless v. City of Cincinnati*, 56 F.3d 710, 716 (6th Cir 1995) (internal quotation marks omitted). NEOCH has not done so in this case.

Instead, NEOCH asserts that it has standing on its own behalf because the Voter ID Law has "harmed, and will continue to harm, NEOCH's ability to carry out its stated goal of working to 'reduce barriers to homeless people actually voting.'" This is merely a frustration of NEOCH's social interest in having homeless people vote. NEOCH has not demonstrated that it has expended any additional resources to encourage homeless people to vote, or any other palpable injury as a result of Defendants' enforcement of the Voter Id Law and therefore, has failed to

establish standing to sue on its own behalf.  *See Greater Cincinnati Coalition for the Homeless*, 56 F.3d at 715-16; *Harkless v. Blackwell*, 467 F.Supp.2d 754, 759-60 (N.D. Ohio 2006) (refusing to find standing where an organization involved in voter registration would likely have conducted its voter registration activities in the absence of defendant's alleged violation of a voter right's statute); *Ass'n of Cmty Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 359-62 (5th Cir. 1999) (finding that, to prove standing, an organization must show that its voter registration resources were consumed as a result of defendants' alleged violation of a voter registration statute).

### ii.  Organizational Standing Based on Plaintiffs' Members

Plaintiffs next argue that they may assert standing on behalf of NEOCH's members.   An organization "has standing to bring suit on behalf of its members when [1] its members would otherwise have standing to sue in their own right, [2] the interests at stake are germane to the organization's purpose, and [3] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Laidlaw*, 528 U.S. at 180-81.  Plaintiffs argue that they have satisfied this test because NEOCH's members have standing to sue, the interests at stake are germane to NEOCH's purpose, and individual participation of NEOCH's members is not required.  Defendants challenge all three prongs of the test.

#### a.  NEOCH Members' Standing

An organization's members have standing to sue in their own right if they satisfy the standing requirements of Article III:  injury in fact, traceability, and redressability.  *See id.* Defendants contend that Plaintiffs do not have organizational standing because they have not demonstrated that their members have standing to sue.  First, Defendants maintain that the homeless are not *members* of Plaintiff NEOCH, but rather "patrons that NEOCH attempts to

-8-

assist." Plaintiffs have, however, produced two declarations from Brian Davis, the Executive Director of NEOCH stating that roughly ten percent of NEOCH members are homeless.  They have also produced the declarations of six homeless individuals who are members of NEOCH. Defendants have done nothing to rebut this showing.  Therefore, the Court finds that, while the entire homeless population of Ohio may not be de facto members of NEOCH, certain homeless individuals are members of NEOCH.

Next, Defendants contend that Plaintiffs have not demonstrated that NEOCH members suffered injury in fact because Plaintiffs have not produced any evidence that homeless individuals were unable to cast a ballot in the 2006 election or that their ballots were not counted.[5]  While this is true, the relevant inquiry for standing purposes is whether Plaintiffs' members faced a "concrete and particularized" risk of "actual or imminent" injury in October of 2006 when the Complaint was filed.  *Cleveland Branch, NAACP*, 263 F.3d at 524.  Plaintiff NEOCH contends that two categories of its homeless members had standing to sue in October of 2006.

The first category is a group of homeless members who did not have any form of identification required by the Voter ID Law but who did have Social Security numbers. Plaintiffs submit the October 18, 2006 declarations of four NEOCH members in this category.

_____

[5]  Defendants place great emphasis on the Sixth Circuit's ruling in *NEOCH v. Blackwell*, 467 F.3d 999 (6th Cir. 2006), in which the court overturned portions of the October 26, 2006 TRO granted earlier by this Court.  In that ruling, the Sixth Circuit found that Plaintiffs had only made a weak showing of standing.  *Id*. at 1010.  However, that court's analysis was limited only to Plaintiffs' challenges to the provisions of the Voter ID Law relating to absentee ballots, which this Court agrees Plaintiffs lacked standing to pursue.  *Id*. at 1004, 1010.  Moreover, the record on standing at that time consisted solely of the unverified complaint, *id*. at 1010, whereas this Court has before it the declarations of NEOCH's executive director and six member voters of NEOCH.

Each declaration states that the declarant: is homeless; is a United States Citizen; intends to vote in the November 2006 election; does not have any form of identification required by the Voter ID Law; and does have a Social Security card.  Plaintiffs argue that these members were suffering a concrete and imminent injury in fact in October 2006 because they lacked the specific forms of identification required by the Voter ID Law and consequently would be unable to cast regular or provisional ballots on election day.  Moreover, Plaintiffs contend that if those members had been permitted to cast provisional ballots, the vagueness of the Voter ID laws created a "real possibility of unequal and nonuniform application of the laws."

The second category is a group of homeless members who had at least one form of identification required by the Voter ID Law.  Here, Plaintiffs submit the April 2008 declarations of two homeless NEOCH members who state:  they were members of the NEOCH in October 2006; they are United States citizens; they voted in the 2006 election; they have at least one form of identification required by the Voter ID Law; and they have a Social Security number. Plaintiffs argue that these members were suffering a concrete and imminent injury in fact in October 2006 because, even though they had the required forms of identification, the BOEs were treating similarly situated absentee voters differently and would inevitably treat similarly situated election day voters differently when applying the Voter ID Law.  Also, Plaintiffs contend that if those two members had been required to cast provisional ballots, the vagueness of the Voter ID laws created a "real possibility of unequal and nonuniform application of the laws."

Plaintiffs' showing of member injury is only sufficient to give them standing to assert three of their six challenges to the Voter ID laws.  As a threshold matter, injury in fact sufficient to confer standing must be "actual or imminent." *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  Thus, to establish standing, Plaintiffs must show that their member's risk of

-10-

future injury as a result of Defendants' enforcement of the Voter ID Law was more than a "real possibility."  Counts Three and Four of Plaintiffs' Complaint allege that the Voter ID Law imposed an undue burden on election day voters right to vote because only election day voters were required to produce identification to exercise their right to vote.  Plaintiffs have demonstrated that NEOCH had members who intended to and actually did vote on election day, inevitably subjecting those members to the challenged identification requirements.  Therefore they have demonstrated member injury on those counts.

Similarly, Plaintiffs have demonstrated member injury relating to Counts Eight, Nine, and Ten of their Complaint ("Former Address Counts").  The Former Address Counts are based on Plaintiff's contention that the Voter ID Law imposed undue burdens on voters who seek to prove their identity with certain forms of identification (e.g. utility bills or bank statements), because the Law requires voters who produce those forms of identification to provide proof of their current address, but does not require voters who use other types of identification (e.g. driver's licenses or state-identification cards) to provide such proof.  Plaintiffs state in their Complaint, and Defendants have not rebutted, that some of their members sought to prove their identity using identification with their former address.  Therefore, those members faced an imminent risk of injury in October of 2006.

Finally, Plaintiffs have demonstrated member injury relating to Counts Twelve and Thirteen.  Those Counts involve challenges to the Voter ID Law provisions governing whether provisional ballots could be counted.  NEOCH has demonstrated that four of its members intended to vote on election day and had no form of identification other than a Social Security number.  Under the Voter ID Law, those voters would be required to submit provisional ballots

due to their lack of other identification.  Ohio Rev. Code Ann. §§ 3501.19(A)(3); 3505.18

(A)(2)-(6).

Conversely, Plaintiffs have not shown member injury sufficient to create standing for

several of their claims.  Counts One and Two of the Complaint ("Vagueness Counts") assert that

the Voter ID Laws are so confusing that they cannot and, in fact, are not being applied uniformly

by the BOEs. The Complaint lists six specific ID requirements that Plaintiffs claim were being

applied differently by different BOEs: (1) what constitutes a "current" government document or

bill; (2) what constitutes an "other government document;" (3) which number on an Ohio

driver's license may be used by absentee voters; (4) whether military identification cards without

a current address are acceptable; and (5) whether early in-person absentee voters must produce

identification.  Plaintiffs' assertion of member injury under the Vagueness Counts seems to be

based solely on their assertion that "[i]n at least some instances this differing treatment will

either threaten to deprive or effectively deprive voters, including Plaintiff's members of their

fundamental right to vote."

Plaintiffs have not, however, identified any of their members who would be affected by

the five areas of disparate interpretation of the Voter ID Law, nor have they claimed that any of

their members would have attempted to use any of the categories of identification that were

alleged to be defined confusingly by the Voter ID Law.  Similarly, they have not claimed that

any of their members were absentee voters in the 2006.  Therefore, they have not demonstrated

that any of their member voters was facing imminent injury based on the alleged definitional

vagaries of the Voter ID Law.

In *Sandusky County Democratic Party v. Blackwell*, on which Plaintiffs rely, the Sixth

Circuit held that political party and labor organization plaintiffs had standing to challenge

-12-

election procedures in the name of their members, even though they could not identify in advance which members would be denied the right to vote by election worker error on voting day.  387 F.3d 565, 573-74 (6th Cir. 2004).  In that case, however, the court believed that it was inevitable that some of the plaintiff's members would be harmed by mistakes at the polls.  *Id* at 574.  Given that one of the plaintiffs in that case was the Ohio Democratic Party, which has thousands of member voters, the court's finding of inevitable member injury was statistically sensible.

In this case, Plaintiff NEOCH has only demonstrated that six of its homeless members intended to vote in the November 2006 election and, as described above, it has not shown that any of those members intended to use a form of identification that might not be accepted at a certain BOE due to definitional discrepancies.[6]  Therefore, the Court finds it is far from a statistical inevitability that any of those six members faced concrete and imminent injury based merely on the vagueness of the Voter ID Laws.

Similarly, Plaintiffs have not established member injury-in-fact relating to Counts Five, Six, Seven, and Eleven of their Complaint ("Social Security Number Counts").  The Social Security Number Counts are based on provisions of the Voter ID Laws that Plaintiffs claim prevented voters with no form of required ID other than a Social Security number from casting any type of ballot.  Plaintiffs have demonstrated that they had members who had only Social Security numbers and, therefore, argue those members faced imminent and inevitable injury when they attempted to vote.

---

[6]  There is no evidence before the Court of the total number of homeless members of NEOCH. Brian Davis' declaration states only that roughly ten percent of NEOCH's membership was homeless and that the organization has "helped hundreds of homeless people, including *some* of its homeless members, register to vote." (Emphasis added).  Therefore the Court has no accurate sense of how many homeless members NEOCH actually had, nor the smaller number of those who were actually voters in the 2006 election.  Therefore, the Court must rely only on the six declarations Plaintiffs have put before the Court.

-13-

Defendants correctly point out, however, that under the Voter ID Law voters who had no form of required identification could cast a provisional ballot by providing the last four digits of their Social Security number. Ohio Rev. Code Ann. § 3501.19(A)(3).  The Voter ID Law even permitted people who lacked other identification *and* could not produce their Social Security numbers to cast a provisional ballot.  *Id*. at  §§ 3501.19(A)(3); 3505.18 (A)(2)-(6).  A provisional ballot would be counted with the same weight as any other vote once the identity of the voter was verified.  *Id*. at § 3505.183.  Therefore, Plaintiffs' members with only a Social Security number faced no risk of imminent injury of being denied the opportunity to cast their vote in October of 2006.

In sum, Plaintiffs have not demonstrated that their members were suffering an injury in fact relating to the Voter ID Law provisions challenged in Counts One, Two, Five, Six, Seven, and Eleven, therefore, they do not have standing to raise those claims.  Consequently, Defendants Motion to Dismiss Counts One, Two, Five, Six, Seven, and Eleven is **GRANTED**.

Plaintiffs' have demonstrated member injury related to Counts Three, Four, Eight, Nine, Ten, Twelve, and Thirteen of their Complaint.  That injury was traceable to Defendants' enforcement of the Voter ID Law and was likely to be redressed by a favorable decision.  Thus, Plaintiffs' members had standing on those Counts.  This is a necessary, but not sufficient, showing to demonstrate organizational standing on those Counts.  Plaintiffs must also demonstrate that the interests at stake are germane to the organization's purpose, and that neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Laidlaw*, 528 U.S. at 180-81.

*b.  Germaness*

-14-

Defendants claim that NEOCH is merely "dedicated to assisting homeless individuals in finding jobs and shelter from the elements" and is not "designed to stand up for the legal rights of the homeless patrons that visit their facilities." Plaintiffs, however, have provided sufficient evidence that securing homeless members' voting rights was germane to NEOCH's purpose. Plaintiffs have produced NEOCH's Homeless Advocacy Initiatives for 2005-2010, which describes NEOCH's organizational goals. One of NEOCH's Civil Rights Initiatives is to "[w]ork to assure that all homeless people are registered to vote, and reduce barriers to registering and homeless people actually voting." Furthermore, Brian Davis, the Executive Director of NEOCH, describes in his declaration that NEOCH has helped hundreds of homeless people, including members, register to vote and obtain the necessary identification to register to vote. Therefore, the Court finds that the interests at stake in this litigation are germane to Plaintiff NEOCH's purpose of promoting and ensuring homeless voting.

*c. Necessity of Individual Member Participation*

Finally, Defendants argue that Plaintiffs do not have organizational standing because "the nature of Plaintiffs' claim requires the participation and testimony of Plaintiffs' individual 'members'." The Court disagrees. Where, as here, an organization "seeks prospective or injunctive relief for its members" the "individual participation of an organization's members" is not necessary. *Sandusky County Democratic Party*, 387 F.3d at 574 (quoting *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 546 (1996)) (internal quotation marks omitted).

Plaintiffs have demonstrated all three requirements for organizational standing with respect to Counts Three, Four, Eight, Nine, Ten, Twelve, and Thirteen of their Complaint.

Therefore Defendants' Motion to Dismiss for lack of standing is **DENIED** with respect to those Counts.

## B.  Plaintiffs' Motion for Attorney's Fees and Costs

### 1.  Entitlement to a Fee Award

The Civil Rights Attorney's Fees Award Act of 1976, 42 U.S.C. § 1988(b), permits a court to award reasonable attorney's fees to the "prevailing party" in a civil rights action brought under 42 U.S.C. § 1983.  A plaintiff is not entitled to any attorney's fees unless it is a "prevailing party."  *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 791-92 (1989); *see also DiLaura v. Twp. of Ann Arbor*, 471 F.3d 666, 670 (6th Cir. 2006).  Once it has established prevailing party status, the "degree of the plaintiff's overall success goes to the reasonableness . . . not to the availability of a fee award."  *Garland*, 489 U.S. at 793.  Unless "special circumstances" exist, a district court *must* award attorney's fees to a prevailing party. *See, e.g., Berger v. City of Mayfield Heights*, 265 F.3d 399, 406 (6th Cir. 2001).

A party qualifies as a "prevailing party" if it has obtained actual relief on the merits of its claim that materially alters the legal relationship between the parties and directly benefits the plaintiff at the time of the judgment.  *Farrar v. Hobby*, 506 U.S. 103, 111-12 (1992).  A consent decree may serve as the basis for an award of attorney's fees.  *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 605 (2001); see also *Maher v. Gagne*, 448 U.S. 122, 129-130 (1980).  The crux of the "prevailing party inquiry must be the material alteration of the legal relationship of the parties."  *Farrar*, 506 U.S. at 111 (quoting *Garland*, 489 U.S. at 792-93).  A court may conclude that a plaintiff is not a prevailing party where the plaintiff's success on a claim is "purely technical or *de minimis*."  *Garland*, 489 U.S. at 792; *see also Sutton v. Cleveland Bd. Of Educ.*, 958 F.2d 1339, 1352 (6th Cir. 1992).  Finally,

-16-

if a "party's change in position is purely voluntary, then there is no prevailing party." *DiLaura*, 471 F.3d at 670.

Plaintiffs argue that they are prevailing parties and entitled to attorney's fees in this case because they obtained a Consent Order and, later, an Agreed Enforcement Order that enforced certain provisions of the Consent Order.[7]  Defendants dispute this, arguing that the Consent Order did not materially alter the relationship of the parties or confer a benefit to Plaintiffs, as required to establish prevailing party status, because it merely parroted the language of the Voter ID Law and Directive 2006-78 without providing additional relief or rights to the Plaintiffs.

According to Plaintiffs, the Consent Order materially altered the relationship between the parties by: (1) defining terms that the Voter ID Law neglected to define, including which of the two numbers on an Ohio Driver's License would be used by BOEs, how "current" a document had to be to constitute valid identification, and what "other government document" could be used as identification; and (2) by providing clear guidance to BOEs—where none had existed before.  Plaintiffs contend that this outcome achieved a significant portion of the relief that they sought because it alleviated voter confusion and ensured fair and equal application of the laws by providing a uniform set of rules for the BOEs to apply and requiring the BOEs to enforce the Voter ID Law as written.[8]

---

[7] Plaintiffs make clear in their brief that they do not seek attorney's fees and costs based upon the TRO and related proceedings before the Sixth Circuit.

[8]  Plaintiffs also claim that the Consent Order achieved the relief they sought because it vindicated the rights of absentee voters by reversing a portion of Directive 2006-78 related to the identification that had to be provided by such voters.  The Court, however, has found that Plaintiffs did not have standing to assert claims challenging absentee voter provisions because they have not demonstrated that they had absentee-voter-members, *see* section II.A.2.ii.a.  The Court cannot base any attorney's fees award on claims for which Plaintiffs lacked standing; therefore, arguments related to the effect of the Consent Order on Plaintiffs' absentee voter provision challenges will not be considered by the Court.  *See Warth v. Seldin*, 422 U.S. 490,

The Court finds that Plaintiffs are prevailing parties because the Consent Order and Agreed Enforcement Order worked a material alteration in the legal relationship of the parties. *See Garland*, 489 U.S. at 792-93. The Consent Order altered Defendants' duties under the Voter ID Law, giving Plaintiffs the right to monitor and secure court enforcement of Defendants' pre-existing duties under that Law—a power over Defendants that Plaintiffs did not have previously. *See Garland*, 489 U.S. at 791 (holding plaintiffs are prevailing parties if they have "succeeded on any significant issue in litigation which achieve[d] some of the benefit the parties sought in bringing suit" (internal quotation marks omitted, alteration in original)). Plaintiffs in fact exercised this right to secure the Agreed Enforcement Order.

Before the Consent Order, Defendants were free to alter or reverse their directions to the BOEs in Directive 2006-78, which could have caused or exacerbated the type of voter confusion Plaintiffs sought to prevent. After the Order, Defendants were required to ensure that BOEs applied the Voter ID Law as it was interpreted in the Order and Plaintiffs were empowered to monitor compliance. Moreover, the Agreed Enforcement Order gave certain rights to election observers that they did not previously have. Specifically, whenever a BOE proposed to reject a provisional ballot, the Agreed Enforcement Order required BOEs to provide observers with a list of proposed rejected provisional ballots and the reason for each proposed rejection.[9] Moreover,

---

498 (1975) (standing determines whether the court has power to entertain the suit); *Assoc. Gen. Contractors of Tenn., Inc. v. County of Shelby*, 5 F.App'x 374, 377 (6th Cir. 2001) (holding plaintiff was not a prevailing party under §1988(b) for claims dismissed for lack of subject matter jurisdiction). Plaintiffs' citation to *Balark v. City of Chicago*, 81 F.3d 658 (7th Cir. 1996) to support its claim that the Court can award attorney's fees even for claims where it does not have jurisdiction is unavailing as that case involved a consent decree vacated on Federal Rule of Civil Procedure 60(b)(5) grounds, not for lack of standing.

[9] While not *sui generis*, this issue has been addressed by the Sixth Circuit in a different factual context. In *Dillery v. City of Sandusky*, 398 F.3d 562, 565, 569 (6th Cir. 2005), a plaintiff sought attorney's fees as a prevailing party under the Americans With Disabilities Act ("ADA")

Plaintiffs' success was not, as Defendants argue, so technical or de minimis that prevailing party status should be denied or that a reasonable fee award would be of a nominal amount. *Compare with Farrar*, 506 U.S. at 115-16 (holding that the plaintiff was not entitled to attorney's fees despite obtaining prevailing party status because he recovered only $1 in nominal damages).

Plaintiffs' success, however, is not as broad as they have characterized it. First, the terms defined in the Consent Order had already been defined, nearly identically, in Directive 2006-78.[10] The Directive was issued nearly a week before the Consent Order was filed. Plaintiffs do not contend that the Directive was issued as a result of their efforts in this lawsuit.[11] The other portions of the Consent Order paraphrase various portions of the Voter ID Law. Thus, much of the clarity Plaintiffs claim was provided by the Consent Order had already been provided by the Directive 2006-78 or the Voter ID Law itself.

### 2. Reasonable Fee and Cost Amount

When, as in this case, the plaintiff is a prevailing party, the court must determine what constitutes a reasonable fee award. 42 U.S.C. §1988(b). "The starting point for determining the amount of a reasonable attorney fee is the 'lodestar' amount which is calculated by multiplying

---

based on the district court's judgment in her favor on the issue of whether the City violated the ADA with respect to the accessibility of its curbs. The court held that the Plaintiff had not obtained relief from her success on that issue because the district court had already granted injunctive relief on that issue in a previous class action suit. *Id*. at 569. Therefore, the court held that the plaintiff did not qualify as a prevailing party despite her technical victory. *Id*.

Unlike *Dillery*, in this case, obtaining the Consent Order and Agreed Enforcement Order provided significant relief to the Plaintiffs, as discussed above. By comparison, the *Dillery* defendants were already judicially bound to take specific remedial action based on a prior injunction and the court's ruling did not impose any additional duties.

[10] The difference in definitions between the Consent Order and the Directive is that the definition of "current" is expanded from six months to one year and the definition of "other government document" is explained at greater length.

[11] Nor would the Court find that argument convincing given that the Directive was issued just two days after Plaintiffs filed their Complaint.

the number of hours reasonably expended on the litigation by a reasonable hourly rate.*" Imwalle
v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 551 (6th Cir. 2008); *see also Hensley v. Eckerhart*,
461 U.S. 424, 433 (1983).   Where, as here, the plaintiff has achieved only partial success, the
lodestar amount may be reduced because attorney's fees are not typically awarded for
unsuccessful claims. *See Hensley*, 461 U.S. at 434-35.

A court may not, however, reduce attorney's fees based on "a simple ratio of successful
claims to claims raised." *DiLaura*, 471 F.3d at 672 (quoting *Deja Vu of Nashville, Inc. v. Metro.
Gov't of Nashville & Davidson County, Tenn*., 421 F.3d 417, 423 (6th Cir. 2005)) (internal
quotation marks omitted).  When a party's various claims are based on a "common core of
facts," the court should focus on the "overall relief obtained by the plaintiff in relation to the
hours reasonably expended on the litigation" to determine if the lodestar amount should be
reduced. *Hensley*, 461 U.S. at 434-35; *Lee v. Javitch, Block & Rathbone, LLP*, – F.Supp. 2d –,
2008 WL 2917087, at * 7 (S.D. Ohio July 30, 2008).  Plaintiffs have submitted supporting
declarations of attorney's fees and costs that set forth what Plaintiffs contend is a reasonable fee
and costs award.  Defendants attack Plaintiffs' calculation as unreasonable.  Both Parties have
requested a hearing on the amount of fees and costs.

The Court hereby grants the parties' request.  A hearing on the reasonableness of fees and
costs will be scheduled by the Court to be held within ninety (90) days of this Order.  The Parties
are to submit supplemental briefing on what constitutes a reasonable fee and costs award in light
of the Court's ruling in this Opinion.  Plaintiffs' opening motion is to be filed within thirty (30)
days of this Order.  Defendants' motion in opposition is to be filed within twenty-one (21) days
of Plaintiff's motion.  Any Reply from Plaintiffs must be filed within eleven (11) days of
Defendants' opposition brief.

## IV.  CONCLUSION

For the foregoing reasons Defendants' 12(B)(1) Motion to Dismiss (dkt. no. 99) is

**GRANTED in PART** and **DENIED in PART**.  Plaintiffs' Motion for Attorney's Fees and

Costs (dkt. no. 96) is **GRANTED** with a reasonable fee award to be determined by hearing.

**IT IS SO ORDERED.**


    **s/Algenon L. Marbley**
**ALGENON L. MARBLEY**
**United States District Court Judge**

**DATED: September 30, 2008**