**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **THE NORTHEAST OHIO COALITION** | : | |
| **FOR THE HOMELESS,** *et al.***,** | : | **Case No. 2:06-CV-896** |
| | : | |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | **JUDGE ALGENON L. MARBLEY** |
| | : | |
| **JON HUSTED, in his official capacity as** | : | |
| **Secretary of the State of Ohio,** | : | **Magistrate Judge Terence Kemp** |
| | : | |
| **Defendant** | : | |
| | : | |
| **and** | : | |
| | : | |
| **STATE OF OHIO** | : | |
| | : | |
| **Intervenor-Defendant.** | : | |

<u>**OPINION AND ORDER**</u>

**I. INTRODUCTION**

This matter comes before the Court on the Defendants' request to vacate the April 22,

2010 Consent Decree (the "Decree," 06-cv-896, Dkt. 210). The Defendants challenged the

Decree's validity following this Court's May 10, 2012 Order granting Plaintiffs' Urgent Motion

to Enjoin State-Court Proceedings, in which the Court enjoined the Relators' collateral challenge

to the enforcement of the Decree's orders filed in the Supreme Court of Ohio. (Dkt. 261.) The

Court directed parties to bring any challenges to the validity or terms of the Decree in this Court,

pursuant to the express terms of the Decree and this Court's exclusive and continuing jurisdiction

to enforce the Decree's orders. Parties have submitted briefs, and argument has been heard, on

the issue of whether the Decree is valid and should remain in force. For the reasons stated

herein, the Decree is **VALID**, and Defendants' request to vacate the Decree is **DENIED**.

## II. BACKGROUND

### A.  Ohio's Provisional Voting Regime

Defendants' current challenge, which is but the latest skirmish in the ongoing battle over Ohio's provisional ballot laws, positions the requirements of the federal consent decree reached in this case, to which they are all parties, at fundamental odds with Ohio's election laws.  The essential legal claim underlying Defendants' request is that the Decree's order requiring, *inter alia*, that boards of elections "may not reject a provisional ballot" cast in the wrong precinct "for reasons attributable to poll worker error," (Decree ¶ 5), run contrary to Ohio's election statutes, which "do not authorize an exception based on poll-worker error to the requirement that ballots be cast in the proper precinct in order to be counted."  *State ex rel. Painter v. Brunner*, 941 N.E.2d 782, 794 (Ohio 2011).  To provide context for the controversy, therefore, it is useful to discuss the basic, *undisputed*, aspects of the law governing provisional ballots in Ohio.

Eligible voters in Ohio vote by precinct.[1]  The Secretary of State oversees the elections process and appoints the members of boards of elections in each of Ohio's eighty-eight counties. O.R.C. § 3501.05(A).  The board of elections is responsible for establishing election precincts, receiving and canvassing the returns of elections, maintaining voter registration records, and appointing and training poll workers.[2]  O.R.C. §§ 3501.06, 3501.22.  Among other duties, O.R.C. § 3505.181(C)(1) delegates to poll workers the duty to direct voters to the correct precinct.  The

---

[1] A "precinct" is an intra-county district established by the board of elections. All residents of a precinct must vote at a specific designated location. O.R.C. § 3501.01(Q).  Under Ohio Rev. Code § 3503.01(A), "[e]very citizen . . . may vote at all elections in the precinct in which the citizen resides," but, conversely, "[n]o person shall . . . vote . . . in a precinct in which that person is not a legally qualified elector."  3599.12(A)(1).

[2] Poll workers are responsible for receiving ballots and supplies, opening and closing the polls, and overseeing the casting of ballots during the time the polls are open.  O.R.C. § 3501.22.

board must perform its duties "as prescribed by law or the rules, directives, or advisories of the secretary of state."[3]  O.R.C. § 3501.11(P).

A voter whose name and current address match those in the precinct's "signature pollbook" and who produces acceptable identification is permitted to vote by regular ballot. O.R.C. § 3505.18.  Additionally, Ohio law permits individuals to cast a provisional ballot under certain circumstances.  O.R.C. § 3505.181.  Eligible provisional voters include individuals whose names do not appear on the precinct's signature pollbook, individuals who do not have one of the acceptable statutory forms of identification, or individuals whose signatures were deemed by the poll worker not to match the names on the registration forms.  *Id.* § 3505.181(A).  Under Ohio law, the poll worker is tasked with determining whether an individual is eligible to vote in the jurisdiction.[4]  O.R.C. § 3505.181(C)(1).

To cast a provisional ballot, the voter must execute an affirmation stating that he or she is registered to vote in the jurisdiction and is eligible to vote in the election.  O.R.C. §§ 3505.181(B)(2), 3505.182.   Ballots cast by provisional voters are not scanned and counted like regular ballots on election day; rather, the eligibility of the voter's provisional ballot must be determined by the county's board of elections.  *See* O.R.C. § 3505.183(B)(4)(a)(ii).  Generally speaking, after the election, the provisional ballot envelopes (with completed ballots sealed inside) are taken to the board of elections where board staff review the information on the

---

[3] In addition to its other duties, the board of elections is required to "[i]nvestigate irregularities, nonperformance of duties, or violations of Title [35] of the Revised Code by election officers and other persons."  O.R.C. § 3501.11(J).

[4] If the voter is in the wrong precinct, the poll worker is to "direct the individual to the polling place for the jurisdiction in which the individual appears to be eligible to vote, explain that the individual may cast a provisional ballot at the current location but the ballot will not be counted if it is cast in the wrong precinct, and provide the telephone number of the board of elections in case the individual has additional questions." O.R.C. § 3505.181(C)(1).

envelope and, based on that information, determine whether the provisional ballot is eligible to be counted. O.R.C. § 3505.183. As previously stated by the Court:

> [i]f the individual is properly registered to vote, is eligible to cast a ballot in the precinct and for the election in which the individual cast the provisional ballot, and signed the affirmation statement indicating that he or she was eligible to vote, then the board shall open the provisional ballot envelope and place the ballot in a ballot box for counting. On the other hand, the board will not open the provisional ballot envelope or count the ballot if, among other things, the individual is not qualified or is not properly registered to vote, or the individual is not eligible to cast a ballot in the precinct or for the election in which the individual cast the provisional ballot.

*Hunter v. Hamilton County Bd. of Elections ("Hunter II")*, No. 10-cv-820, 2012 WL 404786, at *6 (S.D. Ohio Feb. 8, 2012); O.R.C. §§ 3505.183(B)(3), B(4).

Substantial conflict has arisen, however, over how to proceed under Ohio law when the Secretary and the boards of elections turn to the task of determining whether, and how, to open and count provisional ballots that contain deficiencies, or have been cast in the wrong precinct, for reasons attributable to poll worker error.

## B. The NEOCH Lawsuit

In 2006, when the Ohio General Assembly ("General Assembly") amended Ohio's Election Code to require, *inter alia*, that voters provide one of several types of identification in order to cast a regular ballot in state and federal elections held in Ohio, the Plaintiffs filed this action under 42 U.S.C. § 1983 in response, against challenging the constitutionality of several provisions of the newly-enacted voter identification and provisional ballot laws. (Compl. ¶¶ 1-4.) The State of Ohio was subsequently permitted to intervene as a defendant "both in appeal . . . and in the ongoing district court proceedings," on behalf of the people of Ohio and the General Assembly. *NEOCH v. Blackwell*, 467 F.3d 999, 1002, 1008 (6th Cir. 2006) (granting the State

of Ohio leave "to intervene to represent the interests of the people of Ohio and the General

Assembly in defending the constitutionality of the [Ohio voter ID laws]").

### C.  The 2010 Consent Decree

In late 2009, the parties began negotiations globally to settle this litigation.  These

negotiations ultimately resulted in the April 19, 2010 Consent Decree, a final judgment approved

and entered by the Court upon the agreement of the parties.  The Decree provides the Plaintiffs

with detailed injunctive relief, including requiring the Secretary to issue specific directives to

Ohio's County Boards of Elections regarding the casting and counting of provisional ballots.

(*See, e.g.,* Decree-1, Directive 2008-80, adopted and annexed as an order of this Court pursuant

to Paragraph 4 of the Decree.)

Among its other provisions, the Decree mandates that the Boards of Elections "may not

reject a provisional ballot cast by a voter, who uses only the last four digits of his or her social

security number as identification" if certain deficiencies in the ballot, including being cast "in the

wrong precinct, but in the correct polling place," were the result of poll-worker error.[5]  (Decree ¶

5.) Moreover, under the terms of the Decree, the Secretary is required, before every primary and

general election, to direct the Boards of Elections to comply with the injunctive relief as stated in

the Decree.  (Decree ¶ 7.)  The Decree provides for its continuing validity through June 30, 2013.

Pursuant to the consent of the parties, no findings or adjudications of law were made by

the Court or stipulated to in the Decree.  (Decree, p. 2.)  By agreeing to settle the matter through

entering into the Decree, the parties agreed to "waive a hearing and findings of fact and

---

[5] Poll worker error was "further defined" by the secretary of state in subsequent directives, as "'when a poll worker acts contrary to or fails to comply with federal or Ohio law or directive issued by the Secretary of State' and set forth 'objective criteria' for determining poll-worker error."  *See State ex rel. Painter v. Brunner*, 941 N.E.2d 782, 789 (Ohio 2011).

conclusions of law on all issues." (*Id.*) The Decree expressly states that it "shall in no way constitute an adjudicating or finding on the merits." (*Id.*) The parties agreed that the Decree was "final and binding among and between themselves as to the issues raised in Plaintiffs' Complaint and Supplemental Complaint, and the matters resolved in this Decree." (*Id.*) The Decree provided, however, that "any of the parties may file a motion with the Court to modify, extend or terminate this Decree for good cause shown." (*Id.* ¶ 11.)

### D. The Relators' Mandamus Action in the Supreme Court of Ohio

On April 16, 2012, Relators filed an original action for mandamus in the Ohio Supreme Court, seeking "to compel the Secretary of State to rescind directives issued pursuant to a consent decree," referring to the Decree. (Dkt. 246-1, Ohio S. Ct. Case No. 12-0639, Compl. p.1.) On May 8, 2012, Plaintiffs moved this Court to enjoin the Relators' action. On May 10, 2012, the Court granted Plaintiffs' motion and ordered Relators to dismiss their mandamus action in the Ohio Supreme Court. The Court then instructed parties to bring in this Court any further challenges for invalidation or modification of the terms of the Decree.

On May 16, 2012, the Court held a status conference in which Plaintiffs indicated their intent to modify the Decree, and Defendants urged that the Decree should be vacated. The Court ordered briefing on the threshold issue of whether the Decree is valid. Oral argument was held on the matter on June 27, 2012, at which time the Court heard from counsel for the Plaintiffs, Relators, the Secretary, and the State of Ohio. The matter is now ripe for determination.

During the pendency of Defendants' instant request to vacate, Plaintiffs filed their Motion to Modify the Consent Decree to Prevent Constitutional Violations. (Dkt. 288.) In their Motion, Plaintiffs request a "narrowly-tailored" modification to the injunctive relief provided in the Decree, pursuant to the Court making evidentiary findings of continuing constitutional

violations resulting from the widespread arbitrary rejection of eligible voters' provisional ballots due to poll-worker error, as well as "the disparate standards employed by Ohio county boards of elections . . . result[ing] in unequal treatment of voters . . . ." (Dkt. 288, at 2-3.)

Additionally, on June 22, 2012, a related case was filed on behalf of both new and existing organizational and union plaintiffs against the Secretary and members of coutny boards of election. *See Service Employees International Union Local 1 et al.*, *v. Jon Husted et al.*, Case No. 12-cv-562 ("*SEIU*"). A motion for a preliminary injunction was filed in the new action the same day, (12-cv-562, Dkt. 4), requesting substantially similar injunctive relief as Plaintiffs' motion to modify the Consent Decree. The parties in *SEIU* were ordered to appear at the June 27, 2012, hearing in this Court on Defendants' request to vacate the Decree. At that hearing, the Court indicated that it would determine first the threshold issue presently before the Court of the validity of the Decree. The Court indicated that, depending on its decision on whether to vacate the Decree, it would then decide the Plaintiffs' motion to modify, if necessary, and the issues raised by the plaintiffs in *SEIU*.

### III. LAW AND ANALYSIS

Defendants argue that the Decree must be vacated because its orders requiring boards of election to count certain categories of provisional ballots which are found to be deficient "for reasons attributable to poll worker error," (*see* Decree ¶ 5(b)), are in direct conflict with the Ohio election law, as interpreted by the Ohio Supreme Court. To support their claim, Defendants rely chiefly on last year's decision in *State ex rel. Painter v. Brunner*, in which the Ohio Supreme Court held that "[Ohio's elections] statutes do not authorize an exception based on poll-worker error to the requirement that ballots be cast in the proper precinct in order to be counted." 941 N.E.2d at 794. Defendants argue that because the Decree was not issued pursuant to any

7

findings or admissions federal law violations, state law prevails over the terms of the Decree consented to by the parties.

Plaintiffs first dispute the alleged conflict between Ohio law and the Decree.  Plaintiffs maintain, alternatively, that even if the Court rules that *Painter*'s holding does conflict with the Decree's orders, a demonstration by Defendants that the Decree conflicts with Ohio law, without more, is insufficient to meet their burden for vacating the Decree under Rule 60(b)'s requirements for a party's requesting relief from a final order.  Further, while Plaintiffs dispute Defendants' fundamental claim—that, because the Decree conflicts with Ohio law, it may only be enforced pursuant to a judicial finding that its terms are necessary to prevent federal constitutional violations—Plaintiffs argue that ample evidence existed in the record at the time of the Decree to make such a finding.

Finally, Plaintiffs have introduced new evidence into the record in support of their opposition to Defendants' request, to demonstrate that terminating the Decree will result in additional constitutional violations in Ohio with respect to provisional ballot counting laws and practices.  Plaintiffs insist that *if* the Court finds it necessary to reach the issue of whether the Decree is required to remedy or prevent ongoing constitutional violations, the evidence is sufficient to support a finding that constitutional violations would result from terminating the Decree.  Under Supreme Court precedent, argue Plaintiffs, such a finding precludes the Decree from being vacated.

## A.  Defendants' Challenge is Precluded by *Res Judicata*

As a threshold matter, Defendants are precluded by the principles of issue preclusion from re-litigating the issue of whether the Decree is invalid due to a conflict with Ohio election law.  Both this Court and the Sixth Circuit have previously determined that the Decree does not

conflict with Ohio state law, and is consistent with the Ohio Supreme Court's clarification of Ohio law in *Painter*. Defendants' basis for finding the Decree "invalid and unenforceable"[6] has been rejected by at least one final decision by this Court on the merits. *See Hunter II*, 2012 WL 404786, at *46 (holding, "[t]he NEOC Consent Decree is valid"). The Court's prior decision is accorded due preclusive effect in this subsequent challenge.

It is well-established that "a fundamental precept of common-law adjudication is that an issue once determined by a competent court is conclusive." *Arizona v. California*, 460 U.S. 605, 621 (1983). The doctrine of issue preclusion, also known as "collateral estoppel," is the species of modern *res judicata* that "bars relitigation of issues actually litigated and determined in an earlier action and necessary to the judgment." *Kane v. Magna Mixer Co.*, 71 F.3d 555, 560 (6th Cir. 1995). Issue preclusion will generally preclude the present claim where the following four requirements are met:

> (1) the precise issue raised in the present case must have been raised and actually litigated in the prior proceeding; (2) determination of the issue must have been necessary to the outcome of the prior proceeding; (3) the prior proceeding must have resulted in a final judgment on the merits; and (4) the party against whom estoppel is sought must have had a full and fair opportunity to litigate the issue in the prior proceeding.

*Kosinski v. Comm'r*, 541 F.3d 671, 675 (6th Cir. 2008) (citation omitted).

Applying these elements to the case *sub judice*, Defendants' argument for vacating the Decree is precluded because the same issue has already been litigated and decided in the *Hunter v. Hamilton County Board of Elections* litigation, which arose from the disputes over counting certain categories of provisional ballots for the 2010 Hamilton County Juvenile Judge electoral

---

[6] (State Brief, at 3.)

race and the subsequently-ordered investigation into whether the ballots were miscast due to poll-worker error.

### 1. Issue Has Been Raised and Litigated in a Prior Proceeding

The first, and most essential, requirement for issue preclusion is met. The same issue raised by Defendants here was actually litigated in the *Hunter* litigation, and was rejected by both the trial court and the Sixth Circuit. The Board in *Hunter*, like Defendants here, defended against the Decree's enforceability on the basis that the Decree's orders conflicted with Ohio law.[7] The Defendants' request to vacate the Decree, likewise, rests on their claim that the Decree is invalid and unenforceable because the Decree's orders to the Secretary are inconsistent with those of Ohio law.

In the *Hunter I* appeal, the Sixth Circuit had reviewed the defendants' justifications for the Board's "differential treatment" among the categories of provisional ballots. The court opined that while "Ohio law, now made explicitly clear in *Painter*, does not permit the consideration of poll-worker error with respect to ballots cast in the wrong precinct," *Hunter v. Hamilton County Bd. of Elections*, 635 F.3d 219, 239 (6th Cir. 2011) ("*Hunter I*"), "[t]he Ohio Supreme Court in *Painter*, however, does recognize the exception carved out by the NEOCH consent decree for those provisional voters using the last four digits of their Social Security

---

[7] As stated by Chief Judge Dlott in *Hunter II*:

> The Board's argument is as follows: Ohio law provides that a provisional ballot envelope shall not be opened and the ballot shall not be counted if the Board determines that the individual cast the ballot in the wrong precinct. O.R.C. § 3505.183(B)(4)(a)(ii). The Decree suspends Ohio law because it requires the Board to open and count wrong precinct ballots in certain, narrow circumstances, including when a ballot is cast in the wrong precinct but in the correct polling place because of poll-worker error.

*Hunter II*, 2012 WL 404786, at *5.

number as identification." *Id.*, n. 17. The Sixth Circuit found, therefore, that *Painter* was not in conflict with the Decree, and that the Ohio Supreme Court had recognized the Decree's validity.

The specific issue of the Decree's validity, however, was not one of the contested issues on that appeal in *Hunter I. See id.* at 247 (noting that, "[w]ith respect to the NEOCH consent decree, all parties agree that the consent decree remains and should be followed"). On remand to this Court in *Hunter II*, however, the Board *did* contest the Decree's enforceability, making substantially the same claim as Defendants make here. *See Hunter II*, 2012 WL 404786, at *5 (defendants arguing that the Decree conflicts with, and thus "suspends" Ohio law in contravention of the Ohio constitution). The Court "disagree[d] with the Board's argument," holding that "[t]he NEOCH Consent Decree does not suspend any Ohio law." *Id.* After a lengthy consideration of the Decree's requirements, and the impact of the Ohio Supreme Court's decision in *Painter*, the Court concluded the following:

> The NEOCH Consent Decree does not stay, discontinue, permanently enjoin or declare unconstitutional any Ohio law. In fact, Ohio provisional ballot laws remain in full force . . . consequently, the NEOCH Consent Decree does not run afoul of Article I, Section 18 of the Ohio Constitution. NEOCH and ODP are parties in the NEOCH case and are parties to the NEOCH Consent Decree. Because *the Court finds that the Consent Decree is valid*, NEOCH and ODP have standing to pursue the claims asserted.

*Id.* at *5 (emphasis added) (adding, in footnote 7, that, "[a]lternatively, even if the Court were to find that the NEOCH Consent Decree suspends Ohio law, the decree still would not conflict with Article I, Section 18 of the Ohio Constitution because the General Assembly was represented by the Attorney General of Ohio in the NEOCH case").

## 2. The Issue was Necessary to the Outcome of the Prior Final Decision on the Merits

Turning to the second and third requirements for issue preclusion, *Hunter II* resulted in a final decision on the merits from a most competent judge of this Court, in which this issue of the

11

Decree's validity was necessary to decide in order to make the Court's conclusions and grant the relief requested.  The Sixth Circuit, in *Hunter I*, initially affirmed the November 22, 2010 order from this Court granting a preliminary injunction ordering the Hamilton County Board of Elections (the "Board") to investigate whether poll worker error contributed to rejection of the 849 provisional ballots and to include any provisional ballots improperly cast due to poll worker error.  *See Hunter I*, 635 F.3d 219 (6th Cir. 2011).

Then, on remand, in *Hunter II*, this Court rendered its final order on the merits after holding a bench trial, dismissing the Board's motions to dismiss and for summary judgment, and issuing a declaratory judgment and permanent injunction.  *See Hunter II*, 2012 WL 404786, at *6.  This Court's decision in *Hunter II* constituted a final decision on the merits.  *See id.* at *2 ("[H]aving considered the evidence and arguments advanced by the parties regarding the merits of Plaintiffs' claims, the Court finds for the Plaintiffs on their claims that Defendants violated voters' right to equal protection under the law and violated the *NEOCH* Consent Decree."); *see also Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990) (holding that "[a] Fed. R. Civ. P. 56(c) grant of summary judgment constitutes a decision on the merits").

### 3.  Full and Fair Opportunity to Litigate

Finally, the fourth requirement demands that before precluding an issue, the defendants or their privies must have had an adequate opportunity to litigate it in the prior action.  The defendants in the *Hunter* litigation are agents of the Defendants here, or are in sufficient privity with the Defendants here for the purpose of preclusion doctrine.

When determining whether issue preclusion will lie, "[j]udgments are preclusive only as to parties and their privies." *United States v. Vasilakos*, 508 F.3d 401, 406 (6th Cir. 2007) ("Collateral estoppel precludes relitigation of issues between parties or their privies previously

determined by a court of competent jurisdiction.") (citing *Montana v. United States*, 440 U.S. 147, 153 (1979)).  In the Sixth Circuit, "[p]rivity is limited to a successor in interest to the party, one who controlled the earlier action, or one whose interests were adequately represented." *Vasilakos*, 508 F.3d at 406 (internal quotations omitted).  The existence of privity turns on whether there is a "sufficient mutuality of interest" between the parties in the first and second cases.  *See Microvote Corp. v. Casey* 57 F.3d 1070 (6th Cir. 1995).

The *Hunter* case is related to the instant case, with respect to both the issues raised and the parties involved.  The Plaintiffs to this case were permitted to intervene in the *Hunter* case, specifically "to enforce the consent decree."  *See Hunter*, 635 F.3d at n. 17 ("In this litigation, intervenors NEOCH and the Ohio Democratic Party seek to enforce the consent decree with respect to the defendant Board's review of the relevant ballots.").  While none of the Defendants here is among the named defendants in *Hunter*, the defendant Board acted as an agent of the State of Ohio and the Secretary of State, who are parties here.  *See Hunter II*, 2012 WL 404786, at *3  ("[T]he Court finds that the Board functions as an arm of the State with respect to its review and counting of provisional ballots.. . . [and] its membership is appointed by the Ohio Secretary of State.").

In *Hunter*, the Defendant Board of Elections opposed the Plaintiffs' standing to enforce the Decree because the Decree was in conflict with Ohio law.  *See Hunter II*, 2012 WL 404786, at *5 ("NEOCH and ODP intervened in this suit to enforce the terms of the NEOCH Consent Decree.  The Board argues that the Decree does not confer standing to NEOCH and ODP because it violates [Ohio Constitution].")  Defendants' request, here, to vacate the Decree is motivated by the same shared interest, which is to render the Decree's terms unenforceable as a matter of Ohio law.  Defendants argue the Decree is invalid because it amended, changed, or

13

altered Ohio law absent the approval of the General Assembly, in violation of the Constitution, as discussed, *infra*, Section III.B.

In sum, the previous and current sets of defendants had an identical interest, namely, invalidating the Decree or render it unenforceable on the basis that it conflicted with Ohio law. As such, there exists a "sufficient mutuality of interest" on the issue to create privity between the defendants in both actions.  In addition to being successors in interest, the State and Secretary effectively "controlled the earlier action" through their agent and "arm of the State," the Board. *See Hunter II*, 2012 WL 404786, at *3.  The fourth requirement of issue preclusion that there be privity between the parties in prior and the present action, is therefore met.

Hence, because the precise issue raised by Defendants here in support of vacating the Decree—whether the Decree is invalid in light of its apparent conflict with the Ohio Supreme Court's interpretation of Ohio law—has been raised and actually litigated; was necessary to the Court's outcome in the prior proceeding, which resulted in a final judgment on the merits; and because Defendants and their privies have had, and continue to have,[8] a full and fair opportunity to litigate this issue in those proceedings, Defendants' are barred from re-raising the issue here.

Since Plaintiffs did not specifically raise issue preclusion or *res judicata* as a defense to Defendants' arguments, however, the Court is constrained to address the other arguments made by the parties.

### B.  The Decree's Compatibility with Ohio law

Defendants make two slightly different, but related, arguments for the Decree's invalidity, both of which rely on the legal proposition that the Decree is in conflict with Ohio law.  First, Defendants argue that the state officials who were parties to the Decree lacked the

---

[8] The permanent injunction in *Hunter II* is currently on appeal, pending decision by the Sixth Circuit.

authority to bind themselves to its terms, because the Decree's provisions had the effect of amending existing Ohio law without first passing through the General Assembly, in violation of the Ohio Constitution.[9]

Defendants' second argument is that the Ohio Supreme Court's holding in *Painter* regarding provisional ballot laws stands in "direct conflict" with the Decree's orders, (*see* State Brief, at 2), and that because the Decree was not entered pursuant to any findings of federal constitutional violations, the Ohio Supreme Court's interpretation of Ohio law must prevail. Without having first determined that the Decree was necessary to remedy a federal violation, claim Defendants, the state officials cannot agree to "ignore Ohio law and comply with the court-ordered remedy." (*Id.*); (*see also* Secretary Brief, at 3) ("Absent a finding of a federal constitutional deprivation to be remedied by the Consent Order, the Court has no jurisdiction to enforce a Consent Decree that contradicts Ohio law.").

The Court first will examine whether, and to what extent, Defendants' claim—that the Consent Decree is inconsistent with Ohio law—is accurate. If the Court finds no conflict, Defendants verily acknowledge that the basis for their present request to vacate the Decree disappears.[10] Whether, as Defendants assert, proving a demonstrable conflict between the Decree and Ohio law is itself sufficient to grant their request to vacate the Decree is a further question which the Court will address subsequently, if it becomes necessary.

---

[9] The Relators refer, specifically, to Article II of the Ohio Constitution, which provides that, "[t]he legislative power of the state shall be vested in a General Assembly consisting of a Senate and House of Representatives . . . ." Ohio Constitution, Art. II, §1, and requires that a state statute pass both houses of the General Assembly and be signed by the Governor in order to have the force of law. (Relators Brief, at 7).

[10] As counsel for the Secretary acknowledged to the court at the outset of oral argument on the Defendants' request, "obviously, if you assume there is no conflict, then I've lost my argument." (Trans. Oral Proceedings, June 27, 2012, 06-cv-896, 26:21-23.)

### 1. Authority of the Parties to Enter into the Decree

The Decree did not alter or amend state law when it was entered into by the parties and ordered by the Court in April 2010. The Defendants' claim that the party officials to the Decree changed existing state law by consenting to count provisional ballots cast in the wrong precinct is unpersuasive. While it is true that the relevant Ohio election statutes regarding provisional ballots have not changed since before the Decree was entered, when the parties consented to the Decree, the Ohio Supreme Court's controlling interpretation of the provisional voting laws, at most, left open the question of whether poll-worker error could be taken into account for miscast ballots.

Ohio election law concerning the counting of provisional ballots at the time the parties entered into the Decree in April 2010 was reflected in the Ohio Supreme Court's opinion in *State ex el. Skaggs v. Brunner*, 900 N.E.2d 982 (Ohio 2008). *Skaggs* was a mandamus action arising out of the November 2008 general election, in which the relators alleged that Secretary had erroneously interpreted the Ohio election statutes, and sought to compel the Secretary and boards of election "to reject any provisional ballots as not eligible to be counted if they do not include the name and signature of the voter on the affirmation required by R.C. 3505.183(B)(1)(a)." *Skaggs*, 900 N.E.2d at 984. The Secretary had issued directives which required the boards of election to count certain defective provisional ballots, because "[p]oll worker error cannot serve as a basis for rejecting a provisional ballot under Directive 2008-103 and the October 27, 2008 federal court order."[11] *Id.* at 989. The Ohio Supreme Court, thus, had to "determine whether the secretary of state's directives in this regard were unreasonable under the law." *Id.*

---

[11] The "October 27, 2008 federal court order" refers to the Court's order on plaintiffs' motion for preliminary injunction in this case, (Dkt. 143), ordering the Secretary to instruct the County Boards of Election that "'provisional

For each category of provisional ballots at issue in that case, the *Skaggs* Court applied the requirements for counting provisional ballots under Ohio law to the defendants' factual assertions in the record of poll-worker error.  *See Skaggs*, 900 N.E.2d at 988; R.C. 3505.181 (providing the eligibility requirements for casting a provisional ballot); R.C. 3505.183(B)(1) ("To determine whether a provisional ballot is valid and entitled to be counted, the board shall . . . determine whether the individual who cast the provisional ballot is registered and eligible to vote.).  Of relevance here is that, with respect to the first category of provisional ballots,[12] the court determined that the facts presented there of poll-worker error did not justify counting the flawed provisional ballots.  The court reasoned, however, that:

> If we were presented with evidence that the election officials had performed any of their statutorily required actions or evidence that they had affirmatively failed to do so because they were improperly trained or improperly instructed regarding their duties in these circumstances, we may have been persuaded that declinations could be presumed.

*Id.* at 991.

Hence, while the Ohio Supreme Court refused to "assume systematic poll-worker error" in *Skaggs*, *see id.*, the court's holding, *supra*, suggested that, at least in certain circumstances, ballots may be reviewed for evidence of poll-worker error and that establishing poll-worker error could require counting provisional ballots that are otherwise invalid under Ohio law.  In other words, contrary to the position taken by Defendants here, at the time the Decree was entered, there was no clear legal prohibition in Ohio law against considering poll-worker error when determining whether to count deficient provisional ballots.

---

ballots may not be rejected for reasons that are attributable to poll worker error,'" and which she complied with by issuing Directive No. 2008-103.  *Skaggs*, 900 N.E.2d at 985, (quoting Dkt. 143).

[12] These "consist[ed] of ballots on which the individual printed his or her name in the affirmation but did not sign the affirmation."  *Skaggs*, 900 N.E.2d at 987.

The state officials did not amend or alter Ohio law, therefore, by consenting to the Decree's orders for prohibiting the rejection of certain types of deficient provisional ballots where poll-worker error was the demonstrated cause.  The parties' agreed-upon language in the Decree, in fact, reflects the parties' consideration of compliance with Ohio law and *Skaggs*.  For example, the Decree states that "[f]or purposes of this Decree poll worker error will not be presumed, but must be demonstrated through evidence."  (Decree, ¶ 1(e).)  This term, quite deliberately,[13] conforms with the Ohio Supreme Court's holding in *Skaggs*, re-affirmed in *Painter*, that "'[i]n the absence of evidence to the contrary, public officers, administrative officers and public authorities, within the limits of the jurisdiction conferred upon them by law, will be presumed to have properly performed their duties in a regular and lawful manner and not to have acted illegally or unlawfully.'"  *Painter*, 941 N.E.2d at 798 (quoting *Skaggs*, 900 N.E.2d at 990).

The Court determines, therefore, that the Decree was not in conflict with Ohio law, as most-recently interpreted by the Ohio Supreme Court, when the Decree was agreed to by the parties and entered as a final judgment in April 2010.  Defendants do not challenge the ability or authority of state officials' to enter into consent decrees, generally.  Because the Decree was not inconsistent with Ohio law, the Court rejects Defendants' argument that the party-officials to the

---

[13] As represented to this Court by counsel for the Secretary upon the parties entering into the Decree:

> We do take into account poll worker error and what does constitute poll worker error, which would allow for the ballot to be counted in certain circumstances if actual evidence of poll worker error is present. So we believe that to be consistent with both this Court's initial approach in the Skaggs case, and then the Supreme Court's approach in the Skaggs case after remand from the Court of Appeals.

(Doc. 255, Trans. Oral Proceedings, 06-cv-896, Apr. 19, 2010, at 73.)

Decree lacked the authority to enter into the Decree on the basis that the Decree's orders had the effect of amending Ohio law.

### 2. The Decree's Consistency with the *Painter* Decision

Defendants contend, uniformly, that the Ohio Supreme Court's decision in *Painter* conclusively established that the Decree's orders conflict with Ohio election law, and that the Decree's conflicting orders are invalid as a result. According to the Defendants, *Painter* held categorically that poll-worker error cannot serve as a basis for counting defective provisional ballots, including those covered by the Decree. Plaintiffs maintain that the *Painter* decision does not conflict with the Decree, and the Court in *Painter* expressly acknowledged the Decree's orders as valid and binding despite Ohio law's general prohibition against counting deficient provisional ballots, regardless of the reason.

*Painter*, like *Skaggs*, was an original mandamus action filed in the Ohio Supreme Court to compel the Secretary and the Hamilton County Board of Elections to rescind certain directives and decisions relating to the procedure for an investigation ordered by the federal court of the Southern District of Ohio in *Hunter* to determine whether disputed provisional ballots that were not counted because they had been cast in the wrong precinct had been miscast due to error. The *Painter* Court held that the Ohio election statutes "do not authorize an exception based on poll-worker error to the requirement that ballots be cast in the proper precinct in order to be counted." *Painter*, 941 N.E.2d at 794.[14] The *Painter* Court concluded, therefore, that:

---

[14] Citing R.C. 3503.01(A) (every qualified elector "may vote at all elections in the precinct in which the citizen resides"); R.C. 3505.181(C)(2)(a) (providing that "if an individual refuses to travel to the polling place for the correct jurisdiction . . .[a] provisional ballot cast by that individual shall not be opened or counted" if the "individual is not properly registered in that jurisdiction") and (E)(1) (defining "jurisdiction" for purposes of provisional-ballot provisions as "the precinct in which a person is a legally qualified elector"); R.C. 3505.182 (requiring each individual casting a provisional ballot to execute a written affirmation stating that he or she "understand[s] that . . . if the board of elections determines that" the individual is not a resident of the precinct in which the ballot was cast,

> [U]nder Ohio statutory law, the secretary of state's instructions to the board of elections, which required an investigation into whether poll-worker error caused any of the 850 provisional ballots to be cast in the wrong precinct, were erroneous because there is no exception to the statutory requirement that provisional ballots be cast in the voter's correct precinct.

*Id.* (confirming that "[t]hese statutes do not authorize an exception based on poll-worker error to the requirement that ballots be cast in the proper precinct in order to be counted").

At first blush, this language from *Painter* appears to be, as Defendants contend, irreconcilable with the Decree which orders that boards of election "may not reject a provisional ballot cast by a voter, who uses only the last four digits of his or her social security number as identification" for reasons including where "the voter cast his or her provisional ballot in the wrong precinct, but in the correct polling place, for reasons attributable to poll worker error." (Decree ¶ 5(b).)

The *Painter* Court's interpretation of the Ohio provisional ballot counting regime did not end there, however. The court then expressly addressed the interplay between Ohio law and the Decree.  As the court explained, although "[a]s the state's chief election officer pursuant to R.C. 3501.04," the Secretary's duties include "'[c]ompel[ling] the observance by election officers in the several counties of the requirements of the election laws" *Painter*, 941 N.E.2d at 795 (quoting R.C. 3501.05(B), (C), and (M)), "the secretary of state also has a duty to instruct

---

the provisional ballot will not be counted); R.C. 3505.183(B)(4)(a)(ii) (if board determines that the "individual named on the affirmation is not eligible to cast a ballot in the precinct or for the election in which the individual cast the provisional ballot," "the provisional ballot envelope shall not be opened, and the ballot shall not be counted"); and R.C. 3599.12(A)(1) (prohibiting any person from voting or attempting to vote in any election "in a precinct in which that person is not a legally qualified elector") and (B) (making a violation of that section a felony of the fourth degree).

election officials on the applicable requirements of federal election law *as well as federal court orders* that are applicable to them." *Id.* (emphasis added) (basing its reasoning on the premise that "[t]here is nothing in these [Ohio] statutes that restricts the secretary of state's instructions to boards of elections to *state* election law").

The *Painter* Court then analyzed whether the Secretary's disputed directives were warranted under the Decree. In doing so, the court recognized the Decree's orders as limited in scope, but nonetheless binding upon the Secretary:

> The decree specifies only that boards of elections may not reject a provisional ballot "cast by a voter, *who uses only the last four digits of his or her social security number as identification*" for any of several reasons, including that the "voter cast his or her provisional ballot in the wrong precinct, but in the correct polling place, for reasons attributable to poll worker error."

*Id.* (quoting Decree).

The court distinguished the Decree's requirements for counting provisional ballots miscast due to poll-worker error, which it maintained as valid, from the *invalid* directions to count *additional* provisional ballots by the Secretary. *See id.* (concluding that the "consent decree . . . however, does not justify the secretary of state's" issuance of the directives in that case, because "[t]he secretary of state's postelection directives and advisory applied more expansively [than the Decree's] to the 850 provisional ballots cast in the wrong precinct").

A thorough examination of *Painter*, therefore, reveals that it did not interpret a conflict between Ohio law and the Decree. Rather, in *Painter*, the Ohio Supreme Court expressly determined the Decree's orders requiring the counting of certain facially deficient provisional ballots to be valid and binding upon the Secretary, and thus *by definition* consistent with Ohio election law. *See Painter*, 941 N.E.2d at 798 (concluding that "the secretary of state's postelection instructions to the board of elections were not justified by Ohio law *or the pertinent*

21

*federal court orders*.") (emphasis added). This is the same conclusion arrived at by the Sixth Circuit in *Hunter*. *See Hunter*, 635 F.3d at 238 (recognizing that while "Ohio law, now made explicitly clear in *Painter*, does not permit the consideration of poll-worker error with respect to ballots cast in the wrong precinct . . . [t]he Ohio Supreme Court in *Painter*, however, does recognize the exception carved out by the NEOCH consent decree for those provisional voters using the last four digits of their Social Security number as identification").

At oral argument, counsel for the Defendants sequentially implored the Court to find a conflict between the terms of the Decree and Ohio law, notwithstanding the acknowledgement of same counsel that none of the state or federal cases addressing the Decree has expressly found it to be conflict with Ohio law, and the *Painter* Court's acknowledgement of the Decree's orders as binding aspects of Ohio provisional ballot law. [15]

Counsel for the Defendants insisted that the Ohio Supreme Court's holding in *Painter* was "contextual," and that the issue of the Decree's consistency with Ohio law was not properly before the court in *Painter*, which explains why the Ohio Supreme Court did not expressly find a conflict.[16] This contention is unavailing. *Painter*'s own internal account of the issues presented therein confirms that the arguments in defense of the Secretary's challenged directives implicated and relied on the enforceability of the Decree. *See Painter*, 941 N.E.2d at 795. (stating that "the secretary of state and the intervening respondents assert that the secretary's

---

[15] Even if defense counsel were correct asserting that the specific issue presented here was not before the *Painter* Court, as discussed, *supra*, the issue was undoubtedly before the court in *Hunter*. The Court has already determined that the Defendants' challenge to the Decree's validity under this theory is barred by issue preclusion, *see* Section III.A., *supra*. Moreover, even if Defendants were not technically estopped from re-litigating the issue, the federal courts' rationales and holdings in the *Hunter* litigation finding the Decree to be valid are highly persuasive to the Court, here. This Court, in *Hunter II*, held quite simply that "*Painter* does not call the validity of the Consent Decree into question." *Hunter II*, 2012 WL 909987 at *6.

[16] *See*, Trans. Oral Proceedings, June 27, 2012, 08-cv-896, 24:2-19; 32:16-33:2.

postelection instructions were warranted because of the federal consent decree in Northeast Ohio Coalition for the Homeless . . . as well as Judge Dlott's November 22 injunctive order in [*Hunter*]").[17]  Presumably, if the Decree's orders were invalid and/or unenforceable as a matter of law, the Ohio Supreme Court would have mentioned that threshold illegality in its analysis of whether the Secretary's orders were lawful under the Decree.[18]

Switching gears somewhat, counsel for the Secretary suggested, in rebuttal argument, that the Ohio Supreme Court refrained from finding the Decree in conflict with Ohio law because of Supremacy Clause concerns.[19]  This plainly is not the case.  In *Painter*, as elsewhere, the Ohio Supreme Court expressly, and correctly, recognized that while "'the Supremacy Clause binds state courts to decisions of the United States Supreme Court on questions of federal statutory and constitutional law,'" *Painter*, 941 N.E.2d at 797 (quoting *State v. Burnett*, 755 N.E.2d 857 (Ohio 2001)), "we are not bound by rulings on federal statutory or constitutional law made by a federal court other than the United States Supreme Court."  *Id.* (citations omitted) (the court quoting, also, the Sixth Circuit in *Planned Parenthood of Cincinnati Region v. Strickland*,[20] stating that "[t]o allow federal courts free rein in determining whether and under what circumstances a

---

[17] The Sixth Circuit corroborates this, stating that "[i]n this litigation," referring to the *Hunter* litigation, out of which *Painter*'s mandamus action arose, "intervenors NEOCH and the Ohio Democratic Party seek to enforce the consent decree with respect to the defendant Board's review of the relevant ballots."  *Hunter*, 635 F.3d at 238, n.17.

[18] Counsel for the Relators also argued, at the June 27, 2012 hearing, that the issue presented here was not before the court in *Painter*.  Counsel directs this Court's attention to paragraph 27 of *Painter*, and argues that the court's clarification therein that "Directives 2010-74 and 2010-79 were restricted to those situations covered by the federal consent decree in Northeast Ohio Coalition for the Homeless and are not challenged by relators in this action," *Painter*, 941 N.E.2d at 792, shows that the Decree's validity was not before the Court.  Surely it does not follow, however, that simply because two unchallenged directives were restricted to situations covered by the Decree, the Decree's lawfulness was not otherwise put before the court.  *See id.* at 795 (holding that Directives 2010-80 and 2010-87, which were at issue, were not justified by the Decree).

[19] Trans. Oral Proceedings, 06-cv-896, June 27, 2012, at 59:18-20.

[20] *See* 531 F.3d 406, 410 (6th Cir. 2008).

partially deficient provisional ballot will count-under state law-would deprive state courts of their long-established role as the final arbiter on matters of state law").

The *Painter* Court more specifically noted, as well, that it had jurisdiction to decide provisional ballot law, notwithstanding federal court orders.  *See id.* at 793 ("[T]he Help America Vote Act . . . 'conspicuously leaves . . . to the States' the determination of whether a provisional ballot will be counted as a valid ballot.'") (quoting *State ex rel. Skaggs v. Brunner* 549 F.3d 468, 477 (6th Cir. 2008) (additional quotations omitted)).  Hence, the Secretary's argument that the *Painter* Court left the Decree's orders intact out of misplaced deference fails.

Finally, the Plaintiffs' position that the *Painter* Court did not interpret a conflict between Ohio law and the Decree has been corroborated by the Defendants, who previously represented on the record in this case, *after Painter*, that "State Defendants interpret the Consent Decree as requiring them to do no more than what Ohio election law already requires or allows."  (Dkt. 219 at 3.)  For the reasons expressed herein, the Court agrees with Plaintiffs, and with the position maintained by counsel for the State Defendants for the past two years prior to Relators' instant challenge.  There is no conflict between the Decree's orders and Ohio's election law pertaining to provisional ballots, as interpreted by the Ohio Supreme Court.  The Defendants' alleged contradicting mandates facing the Secretary are illusory.[21]  The *Painter* Court held that the Secretary's can, and must, implement and follow the Decree as well as the rest of Ohio election law.

### C. Have Defendants Satisfied their Burden for Vacating the Decree

---

[21] (*See* State Reply, at 6) ("This conflict falls at the feet of the Secretary of State and other state officials: Either they must respect Ohio law and the *Painter* decision, or they must follow the contrary procedures acquiesced to by their predecessors in the 2010 consent decree.")

The Court must now determine whether, in light of its preliminary rulings, any sufficient ground remains for vacating the Decree. Defendants' only asserted basis for vacating the Decree, however, was its alleged invalidity due to it conflicting with Ohio statutory law. Because that precise issue has been rejected previously by this Court, *see* Section III.A., *supra*, and, alternatively, because the Defendants' substantive arguments put forth here for finding such a conflict lack merit, *supra* Section III.B., Defendants' request to vacate the Decree on that basis fails. As Defendants articulate no alternative basis for vacating the Decree—i.e. one that does not rely on the Court adopting their proposition that the election officials' compliance with the Decree is incompatible with complying also with Ohio law—the Defendants' request to vacate the Decree must be denied.

Plaintiffs insist, additionally, that even if Defendants succeeded in proving a conflict between the Decree and Ohio law, that showing alone would not be a sufficient basis to vacate the Decree. Plaintiffs argue that under Fed. R. Civ. P. 60(b) and the applicable case law governing federal consent decrees, it would be improper for the Court to vacate the Decree without first finding that doing so would not result in a constitutional violation. (*See* Plaintiffs' Reply, at 16).[22] Defendants disagree, arguing that Plaintiffs' reliance on Fed. R. Civ. P. 60(b)(4) and (5) is misplaced, because this Decree was not meant as a final order, and it was not entered as a result of finding a federal violation. Defendants provide cases from several circuits (other than the Sixth) in support of their claim that where, as here, the consent decree was not settled to remedy any federal violations, the Decree's invalidity due to a conflict with state law is sufficient to reopen the decree.

---

[22] Citing *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 391 (1992) (providing standards for modifying an institutional reform consent decree and holding, *inter alia*, that "[o]f course, a modification [of a consent decree] must not create or perpetuate a constitutional violation.")

25

The Court will address seriatim the applicability of Rule 60(b) to the Defendants' request to vacate the Decree, and then the appropriate standard that must be met to terminate the Decree under Rule 60(b).  The parties, through their widely divergent positions on the issue, display a manifest need for clarification on the applicable standard for modification or, as in this instance, termination of the Decree.  Particularly in light of Plaintiffs' outstanding motion to modify the decree which has yet to be decided, (*see* Dkt. 288), a discussion is warranted.

### 1.  Applicability of Rule 60(b) to Defendants' Request to Vacate the Decree

Plaintiffs argue that the only available procedures through which Defendants may bring their current request to vacate the Decree are Rule 60(b)'s narrow provisions for a party seeking post-judgment relief from a final order, either for voidness of the judgment or due to significant changes in circumstances.  *See* Fed. R. Civ. P. §§ 60(b)(4) (relief if the "judgment is void"), (60)(b)(5) (describing relief under changed circumstances where continued enforcement of the decree is no longer necessary).[23]  Plaintiffs rely primarily on the Supreme Court's decision in

---

[23] Rule 60(b) states, in full:

> (b) Grounds for Relief from a Final Judgment, Order, or Proceeding. On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:
>
> (1) mistake, inadvertence, surprise, or excusable neglect;
>
> (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
>
> (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
>
> (4) the judgment is void;
>
> (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or
>
> (6) any other reason that justifies relief.

26

*Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367 (1992), in support of their proposed application of Rule 60(b) to Defendants' request.  *Rufo* provided the accepted standard for modifying institutional reform decrees under Rule 60(b)(5), which Plaintiffs insist is the only possible provision under which Defendants' current request can be granted.  (*See* Plaintiffs' Brief, at 3-4.)

Defendants respond that *Rufo*'s application of Rule 60(b)(5) is inapplicable to this request to vacate the Decree for multiple reasons.  First, the Decree's own internal modification provision providing that "any of the parties may file a motion with the Court to modify, extend or terminate this Decree *for good cause shown*" supersedes Rule 60(b).  (*See* Decree ¶ 11) (emphasis added).  Second, Defendants argue the Decree is distinguishable from the *Rufo* line of cases enforcing Rule 60(b)'s standards because it was not entered pursuant to a finding of a federal constitutional violation.  Relators also argue that even if Rule 60(b) applies, the Sixth Circuit has reasoned that under 60(b)(6)'s catch-all provision permitting relief from a judgment for "any other reason that justifies relief," Fed. R. Civ. P. 60(b)(6), the unenforceability of the Decree and/or inconsistency of the Decree with Ohio law is grounds for vacating.[24]

Federal consent judgments are "hybrid" documents, *see Brown v. Neeb*, 644 F.2d 551, 557 (6th Cir. 1981), exhibiting contradicting natures.  For, as stated by the Supreme Court in *Rufo*, while "[a] consent decree no doubt embodies an agreement of the parties and thus in some respects is contractual in nature . . . it is an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally

---

[24] (*See* Relators' Reply, at 7) (citing *United States v. 32.40 Acres of Land*, 614 F.2d 108, 114 (6th Cir. 1980) (reversing a district court's refusal to vacate a stipulated condemnation judgment where the government attorney entered into it without authority, concluding that "[t]he District Court should have granted the motion to vacate judgment under Rule 60(b)(6)")).

applicable to other judgments and decrees." 502 U.S. at 379.  Consent decrees have been utilized

by federal district courts in a number of different scenarios, to achieve a number of important

objectives;[25] however, regardless of the context, "a district court is not merely an instrument of a

consent decree or of the parties' stipulations with respect to it."  *See Cleveland Firefighters for*

*Fair Hiring Practices v. City of Cleveland*, 669 F.3d 737, 742 (6th Cir. 2012).  For any consent

decree, the Court must exercise its "sound judicial discretion" prior to modifying the Decree's

terms.  *See Rufo*, 502 U.S. at 380 (quoting *Railway Employees' v. Wright*, 364 U.S. 642, 650-651

(1961)).

The Court's analysis of the applicable standard to Defendants' request to terminate this

Decree is assisted by two important facts which are not in dispute.  First, there is no longer any

dispute that all of the Defendants challenging the validity of the Decree in these proceedings,

including the Relators, are parties to the Decree.  This Court confirmed this in its prior ruling.[26]

Second, pursuant to the Decree's own stipulated terms, the Decree was not entered pursuant to

any findings of constitutional violations, or any legal violations, by the Defendants. (*See* Decree,

at 2.) (expressly stating that it "shall in no way constitute an adjudicating or finding on the merits

---

[25] *See, e.g.*, *Rufo* (correctional institutional reform); *Cleveland Firefighters for Fair Hiring Practices v. City of Cleveland*, 669 F.3d 737, 742 (6th Cir. 2012) (remedying discriminatory employment practices); *Ford Motor Co. v. Mustangs Unlimited, Inc.*, 487 F.3d 465 (6th Cir. 2007) (private parties' voluntary trademark settlement judgment); *Cleveland County Ass'n for Gov't by the People v. Cleveland County Bd. of Comm'rs*, 142 F.3d 468, 478-79 (D.C. Cir. 1998) (consent decree implementing an election plan).

[26] As stated by the Court in its May 11, 2012, Order:

> As there is no dispute that the State of Ohio is a party to this action, there can accordingly be no
> dispute that Relators, who bring the Mandamus Action "on behalf of" the State of Ohio in their
> capacities as elected state officers and members of the General Assembly, are bound by the terms
> of the Consent Decree when acting in that capacity.

(Order on Plaintiffs' Urgent Motion to Enjoin, Dkt. 261, at 9.)

. . . nor be construed as an admission by the Defendants of any wrongdoing or violation of any applicable federal or state law or regulation").

Finally, despite Defendants' contentions to the contrary, the Decree's orders are final and binding.  The Defendants point out that in the Court's prior order awarding attorney's fees, the Court determined "that the parties . . . did not intend the Decree to be final" for purposes of waiving future rights to move for fees.  (Dkt. 234, at 8.)  It is undoubtedly true, as the Court explained in its prior order, that the Decree's language providing for an expiration date, future modifications, and the simple fact that the Decree was entered prior to a resolution on the merits of Plaintiffs' outstanding claims, "lead[] to the single inference that the parties did *not* intend the Decree to be a final settlement of all claims." (*Id.*)

So long as the Decree's orders remain in force, however, they are nonetheless "final and binding" as between the parties.  (Decree, at 2.); *See Gonzales v. Galvin*, 151 F.3d 526, 531 (6th Cir. 1998) (A "consent decree, although in effect a final judgment, is a contract founded on the agreement of the parties. . . . It should be construed to preserve the position for which the parties bargained. . . .").

## 2.  Standard for Vacating the Decree

Rule 60(b), accordingly, applies to Defendants' request to vacate the Decree's orders. Rule 60(b)'s provisions apply to a party's request for relief from consent decrees, which are final judgments included under the purview of the Rule.  The Sixth Circuit has held that "Rule 60(b) is just as applicable to motions to modify or vacate consent judgments as it is to motions to modify or vacate other judgments." *Northridge Church v. Charter Twp. of Plymouth*, 647 F.3d 606, 614 (6th Cir. 2011) (citing *Rufo*, 502 U.S. at 378, and applying Rule 60 despite the decree's own

language providing for the court's continuing jurisdiction to "to grant whatever legal and/or equitable relief or remedies which the Court deems appropriate").

The Decree is a valid, final order, and the Defendants' request constitutes a post-judgment request for relief from its terms. *See* Fed. R. Civ. P. 60(b). As Plaintiffs demonstrate, the wealth of authoritative case law suggests Rule 60(b) applies to modifications by parties of consent decrees, regardless of whether the decree involves an adjudication of a constitutional violation. *See Frew v. Hawkins*, 540 U.S. 431, 441 (2004) (applying Rule 60(b)(5), which simply "encompasses the traditional power of a court of equity to modify its decree in light of changed circumstances" in the context of a consent decree that did not enforce any federal violations).

Defendants argue, however, that irrespective of Rule 60(b)'s general applicability to consent decrees, because this Decree was not entered pursuant to a federal constitutional violation, a demonstrable conflict between its terms and state law renders its terms unenforceable. In their briefs, as at oral argument, Defendants rely on a group of cases from various other circuits which, they contend, have all enforced a rule requiring invalidation of a federal consent decree where the parties agreed to override state law, *unless* the decree is remedying an adjudicated violation under federal law.[27]

---

[27] *See Perkins v. City of Chi. Heights*, 47 F.3d 212, 216 (7th Cir. 1995) (a district court may approve a consent decree that overrides state law, but only "upon properly supported findings that such a remedy is necessary to rectify a violation of federal law."); *Keith v. Volpe*, 118 F.3d 1386, 1393 (9th Cir. 1997) ("An alteration of the statutory scheme may not be based on consent alone; it depends on an exercise of federal power, which in turn depends on a violation of federal law."); *Cleveland County Ass'n for Gov't by the People v. Cleveland County Bd. of Comm'rs*, 142 F.3d 468, 478-79 (D.C. Cir. 1998) (vacating a consent decree implementing an election plan, holding that "if a violation of federal law necessitates a remedy barred by state law, the state law must give way; if no such violation exists, principles of federalism dictate that state law governs); *Kasper v. Board of Election Comm'rs*, 814 F.2d 332, 341 (7th Cir. 1987) ("A consent decree is not a method by which state agencies may liberate themselves from the statutes enacted by the legislature."); *St. Charles Tower, Inc. v. Kurtz*, 643 F.3d 264, 270 (8th Cir. 2011) ("State actors cannot enter into an agreement allowing them to act outside their legal authority, even if that agreement is styled as a 'consent judgment' and approved by a court."); *League of Residential Neighborhood Advocates v. City of*

Plaintiffs respond that the cases relied upon by Defendants in support of invalidating decrees where they conflict with state law are distinguishable because those cases either: (1) did not involve a challenge from a party to the decree, and thus did not implicate Rule 60(b); or (2) they were brought on direct appeal or collateral attack, and thus also did not proceed under Rule 60(b)'s standards for modification.  Plaintiffs supply their own rebuttal off-circuit authority, expressly rejecting state officials' challenge to their own decree because they lacked authority to enter into it.  *See Congregation Mischknois Lavier Yakov v. Board of Trustees for Village of Airmont*, 301 Fed. App'x 14, 15 (2d Cir. 2008) (holding that, "the impropriety of the settlement stipulation under state law [does] not render the order of a federal court enforcing the settlement . . . void and therefore subject to challenge under Rule 60(b)(4)").

The distinctions between the Defendants' request to vacate here and the challengers to the decrees in the cases cited by Defendants, *see supra* note 27, are well-taken. None of those cases involved a party's own *post-judgment* attack to a consent decree into which it entered.[28] This is crucial, because it also means none of the courts was applying Rule 60(b) to the requests in those cases.  Defendants' failure to provide any Supreme Court or Sixth Circuit support for their position also augers against the Court's adopting it.  As demonstrated by *Congregation Mischknois* from the Second Circuit, which is more analogous to this case and specifically rejects the position maintained by Defendants here, the other circuits are split on whether a

---

*Los Angeles*, 498 F.3d 1052, 1055 (9th Cir. 2007) ("A federal consent decree or settlement agreement cannot be a means for state officials to evade state law.").

[28] At oral argument, the Court asked Defendants whether any of the cases they cited involved a party attacking its own judgment, as is the case here.  Defense counsel offered the *Cleveland County* case from the D.C. Circuit, as involving a challenge of parties to their own consent agreement; however, counsel was mistaken.  In *Cleveland County*, too, it was a third party association challenging the consent agreement reached between the NAACP and the board of commissioners.  *See Cleveland County*, 142 F.3d at 471 (conferring standing upon challenger CCAGP only where the court determined its members' voting rights sufficiently implicated by the parties' agreement).

consent decree must be abrogated where the party officials acted outside their authority under

state law. In rejecting the Defendants' argument in *Congregation Mischknois*, the Second

Circuit opined:

> The defendants argue principally that they are now of the view that they did not
> have the right to enter into the agreement under state law in the first place. It does
> not follow that their due process rights were violated by their entering into it and
> subjecting themselves to an order of the court enforcing the settlement.

*Id.* at 15-16.

It is not essential, however, for the Court to decide which of the parties here has the better

of the argument. The Court has determined that the parties to the Decree did not alter, change, or

modify state law, *supra*, and hence the cases in support of Defendants' argument that it must be

abrogated on that basis are inapposite in determining the application of Rule 60(b) herein.[29]

Plaintiffs argue that, under Rule 60(b), Defendants' request for vacating the Decree due

to its invalidity in light of *Painter* constitutes either a request to void the judgment under Rule

60(b)(4), or a request for relief due to changed circumstances under Rule 60(b)(5). Plaintiffs

contend that Rule 60(b)(4) provides no relief, because under *United Student Aid Funds v.*

*Espinosa*, "Rule 60(b)(4) applies only in the rare instance where a judgment is premised either

on a certain type of jurisdictional error or on a violation of due process that deprives a party of

notice or the opportunity to be heard." 130 S. Ct. 1377, 1380 (2010). Plaintiffs argue that

Defendants cannot succeed with respect the Rule 60(b)(5), either, which authorizes relief where

---

[29] Plaintiffs invite the Court, if necessary, to make a finding now that Ohio's system for casting and counting
provisional ballots violated the Constitution at the time the Decree was entered. (Plaintiffs Reply, at 12.) The Court
refrains from engaging in such a determination, however, because, at least at this time, it is not necessary to resolve
the issues, and moreover could arguably violate the terms of the Consent Decree. (*See* Decree, at 2, "[Decree] shall
in no way constitute an adjudication on the merits").

prospective application of a judgment is no longer equitable.  Under *Rufo*, Plaintiffs contend,

Defendants' alleged "change in law" does not satisfy their burden to modify the Decree.

Defendants are correct, however, that *Rufo*'s specific standards "to be applied in ruling

on Fed. R. Civ. P. 60(b) motions in institutional reform litigation," *Heath v. DeCourcy*, 992 F.2d

630, 635 (6th Cir. 1993),[30] are not entirely applicable to the Decree's regulation of state election

practices.[31]  The Court also accepts Defendants argument that, as Defendants' request to vacate

the decree is not specifically brought under Rule 60(b)(4), *Espinosa*'s standards for voiding a

judgment, while certainly useful, are not necessarily exhaustive.  *See Espinosa*, 130 S.Ct. at 1371

(United filing a motion under Rule 60(b)(4) to void the judgment).  Rule 60(b)(6)'s catchall

provision for relief may also provide a basis for the Defendants' request.  Rule 60(b)(6),

however, is an even more difficult standard for relief from a judgment, "appl[ying] only in

---

[30] As excerpted by the Sixth Circuit in *Heath*, under *Rufo*, to modify a consent decree under Rule 60(b)(5):

> First, the movant must show that a "significant change in circumstances warrants revision of the decree." Second, the movant has the burden of proving significant changes that cause a consent decree to be "onerous," "unworkable," or "detrimental to the public interest." Third, if a movant agreed to a consent decree while anticipating changes in conditions that would make its performance onerous, there is a "heavier" burden to show that the movant: (1) agreed to the consent decree in good faith; (2) made a reasonable effort to comply; and (3) should be relieved of its obligations. Fourth, the lower court must determine whether "their proposed modification is suitably tailored to the changed circumstances."

992 F.2d at 635 (internal citations from *Rufo* omitted).

[31] The Supreme Court in *Rufo* stated that "[t]he standard we set forth applies when a party seeks modification of a term of a consent decree that arguably relates to the vindication of a constitutional right.  Such a showing is not necessary to implement minor changes . . . *unrelated to remedying the underlying constitutional violation*." *Rufo*, 502 U.S. at 383 (emphasis added).  It is not clear, therefore, that the Supreme Court intended *Rufo*'s specific standards to apply to all consent decrees, particularly where, as here, no "underlying constitutional violations" have yet been found. *Id*.; *see also Frew*, 540 U.S. at 441 ("In *Rufo*, the Court explored the application of [Rule 60(b)(5)] to consent decrees involving institutional reform."); *Heath*, 992 F.2d at 635 (*Rufo* provided the "restrictive, but flexible, standard to be applied in ruling on Fed. R. Civ. P. 60(b) motions in institutional reform litigation").

exceptional or extraordinary circumstances which are not addressed by the first five numbered clauses of the Rule." *Ford Motor Co.*, 487 F.3d at 468.

In its earlier decision in *System Federation No. 91 Railway Employees' Dep't v. Wright*, the Supreme Court set forth more general criteria for a district court to weigh before modifying a consent decree under Rule 60(b), holding that "a sound judicial discretion may call for the modification of the terms of an injunction decree if the circumstances, whether of law or fact, obtaining at the time of its issuance have changed, or new ones have since arisen." 364 U.S. 642, 647 (1961). The Sixth Circuit has stated, in turn, that "[a] district court must look to the specific terms of a consent decree in determining whether and when to terminate supervision or jurisdiction over it." *Gonzales v. Galvin*, 151 F.3d 526, (6th Cir. 1998).

The *Gonzales* Court held that factors to be considered include:

> (1) any specific terms providing for continued supervision and jurisdiction over the consent decree; (2) the consent decree's underlying goals; (3) whether there has been compliance with prior court orders; (4) whether defendants made a good faith effort to comply; (5) the length of time the consent decree has been in effect; and (6) the continuing efficacy of the consent decree's enforcement.

*Id* at 531.

The *Gonzales* criteria support Defendants' argument that the Decree's own internal modification provision should at least inform whether to grant the basis for relief. Paragraph 11 of the Decree provides that, "any of the parties may file a motion with the Court to modify, extend or terminate this Decree for good cause shown." (Decree). The *Gonzalez* Court made clear, however, that "[n]otwithstanding this list of 'factors,' a district court may not terminate its jurisdiction until it finds both that Defendants are in compliance with the decree's terms and that the decree's objectives have been achieved." *Gonzalez*, 151 F.3d at 531l; *see also Cleveland Firefighters*, 669 F.3d at 741 (quoting the same). The "good cause" required by Paragraph 11,

34

therefore, must, in the Court's view, at the very least conform to the baseline for termination provided by the Sixth Circuit.

The Sixth Circuit has recently reaffirmed the wide discretion of a district court to determine whether termination of a consent decree is appropriate. *Cleveland Firefighters*, 669 F.3d at 741. ("The court . . . has discretion with respect to whether and how a consent decree shall remain in effect, including the discretion to terminate the decree altogether.") (citing *Rufo*, 502 U.S. at 380; *Gonzales*, 151 F.3d at 531). Given the Court's precautionary principle that, before terminating the decree, a district court should first ensure that "the decree's objectives have been achieved," *see id*., the Court would not exercise its discretion to terminate or "vacate" the Decree, which was settled prior to adjudicating the merits of Plaintiffs' alleged constitutional violations, without first making sufficient evidentiary findings that no further violations would result from the Decree's termination. *See Cleveland Firefighters*, 669 F.3d at 742 (reversing termination of consent decree and remanding to the trial court to "make a careful finding" on whether extension of decree was "necessary to remedy the underlying claims" before "deciding whether to extend or terminate the decree").

### 3. Application of Rule 60(b) to Defendants' Request

Regardless of which provision in Rule 60(b) Defendants' request to vacate the Decree is brought under, where, as here, there are outstanding allegations by the Plaintiffs of ongoing constitutional violations, and where this Court and the Sixth Circuit have confirmed that removing the Decree's protections for provisional voters could risk further deprivations of constitutional rights,[32] the Court would deny the request unless and until Defendants demonstrate

---

[32] *See Hunter*, 635 F.3d at 243–44 ("[W]e have substantial constitutional concerns regarding the invalidation of votes cast in the wrong precinct due solely to poll-worker error. . . [p]articularly when there is evidence of poll-worker error, the categorical treatment of miscast ballots provided by Ohio law is troubling.").

conclusively that no further constitutional violations would result from the Decree's termination. Defendants have not attempted to make such a showing here, and as a result, their request to vacate the Decree is denied.

Plaintiffs have submitted evidence along with their briefing which, they submit, affirmatively establishes that terminating the Decree will add to ongoing constitutional violations in Ohio with respect to provisional ballots.  The determination of this threshold issue of the Decree's validity, however, is not the appropriate juncture to examine Plaintiffs' claims of ongoing violations.  Defendants' request to vacate the Decree is denied here on multiple other grounds.  Moreover, Defendants may suffer prejudice from the Court's conducting an evidentiary inquiry at this time, as they have not yet had an opportunity to respond fully to the Plaintiffs' newly-submitted evidence.  The Plaintiffs' pending request to modify the Decree may well call for such a determination, and will allow Defendants time to conduct their own discovery and respond.

## IV. CONCLUSION

The Court concludes that the Defendants' claim that the Decree is invalid because of its conflict with Ohio law, is barred by *res judicata*.  Defendants are precluded from re-litigating this issue by the Court's final decision in *Hunter v. Hamilton County Bd. of Elections ("Hunter II")*, Case No. 10-cv-820, 2012 WL 404786 (S.D. Ohio Feb. 8, 2012), holding that the Decree is valid, despite the Ohio Supreme Court's decision in *State ex rel. Painter v. Brunner*, 941 N.E.2d 782 (Ohio 2011).  The Court, alternatively, concludes that Defendants' substantive arguments in favor of vacating the Decree on the basis of its orders conflicting with Ohio law's requirements also fail on the merits.  Finally, to satisfy the standards of Rule 60(b) for obtaining the requested

36

relief, Defendants' must establish that vacating the Decree will not result in any further constitutional violations.  Defendants have not met this burden.

For the foregoing reasons, the Consent Decree in this case is **VALID,** and remains binding upon the parties.  Defendants' request to vacate the Decree is **DENIED**.

**IT IS SO ORDERED.**


**s/ Algenon L. Marbley**
**Algenon L. Marbley**
**United States District Judge**


**Dated: July 9, 2012**

37