UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


THE NORTHEAST OHIO COALITION    .
FOR THE HOMELESS, et al.,       .
                                .
  PLAINTIFFS,                   .        CASE NO. 2:06-CV-896
                                .
    VS.                         .        COLUMBUS, OHIO
                                .        JUNE 27, 2012
JON HUSTED, in his official     .        2:00 P.M.
capacity as Secretary of        .
State of Ohio,                  .
                                .
  DEFENDANT,                    .
                                .
and                             .
                                .
STATE OF OHIO,                  .
                                .
    INTERVENOR-DEFENDANT.        .
. . . . . . . . . . . . . . .    .

**_TRANSCRIPT OF ORAL ARGUMENT PROCEEDINGS_**
BEFORE THE HONORABLE ALGENON L. MARBLEY
UNITED STATES DISTRICT JUDGE

APPEARANCES:


FOR THE PLAINTIFFS:          CAROLINE GENTRY, ESQ.
                             MICHAEL JOHN HUNTER, ESQ.
                             DANIELLE E. LEONARD, ESQ.
                             BARBARA J. CHISHOLM, ESQ.
                             DONALD JOSEPH MCTIGUE, ESQ.
                             DONITA JUDGE, ESQ.

FOR THE DEFENDANTS:          AARON D. EPSTEIN, ESQ.
                             JOSEPH NORBERT ROSENTHAL, ESQ.
                             DAVID MARK LIEBERMAN, ESQ.
                             W. STUART DORNETTE, ESQ.
                             BETH A. BRYAN, ESQ.


                             - - -

```
 1                        WEDNESDAY AFTERNOON SESSION

 2                           JUNE 27, 2012

 3                              -  -  -

 4           THE DEPUTY CLERK:  O6-CV-896 and 12-CV-562, the

 5   Northeast Ohio Coalition for the Homeless, et al., versus

 6   John Husted in his official capacity as Secretary of the

 7   State of Ohio, and State of Ohio.

 8           THE COURT:  Would counsel please identify themselves

 9   for the record beginning with counsel for the plaintiff.

10           MS. GENTRY:  Caroline Gentry for plaintiffs NEOCH

11   and SEIU.

12           MR. HUNTER:  Thank you, Your Honor.  On behalf of

13   Plaintiff SEIU District 1199 in 2006-CV-896, and on behalf

14   of all of the plaintiffs in SEIU Local 1 versus Husted in

15   2012-CV-562, I'm Michael Hunter of the law firm of Hunter,

16   Carnahan, Shoub, Byard & Harshman here in Columbus.

17           MS. LEONARD:  Good afternoon, Your Honor.  On behalf

18   of SEIU 1199 in the NEOCH v. Husted case, I'm Danielle

19   Leonard of the Altshuler Berzon law firm, and with me is

20   Barbara Chisholm from my law firm.

21           THE COURT:  What law firm?

22           MS. LEONARD:  Altshuler Berzon.

23           We're also counsel for the Union Plaintiff SEIU

24   Local 1, the Steelworkers, and the UAW Locals in the new

25   case that's been filed against Secretary of State Husted.
```

1          MR. MCTIGUE:  I'm Donald McTigue on behalf of

2     Plaintiff Ohio Democratic Party.

3          THE COURT:  And also on the line is Donita --

4          MS. JUDGE:  Good afternoon, Your Honor.  I am Donita

5     Judge.  I am counsel for the Ohio Organizing Collaborative

6     in the newly filed case SEIU versus Husted, and I'm from

7     Advancement Project in Washington.

8          THE COURT:  Thank you.

9          Counsel for the defense.

10         MR. EPSTEIN:  Aaron Epstein with Joseph Rosenthal,

11    Assistant Ohio Attorneys General on behalf of Secretary

12    Husted in both lawsuits.

13         MR. LIEBERMAN:  Good afternoon, Your Honor.  Dave

14    Lieberman for the State of Ohio in the NEOCH versus Husted

15    case.  I'm with the attorney general's office.

16         MR. DORNETTE:  On behalf of the relators,

17    Mr. Niehaus and Mr. Blessing, I'm Stuart Dornette of Taft,

18    Stettinius & Hollister.  With me is Beth Bryan.

19         THE COURT:  Well, we have a number of matters to

20    address today.  We originally were going to have arguments

21    on the motion of the -- well, both parties were going to

22    tell me why the consent decree should either be

23    invalidated, in the case of the defense, because under

24    *Painter*, the defense said it resulted in a misapplication

25    of Ohio law.

1      I believe that's correct, is it, Mr. Epstein?

2      Please stand.

3      MR. EPSTEIN:  I'm sorry, Your Honor.

4      Yes, Your Honor.  It is the position, I think, of

5      all the defendants and the relators as well that the

6      consent decree that was entered in this case is

7      inconsistent with Ohio law, not just as articulated in

8      *Painter* but with the Ohio Revised Code that existed even at

9      the time, and that the Court is simply without jurisdiction

10     to enter an order that contravenes state law in the absence

11     of a finding from the Court that the order is necessary to

12     remedy a federal constitutional defect.

13     THE COURT:  And at the time that we had our last

14     status conference, the plaintiffs were going to present a

15     position that demonstrated that the consent decree was, in

16     fact, valid; that the defense and the relators both -- the

17     defendants and the relators both were aware of the validity

18     of it when they entered into the consent decree obviating

19     the need for the Court to have made a finding of

20     constitutional deficiency that would warrant them entering

21     into the consent decree.

22     Since that time, however, the plaintiffs have sought

23     modification of the consent decree without even going to

24     the issue of its constitutionality.  And then we have the

25     new case of SEIU versus Husted, which is 12-CV-592 -- I'm

 1    sorry, 562.  Is it 562 or 592?

 2         MR. HUNTER:  562, Your Honor.

 3         THE COURT:  -- which has been determined by the

 4    Court to have been related.

 5         So it's unclear, Mr. Hunter or Ms. Judge --

 6    Ms. Judge is representing the plaintiffs also.  Is that

 7    right, Mr. Hunter?

 8         MR. HUNTER:  That's correct, Your Honor.  And for

 9    economy here, I think with Your Honor's indulgence, it

10    would make the most sense if Danielle Leonard could speak

11    to the interaction of the two cases.

12         THE COURT:  Ms. Leonard, you can speak in broad

13    strokes inasmuch as we've already determined it to be a

14    related case.  I don't know that there's been an objection

15    to that by representatives of the defense.  Please proceed.

16         MS. LEONARD:  Thank you, Your Honor.  I think, as

17    we've discussed in our papers in both cases, the plaintiffs

18    in the NEOCH case, with respect to the issues that are

19    raised by the State's request to terminate the consent

20    decree which the plaintiffs believe under federal law

21    requires the Court to examine whether or not vacating that

22    decree will result in constitutional violations with

23    respect to the voters covered by the decree, and then with

24    respect to the plaintiffs' affirmative motion to modify

25    that consent decree, to strengthen the protection for

1    voters covered by that consent decree, in light of the

2    evidence that we have collected from recent elections

3    regarding the application of that decree in the State of

4    Ohio, particularly after *Painter*, and then along with the

5    plaintiffs in the new affirmative case asking for statewide

6    relief with respect to all provisional voters raising the

7    same constitutional arguments, we believe in the interest

8    of judicial economy and efficiency that the Court should

9    hear these issues together, allow the State and the

10   counties in the new case to file whatever opposing briefs

11   they wish, the plaintiffs in both cases to file their

12   replies, and for the Court to have a hearing.

13          If the State wishes for that to be an evidentiary

14   hearing on the motion to modify the request to terminate,

15   and the preliminary injunction, that should proceed

16   together.  But, in light of the proximity of these issues

17   to the upcoming election and the overlapping issues among

18   all the cases, the plaintiffs' position in both cases is it

19   would be most efficient to proceed together on these issues

20   and set a hearing by no later than the end of July,

21   depending on the Court's availability, in order to resolve

22   all the constitutional issues with respect to whether or

23   not Ohio's provisional ballot system unconstitutionally

24   disenfranchises voters.

25          THE COURT:  One thing is certain, whatever the Court

1  decides to do, we're going to put this on an expedited

2  track so there will be no question at the time of the

3  election as to what rules are in place.  I want to give

4  either side an opportunity to appeal whatever ruling I make

5  and for it to go through its normal course before the Sixth

6  Circuit so that there will be no confusion at the time that

7  the election is held.

8       But here's the overarching concern.  I want

9  everybody to be clear.  I want all of the lawyers to put

10  down your pens because I want you to listen.  And it's

11  simple.  I wish Mr. Coglianese was still working on these

12  matters because Mr. Coglianese is one of the lawyers who

13  really understood this.

14       The most important thing about this lawsuit is the

15  franchise.  I don't want anybody to lose sight of that.  It

16  is certainly the thing that I value most, perhaps, as a

17  federal judge.  There's nothing more important than the

18  franchise, than the right to vote.  So whatever resolution

19  we make, the overarching question that you're going to have

20  to answer is whether this undermines the franchise.  I

21  don't care who you are, who you represent, or what party

22  might be most affected because this Court, this Court, is

23  going to protect the franchise.  We're not going to

24  disenfranchise anyone.

25       So you're going to have to prove to me that this

1    will not infringe upon the right to vote.  Everybody should

2    have a say in how their government is run, how his or her

3    government is run, and this is the only way.  Plus, I'm a

4    Southerner, and I grew up in the Jim Crow south and I still

5    remember the various mechanisms that were used to

6    disenfranchise voters.  It's one of those things that you

7    say as a child: never more.

8         I want everyone to understand that.  As long as you

9    understand that, you can be persuasive because you can

10   persuade me by demonstrating that this does not undermine

11   the franchise.

12        Now that we have that understood, you can pick up

13   your pens and we can proceed with the proceedings.

14        Now, the first question that I have for either you,

15   Mr. Epstein or you Mr. Lieberman, is whether there is any

16   objection to proceeding as Ms. Leonard has prevailed upon

17   the Court to proceed?  That is, we will not proceed with

18   the hearing on the constitutionality of the consent decree

19   today, nor will we proceed on the NEOCH plaintiffs' motion

20   to modify.  But instead, we'll have one hearing, one

21   plenary hearing where I'll take up all three issues,

22   because the issues that are set forth in the preliminary

23   injunction are similar to or essentially the same issues as

24   the NEOCH plaintiffs have raised in their complaining of

25   the pleadings.  There may be some additional facts that you

1 have unearthed, you believe, for the purposes of the

2 preliminary injunction hearing, but it all goes to the same

3 thing: that different boards of election are applying the

4 rules with respect to provisional ballots differently and

5 there should be uniformity.

6   You're claiming that the manner in which they're

7 doing it will disenfranchise your plaintiff class of

8 voters.

9   Mr. Epstein or Mr. Lieberman.

10   MR. EPSTEIN:  Your Honor, as the cases are currently

11 postured, we do not have an objection to proceeding as has

12 been suggested in terms of having one hearing, and in terms

13 of setting aside the question of the expansion of the

14 consent decree, because I think that issue is basically

15 subsumed by the new complaint.  We do think, though, that

16 the issue of the enforceability of the consent decree as it

17 exists now is a threshold issue that should be determined

18 first for a couple of reasons.  One of them being that in

19 the new SEIU lawsuit, one of the allegations in that

20 complaint is that the existence of the consent decree and

21 the use of so-called NEOCH ballots in and of itself creates

22 an equal protection problem.  If the Court were to rule

23 upon the suggestion from our side that the consent decree

24 should be vacated, that issue would become moot.

25   I would suggest to the Court that might be a more

```
1    efficient way to proceed, since the legal issue is fully

2    briefed, rather than have to work up the legal and factual

3    issue of whether that creates an equal protection problem,

4    when that issue may simply go away.

5         MS. LEONARD:  If I may, Your Honor.

6         The problem with Mr. Epstein's argument is that the

7    suggestion that this Court can invalidate the consent

8    decree without considering whether that invalidation will

9    result in a constitutional violation is wrong.  It's not

10   federal law.  The federal law that applies to their request

11   to terminate this consent decree requires examining whether

12   or not ending that content decree will result in

13   constitutional violations.  So to address that issue -- and

14   it is on that question the State's undeniable burden to

15   show that it will not result in constitutional violations.

16        So in order to show that the Court should invalidate

17   a consent decree because they argue it has become contrary

18   to state law -- which as we've set forth in our papers on

19   this issue, the plaintiffs disagree adamantly that a change

20   in state law can invalidate an existing federal court order

21   under Rule 60.  In order to even consider that question,

22   the Court must consider whether or not it will result in a

23   constitutional violation.

24        So we don't see how it would become more efficient

25   for the Court to answer that question first when answering
```

1    that question requires looking at whether the State has met

2    its burden of showing there are no constitutional

3    violations.

4          THE COURT:  Mr. Epstein.

5          MR. EPSTEIN:  If I may.  What we've argued in our

6    papers is that the principle of law that's just been

7    articulated is incorrect.  If the Court issues a decree in

8    furtherance of protecting a federal constitutional right,

9    then they're absolutely correct that the Court is not going

10    to consider modification or vacation of that order unless

11    the Court is persuaded by the parties seeking modification

12    that the constitutional problem is not going to recur.

13    That just makes sense.

14          But there is a separate line of cases that says we

15    don't even get to that if there's no jurisdiction to

16    enforce the order in the first place.  In that case,

17    there's no burden of proof on the State to show that the

18    federal violations won't recur.

19          THE COURT:  You're saying there was no jurisdiction

20    to enforce the order in the first place because there was

21    never a finding of a constitutional violation?

22          MR. EPSTEIN:  That's absolutely correct.

23          THE COURT:  Here is the problem, or at least here is

24    the question that I want you to answer.

25          The lawsuit, the NEOCH lawsuit, alleged

1    constitutional violations.  Then Secretary of State Brunner

2    entered into this consent decree.  The practical effect of

3    it, just as with any lawsuit, neither side admitted

4    liability or admitted to a violation.  But in lieu of a

5    court proceeding, in lieu of my reaching a determination of

6    whether there was a constitutional violation set forth by

7    the facts of the NEOCH case, you validly entered into a

8    legally binding consent decree.  So you can't now complain

9    that the Court didn't make a finding.  The Court didn't

10   have an opportunity to make a finding because you

11   essentially settled the case -- not you Mr. Epstein, but

12   your office settled the case and you are bound by it.  It

13   was settled not only on behalf of the secretary of state,

14   but on behalf of the State of Ohio which included the

15   legislature which I set forth when the relators were before

16   me a month or so ago, whenever it was.

17        I don't think that that line of cases to which you

18   refer and upon which you rely would be dispositive here

19   because we have that major factual distinction.  They

20   just -- you entered into that binding agreement.

21        Now, the question becomes, and it seems to me, under

22   Rufo versus Inmates of Suffolk County, that the better

23   course would be not to make a modification that would

24   create or perpetuate a constitutional violation.  So I

25   think that before we get to your issue, we need to make a

1    determination as to whether there is a constitutional

2    violation based on present Ohio law, whether as the

3    circumstances as they stand right now, whether there are

4    constitutional violations with respect to the provisional

5    ballots.

6         MR. EPSTEIN:  If I could make two points.

7         THE COURT:  Please.

8         MR. EPSTEIN:  First, I would respectfully disagree

9    that *Rufo* applies.  I think that the five circuit court

10   cases that we cite in our papers from the Seventh Circuit

11   and others were all exactly the same in the sense that they

12   all arose out of a case where there was an allegation of a

13   federal violation and a settlement agreement was reached

14   without any adjudication of that federal claim.  The

15   federal appellate courts have uniformly said that's not

16   sufficient to give the district courts jurisdiction to

17   enforce those settlement agreements.

18        The practical concern that I have is that if you

19   adopt the reasoning that they're putting forward -- they're

20   saying we want to expand the consent decree so there won't

21   be new constitutional violations.  Essentially, when we

22   come before the Court, then, for the hearing on the merits,

23   they've switched the burden of proof.  Now, it used to be

24   they had to come in and show that Ohio law was

25   unconstitutional.  Now, under their theory, the State is

14

1    going to have to come in and prove we're not violating the

2    constitution.  I don't see how we can shift the burden of

3    proof when they haven't prevailed on their constitutional

4    claim in the first instance.

5         MR. LIEBERMAN:  Can I make a point?  The plaintiffs

6    and the Court referenced the *Rufo* case.  That's a Rule

7    60(b) case.

8         THE COURT:  Let me clarify one thing, Mr. Lieberman.

9         Please remain standing; you can continue with your

10   argument.

11        The dicta in *Rufo* that I find at least illustrative

12   is the quote: of course, a modification must not create or

13   perpetuate a constitutional violation.  So it just goes to

14   the point of whether I should withhold a decision on the

15   consent decree until the Court makes a determination of the

16   constitutionality of Ohio law.

17        That's the point of *Rufo*.  Go ahead.

18        MR. LIEBERMAN:  My only response to that is *Rufo* is

19   a Rule 60(b) case.  Rule 60(b) requires a final judgment, a

20   final determination on the merits of plaintiffs' claims.

21   Two years ago we had a dispute in this courtroom about

22   whether or not the consent decree was final.  The

23   plaintiffs argued, in fact, that it was not final; it was

24   not intended to be a final disposition of all the claims.

25   Your Honor agreed with plaintiffs' position, disagreed with

1     the State's position and determined that the parties to the

2     present action did not intend the decree to be final.  If

3     there's no final decree, we don't have a final judgment for

4     Rule 60(b) purposes, so Rule 60(b) and *Rufo* are immaterial

5     to the issues at bar.

6          THE COURT:  Do you have anything further,

7     Mr. Lieberman?

8          MR. LIEBERMAN:  No, Your Honor.

9          MR. DORNETTE:  Your Honor --

10         THE COURT:  Mr. Dornette.

11         MR. DORNETTE:  Yes, sir.  If you will recall,

12    obviously, we, on behalf of the relators, Senate President

13    Niehaus and Speaker Pro Tempore Blessing, are here before

14    the Court to address the question that we sought to raise

15    before the Ohio Supreme Court.  That question is whether,

16    under the Ohio Constitution, members of the state executive

17    department have the authority to enter into consent decrees

18    that have the effect of amending legislatively-passed

19    statutes.  We obviously believe the answer is no under Ohio

20    Constitution of law.  It's a separation of powers question

21    which we had asked and suggested is absolutely appropriate

22    for the Ohio Supreme Court to determine.

23         The question was brought to Your Honor based on the

24    urgent motion to enjoin those proceedings that the

25    plaintiffs filed.

```
 1          Now, as Your Honor recognized on May 17th, there is

 2     a threshold question here about the validity of that decree

 3     based upon that constitutional principle.  In Rufo, in

 4     Heath, in the other cases the plaintiffs have cited, there

 5     was no question about the underlying validity of the

 6     consent decree that was sought to be modified.  Here there

 7     is.  And that question about the underlying validity of the

 8     consent decree is something that does not involve the

 9     various issues that are out there both on the plaintiffs'

10     motion to modify and on the plaintiffs' motion for

11     preliminary injunction, the new lawsuit filed last Friday.

12          I would ask that our discrete issue not be drawn

13     into all of that, that we can get a ready and efficient

14     resolution of that issue, purely a legal issue, fully

15     briefed pursuant to Your Honor's orders and before you for

16     decision.

17          THE COURT:  So your position, then, the speakers'

18     position -- Mr. Niehaus and Mr. Blessing's position is

19     decide the threshold issue of the validity of the consent

20     decree first and then look at the other issues?

21          MR. DORNETTE:  Yes, Your Honor.

22          THE COURT:  And I want to make sure that I'm clear

23     on where you stand on this, Mr. Epstein.  On the one hand,

24     I thought you said that you had no objection to how

25     Ms. Leonard proposed to proceed, that is, resolving these
```

1    issues in one proceeding.  But you join with Mr. Dornette

2    in taking the position that the consent decree has to be

3    determined first, the constitutional validity of it, and

4    then the other issues addressed.  Is that your position?

5         MR. EPSTEIN:  I'm sorry if I was unclear.  My intent

6    was to agree with her with one caveat, which is I do think

7    the question of vacating the consent decree is a threshold

8    question that the Court should decide first.

9         THE COURT:  Ms. Leonard.

10        MS. LEONARD:  If I may.  To respond to the last

11   point made with respect to carving out and deciding this

12   legal issue of validity of the consent decree, the problem

13   is that issue can't be resolved without the proper

14   procedural context of bringing that issue to Your Honor in

15   this case.  It is simply not true that the federal cases in

16   the five other circuits have held that a Court has no

17   jurisdiction to enforce a consent decree that was entered

18   into by the State when the State is asking for the Court to

19   vacate that consent decree because of an alleged change in

20   state law.

21        It is simply not the case that a party can challenge

22   the validity of a consent decree through any mechanism

23   other than Rule 60.  That is federal law.  Under Rule 60,

24   under the portion of *Rufo* that Your Honor quoted, in order

25   to determine whether or not the Court can vacate a consent

18

1    decree, it must consider whether or not the State has met

2    its burden of showing there would be no constitutional

3    violation.

4         With respect to the burdens, I want to make sure I'm

5    crystal clear with respect to the three pending requests

6    that are before the Court, because I did not mean to imply

7    that plaintiffs believe on our motion to modify that it's

8    the State's burden.  On the State's request to vacate the

9    consent decree, it's the State's burden to show there will

10   be no constitutional violations that result.

11        Plaintiffs accept that in order to affirmatively

12   strengthen and modify the consent decree, we must show that

13   it's constitutionally necessary.  We embrace that burden

14   and are happy to go forward and do so.

15        In the preliminary injunction, the usual preliminary

16   injunction standards apply and plaintiffs have the burden

17   of showing those are met.  Under the Sixth Circuit's recent

18   case, the Cleveland firefighters case, when the Sixth

19   Circuit remanded to the Court to consider at the same time

20   the competing requests to expand and terminate the consent

21   decree, whether either of those is required by the

22   constitution, we think that's the same procedure that the

23   Court should use here.

24        THE COURT:  So your order, then, Ms. Leonard, would

25   be to decide the constitutionality of the consent decree

1      last, the preliminary injunction hearing first, and the

2      competing interests of the plaintiff to modify and the

3      defendant to terminate?

4              MS. LEONARD:  I don't think it necessarily needs to

5      be -- I think all of these issues do need to be resolved by

6      the Court.

7              THE COURT:  And they all will be.  I want to know

8      what the position of the parties would be with respect to

9      the order in which they would be decided.

10             MS. LEONARD:  We would be perfectly happy if the

11     Court were to resolve the preliminary injunction in the new

12     case first.  We think that the Court would also need to

13     resolve the issue of whether the State has met its burden

14     to show that vacating the consent decree is necessary.  We

15     have no problem with that issue being resolved if it's all

16     at the same hearing, being resolved logically prior to the

17     request to modify the consent decree.  Our concern was that

18     this not happen in piecemeal stages with respect --

19             THE COURT:  No.  I want to get it done as soon as

20     possible and give both sides the opportunity to do any

21     additional discovery that may be necessary.  The SEIU

22     litigation, for all intents and purposes, will be joined in

23     this litigation to resolve all of these issues because at

24     the end of the plenary proceeding, I'll call it, the Court

25     should make a determination as to whether they're entitled

1      to any type of injunctive relief, that is, the SEIU

2      plaintiffs, whether you should be able to modify the decree

3      or whether the decree should be terminated.

4           One of the things that I considered, Mr. Epstein,

5      when this issue first arose, was whether it made sense to

6      consider the modification termination issues first.

7           MR. EPSTEIN:  If I could, I might have a suggestion

8      that could simplify this a little bit.  There is a very

9      simple fundamental legal disagreement between the parties

10     right now, which is they say that in order for us to vacate

11     the consent decree we have to prove certain things, we have

12     to meet an evidentiary burden.  We say that under these

13     cases we don't have to.  Maybe that's the question that the

14     Court should decide first.  If you decide that we don't

15     have to meet that evidentiary burden, then the consent

16     decree goes away.  If you decide that we do, then

17     everything ends up consolidated at the same time for a

18     hearing.  But it seems to me that that's a fully briefed

19     issue.

20          THE COURT:  It is.

21          MR. EPSTEIN:  And it would, I think, simplify the

22     hearing in a number of respects, both in terms of removing

23     substantive claims from SEIU and clarifying what burden of

24     proof, if any, the State has at the hearing.  So I would

25     offer to the Court that suggestion.

21

```
 1          THE COURT:  Any response, Ms. Leonard?
 2          MS. LEONARD:  I think we were prepared to argue
 3    today exactly that, that we believe that the State has that
 4    burden and has not met it.  So I don't think we'd have any
 5    objection to arguing that issue today.  That's what we were
 6    prepared to proceed to address.
 7          THE COURT:  And you're prepared to address that
 8    issue as well, Mr. Epstein?
 9          MR. EPSTEIN:  Yes, Your Honor.
10          THE COURT:  Here is what I'm going to do.  I'm going
11    to give you an opportunity to argue that narrow issue
12    today.  Then we'll reset it for -- assuming that there's
13    anything left, we'll reset it for a date that we can all
14    agree upon or not.  I might just pick a date, because with
15    all of the lawyers, coordinating calendars in the
16    summertime is a virtual impossibility.  But fortunately
17    there are enough lawyers on both sides that if someone is
18    on vacation or has a wedding or whatever to go to, someone
19    can cover for them.
20          So we're going to stand in recess for 30 minutes
21    until -- that clock is about five minutes fast -- until
22    three o'clock.  Then we'll come back and have arguments on
23    those.
24          In the meantime, talk among yourselves and look at
25    possible dates for the subsequent hearing assuming for the
```

1    purposes of scheduling only that we'll have a subsequent

2    hearing.

3      (Recess taken from 2:40 to 3:11.)

4          THE COURT:  Mr. Epstein, are you ready to proceed?

5          MR. EPSTEIN:  Yes, Your Honor.  Would you like me to

6    speak from the podium?

7          THE COURT:  Yes, I would.

8          MR. EPSTEIN:  Your Honor, with the Court's

9    permission, I'm going to speak for a few minutes and then

10   I'll yield to Mr. Dornette.

11         THE COURT:  Just for the purpose of clarification, I

12   think I gave each side -- I usually give each side 20

13   minutes, but given the complexity of it, I will give each

14   side 30 minutes.

15         But I want you to be clear, both sides, that the

16   purpose of oral argument is not for you to kind of

17   summarize your briefs for me but to respond to questions or

18   to highlight things that might have been left unclear.  So

19   if you don't get through all of your outline, don't

20   despair.  As long as you answer my questions, we're good.

21         MR. EPSTEIN:  Thank you, Your Honor.

22         THE COURT:  How much time do you want, 15 minutes?

23   And then Mr. Dornette has 15?  Is that how you're going to

24   do it?

25         MR. EPSTEIN:  That will be fine.

23

```
 1              THE COURT:  You don't wish to reserve any for
 2     rebuttal?
 3              MR. EPSTEIN:  Oh, yeah.  My friend, Mr. Lieberman,
 4     wants some time.  May we have a moment, Your Honor?
 5              THE COURT:  Certainly.
 6              MR. EPSTEIN:  Your Honor, I'll take ten minutes,
 7     Mr. Dornette will take ten, Mr. Lieberman five.
 8              Did you give us 20 or 30 minutes?
 9              THE COURT:  I gave you 30.
10              MR. EPSTEIN:  That should leave me five minutes for
11     rebuttal.
12              THE COURT:  What is Mr. Lieberman going to address?
13     I understand what Mr. Dornette is addressing.
14              MR. LIEBERMAN:  Your Honor, I was going to be
15     prepared to address the standard of review in the *Rufo* case
16     which is something we had briefed; I'm not sure the
17     secretary had briefed.
18              THE COURT:  *Rufo* might be something that you would
19     address in rebuttal.  I'm not going to tell you how to
20     argue.  You certainly are skilled in the art of advocacy.
21              MR. LIEBERMAN:  Understood, Your Honor.
22              MR. EPSTEIN:  Your Honor, I'm going to try to solve
23     the problem by talking really fast.
24              THE COURT:  You might incur Mrs. Evans' sore
25     disfavor.
```

24

```
 1          MR. EPSTEIN:  It wouldn't be the first time I've
 2     annoyed a court reporter.
 3          There are at least five provisions in the Ohio
 4     Revised Code that say that defective provisional ballots,
 5     meaning provisional ballots cast in the wrong precinct,
 6     cannot be opened and counted.
 7          This is in direct conflict with the terms of the
 8     consent decree signed by this Court.
 9          THE COURT:  Mr. Epstein, the Sixth Circuit in Hunter
10     stated that "the Ohio Supreme Court in Painter, however,
11     does recognize the exception carved out by the NEOCH
12     consent decree for those provisional voters using the last
13     four digits of their Social Security as identification."
14     So it appears to me that the Sixth Circuit has recognized
15     the validity of the consent decree already.  So you're now
16     arguing not only that this Court couldn't have validly
17     presided over or had the jurisdiction to enter into a
18     binding consent decree, but the Court that reviewed it when
19     it went up on appeal was wrong too.
20          So could you help me reconcile what you're arguing
21     with what the Sixth Circuit has already said?  Is it res
22     judicata?  Has it already been decided that the NEOCH
23     consent decree is valid?  Because the language that I just
24     read in Hunter – and I think that was at 635 F.3d at page
25     235 – seems to suggest it was valid.
```

1    MR. EPSTEIN:  I will respectfully disagree with that

2 interpretation of *Hunter*.

3    THE COURT:  That's fine.  But I didn't interpret it.

4 That's what it says.  It says again, and I'll quote, The

5 Ohio Supreme Court in *Painter*, however, does recognize the

6 exception carved out by the NEOCH consent decree for those

7 provisional voters using the last four digits of their

8 Social Security number as identification.

9    MR. EPSTEIN:  I think there is a difference between

10 recognizing that the NEOCH consent decree existed and that

11 it was being applied in Hamilton County in that election.

12 That's different from saying that the Supreme Court ruled

13 that there was no conflict between *Painter* and the consent

14 decree, or that the consent decree was incorporated into

15 Ohio law.

16    What the Ohio Supreme Court was trying to do in

17 *Painter* -- everybody is coming in in the middle of a

18 specific election where the votes have already started to

19 be counted.  These NEOCH votes have already been counted,

20 and they can't unring that bell.  So they're recognizing

21 that for purposes of this election, we need to avoid equal

22 protection problems by treating everything equally.  I

23 don't think you can read anything in *Painter* or in *Hunter*

24 to say this resolves the question of whether there is a

25 conflict between the two, if we were starting from scratch

```
 1    without any votes having been counted.

 2         THE COURT:  But we aren't starting from scratch, and

 3    we weren't starting from scratch when the Sixth Circuit

 4    passed on it.

 5         MR. EPSTEIN:  We were not starting from scratch in

 6    the sense that voting was already underway.  Some

 7    provisional ballots had already been opened and counted,

 8    and they were trying to figure out what to do with other

 9    provisional ballots.  My point is come 2012 November, we'll

10    be starting with a clean slate and you can then decide

11    whether there is a conflict between the two or whether Ohio

12    law gives way to the NEOCH consent decree.

13         THE COURT:  I don't want you to go down the wrong

14    road.  You talk as though they're mutually exclusive.  You

15    talk as though the NEOCH consent decree is in derogation of

16    Ohio law.  That's not what this says.  It doesn't say it's

17    in derogation of Ohio law.  That exists only in the minds

18    of the advocates.  Is that right?

19         Has there been any case that said the consent decree

20    was in derogation of Ohio law?

21         MR. EPSTEIN:  No, but there's been no case that

22    specifically found no conflict.  The Supreme Court was

23    working off the assumption that this was a valid federal

24    consent decree, and it recognizes under the supremacy

25    clause they have to give way to it.
```

1          THE COURT:  Couldn't the Supreme Court have said

2     that consent decree is invalid because it's incongruous

3     with Ohio law?  Couldn't the Supreme Court have said that?

4          MR. EPSTEIN:  First of all, they would have been

5     raising a question that the parties hadn't.

6          THE COURT:  I suppose that's novel?

7          MR. EPSTEIN:  It has happened once or twice.  It

8     didn't happen then.  I don't think that their failure to

9     raise an un-pled claim should lead us to believe that

10    they've ruled on that un-pled claim.

11         THE COURT:  But the Supreme Court always has the

12    right or authority to declare that something is

13    inconsistent with Ohio law, doesn't it?

14         MR. EPSTEIN:  Well, I don't think that the Supreme

15    Court is going to declare that a federal order is

16    inconsistent because of supremacy clause concerns.  They

17    would have had to go deeper into it to determine the issue

18    we've been talking about, whether it was grounded in a

19    federal court violation.  That would have taken them well

20    away from the issues that were in front of them, which is,

21    How do we wrap up the counting of voting in Hamilton

22    County?  In a situation where nobody had challenged the

23    validity of the NEOCH consent decree, they were just trying

24    to figure out how to harmonize it with other kinds of

25    provisional ballots.  I don't think we can draw any

1   conclusion about whether it is or is not in conflict with

2   Ohio law.

3          Now, if one assumes that there is a conflict --

4   obviously, if you assume there is no conflict, then I've

5   lost my argument.  But, if there is a conflict – and I

6   believe there is a clear conflict between the terms of the

7   revised code and the terms of the consent decree – the case

8   law from five federal appellate courts have said that the

9   consent of the parties to a consent decree that alters or

10  conflicts with state law is not enough to make it

11  enforceable.  It requires that finding of a federal

12  constitutional violation; otherwise, Article III courts

13  simply have no ability to step in and tell the states how

14  to change their laws.

15         Now, the argument has been made by the plaintiffs to

16  try to distinguish those cases, to say that in those cases

17  it was a third party, a stranger to the consent decree

18  challenging it, and here it's the participants.

19         I would offer the Court two responses to that.

20  First, in the Cleveland County case from the D.C. Circuit,

21  it was, in fact, parties to the consent agreement that

22  challenged their own consent agreement and the Court found

23  it was unenforceable.

24         Second of all, I don't understand the logic of the

25  plaintiffs' position.  If these courts have held that the

```
 1    federal court has no jurisdiction, no authority to enforce

 2    this order, and the consent of the parties can't create

 3    that authority, and these things cannot be enforced simply

 4    as a matter of contract law, then logically it doesn't

 5    matter who is bringing the challenge.

 6         Either the Court has the ability to enforce it or

 7    the Court doesn't.  If the Court doesn't, whether it's a

 8    stranger or a party to it, the result should be the same.

 9         THE COURT:  So your position is that in this case,

10    when the parties came in and said, Judge, we have settled,

11    we've decided to enter into this consent decree, in order

12    to make the consent decree binding, what I had to have done

13    was to say, No, first, I have to require you to litigate

14    this to determine whether there is a federal violation,

15    because the only way for a consent decree to be binding, in

16    the first instance, is for me to determine that there was a

17    reason to have a consent decree, i.e., that there is a

18    constitutional violation.  Now that I've gone through the

19    litigation process and the fact finding process of finding

20    a constitutional violation, now you can settle this case.

21         Is that right?

22         MR. EPSTEIN:  There's one other alternative that

23    could have been pursued.

24         THE COURT:  You have to answer my question first.

25         MR. EPSTEIN:  That could have happened, not
```

1     necessarily that --

2          THE COURT:  That does not answer my question.

3          MR. EPSTEIN:  I'm sorry, Your Honor.

4          THE COURT:  Is that the way that that would have to

5     have played out for this consent decree to have been valid?

6          MR. EPSTEIN:  That is one way for it to have played

7     out for it to be valid.  You could have insisted they go

8     forward so you could make findings.

9          THE COURT:  In every case in which there is a

10    consent decree, the parties -- your position is the only

11    ones that are binding, in this universe of consent decrees

12    that we see all over the landscape at least in federal

13    court, the parties have not been allowed to settle the case

14    short of some evidentiary finding made by the Court that

15    there was a constitutional violation?

16         MR. EPSTEIN:  If you look at *Rufo* and all the other

17    cases they've cited, all of those -- the 60(b) cases, in

18    all of those cases you will find that the Court has reached

19    either a final judgment or at least some strong preliminary

20    finding that there was a federal constitutional violation.

21         Now, there's another mechanism that could have

22    avoided this problem as well, which is that after the state

23    officials reached this agreement with the plaintiffs, they

24    could have gone back to the general assembly to have Ohio

25    law changed to come into compliance with the terms of the

1    consent decree so as to remedy the federal violation.

2        THE COURT:  Then you would make that same argument,

3    unless I had already made a finding that there was a

4    constitutional violation.  Because that's the case that we

5    have here.

6        MR. EPSTEIN:  It's not the case we have here.  It's

7    useful to think of it in terms of a principal and agency

8    relationship.  The agents here, the officers of the state,

9    don't have the ability to bind the State absent legislation

10   from the general assembly.  If the general assembly had

11   gotten onboard, you wouldn't need the consent decree

12   because the terms of Ohio law would now mirror what the

13   parties were going to impose.

14       THE COURT:  Can I infer from the chief elections

15   officer, the secretary of state who entered into the

16   consent decree, the fact that she entered into the consent

17   decree indicated that she recognized that there was a

18   constitutional violation, and, to obviate the need and

19   expense of litigation to prove what she had recognized, she

20   entered into this consent decree?

21       MR. EPSTEIN:  No, Your Honor.  I don't think that's

22   sufficient because parties enter into settlement agreements

23   for a number of reasons.  Wanting to avoid the cost of

24   litigation is a definite motivation, but it doesn't

25   necessarily mean "and I know I have a constitutional

1    violation hiding behind it."  So, no, I don't think that

2    would be a fair inference.

3         THE COURT:  But you come back to the point that the

4    only valid consent decrees are those that are entered into

5    because there has been a finding, or I think you said a

6    strong preliminary showing, that there was a constitutional

7    violation?  Is that what you said?

8         MR. EPSTEIN:  Yes, Your Honor.  But, remember, we're

9    talking about a very small category of consent decrees.

10        THE COURT:  I know that.  I'm trying to see where

11   logically you're going to take me.  Because it seems that

12   the common thread in all of these small species of consent

13   decrees is that there was a constitutional violation.  So I

14   said, Well, can I presume if somebody entered into one

15   that's valid that there was a finding or concession there

16   is a constitutional violation?  You said no because there

17   could have been a host of reasons.

18        But the one reason we know, at least according to

19   your argument, that there was a valid consent decree is

20   that there was a finding somewhere by someone, or a

21   concession somewhere by someone, that there was a

22   constitutional violation.  There must always be a

23   constitutional violation for a valid consent decree.

24        Is that right, Mr. Epstein?

25        MR. EPSTEIN:  There must always be a finding of a

1   federal constitutional violation in order for a consent

2   decree that contradicts state law to be enforceable.  If

3   you're dealing with an area that state law does not touch

4   upon, then you don't have the same considerations.  But in

5   order for the federal court to change state law, you have

6   to meet a higher threshold.

7          THE COURT:  Is Mr. Dornette going to tell me how

8   this consent decree changed state law, or are you going to

9   tell me, or is Mr. Lieberman is going to tell me that?

10         MR. EPSTEIN:  I think my time is running out.

11         THE COURT:  I'm the time giver, so I can expand your

12  time if you tell me you're going to answer that question.

13         MR. EPSTEIN:  I will answer that question.  The

14  primary way which it changed it is that under the terms of

15  the consent decree, provisional ballots cast in the wrong

16  precinct can be opened and counted under certain

17  circumstances, namely, whether there is the existence of

18  poll worker error, whatever that turns out to mean.

19         Under the revised code, both the plain language of

20  the statutes and the interpretation given to it by the Ohio

21  Supreme Court in *Painter*, there is no poll worker

22  exception.  Defective provisional ballots that don't have

23  that information cannot be opened -- I'm sorry, that are

24  cast in the wrong precinct cannot be opened, cannot be

25  counted.

```
 1          THE COURT:  Thank you, Mr. Epstein.

 2          Mr. Dornette.

 3          MR. DORNETTE:  Your Honor, thank you.  To your first

 4  question on what the Hunter court said about the Painter

 5  decision of the Ohio Supreme Court, the Ohio Supreme Court

 6  in the Painter decision made specific reference to two

 7  directives that the secretary of state had issued under the

 8  NEOCH consent decree and said of those that those were not

 9  challenged by the relators in this action.  So the issue of

10  the validity of the NEOCH consent decree, the issue of the

11  validity of the directives that were issued under the NEOCH

12  consent decree, was not something that was before the Ohio

13  Supreme Court in the Painter case.  And that's at paragraph

14  27 of the Painter decision.

15          The question on the -- this whole question of what

16  are the circumstances in which a consent decree may be

17  modified or vacated is something that flows out of -- and

18  the plaintiffs' arguments flow out of Rule 60(b)(5) of the

19  federal rules.  That provides the circumstances under

20  which, in changed circumstances, a consent decree can be

21  modified or terminated.

22          That has no application here under the controlling

23  Sixth Circuit law.  We cited to the case United States

24  versus 32.40 Acres of Land, a Sixth Circuit case, 614 F.2d

25  108.  In that case, a party to a consent judgment - in that
```

1    case an appropriation case – came back before the Court

2    seeking to vacate that judgment because the assistant

3    United States attorney who had entered into it did not have

4    authority to enter into the settlement.  The Sixth Circuit

5    held the district court should have granted the motion to

6    vacate the judgment under Rule 60(b)(6) not 60(b)(5).

7         So I think in this circuit it's fairly clear that it

8    is appropriate for the Court to vacate a judgment that was

9    entered into without appropriate authority under 60(b)(6)

10   without going through the exercise of what 60(b)(5) calls

11   for.  That follows really directly after what the United

12   States Supreme Court did back in 1901 in a case that's been

13   repeatedly cited since then, United States versus Beebe,

14   180 US 343.  There it was a district attorney --

15        THE COURT:  Mr. Dornette, your client, or the

16   legislature, was a party to the consent decree, wasn't it?

17        MR. DORNETTE:  Your Honor, we do not believe our

18   client was a party to the consent decree.

19        THE COURT:  And when you say your client, you're

20   talking about Niehaus and Blessing?

21        MR. DORNETTE:  Niehaus and Blessing.

22        THE COURT:  But the Ohio legislature was a party to

23   the consent decree, wasn't it?

24        MR. DORNETTE:  The State of Ohio was a party to the

25   consent decree.  As Your Honor held, the State of Ohio --

1    and as we argued, the State of Ohio includes the general

2    assembly, the Ohio Supreme Court.  It includes every agency

3    of the State of Ohio.  So, from that standpoint, certainly

4    it was your conclusion that the legislature was a party to

5    that.

6          But the state legislature under the Ohio system does

7    not have the authority to delegate its legislative

8    responsibility to others.

9          THE COURT:  Does it have the authority to enter into

10    consent decrees?

11          MR. DORNETTE:  If it were to pass a piece of

12    legislation modifying Ohio law, it could do so.

13          THE COURT:  As Ohio law exists now, the legislature

14    cannot enter into a consent decree?

15          MR. DORNETTE:  No, Your Honor, it cannot.

16          THE COURT:  Under any circumstances?

17          MR. DORNETTE:  It can by going through the process

18    of authorizing it to happen provided it's modifying Ohio

19    law, in the same way a municipality can enter into a

20    consent decree by having the city council in Ohio pass a

21    resolution to settle it.  That's the same type of

22    process --

23          THE COURT:  And by the same token, the legislature

24    can ratify the actions of entering into a consent decree?

25          MR. DORNETTE:  The legislature could do that, again,

1    pursuant to the procedures that are set out in Article II

2    of the Ohio Constitution.

3              Thank you, Your Honor.

4              THE COURT:  Are you going now or later,

5    Mr. Lieberman?

6              MR. LIEBERMAN:  I'll make three quick points and

7    then I'll leave the rebuttal to Mr. Epstein.

8              THE COURT:  Okay.

9              MR. LIEBERMAN:  Thank you, Your Honor.  Just in

10   reference to your further question of when can we have a --

11   in absence of a constitutional violation, our position is a

12   consent decree cannot override state law.  Your Honor asked

13   Mr. Epstein:  Can we infer it here based on the parties

14   willingness to enter a consent decree?

15             I don't think you can by virtue of page two of the

16   consent decree which explicitly provides that there will be

17   no adjudication of the merits of plaintiffs' constitutional

18   claims, and neither the secretary nor the State will admit

19   to any federal law violation.

20             In response to some of the earlier discussion about

21   what standard of review should Your Honor use to

22   evaluate --

23             THE COURT:  Did that make the consent decree infirm

24   *ab initio*, Mr. Lieberman?

25             MR. LIEBERMAN:  In the Ohio Supreme Court's view,

38

```
 1    yes.  When Attorney General Cordray and Secretary Brunner
 2    entered into the consent decree, they clearly thought that
 3    Ohio law would recognize a poll worker error exception as
 4    has been discussed before.  That had not come up in any
 5    Ohio court yet.  The secretary and the attorney general
 6    don't have the last word on what Ohio law says; only the
 7    Ohio Supreme Court does.
 8         In Painter, the Ohio Supreme Court read 3505 and
 9    said there is no poll worker error exception under Ohio
10    law.  But I don't think the sequence matters all that much.
11    We're here in 2012.  State officials and the secretary are
12    faced with a state law and a consent decree that is glued
13    together just by the acquiescence of two state executive
14    officials.  Five circuits, as Mr. Epstein has mentioned,
15    have addressed that situation.  Those five circuits held
16    that state law prevails.  State officials, the secretary,
17    you're bound to honor state law unless and until a federal
18    court determines that there has been a federal
19    constitutional violation, that state law is in violation of
20    federal law.  That has not occurred in this case, and by
21    virtue of page two of the consent decree, that cannot
22    occur.
23         To the standard of review, we believe that this is a
24    de novo standard of review.  Rule 60(b) does not apply
25    because under Your Honor's previous holdings, the decree is
```

1     not final.  60(b) does not apply.  *Rufo* does not apply.

2     The pure legal question is squarely before the Court.

3     Mr. Epstein addressed, in bulk, all of our points on that.

4     I don't want to repeat him, but to the question that Your

5     Honor opened this session with – What will happen to voters

6     if the consent decree is vacated? – the State's answer is

7     nothing immediate.  The parties simply return to litigation

8     and we will adjudicate the merits of plaintiffs'

9     constitutional claims well before the election, probably in

10    alignment with the SEIU case, and this Court can determine,

11    if there has been a constitutional violation, what relief

12    should be awarded in advance of the election.

13         This is exactly what happened out of the Seventh

14    Circuit in the *Perkins* case.  The Seventh Circuit vacated

15    a consent decree as invalid because state officials

16    consented to something that effectively overrode state law.

17    This was a voting rights act case.  Went back down.  As

18    soon as it went back down to the district court, the

19    district court said, I find a voting rights act violation

20    on the merits, and issued relief.

21         If plaintiffs are successful, if plaintiffs can

22    bring forward the evidence and legal arguments, that's what

23    they will ask for and that's what this Court will award.

24    Nothing untoward will happen.  The sky will not fall if the

25    consent decree is vacated.  We simply go back to the

1    litigation on the merits.

2            Thank you, Your Honor.

3            THE COURT:  Thank you, Mr. Lieberman.

4            Ms. Leonard.

5            MS. LEONARD:  Thank you, Your Honor.

6            Given that the defendants have addressed the

7    underlying issue with respect to the validity of the

8    consent decree in the context of talking about the

9    standard, Ms. Gentry is going to address the issues with

10   respect to why the consent decree was valid at the time it

11   was entered.

12           THE COURT:  So 15 minutes for Ms. Gentry, 15 minutes

13   for you, Ms. Leonard?

14           MS. GENTRY:  Probably more like ten for me.

15           THE COURT:  Ten for you, twenty for you?  All right.

16   Please proceed, Ms. Gentry.

17           MS. GENTRY:  I want to address Mr. Epstein's point

18   or argument that the decree conflicted with Ohio law at the

19   time it was entered.  I found it interesting that

20   Mr. Epstein did not acknowledge in his argument the *Skaggs*

21   case, which, of course, was the leading case at the time

22   the consent decree was entered.  *Painter* hadn't been

23   decided yet.  All we had were the statutes themselves and

24   the *Skaggs* case, which, as we describe in our papers, the

25   reason that all of the parties believed – and indeed told

1      the Court – that Ohio law was consistent with the consent

2      decree was because of *Skaggs*.  We negotiated the consent

3      decree to be consistent with *Skaggs*.

4          I know it's in the papers, but I will summarize what

5      we said.  Ohio law plainly delegates to poll workers the

6      duty to make sure that voters are in the correct precinct.

7      Ohio law says that poll workers must determine the correct

8      precinct, direct the voter to that precinct, tell the voter

9      that ballots cast in the wrong precinct won't be counted,

10     and only after all that happens, permit the voter to cast a

11     wrong precinct ballot only if he or she has refused to

12     travel to the correct precinct.  So the statute contains

13     due process protections that the poll worker has a duty to

14     provide to the voter.

15         What the statute does not say -- it's completely

16     silent on the issue of what happens if poll workers don't

17     follow those duties, what happens to the votes.

18         At the time that the consent decree was entered, we

19     had some indication of how that question might be decided

20     with *Skaggs*.  *Skaggs* did not involve wrong precinct

21     ballots.  It involved different issues relating to

22     technical defects in the ballots.  As we cite in our

23     papers, there is a portion in *Skaggs* where the Ohio Supreme

24     Court said, If we had been presented with evidence that the

25     poll workers didn't follow their duties, we might have

1      reached a different conclusion.

2          And that's, I believe, paragraph 54, paragraph 53 of

3      that decision, which is 120 Ohio St.3d 506.

4          Based on that, the parties negotiated a consent

5      decree that incorporated *Skaggs*' admonition that you cannot

6      presume poll worker error.  We say that at the beginning of

7      the consent decree: no error will be presumed.  It has to

8      be proven through evidence.  That was consistent with

9      *Skaggs*.

10         However, we interpreted *Skaggs* to allow for evidence

11     of poll worker error, to allow votes to be counted, to

12     allow provisional ballots to be counted.  It was not until

13     *Painter* was decided eight months after the consent decree

14     was entered that it became apparent that the Ohio Supreme

15     Court had now decided that provisional ballots cast in the

16     wrong precinct should not be counted.

17         THE COURT:  If that's the case, isn't the consent

18     decree inconsistent with Ohio law?

19         MS. GENTRY:  We would argue it isn't because in the

20     *Painter* case, the Ohio Supreme Court also recognized, as

21     you noted, that the -- they recognized the consent decree

22     and they recognized the exception contained within the

23     consent decree which, as Your Honor noted I believe as

24     well, was based on federal law.  The consent decree was

25     based solely upon claims asserted under federal law and --

```
 1              THE COURT:  It was based on claims asserted under
 2      federal law but there had been no finding of a violation of
 3      federal law.  According to Mr. Epstein, because there was
 4      no violation of federal law, then the consent decree is
 5      infirm because I can't presume that Secretary Brunner
 6      entered into the consent decree because she had found a
 7      violation, because as Mr. Epstein and Mr. Lieberman both
 8      pointed out I believe on page 2 of the consent decree, it's
 9      the absolution clause, no one accepts responsibility for
10      anything but they decide to go forward in this manner,
11      which is common among settlement agreements.
12              So you have a consent decree that is inconsistent
13      with Ohio law, as far as Painter is concerned, and in which
14      there was no evidentiary finding of a federal
15      constitutional violation.  Then why is this consent decree
16      not infirm?
17              MS. GENTRY:  Your Honor, I am addressing only the --
18      and the issue of timing is important.  I believe counsel
19      for the State of Ohio suggested timing doesn't matter.
20      Timing is very important.  The question of whether the
21      consent decree was valid at the time it was entered into is
22      a separate question from what happens now and whether the
23      Court needs to make findings now.
24              THE COURT:  I can always resort to the remedy
25      recommended by Mr. Lieberman.  I could simply find that the
```

1    consent decree is invalid.  We go back to the status quo

2    and we try this case.

3         MS. GENTRY:  Your Honor, we would object to that

4    because we now have a remedy.  The plaintiffs obtained a

5    remedy.  It may be somewhat limited.  Certainly we want to

6    modify it.  But the plaintiffs do have a remedy.  If the

7    Court were to invalidate it, we're back to square one, we

8    have nothing, and we have to re-litigate.

9         THE COURT:  It's not one of those instances where if

10   we do nothing rights will be compromised.  If I invalidate

11   it today and schedule a hearing for two weeks from now to

12   determine the validity of your claim, the constitutionality

13   of the status quo, if you will, then that issue will be

14   resolved by November.  So by the time that provisional

15   ballots are counted, that issue will be resolved.

16        If I invalidate the consent decree today, tomorrow

17   rights are not going to be compromised because nobody is

18   voting.

19        MS. GENTRY:  I would disagree with that.  There are

20   special elections scheduled for August.  There are a number

21   of school levies that are going to be on the ballot in

22   August.

23        THE COURT:  But tomorrow is not even July.

24   Theoretically, we could have it resolved by the first

25   elections in August.

1      MS. GENTRY:  Even so, we would object to

2  invalidating the consent decree for all of the reasons that

3  Ms. Leonard is going to discuss.

4      THE COURT:  Let's talk some more about what you came

5  up to talk about.  Because you're telling me what -- and

6  that's prospective.

7      You seem to concede that the legal landscape has

8  changed in light of *Painter*, that *Skaggs* offered one result

9  but *Painter* offers a contrary result.  So at the time that

10  it was entered into, *Skaggs* was the prevailing law; but it

11  changed.  So once it changes, and coupled with the fact

12  that there was no finding of a constitutional violation,

13  isn't that the basis on which to invalidate the consent

14  decree?

15      MS. GENTRY:  I believe Ms. Leonard will address

16  that.  Through Rule 60, the Court would also have to

17  find -- in addition to it being in conflict of state law,

18  the Court would also have to find that invalidating it

19  would not lead to a further constitutional violation.  So

20  the Court cannot make that simple legal decision and make a

21  conclusion from that point.  The Court has to make factual

22  findings as well.

23      I agree that *Painter* did change the landscape, and

24  that's why we need to modify the consent decree because

25  *Painter* has caused at least some boards of elections to

1　conclude that they can no longer investigate for poll

2　worker error.  But the consent decree requires an

3　investigation for poll worker error, otherwise, it doesn't

4　work.

5　　　　THE COURT:  If the consent decree requires an

6　investigation of poll worker error and the Supreme Court

7　said that poll worker error is irrelevant, is not one of

8　the categories, then which trumps which?

9　　　　MS. GENTRY:  The supremacy clause provides that the

10　federal constitutional rights trump contrary state law.

11　　　　THE COURT:  I understand that.  But there hasn't

12　been a finding.

13　　　　MS. GENTRY:  That's what we're asking Your Honor to

14　do.  That's the purpose of the motion to modify, is in

15　connection with --

16　　　　THE COURT:  So you're asking me basically to go back

17　to square one, to go back to the period right before you

18　signed the consent decree and instead of allowing you to

19　sign the consent decree, this time, with this do-over, you

20　have to litigate whether there was a constitutional

21　violation?

22　　　　MS. GENTRY:  It's a different question, though, Your

23　Honor.  The question -- if we were going back to April of

24　2010, the question would be whether not having the consent

25　decree at that time would create constitutional violations

1    or, in other words, whether that consent decree was

2    necessary in April of 2010 to remedy constitutional

3    violations occurring based on evidence at that time and

4    based on the law at that time.

5        Today, fast forward two years to 2012, the question

6    is a different one.  It's whether the consent decree, in

7    terms of the motion to modify -- and I need to keep them

8    separate because the question is separate for each

9    different motion before the Court.

10        In terms of the motion to modify, the question is

11    whether the consent decree needs to be modified in order to

12    carry out its original purpose.  In connection with that, I

13    agree that the Court should make constitutional findings

14    that it's necessary, that there was a constitutional

15    violation that was -- that the decree needs to be in place

16    to remedy.

17        THE COURT:  Thank you, Ms. Gentry.

18        MS. LEONARD:  Thank you, Your Honor.

19        Let me begin by addressing the question that you

20    were posing to Ms. Gentry with respect to what happens

21    after *Painter* with respect to this decree, which trumps

22    what.  The answer is the binding federal consent decree is

23    valid and enforceable under federal law.

24        Now, the defendants have come in and said first that

25    this consent decree was in conflict with state law at the

1    time it was entered into.  Ms. Gentry very ably explained

2    why given the existence of the statutes in *Skaggs* that was

3    not true and why the defendants themselves represented to

4    the Court that this decree was perfectly consistent with

5    Ohio law.

6         THE COURT:  Once that changed, is the proper

7    recourse to modify the consent decree or invalidate it,

8    because the consent decree is inconsistent with Ohio law?

9         MS. LEONARD:  The proper recourse is not to

10   invalidate it or vacate it because it's inconsistent with

11   Ohio law.  The reason for that is that the parties to a

12   consent decree cannot come back to this Court two years

13   later and say that it is invalid and the Court should

14   invalidate it for that reason only.  The parties to the

15   consent decree, which all of the people represented at this

16   table are parties to the decree, have to use Rule 60.

17        The cases, the five circuits that keep being talked

18   about which say that a Court can't approve a consent decree

19   that conflicts with state law are not cases in which a

20   party has returned to the Court to invalidate a consent

21   decree that it entered into as in conflict with state law.

22        Mr. Epstein claims that the Cleveland city case was

23   such a case.  It is not.  Those were third parties who were

24   challenging, collaterally attacking a consent decree that

25   was entered into by a city and the plaintiffs in that case.

```
1     There are two circumstances under which those cases, those

2     five circuits, arise.  One is direct appeals, which this

3     case is not.  The other is a third-party collateral attack

4     that's required by due process because that third party's

5     contractual or statutory rights have been abrogated by a

6     consent decree.  Under those circumstances, that state law

7     conflict can arise or be raised.

8         The parties themselves cannot raise that issue after

9     the direct appeal time has run, which is exactly this case.

10    Those five circuit court cases which are presented here as

11    federal law requires this Court to hold that it cannot

12    enforce this decree.  That is not -- that is simply not

13    what those cases hold.  There's one circuit that has

14    addressed a case that is exactly on point with this case,

15    and that is the Second Circuit - I'm going to slaughter

16    this name - the *Congregation Mischknois* case in which the

17    Second Circuit distinguished those cases because the party

18    to the consent decree was attempting to raise the argument

19    that the decree conflicted with state law.  The Second

20    Circuit in that case held Rule 60 applies.

21        That argument is not cognizable under Rule 60,

22    particularly 60(b)(4) where the argument is, as they're

23    attempting to argue here, that the decree itself is void,

24    that Rule 60 provision for voidness which is (b)(4).  The

25    *Espinosa* case from the Supreme Court crystal clearly holds
```

50

1    that argument, that a decree is illegal only -- is not

2    cognizable under (b)(4). (b)(4) only applies where the

3    Court lacks subject matter jurisdiction or where the due

4    process rights of the person raising the argument would be

5    violated, and that the State here cannot raise the argument

6    that its own due process rights were violated by a decree

7    that it entered into.

8         Now, the parties have given -- basically, I would

9    say suggested a few different routes for the Court to

10   consider this issue post-*Painter* of whether the Court can

11   invalidate the consent decree. I would argue that those

12   five circuit court cases, which arise on direct appeals and

13   third-party collateral attacks, simply do not stand for the

14   proposition that a party can challenge the validity of a

15   consent decree. *Espinosa*, the Supreme Court case on this

16   point about whether you can attack a consent decree as

17   void, the argument in this case was that the consent decree

18   violated federal law. There wasn't even a question of

19   whether there was a conflict with state law. It was

20   federal law itself. The Supreme Court said it's the party

21   raising that claim, it is not cognizable, it is too late.

22        Now, the only possible mechanism for the parties to

23   this decree to challenge -- based on the fact that state

24   law has changed, challenge the ongoing enforcement of this

25   decree is Rule 60(b)(5) which is the provision by which

1    parties can ask the Court to end ongoing supervision of

2    injunctive relief in a consent decree, which is exactly

3    what the State is asking the Court to do here, to end the

4    consent decree, that provision, to terminate it early.

5        We've addressed in our briefs why the State has not

6    come close to meeting its burden of establishing why the

7    Court, applying *Rufo*, should hold that they've met

8    60(b)(5).

9        I do want to address specifically the point that

10   *Rufo* does not apply because there's been no constitutional

11   violation in this case.  That is simply not the law.  It is

12   taking a step back from the specific arguments made in this

13   case.  It is certainly not the case that consent decrees

14   are only enforceable in general if there's been a finding

15   of liability.  That would be a whole new world for this

16   Court and for people who engage in federal litigation.

17       THE COURT:  I don't know that that's what

18   Mr. Epstein argued.  I think that Mr. Epstein argued that

19   when there is no conflicting state law, then there doesn't

20   have to be a finding of a constitutional violation in order

21   for there to be a valid consent decree.  He's saying

22   here -- and I'm asking you the same thing.  I kind of put

23   that to Ms. Gentry and she deferred to you so this is a

24   convenient time for you to answer this:  Why is it that the

25   consent decree did not later become invalid in light of

1    *Painter*?

2        MS. LEONARD:  The answer is the supremacy clause,

3    because it's a binding federal court order until this Court

4    rules otherwise.

5        THE COURT:  But see, Ms. Leonard, I get that part.

6    But here is what comes back to haunt me is that there was

7    never a finding of a constitutional violation, and if

8    *Painter* hadn't come along and there had not been -- and

9    even if there's no finding of a constitutional violation,

10   even under Mr. Epstein's construction, we're in good shape.

11   There's no need to have this litigation.  The consent

12   decree is fine.

13       But *Painter* comes along and creates this conflict in

14   state -- so we have over here, we have a conflict in state

15   law.  You would agree that there is a conflict between the

16   consent decree and *Painter*?

17       MS. LEONARD:  I would not agree with that.

18       THE COURT:  You think that the consent decree, which

19   allows for provisional ballots to be counted when there is

20   poll worker error, and *Painter*, which does not allow for a

21   provisional ballot to be counted when there is just poll

22   worker error, aren't in conflict?

23       MS. LEONARD:  I do not think they're in conflict for

24   exactly the reasons Chief Judge Dlott gave in denying

25   Hamilton County's request for a stay of her permanent

1    injunction decision where she said that the Ohio Supreme

2    Court, in the *Painter* decision, did not rule that ballots

3    that are covered by this consent decree cannot be counted

4    because of poll worker error.  That's the ruling that would

5    create a conflict, not the general ruling that under Ohio

6    law ballots that are affected by poll worker error cannot

7    be counted.

8         The Ohio Supreme Court's decision in *Painter* does

9    not extend to the NEOCH ballots.  It held that the other

10   ballots could not be investigated or counted because of

11   poll worker error.  So, to the extent that they're relying

12   on the *Painter* decision, which is what the State is

13   absolutely relying on, the fact that the *Painter* decision

14   did not reach and hold --

15        THE COURT:  So *Painter* goes up to NEOCH ballots but

16   doesn't reach them?

17        MS. LEONARD:  Because of the supremacy clause,

18   because of the binding nature of the consent decree from

19   this Court.  We cite in our papers -- there are myriad

20   cases where the Sixth Circuit and other courts have held

21   that consent decrees reached without a finding of liability

22   are enforceable until the Court rules and applies Rule 60.

23   The only case I could say -- the only case that I'm aware

24   of, a circuit court case in which this exact situation is

25   presented where a party has come back and said because of a

54

1    conflict with state law the decree that they entered into

2    should be invalidated is the *Congregation Mischknois* from

3    the Second Circuit.  That Court got it exactly right by

4    saying Rule 60 applies, that's not an argument under Rule

5    60, this consent decree stands.

6         We concede that the State can attempt to make an

7    argument under Rule 60(b)(5) to try to show that changed

8    circumstances -- which they cannot disagree that *Painter*

9    was a changed circumstance because their argument that the

10   consent decree was invalid at the outset simply does not

11   hold.  They can attempt to make an argument that changed

12   circumstances justify vacating this decree, but they cannot

13   meet their standard because the *Rufo* court said that

14   standard is twofold.  First, they must show that there is a

15   change in either law or fact, which means a change in

16   federal law not state law, and that it will not result in

17   constitutional violations.

18        THE COURT:  One of the issues is if I invalidate --

19   one of the issues that Ms. Gentry raised was if I

20   invalidate, or terminate, vacate the consent decree, I

21   return the world as we know it to utter chaos.  That's her

22   argument.  We go to a state of lawlessness.  Elections

23   can't go forward.

24        But there was never a finding, Ms. Leonard, that

25   there were constitutional violations as the status quo

55

```
 1    existed, and that is the day before you entered into the
 2    consent decree.  So, if that is the case, then why not, as
 3    Mr. Lieberman has posited, simply vacate it and give the
 4    parties an opportunity to litigate whether there is, A, a
 5    constitutional violation and, hence, a basis for the
 6    Epstein consent decree which only exists when there is a
 7    finding of a constitutional violation?
 8             MS. LEONARD:  They're two different issues, Your
 9    Honor.  We welcome the opportunity to litigate the
10    constitutional issues raised by the Ohio provisional ballot
11    system and we look forward to doing that.  These voters who
12    are protected by this consent decree should not have to.
13    And the State has not met its burden of --
14             THE COURT:  Inasmuch as there are no imminent
15    elections, would these voters be subject to it?  Would
16    these voters be subject to the harm you just referenced?
17             MS. LEONARD:  Would they be subject to having their
18    vote denied?
19             THE COURT:  Would they be subject to any harm?
20    They're harmed only when there is an election.  Only when
21    there is an election would their ballots be in a position
22    not to be counted.  Right?
23             MS. LEONARD:  That's absolutely correct.
24             THE COURT:  There are elections coming up in August,
25    but the big show is November.  Right?
```

1          MS. LEONARD:  Yes.

2          THE COURT:  Other than the important elections in

3     August.

4          MS. LEONARD:  That's absolutely the case.  And yes,

5     absolutely, if there were elections before then and this

6     consent decree were vacated, absolutely these voters'

7     constitutional rights would be denied because these votes

8     would not be counted under Ohio law.  But that does not

9     address the issue of whether the State has given this Court

10    any authority by which to vacate this consent decree.

11         As a party to this consent decree, under existing

12    federal law, this Court -- there's no procedural mechanism

13    for this Court to hear the State's request, to hear the

14    argument that there is a conflict with state law so

15    therefore you must vacate the decree, other than Rule 60

16    because they are a party to that decree.  So we must apply

17    the standards that exist in Rule 60 to that request.

18         THE COURT:  Let me ask you something.  The

19    plaintiffs have asked me to modify this decree, and at a

20    hearing on the modification of the decree, can I just

21    simply open it up and -- you could say that their request

22    is a modification of sorts, that is, to change the decree

23    to conform with Ohio law.  So why can't I just revisit it

24    in the context of your motion to modify?  Because if I'm

25    going to take a look behind the curtain, why not just look

57

 1    at everything behind the curtain?

 2         MS. LEONARD:  We think you could.  You would have to

 3    apply Rule 60.  We're ready and we've briefed Rule 60 in

 4    our modification request.  That's what we're prepared to

 5    show.  Like the Cleveland firefighters case, we recognize

 6    the competing burdens for the State to show that they will

 7    not result -- it will not result in constitutional

 8    violations if the decree is vacated.

 9         THE COURT:  You understand that you never answered

10    my question about whether there would be a constitutional

11    violation if the decree is vacated, because we said there

12    are two elections, one in August, one in November.  If I

13    can hold a hearing in July that will result in a final

14    order by the August election, then no harm.  Is that

15    correct?

16         MS. LEONARD:  I agree with that, yes, Your Honor.

17    That's exactly what we think Your Honor should do.

18         THE COURT:  Vacate the consent decree and then just

19    hold hearings in July and make a decision in time for

20    August?

21         MS. LEONARD:  No, Your Honor.  To reach a final

22    ruling with respect to the competing requests after that

23    hearing.  We understand that the parties have argued these

24    issues here today.

25         Actually, I have one more point related to what

1    Mr. Dornette argued with respect to 60(b)(6).

2         THE COURT:  Could I ask one more question before you

3    get to that one point?

4         Let's assume for a moment -- I know this is not your

5    position, Ms. Leonard.  But assume for the moment that

6    *Painter* is incongruous with the consent decree.  Now, if

7    *Painter* is incongruous with the consent decree and there

8    has been no previous finding of a constitutional violation

9    before the consent decree was entered into, are those bases

10   sufficient to invalidate the consent decree?

11        MS. LEONARD:  No, Your Honor.

12        THE COURT:  Why not?

13        MS. LEONARD:  It's not a basis under 60(b)(4) for

14   voidness because the State's due process --

15        THE COURT:  How about 60(b)(6)?

16        MS. LEONARD:  Under 60(b)(6) it's not.  The State --

17   the argument would have to be -- under 60(b)(6), which is

18   the catch-all provision, the Supreme Court has said it must

19   be construed very narrowly.  The cases they're relying on

20   are cases in which attorneys did not have the authority to

21   enter into a settlement agreement, and the party then came

22   back to the State saying our attorneys couldn't do that.

23   That is not what's going on here.  The party is coming back

24   saying, We didn't have -- we should not have entered into

25   this because we now think it conflicts, based on a later

1    Supreme Court decision, with state law.

2          That's not the circumstances addressed by those

3    60(b)(6) cases where the party came back and said, Sorry,

4    federal court, our attorneys did not go through the proper

5    motions before entering that decree.

6          I know the relators have taken a different position

7    from the State on that, but I do not hear the State to be

8    arguing that its own attorneys were violating their own

9    authority by entering into this consent decree and by

10   telling the Court at the time they entered into the consent

11   decree in April 2010 that it was consistent with state law.

12         What we're talking about really is an intervening

13   state Supreme Court decision that changed Ohio law and what

14   this federal court should do with an existing federal

15   consent decree that existed before that Ohio Supreme Court

16   decision.  Those 60(b)(6) cases don't address it.

17         *Espinosa*, I would argue, is directly on point, and

18   it says arguments about illegality, unless there is a due

19   process violation or a subject matter jurisdiction concern,

20   are not cognizable.  Then changed circumstances under

21   60(b)(5), you need a change in federal law.  The two types

22   of federal law changes that the courts -- the Sixth Circuit

23   consistently looks to are when the Supreme Court has said

24   the plaintiffs no longer have a claim.

25         If the Court has approved a consent decree for

1    specific constitutional claims and the Supreme Court has

2    come along and said that's no longer a constitutional

3    violation, if the Supreme Court had come along and said

4    somehow that the provisional ballot claims that we're

5    making are not a constitutional violation, that gives the

6    federal court the authority.

7         THE COURT:  You mean the U.S --

8         MS. LEONARD:  Yes.  I should have been clear.

9         THE COURT:  The state supreme court would not have

10   an occasion to say that.

11        MS. LEONARD:  Because a binding consent decree,

12   regardless whether there has been an adjudication of

13   liability that has been approved and entered by a federal

14   law, is binding law on a state regardless of that

15   determination.

16        THE COURT:  Regardless of whether there was an

17   underlying finding of a constitutional violation.

18        Can a constitutional violation be presumed?

19        MS. LEONARD:  I think that the evidence that was

20   before this Court at the time demonstrated that there were

21   constitutional violations occurring in Ohio with respect to

22   provisional ballots.  I think this Court could hold that

23   that evidence so demonstrated -- in the context of ruling

24   on the State's request now, I think that the evidence with

25   respect to the election subsequent to the decree certainly

1    demonstrates the extent of the constitutional violations,

2    but I do not think that the Court can presume from the fact

3    that the State entered into a consent decree that the State

4    was conceding there was a constitutional violation.  I

5    don't think the Court can presume that.

6           THE COURT:  Thank you, Ms. Leonard.

7           MS. LEONARD:  Thank you, Your Honor.

8           MR. EPSTEIN:  Very briefly, Your Honor.

9           I first want to address the discussion that you

10    heard about the Supreme Court's decision in *Painter*.

11    *Painter* unequivocally held that Ohio law does not allow the

12    counting of these provisional ballots.  The argument put

13    forward was there was no conflict because they didn't take

14    the additional step and say, oh, and this federal consent

15    decree is invalid and changes our law and all the rest.

16    But we know from the experience of this case that the

17    Supreme Court could not do that if asked to do so.

18           In fact, this Court would legitimately step in and

19    prevent them from doing it because they cannot, under the

20    supremacy clause, challenge the jurisdiction and the

21    authority of this Court.  But that doesn't settle the

22    question of this Court's power to revisit its own decision

23    and find whether, in fact, it has entered a judgment that

24    it can enforce.  So I think they're reading something into

25    *Painter* that isn't there.

```
 1            You heard about Espinosa, but Espinosa is a

 2     completely different circumstance.  That's an issue about

 3     federal law and, if my memory serves, it may have been

 4     federal officials as well.  The question of whether this

 5     Court can reach down and change state law and state

 6     officials brings in totally different considerations of

 7     federalism.

 8            There is a representation made that there's no

 9     mechanism beyond Civil Rule 60 that allows the Court to

10     revisit and change this consent decree.  That's not true.

11     The answer is paragraph 11 of the consent decree which

12     specifically says the parties agree that you can modify or

13     vacate the order as -- for good cause shown.

14            It's a little funny to me to hear the suggestion

15     that vacating the consent decree now would create chaos,

16     because one of the allegations in the SEIU case essentially

17     is that the existence of the consent decree is causing

18     chaos because it's creating an equal protection problem

19     between the NEOCH ballots and non-NEOCH ballots.  I don't

20     think that argument carries much weight.

21            I'll close by saying that I agree with

22     Mr. Lieberman.  I don't think the timing matters.

23     Certainly, if you say that the Ohio law was not established

24     until Painter, this Court still does not have the authority

25     to modify Ohio law by the consent of the parties.  But, in
```

1    fact, I don't think that *Painter* changed the law.  The

2    statutes were what they were.  The language in *Skaggs* is

3    speculative dicta.  It's impossible to read that as a

4    holding that established that voter error was permissible

5    under Ohio law.

6          THE COURT:  You mean poll worker?

7          MR. EPSTEIN:  Did I misspeak?  Poll worker error.

8          I think the consent was contrary to the revised code

9    at the time it was entered, and it's contrary to the

10   revised code and *Painter* now if it should be enforced.

11         THE COURT:  One final question for you, Mr. Epstein.

12   Which scenario has less a deleterious effect on the

13   franchise?  Does the consent decree or does *Painter*?

14         MR. EPSTEIN:  Your Honor, the answer to that is if

15   you mean by the franchise simply that more votes --

16         THE COURT:  The ability to vote.

17         MR. EPSTEIN:  The ability to vote.  Numerically, the

18   consent decree will probably lead to the counting of more

19   votes than will *Painter*, but I don't think that that's the

20   metric that we should use to understand the franchise.

21         THE COURT:  What metric should we use, then,

22   Mr. Epstein?

23         MR. EPSTEIN:  I think that the franchise should be

24   understood in terms of a number of things, not just

25   absolute numbers of votes, votes cast in the right place,

1    preventing vote dilution.  Because if I permit you to vote

2    in the wrong congressional district, than I'm hurting

3    somebody else who does vote there.

4         THE COURT:  If I vote in the wrong district, that's

5    one thing, but if the vote is not counted because of one of

6    your -- one of the poll worker's errors, isn't that a

7    slightly -- I'm looking at it from the vantage point of the

8    person voting who thinks he's in the right precinct, who's

9    told he is in the right precinct, but when the poll worker

10   tells her that she's in the right precinct, the poll worker

11   himself was in error.  Why should that voter be deprived of

12   his voice in this democracy because of an error of one of

13   the organs of government?

14        MR. EPSTEIN:  Because unfortunately everything is

15   fallible and humans are fallible, and every mechanism that

16   this Court will come up with to correct that problem will

17   create another downstream equal protection problem for

18   someone else.

19        As far as your question about *Painter* versus the

20   consent decree, I think we would probably all agree that

21   the ultimate resolution we would all want to see is as

22   close to an elimination of wrong precinct voting as we can

23   get, as close to an elimination of poll worker error as we

24   can get.  I would submit to the Court that it's worth

25   considering whether the consent decree eliminates the

65

 1    incentives to the State to come up with better and better

 2    and better ways to make sure people can vote in the right

 3    places, whereas the *Painter* rule puts great burden,

 4    political and legal, on the State to keep improving the

 5    system so we can do the best we can to eliminate poll

 6    worker error and increase the franchise.

 7            THE COURT:  Thank you, Mr. Epstein.

 8            One final question for you, Ms. Leonard.  Same

 9    question I posed to Mr. Epstein.

10            MS. LEONARD:  Yes, Your Honor.

11            THE COURT:  About the franchise.

12            MS. LEONARD:  I think Your Honor can probably

13    anticipate my answer.  Absolutely under the consent decree

14    we know in the general election in 2011 that 1,554 votes

15    were counted by county boards of election that would not

16    have been counted under the *Painter* ruling.

17            THE COURT:  1,554.

18            MS. LEONARD:  1,554 in an off-year election.  There

19    are bound to be many more in the upcoming 2012 election.

20            I would like to respond to one issue that

21    Mr. Epstein raised for the first time in his rebuttal with

22    respect to paragraph 11 and whether that gives the Court

23    the authority.

24            THE COURT:  You may.

25            MS. LEONARD:  Paragraph 11 does say that the Court

1    may modify a consent decree for good cause. When parties

2    include language with respect to modification or

3    termination, the Sixth Circuit has held in Heath v. -- the

4    *Heath* case that is cited in our papers that the Court still

5    applies Rule 60 and the Rule 60 standards under *Rufo* to

6    address the question of whether or not the consent decree

7    should be terminated.

8          With respect to the Court's questions about

9    procedure going forward, the plaintiffs would urge and

10    request -- we thank the Court for the opportunity to

11    address these issues now, as Mr. Epstein requested, but we

12    would urge the Court to issue one final ruling with respect

13    to all three competing requests after the next hearing

14    rather than issuing any ruling with respect to the validity

15    or invalidity of the consent decree at this time.

16          THE COURT: Thank you, Ms. Leonard.

17          At this time, what I want to do is get the dates.

18    I'm not saying how I'm going to rule. I still have to

19    address the preliminary -- the issues raised by the

20    preliminary injunction. So we're going to have a

21    preliminary injunction hearing. What I want to do is I

22    want to schedule that. And assume just for the purposes of

23    scheduling that we're going to consider all of these

24    issues -- we're going to go forward and consider all of

25    these issues at a plenary hearing. So I want you to

 1     consider how much time it will take, under an expedited

 2     discovery regimen, how much time it will take for you to

 3     conclude your discovery and be prepared for what I'm

 4     assuming will be an evidentiary hearing.

 5          Mr. Epstein.

 6          MR. EPSTEIN:  Your Honor, if I could ask the

 7     plaintiffs -- they've submitted a great deal of documentary

 8     evidence into the record.  If they could give us a sense to

 9     what extent they intend to rest on that record or how many

10     witnesses they intend to call live, I think that would help

11     us know how much discovery we needed.

12          MS. LEONARD:  I'm going to have my colleague,

13     Ms. Chisholm, address the logistical question about the new

14     case.

15          MS. CHISHOLM:  We have done significant public

16     records requests and have submitted that documentary

17     evidence together with the preliminary injunction moving

18     papers.  There are about half of the county boards of

19     elections who have not responded.  That is the discovery in

20     particular we're looking to do.  We have discovery requests

21     drafted and would be ready to send those out by Friday and

22     hope to get them back within a week.  Some of the counties

23     responded within two days.  We think that's doable, though

24     we would listen to what defendant's counsel would say.

25          With respect to a hearing, as Ms. Leonard said

```
 1    earlier, I think we are looking at if the Court is
 2    available, having a hearing at the end of July and would
 3    work backwards from that in terms of briefing.
 4         THE COURT:  When are the August elections,
 5    Ms. Gentry?
 6         MS. GENTRY:  I'm sorry.  I don't know the exact date
 7    in August.
 8         THE COURT:  Does anybody know?
 9         Mr. Coglianese, do you know?
10         MR. EPSTEIN:  August 7th, Your Honor.
11         THE COURT:  August 7th.
12         MS. CHISHOLM:  So we would have some discovery that
13    we would serve on the secretary of state.  It would be
14    limited in nature.  I think the August 7th election
15    obviously weighs in favor of doing it as soon in late July
16    as we can.  We have the possibility of an appeal to the
17    Sixth Circuit that we would want to have time to have
18    resolved.
19         The other housekeeping matter, in terms of what we
20    would want to be filing in a preliminary injunction case,
21    is that, as the Court may be aware, we have sued a
22    defendant class.  We've named three members of the boards
23    of election, and then asked for a class of the members of
24    the boards of election.  There are 88 boards of elections.
25    We can put a motion for that class certification on file by
```

     1     Friday and would suggest that the defendants respond on the

     2     same schedule as we're responding to the preliminary

     3     injunction papers.

     4          THE COURT:  I am sitting on the Sixth Circuit the

     5     26th and the 27th, but I could possibly -- how long do you

     6     anticipate the presentation of your case will be on behalf

     7     of the SEIU?

     8          MS. CHISHOLM:  Again, I was remiss in not answering

     9     that question that was raised.  At this point we would be

    10     prepared to submit argument and submit only the documentary

    11     evidence.

    12          THE COURT:  So for the PI hearing, documentary

    13     evidence?

    14          MS. CHISHOLM:  Yes.

    15          THE COURT:  We're operating under the assumption

    16     we're going to have a hearing on the underlying merits.

    17     I'm just trying to figure out how many days you're going to

    18     need.

    19          MS. CHISHOLM:  I think that oral argument could be

    20     presented on one day.

    21          THE COURT:  We aren't going to have an evidentiary

    22     hearing on any of these other matters?

    23          MS. CHISHOLM:  Unless the defendants would want an

    24     evidentiary --

    25          MR. EPSTEIN:  We would anticipate no more than two

1    to four witnesses, a couple of hours of testimony.  And if

2    possible, we would get stipulations from the other side to

3    avoid the need to present it live.

4         THE COURT:  So altogether you could get this done in

5    a day?

6         MS. CHISHOLM:  We might want to reserve two days.  I

7    don't know who the witnesses are, who they're planning to

8    call.  It's hard for me to say without a witness list.  At

9    this point, we would simply be cross-examining those

10   witnesses although would want to reserve rebuttal

11   witnesses.

12        THE COURT:  Mr. Epstein, is that going to give you

13   sufficient time?

14        MR. EPSTEIN:  We're talking about the last week in

15   July, Your Honor?

16        THE COURT:  Yes.  If I set the hearing for the 30th

17   and 31st, or thereabout, will that give you sufficient time

18   to complete your discovery?

19        MR. EPSTEIN:  Your Honor, it could be done, but if

20   we could -- we have the August 7th election.  Given the

21   constraints of the election, we'll do what we have to do,

22   but the most time we could have, we would ask for.

23        THE COURT:  Well, in light of my commitment to the

24   Sixth Circuit, the earliest that I could do it would be the

25   30th and 31st.  I could block off those two days.  I could

1    have -- render a decision certainly not later than the 3rd,

2    but certainly sometime that week, probably sooner.

3    Sometime between the 31st and the 3rd I could render a

4    decision.

5          And the election is on the 7th, Mr. Coglianese?

6          MR. COGLIANESE:  Yes, it is, Your Honor.

7          THE COURT:  That will give us -- that will give me

8    enough time to rule and for you to take it up to the Sixth

9    Circuit -- for one side or the other to take it up to the

10   Sixth Circuit on an expedited appeal.  I think that that

11   would provide sufficient time.

12         MS. CHISHOLM:  Yes, Your Honor.  I think that would

13   work.  And I would suggest that we work backwards from

14   there in terms of how -- when Your Honor would want to get

15   reply papers and from there figure out when the defendants

16   would be filing their papers.  I think the motion to modify

17   was filed last Wednesday, and the preliminary injunction of

18   course was filed on Friday.

19         THE COURT:  Mr. Epstein, when can you get responsive

20   papers -- well, I should ask, how far along are you to

21   responding to the motion to modify?

22         MR. EPSTEIN:  Not very.  The --

23         THE COURT:  That was filed on the 20th?

24         MS. CHISHOLM:  On the 20th, Your Honor.

25         MR. EPSTEIN:  The documents that were submitted are

72

1    voluminous.  What we're preparing is essentially a merit

2    brief for the hearing.  If I could have -- I don't have a

3    calendar in front of me, but if I could have at least

4    until --

5         THE COURT:  Maybe the 3rd of July?

6         MR. EPSTEIN:  I was hoping maybe I could work over

7    the holiday.  6th of July?

8         THE COURT:  And the defendants -- I'm sorry, the

9    plaintiffs will have until July 13th to file any response

10   to the defendant's reply to the motion to modify.

11        Now, how about the motion for preliminary

12   injunction?

13        MR. EPSTEIN:  I misunderstood.  I thought we were

14   talking about the motion for preliminary injunction.

15        THE COURT:  I was talking about the motion to

16   modify.  But we can make the 6th the due date for both.

17   Because you have -- I said that because I know that

18   Mr. Lieberman is going to pitch in.  So with the two of you

19   working diligently on it, that's possible.

20        MR. EPSTEIN:  We will file both of those on

21   July 6th, Your Honor.

22        THE COURT:  And both responses will be due on the

23   13th.

24        MS. CHISHOLM:  We would ask, if possible, if there's

25   any room in your schedule to have ten days to respond

73

```
 1     simply because --
 2          THE COURT:  It's just --
 3          MS. CHISHOLM:  We just don't know what evidence
 4     they'll be putting in and whether we'll need additional
 5     discovery based on their responses.
 6          THE COURT:  This is an expedited process and it's
 7     just a response to a reply.  I will also tell you that I
 8     expect all of the papers to be within the page limitations.
 9          It's the rare case, Ms. Leonard, that the reply
10     needs to exceed in length the memorandum contra.  That's
11     what they call them here in the southern district,
12     memorandum contra.  So your reply to the memorandum contra
13     should not exceed what Mr. Epstein and what Mr. Lieberman
14     have to say in page length.
15          MS. LEONARD:  I understand, Your Honor.
16          MS. CHISHOLM:  Your Honor --
17          THE COURT:  Yes, ma'am.
18          MS. CHISHOLM:  One additional housekeeping matter.
19     I mentioned the class certification motion with respect to
20     the members of the county boards of elections.  The federal
21     rules require that we have leave of Court in order to file
22     such a motion before the discovery conference, and so we
23     would ask leave of Court to go ahead and file that.
24          THE COURT:  Now that you've expressed your nonverbal
25     sentiment, Mr. Epstein, I'm going to give you an
```

1    opportunity to respond verbally.

2         MR. EPSTEIN:  This is a bad moment for me.  I

3    actually wasn't nonverbally responding to Ms. Gentry at

4    all.

5         THE COURT:  No, you were responding to Ms. Chisholm

6    because Ms. Chisholm was talking about adding a class

7    certification motion onto all the other stuff we have to

8    do, and I was wondering why that was going to be necessary,

9    but I'm simply the arbiter.

10         MR. EPSTEIN:  I share your confusion, Your Honor.

11    It seems to me that the way the system is set up, if Your

12    Honor makes a ruling that says that the election must be

13    conducted in such a fashion, the secretary of state is a

14    party, it is incumbent upon him to issue a directive to all

15    of the boards of elections.  We have three of them here as

16    parties, I presume, because they are directly involved in

17    the evidence they want to present.  I don't understand what

18    the class certification gives that the Court doesn't

19    already have.

20         THE COURT:  You're concerned they don't feel

21    constrained to follow the secretary's directives?

22         MS. CHISHOLM:  That's correct.  The members of the

23    boards of elections are the people who vote on whether to

24    reject or count a ballot, and they're the ones that any

25    court order would need to address.  The secretary issues

1     directives to the boards of elections.

2          THE COURT:  Aren't they duty-bound by state law to

3     follow the directives of the secretary?

4          MS. CHISHOLM:  They are duty-bound.

5          THE COURT:  So creating a class, will that somehow

6     enhance the duty?  Will it make the duty more special, more

7     likely to be followed?

8          MS. CHISHOLM:  It will allow the Court greater

9     authority to compel the counties to comply as opposed

10    working through the secretary of state.  That's the reason

11    to do it.  The class certification motion itself would be

12    very straightforward.  All of the members have the same

13    duty to enforce --

14         THE COURT:  Understand that we're trying to get all

15    of this done by August 7th, and so instead of running on

16    two tracks, we're conceivably running on three tracks.  We

17    have a class certification motion whose primary purpose is

18    to make sure that the boards of election follow the Court's

19    ruling, even though they're already under a duty to follow

20    the Court's ruling because the Court has jurisdiction to

21    require the secretary of state to do or not to do an act

22    and they're obligated to do what the secretary of state

23    requires them to do.

24         MS. CHISHOLM:  The reason to do it is so that the

25    preliminary injunctive relief, if you grant preliminary

1    injunctive relief, would run directly to the county boards

2    of election.  I can say in some other circuits there has

3    been concern about the Court's authority to order sort of

4    class-wide relief without a class certification motion on

5    file.  We did it for that reason, as a protective measure.

6         We also assume that the county boards will comply

7    with the law.

8         THE COURT:  I can't tell you not to file your

9    motion.  You may file your motion.  When are you filing it?

10        MS. CHISHOLM:  We could file it on Friday.

11        THE COURT:  Friday the 29th.

12        I will give the defendants until the 13th to file a

13   memorandum contra, and you until the 20th to file any

14   response.

15        MS. CHISHOLM:  Thank you, Your Honor.

16        THE COURT:  Now, from here, I will issue an order

17   within a week.  Well, not later than -- yes, within a week

18   on the issues that we heard today so that we'll know what

19   we're going to hear on the 30th and the 31st, how narrow or

20   expansive our hearing will be.  I'll include all of the

21   other operative dates in that order.

22        Ms. Leonard.

23        MS. LEONARD:  You're anticipating that I have

24   something else to say.  The final piece of housekeeping

25   that I would think we would be remiss not to raise is until

```
 1    this point in time, Your Honor has included the relators'

 2    counsel in briefing and arguing the issues that are before

 3    the Court despite the fact that they are agents of the

 4    State of Ohio.  We would ask going forward for

 5    clarification with respect to the counsel who are

 6    participating in the briefing, because, as of now, the

 7    State of Ohio is getting two briefs through the State of

 8    Ohio and through the relators' counsel.

 9         Our motion for modification is against the parties

10    to the consent decree.  The preliminary injunction is

11    against the state and the counties.  We do not think that

12    the relators' counsel, as a separate matter, should be

13    participating going forward.

14         THE COURT:  Mr. Dornette.

15         MR. DORNETTE:  Your Honor, as I said at the outset,

16    our interest is in the issue of the consent decree, so to

17    the extent to which that issue continues --

18         THE COURT:  I'm going to allow the relators' counsel

19    to participate in the consent decree briefing.  You won't

20    need to participate in the preliminary injunction briefing.

21         MR. DORNETTE:  Thank you, Your Honor.

22         THE COURT:  So you have to adhere to the same

23    schedule as announced with respect to the consent decree

24    briefing.

25         MR. DORNETTE:  Thank you, Your Honor.
```

```
 1            THE COURT:  Is there anything further?  Any further
 2      items from the plaintiffs?
 3            Anything further from the defense?
 4            MR. EPSTEIN:  No, Your Honor.
 5            THE COURT:  I want to thank everyone for some really
 6      very good and thorough and compelling arguments.  I don't
 7      say that in every case, but, in this case, the level of
 8      advocacy is what I would expect to be given the important
 9      issues.  I want to commend you for your thorough
10      preparation and your presentations.
11            Thank you very much, everyone.
12        (Proceedings concluded at 4:37.)
13                              - - -
14
15
16
17
18
19
20
21
22
23
24
25
```

1                   C E R T I F I C A T E

2

3         I, Shawna J. Evans, do hereby certify that the

4    foregoing is a true and correct transcript of the

5    proceedings before the Honorable Algenon L. Marbley, Judge,

6    in the United States District Court, Southern District of

7    Ohio, Eastern Division, on the date indicated, reported by

8    me in shorthand and transcribed by me or under my

9    supervision.

10

11

12                          s/Shawna J. Evans
                             Shawna J. Evans, RMR

13                         Official Federal Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25