**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| THE NORTHEAST OHIO COALITION FOR THE HOMELESS, *et al.*,<br><br>    Plaintiffs,<br><br>vs.<br><br>JON HUSTED, in his official capacity as Secretary of State of Ohio, *et al.*,<br><br>    Defendants. | CASE NO. 2:06-cv-896; 2:12-cv-562<br><br>Judge Algenon Marbley<br><br>Magistrate Judge Terrence P. Kemp |

**PLAINTIFFS NEOCH, CCH, AND ODP'S SECOND SUPPLEMENTAL COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

For their Second Supplemental Complaint, Plaintiffs The Northeast Ohio Coalition for the Homeless ("NEOCH"), Columbus Coalition for the Homeless ("CCH") and The Ohio Democratic Party ("ODP") state and allege as follows:

**NATURE OF ACTION**

1.     This Second Supplemental Complaint challenges portions of Ohio Substitute Senate Bill 205 ("S.B. 205"), which Ohio Governor Kasich signed into law on February 21, 2014, and Ohio Substitute Senate Bill 216 ("S.B. 216"), which Governor Kasich signed into law on February 28, 2014. Both laws took effect on June 1, 2014.

2.     This Second Supplemental Complaint is based upon events that occurred after Plaintiffs filed their first Supplemental Complaint on November 21, 2008, and after the Court entered the Consent Decree on April 19, 2010.

3.      If the challenged portions of S.B. 205 and S.B. 216 are not permanently enjoined, they will unlawfully disenfranchise thousands of Ohio voters who cast absentee or provisional ballots in upcoming elections—and who primarily are minority voters and/or voters who support the Democratic Party.

4.      The challenged laws unlawfully require absentee and provisional voters, as a condition of having their votes be counted, to demonstrate their ability to read, write, understand and interpret any matter by completing the State's voting-related forms *without making even a single error or omission*, in violation of the Voting Rights Act, 42 U.S.C. § 1973aa.

5.      The challenged laws permit or require Boards of Elections to reject and not count absentee and provisional ballots because of technical and immaterial errors or omissions and/or because of mismatches with the Statewide Voter Registration Database ("SVR Database"), even where such errors, omissions, or mismatches are not material in determining whether the voter is qualified under State law to vote in the election, in violation of the Voting Rights Act, 42 U.S.C. § 1971(a)(2)(B).

6.      The challenged laws fail to provide adequate due-process notice and opportunity to cure for absentee voters or ***any*** due-process notice and opportunity to cure for other absentee voters and all provisional voters (with one limited exception for certain provisional voters although without providing specific notice) before depriving voters of their fundamental right to vote because of errors, omissions, or mismatches with the SVR Database, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

7.      The challenged laws fail to provide disenfranchised voters with notice of the fact of and reason(s) for the disenfranchisement, and also fail to give such voters the opportunity to address any errors, omissions, or mismatches so that their votes will be counted in future

elections, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

8.      The challenged laws impose severe and undue burdens on the voting rights of thousands of Ohio provisional and absentee voters, in violation of the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

9.      The challenged laws and the Secretary of State's directives fail to provide uniform standards for Boards of Elections to apply when determining whether to reject or count ballots where information on the accompanying Provisional Form or Absentee Envelope is incomplete and/or does not match the SVR Database, and thereby fail to ensure that Boards of Elections will treat similarly situated absentee and provisional voters equally from county to county or within a county, in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

10.     The challenged laws and the Secretary of State's directives treat similarly situated voters differently by providing limited due-process rights to some absentee voters but providing no due-process rights to provisional voters and other absentee voters, by treating wrong-precinct provisional voters differently from county to county, and by treating absentee and provisional voters who have an error or mismatch with respect to their date of birth, name, address or signature differently from county to county or within a county, without any valid or justifiable reason for treating these groups of voters differently, in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

11.     The challenged laws impose extraordinary voting restrictions that render the State's electoral system fundamentally unfair, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

12.     The challenged laws create barriers to voting that will have a disparate impact on minority voters and will result in the denial or abridgement of their right to vote on account of race or color, in violation of Section 2 of the Voting Rights Act, 42 U.S.C. § 1973.

13.     The challenged laws intentionally discriminate against minority voters on the basis of race or color, in violation of the Equal Protection Clause of the Fourteenth Amendment and the Fifteenth Amendment.

14.     The challenged laws intentionally discriminate against and will have a disparate impact on voters who support the Democratic Party on the basis of their political viewpoint, in violation of the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, and 42 U.S.C. § 1983.

15.     If the challenged provisions of S.B. 205 and S.B. 216 are not permanently enjoined, they are likely to unlawfully disenfranchise thousands of Ohio voters who cast absentee or provisional ballots. Disenfranchisement is a severe and irreparable harm.

16.     The State of Ohio does not have a valid, justifiable or compelling interest in disenfranchising absentee and provisional voters based upon technical and immaterial errors/omissions and/or mismatches with the SVR Database, particularly where a Board of Elections can otherwise determine that the voter is qualified, registered, and eligible to vote.

17.     **The challenged provisions of S.B. 205 and S.B. 216 were intended to have and will have a disproportionate adverse impact on African-American and Latino voters who reside predominantly in urban counties and have historically cast a high percentage of absentee and provisional ballots in Ohio elections.**

18.     The challenged provisions of S.B. 205 and S.B. 216 also were intended to have and will have a disproportionate adverse impact on Ohio voters who tend to cast their votes in

favor of candidates from the national, state, or local Democratic Party and have historically cast a disproportionately high number of absentee and provisional ballots in Ohio elections.

19.     The challenged provisions of S.B. 205 and S.B. 216 violate the Voting Rights Act, 42 U.S.C. §§ 1971, 1973, and 1973aa, as well as the First and Fourteenth Amendments to the United States Constitution.

20.     Plaintiffs seek a declaratory judgment and permanent injunction prohibiting Defendants from implementing or enforcing the challenged provisions of S.B. 205 and S.B. 216 in Ohio Rev. Code §§ 3501.01(AA), 3501.22, 3505.18, 3505.181, 3505.182, 3505.183, 3509.03, 3509.04, 3509.06, and 3509.07.

21.     The claims that Plaintiffs assert in this Second Supplemental Complaint are substantially related to Plaintiffs' previous claims against Defendants in this lawsuit and the Consent Decree entered by the Court in this lawsuit, as demonstrated by the Notice of Defendant Jon Husted, Ohio Secretary of State, of Changes in Ohio Statutory Law That Modify The Consent Decree (Doc. #418) that was filed on May 8, 2014.  It is therefore proper to assert these claims in a supplemental complaint filed in this lawsuit.

## PARTIES

22.     Plaintiff Northeast Ohio Coalition for the Homeless ("NEOCH") is a non-profit charitable organization operating in the City of Cleveland. Its mission is to organize and empower homeless and at-risk men, women, and children, and to break the cycle of poverty through public education, advocacy, and creating nurturing environments. NEOCH is a coalition of service providers, housing activists, members, and homeless people. Approximately 10% of NEOCH's members are homeless.

23.     NEOCH believes that participation in the democratic process is critical for those who struggle with their housing. For many years, NEOCH has worked to reduce barriers that

deter or prevent homeless people from exercising their right to vote. Among other things, NEOCH has helped thousands of homeless people register to vote, has mobilized and educated homeless voters about their right to vote, has worked with county officials to ensure that homeless people have access to voting, has collaborated with and founded a program to allow homeless voters to satisfy Ohio's voter-identification law by helping them to obtain State identification cards (although this program is likely to run out of funding prior to the November 2014 election), has provided funds to help homeless people obtain birth certificates (which are necessary to obtain identification that is acceptable under Ohio's voter-identification law), and has driven homeless voters to their Board of Elections to vote early by absentee ballot so that they are not required to cast provisional ballots on Election Day. NEOCH devotes and has devoted significant staff and financial resources to these activities.

24.     NEOCH sees and assists approximately 25,000 homeless people in Cleveland each year. About 78% of the population that NEOCH assists is African-American and 7% is Latino. Between 20% and 30% of this population does not have any form of identification that is necessary to cast a regular ballot under Ohio's voter-identification law. Many of these homeless voters are likely to cast their votes by absentee or provisional ballot. In addition, approximately 30% of the population assisted by NEOCH has a mental illness that could impede their ability to read, understand, and fill out the Provisional Form, Absentee Envelope, and other voting-related forms without assistance. Also, a substantial portion of the population assisted by NEOCH is illiterate and so is unable to read, understand, and fill out these forms without assistance. Finally, while NEOCH is a non-partisan, non-profit organization, a substantial portion of the population that it assists tends to vote in favor of candidates from the national, state, or local Democratic Party.

25.     Plaintiff Columbus Coalition for the Homeless ("CCH") is a coalition of service providers, currently and formerly homeless people, and concerned citizens. Part of its mission is to advocate on behalf of homeless persons and to empower them to achieve greater self-sufficiency. One of the ways in which Plaintiff CCH has carried out its mission is by assisting its homeless members and other homeless persons to register to vote and cast their votes.

26.     Plaintiff Ohio Democratic Party ("ODP") is a political-party organization dedicated to electing Democratic Party candidates to public office throughout Ohio. The Ohio Democratic Party has hundreds of thousands of members from across the state, including many eligible voters, who regularly support and vote for candidates affiliated with the Ohio Democratic Party. Many of its members are African-American or Latino. Many of these registered voters are likely to cast their votes by absentee or provisional ballot.

27.     As a result of the unlawful requirements imposed by S.B. 205 and S.B. 216 on Ohio voters who cast absentee or provisional ballots, Plaintiffs will be required to divert substantial resources to seek to prevent these voters' disenfranchisement. Plaintiffs will have to conduct significant voter-outreach-and-education programs, which will require diverting personnel and financial resources, to explain to members, supporters, and homeless people whom they assist that their absentee and provisional-ballot forms must be filled out perfectly and completely, and to encourage these voters to vote despite these new hurdles that may cause their ballots to be rejected.

28.     Many of Plaintiffs' members, supporters, and homeless people whom they assist have previously cast their votes by absentee or provisional ballot. These voters will be significantly and irreparably harmed if their absentee or provisional ballots are rejected and not counted even though they are qualified, registered, and eligible to vote, merely because they fail

to read and understand the Provisional Form or Absentee Envelope, fail to fully and correctly provide all the information, and/or there is a mismatch with information in the SVR Database.

29.     Defendant JON HUSTED ("Secretary of State" or "Defendant") is the Secretary of State of Ohio and is sued in his official capacity. Under Ohio Rev. Code § 3501.04, the Secretary of State is Ohio's chief election officer and, as such, is responsible for the administration of state laws affecting voting, and for ensuring that elections in the state are conducted in accordance with federal and state law.

30.     Defendant MIKE DEWINE ("Attorney General" or "Defendant") is the Ohio Attorney General and is sued in his official capacity (as a representative of Intervenor-Defendant State of Ohio). Under Ohio Rev. Code § 109.02, the Attorney General is Ohio's chief law officer and represents the State in all legal matters.

## JURISDICTION AND VENUE

31.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331, 1343(a)(3), 2201 and 2202, as well as 42 U.S.C. § 1983.

32.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the direct and immediate harm faced by Plaintiffs CCH and ODP is threatened in this judicial district and because both Defendants have their principal offices in this judicial district.

## FACTUAL ALLEGATIONS

### I.     Ohioans have a right to vote if they are qualified, registered, and eligible.

33.     Article V, Section 1 of the Ohio Constitution provides that "[e]very citizen of the United States, of the age of eighteen years, who has been a resident of the state, county, township, or ward, such time as may be provided by law, and has been registered to vote for thirty days, has the qualifications of an elector, and is entitled to vote at all elections."

34.     With only a few exceptions (e.g., serving sentence for felony conviction), every person who meets these constitutional requirements is ***qualified*** to vote in Ohio.

35.     Individuals who are qualified to vote in Ohio can ***register*** to vote by providing their name, current address, date of birth, identification (i.e., Ohio driver's license number, Social Security number's last four digits, or a copy of one of the documents described in Ohio Revised Code Section 3505.18(A)(1) ("Voter-ID Document")) and a signature affirming that they have the qualifications of an elector.

36.     Individuals who are qualified and registered to vote in Ohio are ***eligible*** to vote in all elections held in their voting precinct at least 30 days after the date they registered to vote.

37.     Every Ohioan who is qualified, registered, and eligible to vote in a particular election has a right to vote and to have that vote be counted.

## II.     Ohioans cast regular, absentee, or provisional ballots.

38.     Ohio voters cast regular, absentee, or provisional ballots.

39.     Most voters cast a "regular ballot" at a polling place on Election Day. A voter must provide a Voter-ID Document to cast a regular ballot. Regular ballots are counted after the polls close on Election Day. To cast a regular ballot, the voter is not required to print his name, write his address, read and understand the instructions on a form, check a box as to the form of ID provided, or provide his date of birth. Regular ballots cannot be rejected for any reason.

40.     A significant number of voters choose to cast an absent voter's ballot, commonly referred to as an "absentee ballot," before Election Day, either in person at the Board of Elections or by mail. Some absentee ballots are counted on and some after Election Day. Before S.B. 205 was enacted, there were only a few reasons why an absentee ballot might be rejected. Since 2005, Boards of Elections have rejected a very low percentage of absentee ballots.

41.     Some voters are not permitted to cast either a regular ballot or an absentee ballot, but instead are required to cast a "provisional ballot" before or on Election Day. Provisional ballots are required in a variety of circumstances—e.g., if the voter's name does not appear in the poll book, if the voter has moved, if the voter does not have a Voter-ID Document and wishes to vote on Election Day, if the voter has changed her name or if the Board of Elections is erroneously unable to find the voter on the rolls. Provisional ballots are not counted until more than ten days after Election Day. There are a number of reasons why a provisional ballot might be rejected. Since 2005, Boards of Elections have rejected and not counted a large number of provisional ballots.

42.     Voters who vote before Election Day are permitted to cast an absentee ballot by writing their Social Security number's last four digits as the only proof of identity. They may, but are not required, to provide a Voter-ID Document to prove their identity.

43.     Voters who vote on Election Day are not permitted to cast a regular ballot unless they show elections officials a Voter-ID Document. Voters who can only prove their identity through their Social Security number's last four digits must cast a provisional ballot.

44.     Many homeless voters have a Social Security number but do not have a Voter-ID Document. These voters can vote by absentee ballot before Election Day but would have to vote by provisional ballot on Election Day.

45.     Because absentee ballots are more likely to be counted than provisional ballots, Plaintiffs NEOCH and CCH encourage homeless voters, including their members, to cast their votes early by absentee ballot.

46.     Many of Plaintiff ODP's members and supporters prefer to vote early by absentee ballot because it is easier and less burdensome than voting on Election Day. Some voters have work, family, or school obligations that will make it difficult for them to cast their ballots in

person on Election Day, particularly if there are long lines and/or an insufficient number of voting machines at the polling place. Other voters have transportation or physical difficulties that make it difficult to travel to their polling place or the Board of Elections, and so prefer to cast their ballots by mail. Other voters prefer to travel to the Board of Elections before Election Day as part of a group, such as the "Souls to the Polls" programs that are popular in African-American communities in urban counties, in communal affirmation over the historic struggle over the right to vote. Plaintiff ODP encourages these and other members and supporters to cast their votes early by absentee ballot.

**III.    Use of absentee and provisional ballots since 2005.**

47.    The Ohio General Assembly instituted universal absentee voting in 2005. That legislation followed numerous complaints of unreasonably long lines and insufficient numbers of voting machines in the November 2004 election that deterred or turned away thousands of Ohio voters on Election Day. The problems that gave rise to these complaints were particularly prevalent in urban counties with many voters.

48.    Since 2005, voters and Boards of Elections in urban counties have relied heavily upon absentee voting.

49.    A significantly higher percentage of the populations in Ohio's urban counties is African-American or Latino as compared to the populations in Ohio's non-urban counties.

50.    Minority voters in Ohio's urban counties have suffered the effects of discrimination in the areas of education, employment, housing and health, which has hindered their ability to participate effectively in the political process.

51.    Upon information and belief, African-American and Latino voters in Ohio's urban counties are less likely than their non-minority counterparts to possess a Voter-ID Document that is necessary to receive and cast a regular ballot that will be counted, and they will

be subject to greater burdens and more severe hurdles in having their absentee or provisional ballots counted than other members of the electorate who can cast regular ballots.

52.     Upon information and belief, a disproportionate number of African-American and Latino voters in Ohio's urban counties cast their votes by using absentee and/or provisional ballots, when compared to their non-minority counterparts.

53.     This conclusion is buttressed by a statistical study of Ohio early voting data that concluded that minority voters, especially African-American voters, are disproportionately more likely to use early in-person voting opportunities when compared to white voters.

54.     Since minority voters in Ohio's urban counties are more likely to cast their votes by using absentee and/or provisional ballots than are non-minority voters, S.B. 205 and S.B. 216 will disproportionately impact and disenfranchise African-American and Latino voters.  The State of Ohio's political processes therefore will not be equally open to participation by African-American and Latino voters, and they will have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

55.     The challenged provisions of S.B. 205 and S.B. 216 were intended to and will interact with social and historical conditions in Ohio's urban counties to cause an inequality in the opportunities enjoyed by African-American and Latino voters to elect their preferred representatives.

56.     **The challenged provisions of S.B. 205 and S.B. 216 are intended to have, and will have, a racially disparate impact on African-American and Latino voters.**

57.     **The challenged provisions of S.B. 205 and S.B. 216 also are intended to have, and will have, a disparate impact on voters who support candidates affiliated with the Democratic Party.**

58.     The Ohio General Assembly and Governor Kasich knew, at the time they passed and signed S.B. 205 and S.B. 216, that the rejection of absentee and provisional ballots based wholly on technical and immaterial errors/omissions and/or mismatches with the SVR Database will have a racially disparate impact upon African-American and Latino voters and, in addition, will have a disparate impact upon voters who support candidates affiliated with the Democratic Party.

59.     When they passed and signed S.B. 205 and S.B. 216, the Ohio General Assembly and Governor Kasich intended to disenfranchise African-American and Latino voters and, in addition, voters who support the Democratic Party.

**IV.    Events that led up to S.B. 205 and S.B. 216.**

60.     Universal absentee voting was passed and signed into law in October 2005. At that time, Ohio Republican Party members controlled both chambers of the Ohio General Assembly. Governor Bob Taft was also an Ohio Republican Party member.

61.     Although Republicans passed and signed the law that instituted universal absentee voting, they did not do so because of their support for absentee voting. Instead, they passed and signed the law to deter Ohio voters from approving a constitutional amendment to institute universal absentee voting that appeared on the November 2005 ballot. That amendment was part of a package of constitutional amendments that was referred to as "Issue 2."

62.     Defendant Husted, who was then the Republican Speaker of the House, reportedly stated: "It hurts Issue 2's chances of passing if you start talking about the fact that we've already given voters the ability to do this legislatively."

63.     Republican State Senator Jeff Jacobson, who was described as being "no fan" of universal absentee ballots, reportedly stated: "This is a not-bad idea whose time will come. It will

come either way. I prefer that it comes without us doing lasting damage to the constitution, lasting damage to our state, and lasting damage to the sanctity of our vote."

64. At the time, Ohio Democratic Party members warned that the law was not an adequate substitute for the constitutional amendment because it could later be undone.

65. Democratic State Senator Eric Fingerhut reportedly stated: "There is a risk that what the legislature giveth, the legislature could taketh away."

66. During the next election in November 2006, Ohio voters elected Ted Strickland to the office of Governor. Ohio voters also elected Jennifer Brunner to the office of Secretary of State. Governor Strickland and Secretary Brunner are Ohio Democratic Party members.

67. Governor Strickland and Secretary Brunner remained in office until December 31, 2010. While they were in office, no legislation was signed into law, and no action was taken by the Secretary of State, that would restrict the right of Ohio voters to vote by absentee ballot.

68. In November 2010, Ohio voters elected John Kasich to the office of Governor. Ohio voters also elected Defendant Husted to the office of Secretary of State. Governor Kasich and Defendant Husted are Ohio Republican Party members.

69. After the November 2010 election, the Ohio General Assembly (which was controlled by members of the Ohio Republican Party) passed, and Governor Kasich signed into law, legislation that would make it significantly less likely that absentee and provisional ballots cast by Ohio voters would in fact be counted.

70. Specifically, on July 1, 2011, Governor Kasich signed into law House Bill 194 ("H.B. 194"). H.B. 194 contained numerous provisions that would have restricted the right to vote by absentee or provisional ballot. H.B. 194 contained some of the same provisions of S.B. 205 and S.B. 216 that this supplemental complaint challenges.

71.     Opponents of H.B. 194 succeeded in placing a referendum on the November 2012 ballot. Rather than allow the referendum to go forward, the Ohio General Assembly repealed H.B. 194 effective August 15, 2012.

72.     Defendants also took action that was designed to limit the right to vote by absentee ballot. For example, Defendant Secretary of State issued directives to cut back on early voting hours and reduce voters' ability to cast absentee ballots in person following passage of a series of bills attempting to eliminate in-person early voting during the three days before an election. These actions were successfully challenged in another federal lawsuit, *Obama for America v. Husted*, S.D. Ohio Case No. 2:12-cv-636.

73.     When the Republican-controlled Ohio General Assembly, Governor Kasich and Defendant Husted acted to limit the rights of and/or to disenfranchise absentee and provisional voters in Ohio, they intended to suppress the votes of African-American and Latino voters and, in addition, voters who support the Democratic Party.

74.      Doug Preisse, the Franklin County Republican Party's chairman, admitted to this intent when he reportedly stated: "I guess I really actually feel we shouldn't contort the voting process to accommodate the urban—read African-American—voter turnout machine."

75.     A number of observers, including members and supporters of Plaintiff ODP, called Chairman Preisse's remark patently racist.

76.     In response, Matt Borges, the Ohio Republican Party's executive director, reportedly stated that Mr. Preisse thought that he was speaking "off the record" when he made the remark to a reporter.

77.     Less than a year after the November 2012 election—when H.B. 194 would have been subject to a referendum vote if it had not been repealed by the Ohio General Assembly— Republican members of the Ohio Senate sought to pass portions of H.B. 194 in separate bills.

78.     Republican State Senator Bill Coley introduced S.B. 205 on October 10, 2013. The Ohio Senate passed it less than one month later on November 6, 2013. The Ohio House then passed it on February 19, 2014 and Governor Kasich signed it into law on February 21, 2014.

79.     Republican State Senator Bill Seitz introduced S.B. 216 on October 29, 2013. The Ohio Senate passed the bill less than one month later on November 20, 2013. The Ohio House then passed it on February 26, 2014 and Governor Kasich signed it into law on February 28, 2014

80.     On June 2, 2014, Defendant Husted issued Advisory 2014-04 to the county boards of elections summarizing changes enacted by S. B. 205, S. B. 216 and S. B. 238. On June 30, 2014, Defendant Husted prescribed Form 11-S for use by absentee voters with errors or omissions on their ID envelopes. On July 2, 2014, Defendant Husted issued Directives 2014-18 [Absentee Ballots], 2014-19 [UOCAVA Ballots] and 2014-20 [Provisional Ballots] providing instructions implementing the three referenced Senate Bills.

81.     On July 10, 2014, counsel for the Ohio Democratic Party delivered a letter to Defendant Husted noting specific concerns about: (1) the inadequacy of notice or lack of notice to absentee and provisional voters concerning errors, omissions or non-conforming information on their absentee ID envelopes or provisional affirmations; (2) inadequate or no opportunity to cure errors or omissions; and (3) equal-protection issues regarding the same. The letter noted that the Secretary has broad authority to issue directives and instructions to the county boards of elections regarding the conduct of elections.

82.     Following the July 10, 2014 letter and oral and email discussions with the staff of the Secretary of State's office, Defendant Husted, on September 5, 2014, issued Directive 2014-27 setting forth additional procedures for boards to follow regarding notice to absentee voters

who had errors or omissions on their ID envelopes or when there was a mismatch with the SVR database, and setting forth additional procedures regarding how such absentee voters could cure such errors or omissions. The Directive addressed many but not all of the issues raised by in the July 10, 2014 letter regarding absentee voters, but none of the issues raised regarding provisional voters. On the same date, Defendant Husted also re-prescribed Form 11-S for use by absentee voters, which in large measure addressed the principal concern about the form raised in the July 10th letter. Defendant Husted has declined, however, to resolve other issues, including: lack of notice to and opportunity to cure for provisional voters with an error or omission on their provisional affirmation form or a mismatch with the SVR database; requiring boards to attempt to contact voters by phone or email, in addition to mail, when the board has the voter's phone number or email address; setting uniform standards for determining when a printed name or address is not complete or when a signature does not conform to the voter's signature on file; requiring boards to not reject absentee and provisional ballots due to uncorrected birthdate errors when all other required information has been provided; and requiring boards to use a unified poll book in multi-precinct polling locations.

**V.      Challenged provisions of S.B. 205 and S.B. 216.**

83.      Plaintiffs challenge the following provisions of S.B. 205 and S.B. 216 that will unlawfully disenfranchise thousands of Ohio voters who cast absentee or provisional ballots.

### *A.      Absentee voters: Mandatory fields on absentee ID envelope*

84.      S. B. 205 and S. B. 216 and Secretary of State directives require boards of elections to reject ballots cast by absentee voters who have an error or omission on the form printed on their ID envelope (Form 11) as to the month and/or day of their date of birth, signature or ID (i.e., last four digits of their social security number, full Ohio driver's license number (ODLN), or a copy of one of the permissible forms of documentary ID) or if the date of

birth or ID (SSN or ODLN) does not conform to information in the SVR Database, or the voter's signature does not reasonably match the voter's signature on file with the board, unless the voter supplies or corrects the information using Form 11-S, prescribed by the Secretary of State, no later than seven days after the election. The voter cannot, however, correct or challenge an incorrect date of birth, social security number, or driver's license number in the SVR Database.

85.     Boards are required to reject the ballot in such cases even though the voter supplied the correct information as to date of birth and ID to the board on or with the absentee-ballot application that the board validated before delivering the ballot to the voter and even where the date of birth or SSN or ODLN on the ID envelope is clearly apparent as an error when compared to the application or other board records—and the identity of the voter is not in question; thus imposing an unnecessary burden on voters and disenfranchising voters without sufficient or legitimate cause.

### B.     *Absentee voters: Notice of opportunity to cure*

86.     Boards of Elections are required to mail by U. S. first-class mail notice to the voter of the omission, error, or mismatch and of their right to supply or correct the information on the ID envelope using Form 11-S no later than seven days after the election. No notice is sent to absentee voters whose ballots are received by the board later than six days after the election. Boards are apparently not permitted to provide additional notice via telephone or electronic mail even if the voter has provided such contact information and even when such methods may be more effective in quickly reaching a voter to provide notice to cure within a very brief timeframe. Further, many notices mailed on the sixth day after the election, or even two or three days earlier, will  not be delivered by the post office until after the seven-day cure period has lapsed or, if delivered on the last day of the period, not in sufficient time for the voter to respond because it

will be too late to travel to the board of elections or have the return envelope postmarked that day by the post office. Thus, as a result of a statutory scheme that fails to provide for a minimum period for providing notice prior to expiration of the cure period and limits how notice is provided, some voters will receive adequate notice and opportunity to cure while others will not.

87.     Further, given that the period to cure omissions or errors on the ID envelope inexplicably ends three days before the deadline under Ohio law to actually return the ballot by mail, ten days after the election, some absentee voters with the same error or omission will be mailed a notice and have an opportunity to cure, while others will not. Indeed, voters whose ballots are received during the final four days of the period will not even be sent a notice because it would be pointless.

88.     A voter who does receive a notice prior to expiration of the cure period and is able to complete Form 11-S and postmark it by the seventh day after the election will be deemed to have timely submitted the form if it is received by the tenth day after the election. Alternatively, the voter, or certain relatives of the voter statutorily authorized to return the voter's ballot, may personally deliver the form to the board by close of business on the seventh day after the election. It may not be delivered, however, by any other person chosen by the voter even though it is only a form, not the ballot, and the voter's original application form, which contains the same information fields, can be personally delivered to the board by any person the voter choses. Further, in most cases the form is not required to be signed by the voter. Thus, a voter faced with a very short period to cure an error or omission may be deprived of the opportunity to do so even though there is someone who could timely return the form on the voter's behalf.

### C.     *Absentee Voters: date of birth*

89.     Although the statutes provide that an absentee ballot may not be counted if the voter has not filled in or has incorrectly filled in his or her date of birth or if the date of birth does

not conform to the SVR database, the law then creates two exceptions. First is that the year can be wrong so long as the month and day are correct. Second is when a board of elections by a vote of at least three members determines that the voter has correctly supplied the other required information, namely signature and ID. Thus, the statute itself acknowledges that the date of birth is unnecessary to identifying the voter when the other mandated information is provided. Yet, it leaves to each board's discretion whether to enforce the date-of-birth requirement. This may result in different treatment of similarly situated voters from county to county, and even within a county. Some will be required to timely file Form 11-S and others will not be. Some voters will be required to jump over this additional hurdle to have their ballot counted and others will not. Indeed, given, as explained above, that some absentee voters will not be given any opportunity or any realistic opportunity to cure based on timing issues, the potential unequal treatment and disenfranchisement of these voters with birthdate issues is even more egregious. Further, the Secretary of State could, but has not, directed the county boards to follow a uniform practice by voting to establish a policy that absentee ballots will not be rejected due to birthdate issues on the form if the other four fields have been properly completed.

### D.     *Absentee Voters: Missing ID envelope*

90.     A frequent basis for not counting absentee ballots is when the ballot is mailed back to the board of elections by the voter in the return envelope provided by the board, but without including the separate ID envelope. These absentee voters are effectively in the same position as voters who enclose the ballot in the ID envelope but fail to complete the mandatory fields on the ID envelope. In both cases, the voter has failed to provide the required information. One group, however—those who placed the ballot in the ID envelope—will have an opportunity to cure any and all incomplete portions of the ID envelope, while the other group—those who did not return the ID envelope with the ballot—will not. Voters who cast their ballots without returning the ID

envelope can be identified by the board of elections by the ballot stub number, giving the board the ability to send the same notice to cure as is sent to voters who returned the ballot in the ID envelope but did not fill out the envelope.

### E. Absentee Voters: Signature conformity

91.     An absentee ballot may be rejected if the voter's signature on the ID envelope does not reasonably match the voter's signature "on file" with the board. In which case, the voter is to be sent a notice and asked to submit his or signature using Form 11-S. There are no guidelines set forth in the law or Secretary of State directives, however, as to what "reasonably match" means, such as whether a full formal first name, middle initial and suffix after the surname must be provided if they are contained in the voter's signature on file at the board, or whether it must be fully cursive if the signature on file is fully cursive. Further, the notice to the voter simply informs the voter that his or her signature did not match their voter-registration record and asks the voter to "provide your signature." There is no explanation to the voter of the nature of the mismatch. Thus, it is likely that many voters will sign the form the same way they signed the ID envelope and not cure whatever the board's issue is with the signature. The result will be disenfranchisement due to inadequate notice, including when there is no reasonable doubt as to the voter's identity. Further, there will be different standards applied from county to county or within the same county from voter to voter. In addition, it is unclear what is meant by "on file." Some boards will interpret this as the voter-registration card, others as the most recent poll-book signature or even the signature on the absentee-ballot application form, all of which may vary considerably for the same voter.

### F. Absentee Voters: State identification number

92.     Unlike for provisional voters, an absentee voter is not able to use a state identification card number to vote (i.e., by writing the identification card number on the ID envelope), but rather must provide a copy of the state identification card.

### G.     Provisional Voters: Mandatory fields on provisional-voter form

93.     As with absentee voters who must complete a form at the time they vote, namely, the form printed on what is known as the ID envelope, provisional voters must complete a Provisional Ballot Affirmation, Form 12-B, which requires the same five fields of voter information. S. B. 216 and Secretary of State directives require boards of elections to reject ballots cast by provisional voters who have an error or omission on the provisional form with respect to the voter's printed name, address, month and/or day of their date of birth, signature or ID (i.e., last four digits of their social security number, full Ohio driver's license or full state ID number or failure to check-mark one of three boxes on the form indicating that one of the permissible forms of documentary ID was shown to the precinct election official) or if the printed name, address (except in the case of a change of address), date of birth or ID (SSN, ODLN or OSIN) does not conform to information in the SVR Database, or the voter's signature does not reasonably match the voter's signature on file with the board. Previously, provisional ballots could not be rejected based on address because the voter was not required to write his address on the form.

94.     Boards are required to reject the ballot in such cases even where the error on the form is clearly apparent as an error when compared to the board records and the voter's identity is not in question, thus imposing an unnecessary burden on voters and disenfranchising voters without sufficient cause. There is one narrow exception for a voter whose form has a problem on the ID portion (error, omission, box not check-marked, or mismatch with SVR database). The ballot will be counted, assuming no other problem, if the voter personally appears at the county

board of elections office no later than seven days after the election and corrects or supplies the ID information and, if the voter is showing documentary ID, also check-marks one of the three boxes. The voter cannot, however, correct or challenge any incorrect information regarding name, address, date of birth, social-security number, driver's license, or state ID number in the SVR Database. Further, S. B. 216 has reduced the period for provisional voters to correct or supply ID from ten to seven days after the election.

95.     As set forth above, a provisional voter who shows one of the permitted forms of documentary ID to the precinct election official must also check-mark one of three boxes indicating that he or she has done so. Previously, it was the precinct election official's responsibility to specify on the form the type of ID provided or to specify on the form that the voter must still provide ID to the board. Further, it was the precinct election official's responsibility to sign a statement on Form 12-B below the portion of the form the voter completes confirming that the voter had executed the affirmation form and then the voter was entitled to cast a provisional ballot. S. B. 216 repeals both of these precinct-election-official responsibilities.

### H.     *Provisional Voters: Notice and opportunity to cure*

96.     Except for the one narrow circumstance described above, a provisional voter whose form has an error or omission in any of the other four information fields (name, address, date of birth, signature) or a mismatch with the SVR database regarding their name, address, or date of birth is not permitted to cure the error or omission after the election and, hence, is not sent any notice of the error, omission, or mismatch that will cause his or ballot to not be counted. Further, even though there is technically the right to cure an ID error or omission during the seven days after the election, no notice is provided to the voter of the error, omission, or mismatch. Thus, the voter will not necessarily know of the problem.

97.     Absentee and provisional voters are similarly situated voters as to the five information fields they are required to correctly and fully complete, to not be disenfranchised. Only absentee voters, however, are mailed a notice if there is a problem (an error, omission, or mismatch with the SVR database) with any of the five fields. Provisional voters are not mailed a notice for the same issues. Further, even if a provisional voter became aware of a problem, other than as to the ID field, he or she is not permitted to cure the problem post-election, even though absentee voters are. And as to a problem with the ID field, assuming that a provisional voter is aware of the problem, he or she must personally appear at the board office to correct an error on the ID portion of the form or supply missing ID information and also check-mark the appropriate box if showing documentary ID. Absentee voters, on the other hand, may address the exact same issues by mail, in person, or by entrusting personal delivery to a  relative.

### I.     *Provisional Voters: Date of birth*

98.     Although the statutes provide that a provisional ballot may not be counted if the voter has not filled in or has incorrectly filled in his or her date of birth or if the date of birth does not conform to the SVR database, the law then creates two exceptions. First is that the year can be wrong so long as the month and day are correct. Second is when a board of elections by a vote of at least three members determines that the voter has correctly supplied the other required information, namely printed name, residence address, signature, and ID. Thus, the statute itself acknowledges that the date of birth is unnecessary to identifying the voter when the other mandated information is provided. Yet, it leaves to each board's discretion whether to enforce the date-of-birth requirement. This may result in different treatment of similarly situated voters from county to county and even within a county. Some will have their ballots counted and others will not. The situation is exacerbated by the unequal treatment of provisional and absentee voters, with most absentee voters being afforded notice and an opportunity to provide or correct

birthdate information, but provisional voters not being provided any notice or opportunity. Further, the Secretary of State could, but has not, directed the county boards to follow a uniform practice by voting to establish a policy that absentee ballots will not be rejected due to birthdate issues on the form, if the other four fields have been properly completed.

### J.      Provisional Voters: Printed name, address and signature conformity

99.      A provisional ballot may be rejected if the voter does not print his or her full name on Form 12-B, does not write his or her current address on the form, or the voter's signature on the form does not reasonably match to the voter's signature on file with the board or if there is a mismatch between the printed name or address and the SVR database. There are no guidelines set forth in the law or Secretary of State Directives, however, as to what will and will not be acceptable as being a "full" printed name, how complete an address must be, or what "reasonably match" means regarding the signature. For example, it is unclear whether "full" means formal first name, middle initial and suffix after the surname if they are contained in the SVR database, whether a conforming signature must include a middle initial or suffix after the surname if part of the voter's signature on file at the board, or whether the signature must be fully cursive if the signature on file is fully cursive. In addition, it is unclear what signature on file with the board should be used. Some boards will interpret this as the voter-registration card, others as the most recent poll book signature, which may vary considerably for the same voter. It is unclear whether the address the voter writes must include a directional designation, a correct road, street, avenue, etc. designation, or an apartment or unit number. The result of a lack of guidelines regarding these three mandatory components will be disenfranchisement of qualified voters, including when there is no reasonable doubt as to voter's identity. Further, there will be different standards applied from county to county or within the same county from voter to voter.

### K.      Provisional Voters: Current address

100.    As set forth above, a provisional voter is required to write his or her current address on Form 12-B. There is a lack of clarity, however, whether this means the address at which the voter is registered to vote or the address at which the voter is living on the day he or she casts a provisional ballot. There are many reasons that a voter may have a current address that is different than the address at which he or she is registered to vote, but still be a qualified elector. For example, a college student's current address may be a dormitory, but the student is registered at his or her parent's address as entitled under Ohio law. Absentee voters do not face this risk of disenfranchisement because the absentee application asks for the voter's home address and where to send the ballot if a different address. Further, the voter's registration address is pre-printed on the absentee ID envelope.

**L.    *Provisional Voters: Prior registration address***

101.    S. B. 216 provides that the provisional-voter form inform the voter that failure to provide your former address will not cause your provisional ballot to be rejected. This is not always the case, however. A leading reason for voters casting provisional ballots is because they have moved without updating their voter-registration address before the deadline, which is 29 days before the election. In such cases, a board of elections must verify that the person was registered at another address somewhere in Ohio. If the voter showed a form of documentary ID at the time of voting, rather than writing the last four digits of his or her social security number or full Ohio driver's license or state ID number, it may be difficult, if not impossible, to verify that the person is a registered voter.

**M.    *Provisional Voters: Wrong precinct, right polling place***

102.    A prevalent ground on which provisional ballots have been rejected is when a voter votes in the wrong precinct, but at the correct polling location. S. B. 216 provides that a

board of elections may by a vote of three of its members decide to combine the poll books for a multi-precinct polling location into a unified poll book. Doing so eliminates casting a provisional ballot in the wrong precinct when the voter is in the correct polling location. Because this is discretionary with each county board of elections, however, provisional voters in counties where the board does not vote to combine the poll books will be at greater risk of their provisional ballot not being counted at all or only partially counted if they are cast in the wrong precinct, but correct polling location; while the provisional voter at a polling place where the precinct poll books have been combined will have all of his or her votes counted. Further, S. B. 216 provides that if the precinct election official correctly completes a form the Secretary of State prescribes (Form 12-D) stating that he or she informed the voter of their correct precinct, then the precinct election official will be "deemed" to have directed the voter to the correct precinct, even if that is not the case.

### N.    *Provisional Voters: Wrong polling place*

103.    Ohio law requires precinct election officials to inform persons, who appear to vote but are not residents of that precinct, of the location of their correct precinct and that if they vote in the wrong precinct, their ballot will not be counted. This duty is the same regardless of whether the voter is at the correct or incorrect polling location. S.B. 216 provides that in the case of a voter who casts a provisional ballot in the wrong precinct, but at the correct polling location, the ballot will be counted in full or part if the precinct election official failed to correctly complete a form prescribed by the Secretary of State (Form 12-D) that states that the precinct election official directed the voter to the correct precinct and informed the voter that his or her ballot will not be counted if cast in the wrong precinct. It makes no such provision, however, for the voter who is at the wrong polling location—despite the duty on the precinct election official being the same. Rather, it requires that such provisional ballots cannot be counted and the precinct

election official is not required to complete a form stating that the voter was informed of his or her correct precinct and that the ballot would not be counted if cast in the wrong precinct.

### O.    *Provisional Voters: No ID*

104.    S. B. 216 repeals a provision of Ohio law that protected the right to vote of those individuals who do not have any of the permitted forms of identification. Previously, a person who did not possess a social security number, an Ohio driver's license, an Ohio state ID card number, or one of the other allowable forms of ID could still cast a provisional ballot upon execution of an affirmation under penalty of election falsification that he or she does not possess any of the acceptable forms of ID. The ballot would be counted only if the board of elections determined that the person met the qualifications of an elector in the precinct. Such electors will now be disenfranchised.

### P.    *Provisional Voters: Access to information*

105.    As set forth above, a provisional voter, whose affirmation form did not provide his or her social security number's last four digits, or full driver's license or state ID number, or who failed to check-mark one of three boxes regarding other forms of ID, or who have an ID error or mismatch, will not have their ballot counted unless the voter personally comes to the board of elections no later than seven days after the election and provides such information. S. B. 216 appears to prohibit access to the identity of such voters, except by the individual voter; thus preventing Plaintiffs and other third-party voter-protection organizations from being able to notify voters that their ballot will not be counted unless they timely address the matter. By contrast, access to the identity of absentee voters who must correct or supply information to the board within the same seven-day period is provided to third-party organizations.

106.    Plaintiffs and their members and supporters will be irreparably harmed if the foregoing provisions of S.B. 205 and S.B. 216 are not preliminarily and permanently enjoined.

**COUNT ONE**
**VIOLATION OF THE VOTING RIGHTS ACT, 42 U.S.C. § 1973AA AND 42 U.S.C. § 1983**
**(BAN ON LITERACY TESTS)**

107.    Plaintiffs restate each of the allegations contained in each of the paragraphs above as if they were fully set forth here.

108.    The Voting Rights Act, 42 U.S.C. § 1973aa, imposed a nationwide ban on literacy tests that were historically used by various states to disenfranchise minority voters, including African-American and Latino voters.

109.    Section 1973aa(a) provides that "[n]o citizen shall be denied, because of his failure to comply with any test or device, the right to vote in any federal, State, or local election conducted in any State or political subdivision of a State."

110.    Section 1973aa(b) defines the term "test or device" to include "any requirement that a person as a prerequisite for voting or registration for voting ... demonstrate the ability to read, write, understand, or interpret any matter [or] demonstrate any educational achievement or his knowledge of any particular subject ....."

111.    S.B. 205 and S.B. 216 require that Ohio voters who cast absentee or provisional ballots are able to and in fact do thoroughly read, completely understand, and perfectly fill out the Provisional Form or Absentee Envelope as a precondition of having their vote counted, regardless of whether they are otherwise qualified, registered, and eligible to vote.

112.    S.B. 205 and S.B. 216 require that Ohio voters who wish to cast absentee or provisional ballots and are unable to fill out the applicable forms without help from the election official must know that Ohio law requires them first to declare that they need assistance because of blindness, disability, or illiteracy.

113.    Thousands of Ohio voters, including Plaintiffs' members and supporters, will be disenfranchised by their inability or failure to thoroughly read, completely understand, and/or

properly interpret the requirements of the Provisional Form or Absentee Envelope, as well as because of their ignorance of the requirement that they must declare that they need assistance due to blindness, disability, or illiteracy as a condition of receiving help filling out these forms.

114.    Thousands of Ohio voters, including Plaintiffs' members and supporters, will suffer direct and irreparable injury as a result of S.B. 205 and S.B. 216.

115.    The challenged provisions of S.B. 205 and S.B. 216 should therefore be permanently enjoined, and Plaintiffs should be awarded declaratory relief and their costs and reasonable attorneys' fees.

## COUNT TWO
## VIOLATION OF THE VOTING RIGHTS ACT, 42 U.S.C. § 1971 AND 42 U.S.C. § 1983
## (IMMATERIAL ERRORS/OMISSIONS)

116.    Plaintiffs restate each of the allegations contained in each of the paragraphs above as if they were fully set forth here.

117.    The Voting Rights Act, 42 U.S.C. § 1971, prohibits States from disenfranchising voters based upon immaterial errors or omissions in any voting-related record or paper.

118.    Section 1971(a)(2)(B) provides: "No person acting under color of law shall ... deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election."

119.    S.B. 205 and S.B. 216 will cause thousands of Ohio voters who cast absentee or provisional ballots to suffer the severe and irreparable harm of disenfranchisement solely because of technical and immaterial errors/omissions on a Provisional Form or Absentee Envelope and/or mismatches with the SVR Database, even if the applicable Board of Elections can otherwise determine that the voter is qualified, registered, and eligible to vote.

120.    Tens of thousands of Ohio voters, including Plaintiffs' members and supporters, will suffer direct and irreparable injury as a result of S.B. 205 and S.B. 216.

121.    The challenged provisions of S.B. 205 and S.B. 216 should therefore be permanently enjoined, and Plaintiffs should be awarded declaratory relief and their costs and reasonable attorneys' fees.[1]

## COUNT THREE
## VIOLATION OF THE FOURTEENTH AMENDMENT AND 42 U.S.C. § 1983
## (PROCEDURAL DUE PROCESS)

122.    Plaintiffs restate each of the allegations contained in each of the paragraphs above as if they were fully set forth here.

123.    The right to vote is fundamental and is one of the most important rights in our democratic society. It is protected by the United States Constitution, which protects the right of all qualified citizens to vote in elections for federal office.

124.    Plaintiffs' members and supporters have a liberty interest in the right to vote that is protected by the Due Process Clause of the Fourteenth Amendment.

125.    The challenged provisions of S.B. 205 and S.B. 216 threaten to deprive Plaintiffs' members and supporters of their right to vote without due process of law.

126.    Specifically, the challenged laws do not require reasonable notice of or reasonable opportunity to correct errors or omissions on a Provisional Form or Absentee Envelope or to challenge incorrect information in the SVR database prior to rejection of a provisional or absentee ballot on such grounds.

127.    The challenged laws also do not require that disenfranchised voters be provided

---

[1] Although Plaintiffs acknowledge that the Sixth Circuit has held that there is no private right of action under 42 U.S.C. § 1971, there is a circuit split on the issue. *Compare McKay v. Thompson*, 226 F.3d 752 (6th Cir. 2000) *with Schwier v. Cox*, 340 F.3d 1284 (11th Cir. 2003). This claim is included to preserve the issue for appeal.

with notice of the fact and reason(s) of the denial of their right to vote, or be given an opportunity to correct any errors, omissions or mismatches so that their votes will be counted in future elections.

128.    The right to vote is a fundamental constitutional right.

129.    The challenged laws create a significant risk that Plaintiffs' members and supporters will be erroneously deprived of their right to vote.

130.    It is probable that additional safeguards will be of value in protecting the right to vote.

131.    The State's asserted interests in the challenged laws do not justify the failure to provide adequate due process before depriving Plaintiffs' members and supporters of their right to vote.

132.    Because no administrative remedy can cure the disenfranchisement of the right to vote after certification of election results, post-deprivation procedures are not sufficient to satisfy the requirements of due process.

133.    Thousands of Ohio voters, including Plaintiffs' members and supporters, will suffer direct and irreparable injury as a result of S.B. 205 and S.B. 216.

134.    S.B. 205 and S.B. 216's challenged provisions should thus be permanently enjoined, and Plaintiffs should be awarded declaratory relief and their costs and reasonable attorneys' fees.

## COUNT FOUR
## VIOLATION OF THE FIRST AND FOURTEENTH AMENDMENTS AND 42 U.S.C. § 1983
### (UNDUE BURDEN ON SPEECH AND ASSOCIATION RIGHTS)

135.    Plaintiffs restate each of the allegations contained in each of the paragraphs above as if they were fully set forth here.

136.    The First and Fourteenth Amendments prohibit the imposition of severe burdens on the right to vote unless they are narrowly drawn to advance a state interest of compelling importance.

137.    Even where burdens on the right to vote are not severe, the First and Fourteenth Amendments prohibits them if they are not justified by relevant and legitimate state interests that are sufficiently weighty to justify the limitations.

138.    As shown above, S.B. 205 and S.B. 216 will severely burden the fundamental right to vote of tens of thousands of Ohio voters who cast absentee and provisional ballots by imposing restrictions that go beyond mere inconvenience and that represent a significant increase over the usual burdens of voting.

139.    The voting restrictions imposed by S.B. 205 and S.B. 216 are not reasonable, generally applicable, nondiscriminatory or neutral.

140.    The State of Ohio has not asserted, and cannot assert, any interest (much less an interest of compelling importance) that justifies imposing and/or makes it necessary to impose these severe burdens upon the rights of Ohio voters who cast absentee or provisional ballots.

141.    Thousands of Ohio voters, including Plaintiffs' members and supporters, will suffer direct and irreparable injury as a result of S.B. 205 and S.B. 216.

142.    The challenged provisions of S.B. 205 and S.B. 216 should therefore be permanently enjoined, and Plaintiffs should be awarded declaratory relief and their costs and reasonable attorneys' fees.

## COUNT FIVE
### VIOLATION OF THE FOURTEENTH AMENDMENT AND 42 U.S.C. § 1983
### (EQUAL PROTECTION/LACK OF UNIFORM STANDARDS)

143.    Plaintiffs restate each of the allegations contained in each of the paragraphs above as if they were fully set forth here.

144.    The Fourteenth Amendment's Equal Protection Clause protects the right of every qualified voter to vote and have that vote be counted on equal terms with other qualified voters.

145.    The State is required to treat similarly situated ballots cast by provisional voters and absentee voters equally.

146.    Boards of elections will necessarily exercise their discretion when determining whether to count provisional ballots after Election Day. This circumstance raises significant constitutional concerns because the preliminary outcome of the election is already known. It is therefore especially important to apply uniform rules and specific standards when determining whether to count or reject provisional ballots.

147.    The lack of uniform standards in state law and/or directives from Defendant Husted with regard to the application of S.B. 205 and S.B. 216 will lead to the arbitrary and disparate treatment of absentee and provisional voters because it will inevitably cause Boards of Elections to treat similarly situated voters differently from county to county and within a county.

148.    Thousands of Ohio voters, including Plaintiffs' members and supporters, will suffer direct and irreparable injury as a result of S.B. 205 and S.B. 216.

149.    The challenged provisions of S.B. 205 and S.B. 216 should therefore be permanently enjoined, and Plaintiffs should be awarded declaratory relief and their costs and reasonable attorneys' fees.

## COUNT SIX
### VIOLATION OF THE FOURTEENTH AMENDMENT AND 42 U.S.C. § 1983
### (EQUAL PROTECTION/ARBITRARY AND DISPARATE TREATMENT)

150.    Plaintiffs restate each of the allegations contained in each of the paragraphs above as if they were fully set forth here.

151.    The Fourteenth Amendment's Equal Protection Clause prohibits the arbitrary and disparate treatment of voters.

152.    The challenged provisions of S.B. 205 and S.B. 216 treat similarly situated voters in an arbitrary and disparate manner without lawful justification.

153.    Thousands of Ohio voters, including Plaintiffs' members and supporters, will suffer direct and irreparable injury as a result of S.B. 205 and S.B. 216.

154.    The challenged provisions of S.B. 205 and S.B. 216 should therefore be permanently enjoined, and Plaintiffs should be awarded declaratory relief and their costs and reasonable attorneys' fees.

## COUNT SEVEN
### VIOLATION OF THE FOURTEENTH AMENDMENT AND 42 U.S.C. § 1983
### (SUBSTANTIVE DUE PROCESS)

155.    Plaintiffs restate each of the allegations contained in each of the paragraphs above as if they were fully set forth here.

156.    The Due Process Clause of the Fourteenth Amendment to the United States Constitution protects against extraordinary voting restrictions that render the voting system fundamentally unfair.

157.    The challenged provisions of S.B. 205 and S.B. 216 constitute extraordinary voting restrictions that render the voting system fundamentally unfair. Among other things, it is fundamentally unfair to disenfranchise Ohio voters who cast absentee or provisional ballots based solely upon technical and immaterial errors/omissions on a Provisional Form or Absentee

Envelope and/or mismatches with the SVR Database, even if the applicable board of elections can otherwise determine that the voter is qualified, registered, and eligible to vote.

158.     Thousands of Ohio voters, including Plaintiffs' members and supporters, will suffer direct and irreparable injury as a result of S.B. 205 and S.B. 216.

159.     S.B. 205 and S.B. 216's challenged provisions should therefore be permanently enjoined, and Plaintiffs should be awarded declaratory relief and their costs and reasonable attorneys' fees.

**COUNT EIGHT**
**VIOLATION OF THE VOTING RIGHTS ACT, 42 U.S.C. § 1973 AND 42 U.S.C. § 1983**
**(SECTION 2 RACE DISCRIMINATION)**

160.     Plaintiffs restate each of the allegations contained in each of the paragraphs above as if they were fully set forth here.

161.     The Voting Rights Act, 42 U.S.C. § 1973 (commonly referred to as "Section Two"), outlaws the use of any standard, practice, procedure, qualification, or prerequisite to voting that denies the right of any United States citizen to vote on account of his or her race.

162.     Section 1973(a) provides, in relevant part: "No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State ... in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color."

163.     Pursuant to Section 1973(b), a violation is established if members of a particular race or color "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."

164.     S.B. 205 and S.B. 216 will cause thousands of Ohio voters who cast absentee or provisional ballots to suffer the severe and irreparable harm of disenfranchisement solely because of technical and immaterial errors and/or omissions on a Provisional Form or Absentee

Envelope, even if the applicable Board of Elections can otherwise determine that the voter is qualified, registered, and eligible to vote.

165.    These provisions of S.B. 205 and S.B. 216 are a voting qualification, prerequisite, standard, practice or procedure that will result in a denial or abridgement of the rights of Plaintiffs' members and supporters to vote on account of race or color.

166.    **The unlawful, severe, and irreparable harm of disenfranchisement caused by these challenged provisions was intended to and will have a disparate impact on African-American and Latino voters.**

167.    The challenged provisions of S.B. 205 and S.B. 216 also will have a discriminatory result because:

> a.   The laws will interact with social and historical conditions in Ohio to cause an inequality in the opportunities enjoyed by African-American and Latino voters to elect their preferred representatives;
>
> b.   The disproportionate impact will result from the fact that minority voters suffer from the effects of prior discrimination, including inferior education, segregated housing, poor employment opportunities, low incomes and poverty; and
>
> c.   The disproportionate impact will result from the interaction of the challenged law with the effects of past and/or present discrimination and will not be merely a product of chance.

168.    The totality of circumstances shows that political processes in Ohio are not equally open to participation by minority voters in that they have less opportunity than white voters to participate in the political process and to elect representatives of their choice. For example:

    a.   Voting in statewide elections is racially polarized;

    b.   Minority individuals in the state bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

    c.   Minority candidates have been relatively unsuccessful in being elected to statewide public office;

    d.   Elected officials have demonstrated a significant lack of responsiveness to the particularized needs of minorities; and

    e.   The policy underlying the challenged provisions of S.B. 205 and S.B. 216 is tenuous at best.

169.    Tens of thousands of African-American and Latino voters, including Plaintiffs' members and supporters, will suffer direct and irreparable injury as a result of S.B. 205 and S.B. 216.

170.    The challenged provisions of S.B. 205 and S.B. 216 should therefore be permanently enjoined, and Plaintiffs should be awarded declaratory relief and their costs and reasonable attorneys' fees.

## COUNT NINE
## VIOLATION OF THE FOURTEENTH AND FIFTEENTH AMENDMENTS AND 42 U.S.C. § 1983
### (INTENTIONAL RACE DISCRIMINATION)

171.    Plaintiffs restate each of the allegations contained in each of the paragraphs above as if they were fully set forth here.

172.    The Equal Protection clause of the Fourteenth Amendment to the United States Constitution prohibits the states from "deny[ing] to any person within its jurisdiction the equal protection of the laws."  This provision prevents a State from discriminating against Ohio voters on account of their race or color.

173.    The Fifteenth Amendment to the United States Constitution states that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude."

174.    A motivating purpose behind S.B. 205 and S.B. 216 was to suppress the number of votes cast by African-American and Latino voters in Ohio's urban counties, who disproportionately cast their votes by absentee or provisional ballots.  As noted above, S.B. 205 and S.B. 216 will be successful in effectuating that purpose.

175.    The historical background of universal absentee voting in Ohio and the sequence of events leading up to the enactment of S.B. 205 and S.B. 216 indicate that race was a motivating factor in the law's enactment.

176.    The presence of intentional race discrimination invalidates S.B. 205 and S.B. 216 under the Fourteenth and Fifteenth Amendments.

177.    Tens of thousands of Ohio voters, including Plaintiffs' members and supporters, will suffer direct and irreparable injury as a result of S.B. 205 and S.B. 216.

178.     The challenged provisions of S.B. 205 and S.B. 216 should therefore be permanently enjoined, and Plaintiffs should be awarded declaratory relief and their costs and reasonable attorneys' fees.

## COUNT TEN
### VIOLATION OF THE FIRST AND FOURTEENTH AMENDMENTS AND 42 U.S.C. § 1983
### (VOTER SPEECH/VIEWPOINT & ASSOCIATION DISCRIMINATION)

179.     Plaintiffs restate each of the allegations contained in each of the paragraphs above as if they were fully set forth here.

180.     The First and Fourteenth Amendments prohibit states from abridging the freedoms of speech and association and the right to equal protection of the laws.

181.     The manipulation and distortion of a State's electoral system to gain a partisan advantage in the casting and counting of votes—including by creating barriers that fall disparately upon a class of voters based upon their actual or suspected viewpoint—violates the First and Fourteenth Amendments.

182.     The challenged provisions of S.B. 205 and S.B. 216 were intended to and will impose severe and undue burdens on Ohio voters who cast absentee and provisional ballots based upon their actual or suspected political viewpoint.

183.     Ohio voters who cast absentee and provisional ballots are more likely to cast their votes in favor of candidates from the national, state, or local Democratic Party than in favor of candidates from the national, state, or local Republican Party.

184.     When they enacted and signed S.B. 205 and S.B. 216 into law, the Republican-controlled Ohio General Assembly and Republican Governor Kasich intended to and did impose burdens and barriers to voting that will fall most heavily upon Ohio voters who cast absentee or provisional ballots.

185.    In so doing, the Ohio General Assembly and Governor Kasich acted upon their expectations that the voters who would be disparately impacted and burdened and in some cases disenfranchised (i.e., those that cast absentee and provisional ballots) are likely to cast their votes in favor of Democratic Party candidates rather than Republican Party candidates.

186.    Therefore, S.B. 205 and S.B. 216 unlawfully discriminate against Ohio voters who cast absentee and provisional ballots based on the State of Ohio's expectation that when they cast their votes more of them will express and exercise a political preference (speech/viewpoint and association) in favor of a certain political party (i.e. the national, state or local Democratic Party), in violation of the First and Fourteenth Amendments to the United States Constitution.

187.    Tens of thousands of Ohio voters, including Plaintiffs' members and supporters, will suffer direct and irreparable injury as a result of S.B. 205 and S.B. 216.

188.    S.B. 205 and S.B. 216's challenged provisions should therefore be permanently enjoined, and Plaintiffs should be awarded declaratory relief and their costs and reasonable attorneys' fees.

THUS, Plaintiffs pray and request that the Court grant the following relief:

a)    Enter a declaratory judgment under 28 U.S.C. § 2201 declaring that S.B. 205 and S.B. 216's challenged provisions violate federal law, are null and void, and are *either* facially unconstitutional *or* are unconstitutional as applied to Plaintiffs' members and similarly situated Ohio voters;

b)    Enter a permanent injunction that restrains and enjoins Defendants from enforcing or applying S.B. 205 and S.B. 216's challenged provisions as to *either* all Ohio voters (facial invalidity) *or* Plaintiffs' members and similarly situated Ohio voters (as-applied invalidity);

c) Award Plaintiffs their reasonable attorneys' fees and costs; and

d) Award Plaintiffs such other and further relief that the Court deems just and

equitable.

Respectfully submitted,

/s/ Subodh Chandra
Subodh Chandra, Trial Attorney (0069233)
Donald P. Screen (044070)
Ashlie Case Sletvold (0079477)
Sandhya Gupta (0086052)
THE CHANDRA LAW FIRM, LLC
1265 W. 6th St., Suite 400
Cleveland, OH 44113-1326
216.578.1700 Phone
216.578.1800 Fax
Subodh.Chandra@ChandraLaw.com
Donald.Screen@ChandraLaw.com
Ashlie.Sletvold@ChandraLaw.com
Sandhya.Gupta@ChandraLaw.com

/s/ Caroline H. Gentry [per consent]
Caroline H. Gentry (0066138)
PORTER, WRIGHT, MORRIS & ARTHUR LLP
One South Main Street, Suite 1600
Dayton, OH 45402
937.449.6748 Phone
937.449.6820 Fax
cgentry@porterwright.com

*Attorneys for Plaintiffs NEOCH and Columbus Coalition for the Homeless*

/s/ Donald McTigue     [per consent]
Donald J. McTigue, Trial Attorney (0022849)
Mark A. McGinnis (0076275)
J. Corey Colombo (0072398)
MCTIGUE  MCGINNIS & COLOMBO, LLC
 545 East Town Street
Columbus, OH 43215
614.263.7000 Phone
614.263.7078 Fax
dmctigue@electionlawgroup.com
mmcginnis@electionlawgroup.com
ccolombo@electionlawgroup.com

*Attorneys for Intervenor-Plaintiff Ohio Democratic Party*

**CERTIFICATE OF SERVICE**

I certify that on August 10, 2015, my office filed the foregoing document using the Court's online-filing system, which will send a copy of the foregoing to all counsel of record.

*/s/ Subodh Chandra*
*One of the Attorneys for Plaintiffs*