**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **THE NORTHEAST OHIO COALITION** | **:** | |
| **FOR THE HOMELESS**, *et al.*, | **:** | |
| | **:** | |
| **Plaintiffs,** | **:** | **Case No. 2:06-CV-896** |
| | **:** | |
| **v.** | **:** | **JUDGE ALGENON L. MARBLEY** |
| | **:** | |
| **JON HUSTED, in his official capacity as** | **:** | **Magistrate Judge Terence P. Kemp** |
| **Secretary of the State of Ohio,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

**<u>FINAL JUDGMENT</u>**

TABLE OF CONTENTS

I.  Introduction ................................................................................................. 1

II.  Procedural History ..................................................................................... 1

   A.  2010 Consent Decree .......................................................................... 4

   B.  Second Supplemental Complaint ....................................................... 7

III.  Findings of Fact ......................................................................................... 9

   A.  Parties ................................................................................................. 9

      1.  Plaintiffs ........................................................................................ 9

         a.  NEOCH ................................................................................... 9

         b.  CCH ...................................................................................... 13

         c.  ODP ...................................................................................... 14

      2.  Defendant ..................................................................................... 15

   B.  Voting in Ohio .................................................................................. 15

      1.  Election-Day Voting ................................................................... 15

      2.  Absentee Voting .......................................................................... 16

         a.  In-Person Absentee Voting ................................................... 17

         b.  Mail-in Absentee Voting ...................................................... 17

      3.  Provisional Voting ...................................................................... 18

   C.  The Challenged Laws ....................................................................... 19

      1.  SB 205 ......................................................................................... 19

      2.  SB 216 ......................................................................................... 20

   D.  The Lead-up to SB 205 and SB 216 ................................................ 22

   E.  The Implementation of SB 205 and SB 216 .................................... 27

      1.  Individual Voter Testimony ........................................................ 27

      2.  Aggregate Data and Testimony from Board Officials ................ 30

      3.  Varied Board Practices ............................................................... 31

   F.  Burden on Plaintiffs ......................................................................... 33

      1.  Information Requirements ........................................................... 33

      2.  Prohibition Against Poll-Worker Assistance .............................. 34

      3.  Reduction of the Cure Period ..................................................... 35

G. The State's Justifications for Enacting the Challenged Laws ................................. 35

    1. Information Requirements ................................................ 35

    2. Prohibition Against Poll-Worker Assistance .................................... 37

    3. Reduction of the Cure Period .............................................. 37

H. Disparate Impact .......................................................... 38

    1. Dr. Jeffrey Timberlake ................................................... 38

        a. Background and Methodology .......................................... 38

        b. Conclusions Regarding Disparate Impact ................................ 40

    2. Dr. Nolan McCarty .................................................... 42

    3. Dr. M.V. "Trey" Hood ................................................ 45

    4. Conclusions from Expert Reports .......................................... 47

I. Racial Discrimination ...................................................... 48

    1. The Senate Factors ..................................................... 48

        a. Fifth Factor: Extent of Discrimination Hindering Participation in
           Political Process ................................................... 49

        b. First and Third Factors: Voting-Related Discriminatory Processes ........... 53

        c. Second Factor: Racially Polarized Voting in Ohio ...................... 56

        d. Sixth Factor: Racialized Appeals in Politics ............................ 57

        e. Seventh Factor: Minority Representation ................................ 59

        f. Eighth Factor: Lack of Responsiveness ................................ 60

        g. Ninth Factor: Tenuousness ........................................... 60

    2. The Calculus of Voting .................................................. 61

IV. Conclusions of Law ........................................................ 62

A. Standing ................................................................ 62

    1. Organizational Standing.................................................. 63

    2. Associational or Representational Standing ................................... 66

    3. Third-Party Standing.................................................... 67

B. Constitutional Claims.................................................................................. 69

   1. Equal Protection: Undue Burden .............................................. 69

      a. Information Requirements............................................... 72

      b. Prohibition Against Poll-Worker Assistance ................. 76

      c. Reduction of Cure Period............................................... 77

   2. Equal Protection: Disparate Treatment of Election-Day, Provisional, and Absentee Voters ................................................................ 79

   3. Equal Protection: Lack of Uniform Standards................................ 82

   4. Procedural Due Process ................................................................ 83

   5. Substantive Due Process .............................................................. 85

   6. Race Discrimination under the Fourteenth and Fifteenth Amendments.......... 86

   7. Viewpoint Discrimination............................................................. 90

C. Voting Rights Act Claims ........................................................................ 92

   1. Section 2.......................................................................................... 92

      a. SB 205 and SB 215 Have a Disparate Impact on African-Americans ....... 94

      b. SB 205 and SB 216 Combine with the Effects of Past Discrimination to Interfere with the Voting Power of African-Americans ........................ 97

   2. Materiality Provision ................................................................ 106

   3. Literacy Test ............................................................................. 107

V. Conclusion .......................................................................................... 110

## I.     INTRODUCTION

Because the right to exercise the franchise "is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized."  *Reynolds v. Sims*, 377 U.S. 533, 562 (1964).  Throughout this protracted litigation, the Court has endeavored to fulfill its duty to scrutinize various restrictions of this basic right in Ohio.  The current dispute centers on Plaintiffs' challenge to certain portions of Senate Bills 205 ("SB 205") and 216 ("SB 216"), which took effect on June 1, 2014 and made changes, respectively, to Ohio's absentee- and provisional-voting regimes.  Plaintiffs, the Northeast Ohio Coalition for the Homeless ("NEOCH"), the Columbus Coalition for the Homeless ("CCH"), and Plaintiff-Intervenor the Ohio Democratic Party ("ODP"), ask the Court to declare that the challenged portions of the laws are unconstitutional and violate the Voting Rights Act, and to enjoin the Secretary of State of Ohio ("Defendant" or "Secretary") from enforcing them.

The Court presided over a bench trial on the matter and, after carefully considering all of the evidence, issues its findings of fact and conclusions of law under Federal Rule of Civil Procedure 52(a).  For the reasons that follow, the Court enters **JUDGMENT in part** for Plaintiffs, and **JUDGMENT in part** for Defendant.  The Court finds that the new information requirements, prohibition against poll-worker assistance to voters, and reduction in the cure period in SBs 205 and 216 are unconstitutional and violate the Voting Rights Act ("VRA").  The Court **ENJOINS** the Secretary from enforcing them.

## II.     PROCEDURAL HISTORY

The Court has recited the byzantine factual and procedural background of this case, and its related case, *Service Employees International Union, Local 1 v. Husted*, Case No. 2:12-cv-

1

562 (the "*SEIU* case") numerous times. (*See* Docs. 108, 383, 452; *SEIU* case, Docs. 90, 103.) For purposes of this Final Judgment, the following overview of the litigation's history will suffice.

Plaintiffs NEOCH and the Service Employees International Union ("SEIU") initiated this action against the Secretary on October 24, 2006. (Compl., Doc. 2 at 50-52.) The Complaint alleged that portions of recently-enacted Ohio election laws ran afoul of the Due Process and Equal Protection clauses of the Fourteenth Amendment to the United States Constitution, constituted a poll-tax in violation of the Twenty-Fourth Amendment, and violated 42 U.S.C. § 1971(a)(2)(A) and (B), sections of the Civil Rights Act of 1964. (Doc. 2 at 38-49.)

Plaintiffs challenged the new laws on the basis that they subjected voters to possible criminal penalties that were confusing, vague, and impossible to apply; placed an unequal and undue burden on election-day voters by requiring them to produce identification ("ID") while exempting absentee voters from that requirement; imposed a poll tax by mandating that voters purchase a state-ID card or birth certificate; and treated provisional voters fundamentally unfairly by applying vague and internally inconsistent standards in a non-uniform manner. (*Id.* at ¶¶ 1-4.) Plaintiffs asked the Court to declare the challenged laws unconstitutional and to restrain the Secretary from enforcing those laws. (*Id.* at 50-51.)

The Court granted Plaintiffs' motion for a temporary restraining order on October 26, 2006. (Order Granting Mot. for TRO, Doc. 17.) The Court exempted certain voters from some of the ID requirements of the challenged laws, and the Court found that phrases in the challenged laws were unconstitutionally vague and unequally applied by county Boards of Elections ("Boards"). (*Id.* at 3.) On November 1, 2006, the parties entered into a consent order, which applied only to the November 2006 general election, addressing and clarifying election-day,

Case: 2:06-cv-00896-ALM-TPK Doc #: 691 Filed: 06/07/16 Page: 7 of 115 PAGEID #: 33800

absentee, and provisional voter-ID requirements for the 2006 election. (Consent Order, Doc. 51.) The Consent Order reiterated the requirements of certain provisions of the state voter-ID Law, amended the ID requirements for in-person absentee voters, and defined the terms of the Secretary's Directive 2006-78, which sought uniformity in administering the voter-ID law. (*Id.*)

On November 14, 2006, Plaintiffs filed a Motion to Enforce the Consent Order, alleging that some Boards were in violation of the 2006 Consent Order. (Mot. to Enforce Consent Order, Doc. 55.) The next day, all parties entered into an agreed enforcement order. (Doc. 57.) As with the Consent Order, the Enforcement Order set forth guidelines for the Secretary and Boards to follow in administering the election. (*Id.*)

Subsequently, on September 30, 2008, the Court found that Plaintiffs' showing of member injury was sufficient to confer standing for only three of their six challenges to the voter-ID laws. (Order Granting in Part and Den. in Part Mot. to Dismiss for Lack of Jurisdiction, Doc. 108.)

On October 14, 2008, Plaintiffs moved the Court for a preliminary injunction that would enjoin the enforcement of Ohio voter-ID laws as unconstitutional, both facially and as applied to Plaintiffs' homeless members and other similarly situated homeless Ohio voters in the 2008 general election. (Mot. for Prelim. Inj., Doc. 111.) On October 27, 2008, the Court adopted then-Secretary of State Jennifer Brunner's directive resolving some of the issues in the Motion for Preliminary Injunction. (Order Granting Mot. for Prelim. Inj., Doc. 143.) The Court ordered the Secretary to instruct the Boards not to reject provisional ballots for reasons attributable to poll-worker error and not to reject provisional ballots when a voter with no fixed place of residence failed to list a building address on the form. (*Id.* at 2-3.)

NEOCH and SEIU filed an amended supplemental complaint on November 21, 2008, adding CCH and individual homeless Ohio voters as additional Plaintiffs.  (Am. Compl., Doc. 159 at ¶¶ 2-20.)  The Amended Complaint made allegations regarding events that happened after the Complaint in the matter was filed, and added new claims based on those new facts in light of the Supreme Court's decision in *Crawford v. Marion County*, 553 U.S. 181 (2008).  According to the Amended Complaint, many homeless persons wishing to vote in the 2008 election did not have and could not easily obtain required ID.  (*Id.* at ¶¶ 6-24.)  Plaintiffs alleged that the Secretary and Boards administered the 2006 and 2008 general elections in violation of the Fourteenth and Twenty-Fourth Amendments.  (*Id.* at ¶¶ 116-131.)  Plaintiffs requested, among other remedies, a declaration from the Court that the voter-ID laws were unconstitutional, both facially and as applied to NEOCH, CCH, and their members.  (*Id.* at ¶ 39a-b.)

## A.  2010 Consent Decree

On April 19, 2010, the parties entered into a consent decree.  (Doc. 210.)  The Consent Decree included various terms and orders, including an order for the Secretary to instruct Boards that voters who met certain criteria would be able to cast a valid provisional ballot using the last four digits of their Social Security number ("SSN-4") as ID, and an order for the Secretary to instruct Boards that they could not reject ballots filed erroneously due to poll-worker error.  (*Id.* at ¶ 5a-c.)  Specifically, the parties stated in Section I of the Decree that:

> [i]n resolution of this action, the parties hereby AGREE to, and the Court expressly APPROVES, ENTERS, and ORDERS, the following . . .

> 1.    The purposes of this Decree are to ensure that:

> > a. The fundamental right to vote is fully protected for registered and qualified voters who lack the identification required by the Ohio Voter ID Laws, including indigent and homeless voters—such as the Individual Plaintiffs and certain members of the Coalitions—who do not have a current address and cannot readily purchase a State of Ohio ID Card;

4

b. These voters are not required to purchase identification as a condition to exercising their fundamental right to vote and have their vote be counted;

c. The legal votes cast by these voters will be counted even if they are cast by provisional ballot on Election Day;

d. These voters will not be deprived of their fundamental right to vote because of differing interpretations and applications of the Provisional Ballot Laws by Ohio's 88 Boards of Elections;

e. These voters will not be deprived of their fundamental right to vote because of failures by poll workers to follow Ohio law. For purposes of this Decree[,] poll[-]worker error will not be presumed, but must be demonstrated through evidence; and

f. All legal votes that are cast by indigent and homeless voters on Election Day will be counted.

(*Id.* at ¶ 1.)

The Consent Decree enjoined the Boards to count provisional ballots cast by persons with no ID other than the last four digits of their Social Security numbers so long as:

i. The individual who cast the provisional ballot is registered to vote;

ii. The individual is eligible to cast a ballot in the precinct and for the election in which the individual cast the provisional ballot;

iii. The provisional ballot affirmation includes a statement that the individual is registered to vote in the precinct in which the provisional ballot was cast and a statement that the individual is eligible to vote in the election in which the provisional ballot was cast;

iv. The individual's name and signature appear in the correct place on the provisional ballot affirmation form, unless the voter declined to execute the affirmation and the poll workers complied with their statutory duties under R.C. 3505.182 and R.C. 3505.181(B)(6) when a voter declines to execute the affirmation;

v. The signature of the voter substantially conforms to the signature contained in the Board of Election's records for that voter;

vi. The provisional ballot affirmation includes the last four digits of that voter's social security number, which is not found to be invalid;

5

vii. The individual's right to vote was not successfully challenged;

viii. The individual did not already cast a ballot for the election in which the individual cast the provisional ballot; and

ix. Pursuant to R.C. 3505.183(B)(2), the Board of Elections determines that, in addition to the information included on the affirmation, there is no additional information for determining ballot validity provided by the provisional voter or to the Board of Elections during the ten days after the day of the election that casts doubt on the validity of the ballot or the individual's eligibility to vote.

(Doc. 210 at ¶ 5a.)  The Consent Decree further enjoined the Boards from rejecting, for any of

the following reasons, a provisional ballot cast by a voter who uses only her SSN-4:

i. The voter provided the last four digits of a Social Security Number but did not provide a current driver's license, state issued identification, or other document which serves as identification under Ohio law;

ii. The voter did not provide a date of birth;

iii. The voter did not provide an address that is tied to a house, apartment or other dwelling provided that the voter indicated that he or she resides at a non-building location, including but not limited to a street corner, alley or highway overpass located in the precinct in which the voter seeks to cast a ballot and that the non-building location qualifies as the individual's voting residence under R.C. 3503.02;

iv. The voter indicated that he or she is homeless;

v. The voter cast his or her provisional ballot in the wrong precinct, but in the correct polling place, for reasons attributable to poll[-]worker error;

vi. The voter did not complete or properly complete and/or sign the provisional ballot application for reasons attributable to poll[-]worker error; or

vii. The poll worker did not complete or properly complete and/or sign the provisional ballot application witness line and/or the provisional ballot affirmation form, except for reasons permitted by the governing statutes.

(*Id.* at ¶ 5b.)

The Consent Decree originally was set to expire on June 30, 2013.  (*Id.* at ¶ 9.)  On

August 5, 2013, on Plaintiffs' motion, the Court extended the Consent Decree through December

31, 2016.  (Order Granting in Part Mot. to Extend and Modify Consent Decree, Doc. 383 at 21.)

### B.  Second Supplemental Complaint

On September 24, 2014, the State provided notice to the Court that SB 216 would amend

portions of the Notice required under Article IV, ¶ 8 of the Consent Decree.  (Notice, Doc. 425.)

Specifically, Defendant provided that the following changes in the new law were relevant to, and

would supersede, these terms of the Consent Decree: (i) the elimination of a procedure allowing

an individual who refused to execute a provisional ballot affirmation to still cast a provisional

ballot; (ii) the requirement that the provisional ballot voter provide his or her date of birth on the

provisional ballot affirmation in order for the provisional ballot to count, and that if the day and

month of the date of birth does not match that of the voter in the Statewide Voter Registration

Database (the "SVR"), the ballot cannot be counted unless the SVR states that the voter's date of

birth is January 1, 1800, or the Board finds, by a vote of at least three members, that the voter has

met all the other requirements; (iii) the requirement that the provisional ballot voter provide his

or her current address on the provisional ballot affirmation; (iv) the revision of the time period a

provisional ballot voter may appear at the Board to provide acceptable ID from ten to seven

days; and (v) the requirement that a provisional ballot voter is responsible for completing all

parts of the provisional ballot affirmation.  (*Id.* at 2-3.)

On October 30, 2014, Plaintiffs filed their Motion for Leave to File a Second

Supplemental Complaint.  (Mot. for Leave to File Second Suppl. Compl., Doc. 429).  The Court

granted the Motion on August 7, 2015 (Order Granting Mot., Doc. 452 at 26), later deeming the

Second Supplemental Complaint to have been filed on October 30, 2014. (*See* Order, Doc. 642 at

6.)  This is now the operative complaint in the case.

Plaintiffs contend that the contested portions of SB 205 and SB 216, in violation of the

Due Process and Equal Protection Clauses of the Fourteenth Amendment, as well as the First and

Fifteenth Amendments, abridge, burden, and/or deny voting rights by:

- Requiring Boards to reject absentee and provisional ballots on the basis of technical errors or omissions, or mismatches with the SVR database—such as errors in the month and/or day of the voter's date of birth, signature or ID—even when the information sought is otherwise verifiable and the voter's identity is not in question;

- For absentee voters, creating a period to cure errors that is shorter than the period for timely submitting ballots (and shorter than the period within which one might receive notice of any errors);

- For provisional ballot voters, shortening the period for correcting ID issues and providing no opportunity to correct any other errors; and

- Creating the risk of disparate treatment of "right location, wrong precinct" provisional ballot voters from county to county, based on whether a Board chooses to combine its poll books at multiple-precinct locations.

(Second Supplemental Compl., Doc. 453 at 31-41.)  Plaintiffs further contend that the challenged

laws violate Section 2 of the VRA because they will have a disproportionate impact on African-

American and Latino voters, and that the Ohio legislature in fact intended as much.  (*Id.* at 36-

40.)  Finally, Plaintiffs claim that SBs 205 and 216 violate additional provisions of the VRA that

prohibit disenfranchisement of voters due to literacy tests and immaterial errors or omissions in

an application to vote.

The Court presided over a twelve-day bench trial that concluded on March 31, 2016, and

now issues the following findings of fact and conclusions of law.

### III.     FINDINGS OF FACT

#### A.  Parties

*1. Plaintiffs*

At trial, the Court had an opportunity to hear the testimony and observe the demeanors of NEOCH Executive Director Brian Davis, CCH Board Member Donald Strasser, and ODP General Counsel and Director of Operations Zachary West.  The Court has no reservations as to the competency or credibility of any of those witnesses.

##### a.  NEOCH

NEOCH is a Cleveland-based 501(c)(3) non-profit charitable organization comprising service providers, homeless persons, and volunteers.  (Test. of Brian Davis, Tr., Vol. 4 at 161-62.)  Founded in the 1980s, NEOCH advocates on behalf of the Cleveland homeless, airing and addressing issues related to their lack of housing, employment, and health care.  (*Id.* at 162.)  One of NEOCH's primary purposes is to protect the civil rights of homeless persons, including their right to vote.  (*Id.* at 162-63.)  Indeed, it was a picture of nuns registering homeless persons to vote that first piqued Brian Davis's interest in the organization.  (*Id.* at 163.)  According to Davis, ensuring that homeless persons exercise their right to vote is crucial to NEOCH's advocacy because elected officials are more attentive to the will of electors than of non-voters.  (*Id.*)  As he put it, "[E]lected officials don't often think that homeless people participate in the voting process, and so if you can sit down with a mayor or city council member and say . . . we have X number of voters who are here with us, that says a lot more than just people who are coming with issues with government."  (*Id.*)

To become a member of NEOCH, individuals sign a form and return it to the organization.  (*Id.* at 184.)  NEOCH annually sends a letter asking members to renew their

9

memberships for the upcoming year.  (*Id.*)  Individuals maintain membership in the organization by filling out and returning those forms, which are also available at membership meetings and during other face-to-face meetings with individuals.  (*Id.*)  NEOCH's membership includes about 400 homeless persons, about 60 of whom are currently homeless.  (*Id.* at 185.)  The small number of currently homeless members compared to total membership is due to the ephemerality of homelessness—the average duration of any bout of homelessness in Cuyahoga County is 22 days for an individual, and 52 to 54 days for a family.  (*Id.*)  Approximately 70% of NEOCH's in-person homeless applicants are African-American.  (*Id.* at 186.)  This mirrors statistics for the homeless population in Cuyahoga County, which is double the percentage of African-Americans residents in Cuyahoga County.  (*Id.* at 186, 232.)

NEOCH staff members meet daily with homeless individuals to address their problems and also conduct monthly membership meetings to discuss important issues for the homeless community.  (Davis Tr., Vol. 7 at 58.)  The Court finds that NEOCH has a close relationship with its members.  (*See id.*)

NEOCH has succeeded in improving the conditions of homeless persons, including getting the Cleveland Police to agree not to harass persons for innocent behavior on public streets under the terms of a federal consent decree, one of only a few in the United States. (Davis Tr., Vol. 4 at 164.)  Davis attributes such success to the votes cast by NEOCH's homeless constituents.  (*Id.*)  Were NEOCH's members unable to vote, their bargaining power vis-à-vis elected officials would be diminished, which would in turn diminish NEOCH's effectiveness at advocating on their behalf, frustrating its mission and exposing an already vulnerable population to further governmental neglect.  (*Id.* at 165.)  The homeless constituents of NEOCH and CCH face challenges that hinder them from asserting their own rights, including mental illness and/or

addiction, difficulty maintaining a regular address or phone number, limited access to

transportation, and illiteracy or lack of education.  (Davis Tr., Vol. 7 at 59-60.)  They also find it

challenging to gain entrance to courtrooms and public buildings due to lack of ID, and many

homeless people have a negative relationship with the judicial system or hesitate to get involved

in litigation to assert their rights because they are more focused on meeting their immediate

needs.  (*Id.*)

      Promoting voting among its members, and among the homeless county-wide, is central to

NEOCH's mission, and NEOCH's executive director, staff, and volunteers expend substantial

resources on voting activities in even-numbered years.  Davis spends as much as 80 hours per

week around the voting registration deadline on such activities, and one part-time NEOCH staff

person devotes 20 hours per week to early voting turnout efforts.  (Davis Tr., Vol. 4 at 211, 221.)

In presidential election years, between 100 and 125 persons volunteer their time to help

NEOCH's homeless members vote.  (*Id.* at 227.)  In the month before Election Day, almost all of

Davis' official activities are voting-related.  (*Id.* at 217.)  In the month prior to that, about 60-70

percent of Davis' time is spent devoted to getting as many homeless people as possible registered

to vote and then ensuring they cast a ballot that is counted.  (*Id.*)  NEOCH's members are keen

for the help—all but one of its homeless members that have filled out NEOCH membership

forms have said they plan to vote in the 2016 general election.  (*Id.* at 187-88, 192-93.)  Of the

NEOCH homeless members who have voted in primary elections, about eight vote in the

Democratic primary for each one who votes in the Republican primary.  (*Id.* at 198.)

      If the challenged laws are not enjoined, NEOCH will have to divert significant resources

to educate and assist voters to ensure that they cast a valid, counted ballot.  This is because

NEOCH will have to change its strategy for the 2016 election to focus on early in-person voting

as opposed to vote-by-mail.  (*Id.* at 203-04, 212-13, 220-21.)  In the 2014 election, NEOCH encouraged both options, and handed out blank absentee ballot applications to members.  (*Id.* at 203.)  NEOCH later found that its members had difficulty filling out the Cuyahoga County absentee ballot identification envelope.  (*Id.*)  In Davis's experience, eight to ten percent of those living in shelters across Cuyahoga County are absolutely illiterate, and the majority read at only a fourth-grade level.  (*Id.* at 195.)  Davis feared that the complexity of the form, along with SB 205's provisions demanding that voters fill out the required fields completely and accurately, discussed in Section III(C)(1), *infra*, increased the risk of NEOCH's members being disenfranchised.  (*Id.* at 195, 202.)  In his twenty years working with the homeless, Davis has noticed that homeless persons have pervasive and profound problems filling out the forms.  (*Id.* at 195.) Not being able to read or fill out forms correctly is embarrassing and humiliating for many of NEOCH's members, and they hesitate to ask for help.  (*Id.*)  NEOCH's practice with other government forms, such as those relating to Social Security disability and Medicaid benefits, is to read the forms aloud and fill them out on the homeless person's behalf as a matter of course.  (*Id.* at 194-95.)

In response to concerns about the complexity of the new voting forms, NEOCH will no longer provide blank cards to its members to vote by mail, but will instead focus its get-out-the-vote campaign on driving people to the polls to vote, which will divert drivers and vehicles from doing other work on behalf of the organization and its members, burdening NEOCH staff members and volunteers appreciably more than if it handed out blank forms.  (*Id.* at 206-07, 224.)  The push to drive voters to the polls also will require more financial resources than a vote-by-mail effort.  (*Id.* at 224.)

b. <u>CCH</u>

CCH is a Columbus-based 501(c)(3) non-profit charitable organization dedicated to advocacy and education to improve the lives of homeless people in Columbus.  (Test. of Donald Strasser, Tr., Vol. 7 at 14.)  It is a coalition of service providers, current and former homeless persons, and concerned citizens.  (*Id.* at 16-17.)  Its mission is:

> to work together to educate the central Ohio community about the devastating effects of homelessness upon individuals and families; to advocate on behalf of homeless persons and organizations that serve them; and to empower homeless persons to achieve greater self-sufficiency.

(CCH website, P-1566.)

CCH's organizing efforts include holding monthly meetings in which CCH encourages people both to register and vote, and directs them to resources that can help with obtaining the ID required to vote.  (Pl.'s Resp. to Interrog., P-1559 at 5.)  CCH also assists members one-on-one by accompanying them to appointments to access social services.  (Strasser Tr., Vol. 7 at 16.) Sixty percent of homeless people in shelters in Columbus, the population for which CCH advocates, are African-American.  (*Id.* at 12.)  Both homeless individuals and homeless shelters are members of CCH, and the shelter members also have daily interaction with homeless people and provide direct services to them.  (*Id.* at 18.)  CCH has a close relationship with its members. (*Id.* at 16-18.)  Its members often have difficulty dealing with large-scale bureaucracies or courts, and they face other challenges in asserting their rights such as mental health and chemical dependency problems, low literacy rates, inadequate work history, and residential instability. (*Id.* at 19.)

CCH plans to increase its voter-education efforts by explaining new voting requirements to homeless persons at meetings, publishing articles about the requirements, and training its constituent homeless members to educate other homeless persons about the voting requirements.

13

(P-1559 at 5.)  CCH plans to spend its resources educating voters in 2016 about the new

requirements in the challenged laws.  (Strasser Tr., Vol. 7 at 32-33.)  CCH is a small concern—

with one full-time staff person and one part-time staff person, and a 2012 account balance of

$77,624.30—and any time or money spent on educating the homeless about new voting

requirements will pose an immediate and stark burden on the organization.  (P-1559 at 4-5; 2012

Annual Report, P-1565.)

c.  ODP

ODP is a political party comprising 1.2 million members dedicated to, among other goals,

advancing the interests of the Democratic Party.  (Test. of Zachary West, Tr., Vol. 2 at 228);

*Ohio Democratic Party: Constitution and Bylaws, 2014*, https://ohiodems.org/wp-

content/uploads/2015/08/2014odpconstitution.pdf (last visited June 2, 2016).[1]  Like NEOCH and

CCH, ODP spends significant resources on voting-related activity, including voter registration,

education, and protection efforts, and will continue to do so through the 2016 general election

and beyond.  (West Tr., Vol. 2 at 222-25.)  This includes sending out a Voter Bill of Rights in

presidential election years, which contains information such as polling locations and hours and

the types of ID voters need to cast a valid ballot.  (*Id.* at 223-24.)  ODP conducts more voter

outreach and education during presidential election years because those are the elections that

have the highest turnout and the most new registrants.  (*Id.* at 224.)  ODP conducts activities

aimed at promoting vote-by-mail and early in-person voting as part of its Get Out the Vote

("GOTV") strategy.  (*Id.* at 228, 234.)  Changes to election laws between 2012 and 2016 will

require ODP to devote more resources to educate voters about the new procedural requirements.

(*Id.* at 234-35.)  In some cases, ODP will have to re-educate voters to whom it already has

---

[1] The the Court takes judicial notice of this non-controversial, publicly available foundational
fact.  *See United States v. Harris*, 331 F.2d 600, 601 (6th Cir. 1964) (per curiam).

conducted outreach to inform them that they must comply with the five-field requirement. (*Id.* at 235.) This will be especially burdensome to ODP because, as a result of a 2010 action by the Federal Elections Commission ("FEC"), GOTV activity must be paid for with "hard" money, which is subject to stricter contribution limits and thus more challenging for the party to raise than "soft" money. (*Id.* at 234.)

### 2. *Defendant*

The Secretary functions as Ohio's chief election officer. Ohio Rev. Code § 3501.04. His responsibilities include, among others, appointing members of the Boards, issuing directives and advisories to Board members regarding election administration and enforcing them, and prescribing the form of registration cards, ballots, cards of instructions, and poll books. *Id.* § 3501.05.

## B. Voting in Ohio

To cast a legitimate vote in Ohio, an elector must be at least eighteen years old and a citizen of the United States. Ohio Const., Art. V, § 1. Electors also must have resided in Ohio and the requisite county, township, or ward, and have been registered for at least 30 days prior to the election. *Id.* Ohio voters can cast a legitimate ballot in the following three ways: (1) in-person on Election Day; (2) no-excuse, mail-in early absentee voting; and (3) no-excuse, in-person early absentee voting. (Test. of Dr. M.V. "Trey" Hood, III, Tr., Vol. 10 at 18-19); Ohio Rev. Code §§ 3505.181-82, 3509.01, 3509.06(D)(3)(b). Voters may cast a provisional ballot either on Election Day or before. (Test. of Matthew Damschroder, Tr., Vol. 11 at 120.)

### 1. *Election-Day Voting*

In-person, Election Day voting is the most common form of voting in Ohio, accounting for approximately two-thirds of all votes cast in any given election. (*Id.*)

Election-Day voters go to their assigned polling place on Election Day, check in with a poll worker, and announce their name and address.  *See* Ohio Rev. Code § 3505.18(A)(1).  A voter must provide proof of identity in the form of a current and valid photo ID, a military ID, or a copy of a current utility bill, bank statement, government check, paycheck, or other government document, other than a notice of voter registration mailed by a Board.  *Id.*  If the elector cannot provide proof of identity, she may cast a provisional ballot.  *Id.* § 3505.18(A)(2).

### 2.  *Absentee Voting*

Beginning in 2006, all registered voters have had the option to vote absentee instead of on Election Day, without excuse, either in person or by mail.  (Damschroder Tr., Vol. 11 at 127-28.)  To receive an absentee ballot, a voter must furnish to the Board of the county in which the voter will vote a written application including the voter's name, signature, address, date of birth, and one of these three items: (1) the voter's driver's license number; (2) the voter's SSN-4; or (3) a copy of the voter's current and valid photo ID, military ID, utility bill, bank statement, government check, paycheck, or other government document besides a notice of voter registration mailed by a Board that shows the name and address of the elector.  *See* Ohio Rev. Code § 3509.03(A)-(E).  If a Board director receives an absentee ballot application that does not contain the required information, the director "promptly shall notify the applicant of the additional information required to be provided by the applicant to complete that application."  *Id.* § 3509.04(A).  If the application meets the requirements, the Board "shall deliver to the applicant in person or mail directly to the applicant" the absentee ballot.  *Id.* § 3509.04(B).  Voters may then submit their absentee vote either in-person or by mail.  (Test. of Anthony Perlatti, Tr., Vol. 2 at 147; Test. of Sherry Poland, Tr., Vol. 10 at 207-08.)

### a. In-Person Absentee Voting

Beginning four weeks before an election, any Ohio voter may vote early and in-person at their county Board during designated days and hours. *See* Ohio Rev. Code §§ 3509.01(B)(3), 3501.10(C). For the 2016 general election, Ohio will offer 23 days of early in-person voting starting on October 12.[2] (2016 General Election Early Voting Calendar, D-32.) The requirement to fill out the absentee ballot application is the same for in-person absentee voting as mail-in absentee voting. *See* Ohio Rev. Code § 3509.03.

### b. Mail-in Absentee Voting

Ohio also offers all voters a no-excuse mail-in absentee option. *See id.* § 3509.05. Since 2012, the Secretary has mailed absentee ballot applications statewide for even-year general elections both to every registered, active voter and to every registered voter who cast a ballot in one of the past two federal general elections, regardless of voter status. (Dir. 2014-15, D-35; Damschroder Tr., Vol. 11 at 129.)

Before mailing the form back to the Board, the voter must sign and include in the envelope an affirmation declaring that the voter is eligible to vote and, if the voter did not provide a driver's license number or SSN-4 on the affirmation, the voter must include in the application a copy of the voter's: (1) current and valid photo ID; (2) military ID; or (3) current utility bill, bank statement, government check, paycheck, or other government document, besides a notice of voter registration mailed by a Board, that shows the name and address of the elector. *See* Ohio Rev. Code § 3509.05(A).

---

[2] Since the conclusion of the trial, another court in this district has reinstated an additional week of early voting, known as "Golden Week," on the grounds that the elimination of that week of voting violates the VRA and the Fourteenth Amendment. *See Ohio Organizing Collaborative v. Husted*, No. 2:15-cv-1802, slip op. at 102 (S.D. Ohio May 24, 2016) (Watson, J.). Therefore, more than 23 days will now be offered.

If the Board finds an error in one of the five fields on a voter's absentee ballot

identification envelope, the Board mails a Form 11-S to the voter specifying which of the five

fields contained an error and informing the voter that her ballot will not be counted unless: (1)

she returns the Form 11-S to the Board by the seventh day after the election; or (2) mails it by the

seventh day after the election and it is received by the Board by the tenth day after the election.

(Form 11-S, D-48; Damschroder Tr., Vol. 11 at 160.)

### 3. Provisional Voting

Sometimes, if the Board cannot confirm eligibility, a voter is not able to cast a regular

ballot either early in-person or on Election Day. *See* Ohio Revised Code § 3505.181(A)(1).

Those voters must instead complete a provisional ballot.  As the name suggests, provisional

ballots allow voters to cast ballots provisionally, subject to later verification.  (Damschroder Tr.,

Vol. 11 at 124-25.)  The vast majority of provisional ballots are cast at the polling place on

Election Day.  (Poland Tr., Vol. 10 at 187; Damschroder Tr., Vol. 11 at 126.)

Provisional ballots are available to those voters: (1) who declare that they are eligible to

vote and registered in the precinct in which they wish to vote but whose names do not appear on

the list of eligible voters; (2) who are unable to provide the requisite forms of ID pursuant to

Ohio Revised Code § 3505.18(A)(1); (3) whose names are marked as having requested an

absentee, uniformed services, or overseas ballot for that same election but appear in person to

vote; (4) whose notification of registration has been returned undelivered to the Board and whose

address the Board was unable to verify as correct; (5) whose eligibility has been successfully

challenged by a poll worker at the polling place pursuant to Ohio Revised Code §§ 3505.20 or

3513.20, or whose application or challenge hearing will be held after Election Day pursuant to

Ohio Revised Code § 3503.24(D)(1); (6) whose name has changed and remains within the

precinct without providing proof of the name change, or who has moved from one precinct to another within a county, or moved from one county to another within Ohio; and (7) whose signature is not the same as the signature of the person who signed the registration forms.  Ohio Rev. Code § 3505.181(A)(1)-(7).  Voters who cast provisional ballots because they do not have a valid ID may provide either a driver's license number or SSN-4 or appear at the Board of Elections within seven days of Election Day to provide an ID or their driver's license number or SSN-4.  *Id.* § 3505.18(A)(2)(a)-(b).

## C.  The Challenged Laws

### 1.  SB 205

SB 205 changed Ohio law regarding absentee voting procedures.  At issue here are the amendments as reflected in §§ 3509.03-04 and 3509.06-07 of the Revised Code.  Plaintiffs challenge the portions of §§ 3509.03 and 3509.04 that explicitly prohibit any election official from filling out any portion of the required forms unless the voter declares to an election official that she cannot fill the form out due to blindness, disability, or illiteracy.  *See* Ohio Rev. Code § 3505.24.

Section 3509.06 now imposes a completeness requirement for absentee ballot ID envelopes, mandating that an ID envelope is considered incomplete if the voter fails to fill out the five fields of required information—name, residence address, date of birth, signature, and some form of ID, which includes all types of ID required for the absentee ballot application form—or the information does not conform to the information contained in the SVR.  *See id.* § 3509.06(D)(3)(a)-(b).  In such event:

> the election officials shall mail a written notice to the voter, informing the voter of the nature of the defect.  The notice shall inform the voter that in order for the voter's ballot to be counted, the voter must provide the necessary information to the board of elections in writing and on a form prescribed by the secretary of state

not later than the seventh day after the day of the election.  The voter may deliver
the form to the office of the board in person or by mail.  If the voter provides the
necessary information to the board of elections not later than the seventh day after
the day of the election and the ballot is not successfully challenged on another
basis, the voter's ballot shall be counted in accordance with this section.

*Id.* § 3509.06(D)(3)(b). Before SB 205 was enacted, the absentee voter ID envelope *requested*

the information contained in the five fields (name, address, date of birth, identification and

signature), but did not *require* it, meaning that Boards had the discretion to count the ballot even

if some of the information requested in the five fields was missing or incorrect.[3]  (Test. of

Timothy Burke, Tr., Vol. 2 at 192.)

Section 3509.07 provides that absentee voters must complete the five fields in the manner

described in § 3509.06(D)(3)(a), or the election officials "shall not" accept or count the ballot

unless the would-be voter provides the missing required information no later than the seventh

day after the election. *See* Ohio Rev. Code § 3509.07(A).  Before SB 205, voters had ten days

after the election to cure any deficiencies, pursuant to a directive issued by Secretary Brunner.

(Damschroder Tr., Vol. 11 at 158; D-34, Directive 2010-68 at 6.)

### 2.  SB 216

The challenged portions of SB 216 concern provisional voting procedures, and are

reflected in §§ 3501.22, and 3505.181-83 of the Revised Code.

---

[3] Ohio law makes an exception for a voter who fills in an incorrect birth date provided that the
voter has filled in the field and: (1) the voter has filled in the correct month and day; (2) the SVR
lists the voter's birthday as January 1, 1800; or (3) by a vote of at least three members the Board
finds that the voter has met the requirements of the other four fields.  *See* Ohio Rev. Code §
3509.06(D)(3)(a)(iii)(III).

Section 3501.22(A)(2)(b) gives Boards, by a vote of three of four members, the option to combine the poll books in multi-precinct voting locations, creating a single poll book for each location.[4]

Under § 3505.181(B)(2), a provisional voter must complete and execute the provisional ballot affirmation, which requires the following fields: printed name, date of birth, current address, signature, and proof of identity, which may include SSN-4, Ohio driver's license number, a form of unexpired government ID containing the voter's name and current address (or former address if an Ohio driver's license or ID), a military ID card, current utility bill, bank statement, government check, paycheck, or other government document that contains the voter's name and address, other than a notice of voter registration mailed by a Board.  *See* Ohio Rev. Code § 3505.182(A)-(D).  SB 216 added two new fields—date of birth[5] and current address— that voters must fill in on a provisional ballot affirmation form.  *Id.* § 3505.183(B)(1)(a); Damschroder Tr., Vol. 11 at 133.  Before SB 216 amended the Code, under § 3505.183, voters were required to provide only their names, IDs, and signatures. (Senate Bill 216, P-1189 at 22.) SB 216 also required voters to *print*, rather than simply include, their names on the provisional ballot envelope. (*Compare id. with* Ohio Rev. Code § 3505.183.)  Finally, unlike SB 205, SB 216 did not create a new completeness requirement for the five fields, because § 3505.182(F) already contained such a requirement.  (*See* P-1189 at 18.)

---

[4] Since the Second Supplemental Complaint was filed, the Secretary has issued a directive requiring all county boards to combine poll books in multi-precinct voting locations into a single poll book for each location.  (D-2, Directive 2015-24 at 2-80-81; Damschroder Tr., Vol. 11 at 150.)  The Court finds, therefore, that Plaintiffs' challenge to the portion of SB 216 that gives Boards the option, but does not require, the combining of poll books is moot.

[5] Like for absentee ballots, Ohio law makes an exception for an incorrect birth year, a birth year in the SVR of January 1, 1800, or if by a vote of at least three members the Board finds that the voter has provided all other required information.  Ohio Rev. Code § 3505.183(B)(3)(e).

Section 3505.181(F) dictates that, like with the challenged portions of the Code as amended by SB 205, persons filling out provisional ballots may receive help from poll workers, but only if the voter "[d]eclares to the . . . election official" that the voter "is unable to mark the . . . ballot by reason of blindness, disability, or illiteracy."  Ohio Rev. Code § 3505.24(b).

SB 216 reduced the period to cure incomplete or incorrect provisional ballots from ten to seven days after the election.  *Id.* § 3505.181(B)(7).  (Damschroder Tr., Vol. 11 at 133-34; P-1189 at 14.)  Provisional voters who did not provide a driver's license number, SSN-4, or valid ID on Election Day may go to the Board during this period to cure their ballots, but voters with other errors on the affirmation forms may not.  Ohio Rev. Code § 3505.181(B)(7).  The Board is not required to notify a provisional voter before the end of the cure period if the information on the provisional ballot envelope is incomplete or defective.  *See id.* § 3505.181.

### D.  The Lead-up to SB 205 and SB 216

The only members of the General Assembly from whom the Court heard testimony at trial were Representative Kathleen Clyde and former Senator Nina Turner, both Democrats who voted against the bills.  The Court found both witnesses credible as to their recollection of the events surrounding passage of the challenged laws.  Representative Clyde, who has represented the 75th district in the Ohio House of Representatives since 2011, has an extensive background as a lawyer and advocate on voting rights and election law issues.  (Test. of Kathleen Clyde, Tr., Vol. 1 at 26.)  Her work experience includes internships at the Brennan Center for Justice and Election Law at Moritz, an election law institute at the Ohio State University Moritz College of Law, and Secretary Brunner's office, as well as employment as the Democratic Director of the Early Vote Center in Franklin County for Barack Obama's 2008 presidential election campaign and as Deputy Legal Counsel to the Ohio House Democrats.  (*Id.* at 28-29, 31.)  She has also

22

worked with homeless populations at the Community Shelter Board in Columbus, Ohio and is thus familiar with issues homeless people face in voting. (*Id.* at 26-27.)

Former Senator Turner, who represented the 25th district in the Ohio Senate from 2008-2015, was born and raised in Cleveland, Ohio, where she currently is a tenured professor of African-American and United States history at Cuyahoga Community College.  (Test. of Nina Turner, Tr., Vol. 6 at 88-89, 110, 118.)  Senator Turner's district was primarily African-American, and throughout her career, including her time in the Senate and her employment with different elected officials, she has worked on issues affecting African-Americans, particularly with regard to socioeconomic disparities and the educational achievement gap between African-American and white students.  (*Id.* at 99-101.)

Following the 2010 election, control of the Ohio House of Representatives switched from the Democratic to the Republican Party.  (Clyde Tr., Vol. 1 at 33.)  "Rather quickly" after that change in leadership, House Republicans introduced two bills: (1) a bill to require all Ohioans to show a photo ID when voting; and (2) House Bill 194 ("HB 194"), an expansive election-law bill that included "a number of restrictions on voting, including the restrictions that we see in [SBs 205 and 216]." (*Id.* at 33.)  Representative Clyde testified that the debate over HB 194 was "very partisan and hostile" and "very quick." (*Id.* at 39.)  HB 194 was ready for the Governor's signature within two months of its introduction, which Representative Clyde testified marks a significantly shorter time period than usual for the passage of legislation of such complexity. (*Id.* at 50.)

In August 2012, in an unprecedented move, the Ohio legislature voted to repeal HB 194 after hundreds of thousands of Ohioans signed petitions to place it on the ballot for a statewide referendum in November 2012.  (*Id.* at 55, 57.)

Sixteen other bills proposing voting restrictions were introduced in the 2013-2014 General Assembly, eight of which passed. (*Id.* at 59.) One bill was passed to shorten the window to gather signatures for referenda, which made it more difficult for citizens to put a referendum on the ballot. (*Id.* at 60.) Another bill was passed making it easier to purge voters from the registration rolls. (*Id.* at 60-61.) Senate Bill 238, which eliminated the first week of the early voting period, also was enacted.[6] (*Id.* at 62.) Other bills were introduced, but not passed, which would have limited voting in the following ways: shortening the early voting period to 14 days; eliminating early voting hours; limiting the mailing of absentee ballot applications to voters and preventing the paying of return postage on absentee ballot envelopes; instituting a photo-ID requirement; and requiring state universities to provide in-state tuition rates to students if they provided those students with ID that they needed to vote. (*Id.* at 64.)

SB 205 was considered by the Policy and Legislative Oversight Committee for approximately one or two months, and it passed the House in a total of four or five months. (*Id.* at 70, 80.) Representative Clyde and Senator Turner both testified that proponents of the challenged laws defended them on the ground that they would create a more uniform voting process and that voters needed to take responsibility to fill out information without the assistance of poll workers. (*Id.* at 69, 71; Turner Tr. Vol. 6 at 162.) None of the proponents cited fraud as a justification. (*Id.*) Representative Clyde also stated that during the floor debate over SB 205, Representative Mike Dovilla, the floor manager of the bill and Chairman of the Committee, argued that "Government doesn't need to spoon-feed voting materials to voters." (Clyde Tr., Vol. 1 at 69.) She further testified that, in contrast to most proposed legislation, there was no

---

[6] As noted above in Section III(B)(2)(a), another court in this district subsequently found SB 238's elimination of the first week of the early voting period to be unconstitutional and in violation of Section 2 of the Voting Rights Act. *See OOC*, slip op. at 102. Accordingly, that court enjoined SB 238's enforcement.

data or testimony offered about the need for the measures proposed in SB 205.  (*Id.* at 72.)

Clyde and other opponents of the bill raised concerns about the impact of the proposed changes

on voters with disabilities or low literacy levels.  (*Id.* at 73-74.)  Clyde also testified that it was

highly unusual that no proponents of the bill testified in its favor in front of the legislature,

although on cross-examination she conceded that at least one proponent did testify.  (*Id.* at 81,

114-15.)  Several interest groups spoke against the proposed changes in front of the committee.

(*Id.* at 81-82.)  Clyde and Turner both recalled some of their Democratic colleagues arguing that

the bill would have a "negative impact . . . on the African-American community."  (Turner Tr.,

Vol. 6 at 164; Clyde Tr., Vol. 1 at 101.)  During committee debate, Representative Matt

Huffman, speaking in favor of SB 205, asked "should we really be making it easier for those

people who take the bus after church on Sunday to vote," which Clyde testified she understood

to be referring to the Souls to the Polls initiative for African-American voters to vote early in

person.  (*Id.* at 82-83.)

 During the debate over SB 216, its supporters in the legislature testified that the intent

behind the bill was to comply with the court order in the *SEIU* case.  (*Id.* at 96.)  Turner also

stated that Senator Seitz, the bill's sponsor, characterized the bill as "streamlining the process for

elections officials."  (Turner Tr., Vol. 6 at 166.)  Two Democratic amendments were tabled on

party-line votes and not included in the final bill.  (Clyde Tr., Vol. 1 at 105.)  The first

amendment would have counted provisional ballots cast at the wrong polling place when there

was evidence of poll-worker error.  (*Id.* at 103.)  The second would have counted provisional

ballots as long as there was enough information to identify the voter.  (*Id.* at 103-04.)

 With respect to both SB 205 and SB 216, Democratic legislators spoke about their

concerns that the provisional and absentee ballots of African-American voters would be thrown

out disproportionately.  (*Id.* at 102.)  Clyde and other House Democrats also spoke out about their concerns that voters who made minor errors or had low literacy would be adversely affected by the bill.  (*Id.* at 99-101.)  Both chambers passed an amendment, which eventually made it into the final version of SB 216, that allowed ballots to be counted in some circumstances if the voter put the wrong year for his or her birthdate.  (*Id.* at 106; Test. of Kenneth Terry, Tr., Vol. 11 at 51; Ohio Rev. Code § 3509.06(D)(3)(a)(iii)(III).)

The Court also heard testimony from two members of the Ohio Association of Election Officials ("OAEO"), Kenneth Terry and Timothy Ward.  Terry, a Democrat, is Director of the Allen County Board of Elections and was a Legislative Committee Member and Democratic Co-Chair of the OAEO's Legislative Committee.  (Terry Tr., Vol. 11 at 18-19.)  Ward, a Republican, is currently Director of the Madison County Board of Elections and the first Vice President of the OAEO.  (Test. of Timothy Ward, Vol. 7 at 189-90.)  He was the Republican co-chair of the OAEO's Legislative Committee, which reviews draft legislation and makes recommendations to the General Assembly.  (*Id.* at 190-91.)  The Court found both witnesses credible regarding the operations and actions of the OAEO.

The OAEO is an organization comprising directors, deputy directors, board members, and staff from Boards of each of Ohio's 88 counties.  (Terry Tr., Vol. 11, Doc. 665 at 19.)  The OAEO is bipartisan, with equal representation from the Democratic and Republican Parties.  (*Id.* at 20; Ward Tr., Vol. 7 at 191.)  It seeks to uphold and promote professionalism among elections administrators in Ohio.  (*Id.*)  Both Terry and Ward testified that they served on a 2013 OAEO task force to address how to improve Ohio's absentee balloting system.  (*Id.* at 193; Terry Tr., Vol. 11 at 23-24.)

26

Ultimately, many of the OAEO's suggestions were rejected by the legislature.  The OAEO, for example, recommended that early in-person voters be treated identically to Election Day voters, obviating the requirement to fill out an identification envelope.  (*Id.* at 95; D-62 at 4.)  Moreover, although the OAEO supported the five-field requirements in the challenged laws (Ward Tr., Vol. 7 at 196), Terry testified that they did not discuss whether the ballots would be thrown out if the five fields were not complete.  (Terry Tr., Vol. 11 at 96.)  As such, the Court finds that the OAEO's position on the legislation sheds little light on the intent of the General Assembly since the General Assembly only adopted the OAEO's recommendations in part.

### E.  The Implementation of SB 205 and SB 216

#### *1. Individual Voter Testimony*

Plaintiffs introduced testimony from individual voters who were disenfranchised for failing to follow the challenged laws' new information requirements.  Kenneth Boggs, for example, voted by absentee ballot in the 2014 election in Franklin County.  (Doc. 672-2.)  His ballot was rejected because, it being October when he filled out the form, he mistakenly wrote "10" instead of "6" in the field for his birth month.  (*Id.*)  He later received notice that his vote was thrown out, but when he was notified it was too late to correct the error, leaving him "furious" that his vote was thrown out because he made "a very minor and obvious mistake." (*Id.*)

Elizabeth Coffman and her husband voted by provisional ballot in Franklin County in the 2015 general election.  (Doc 672-3.)  She mistakenly wrote her current address in the "former address" field.  (*Id.*)  She and her husband received notice from the Board of Elections asking them to verify their new address, which they filled out and returned. Ms. Coffman's ballot was

nonetheless rejected, which she did not know until contacted as a result of this litigation.  (*Id.*)
She is "angry" that she was disenfranchised.  (*Id.*)

Cheryl and Hugh Davis voted by absentee ballot in Franklin County in the 2014 general
election.  (Docs. 672-4, 672-5.)  Mr. Davis filled out their ID envelopes, accidentally swapping
their information.  (*Id.*)  Mr. Davis crossed out the information and corrected the mistakes as to
all fields except their dates of birth.  (*Id.*)  Both of their ballots were rejected without notice, for
what Mr. Davis characterized as a "mistake . . . clear to anyone who looked at [their] ballot
forms and ID envelopes."  (Doc. 672-5.)

Keith Dehmann is a Fairfield County resident and active serviceman for the United States
Air National Guard Reserves.  (Doc. 672-6.)  He voted by absentee ballot in the 2014 general
election.  (*Id.*)  After mailing his ballot, he received notice of an error on its ID envelope for
failing to fill in the date of birth field.  (*Id.*)  He received a supplemental form from the Fairfield
Board of Elections to correct the mistake, which he filled out and returned soon after receiving it.
(*Id.*)  His ballot was ultimately rejected, which he did not know until contacted as a result of this
litigation, leaving him "frustrated and disappointed" that his ballot was not counted.  It made him
question "whether [he] should continue doing absentee voting in the future."  (*Id.*)

Katherine Galko is a Summit County resident who resides in an assisted-living facility.
(Doc. 672-7.)  She is 92 years old, and has been voting since she was 18.  (*Id.*)  She voted in her
assisted-living facility for the 2014 general election with assistance from someone who read the
ballot to her.  (*Id.*)  The person who helped her fill out the form mistakenly wrote the date of the
election instead of her Social Security number.  (*Id.*)  Her ballot was rejected. (*Id.*)

Roland Gilbert is a Franklin County resident.  (Doc. 672-8.)  A lawyer by training, he is
86 years old and legally blind.  (*Id.*)  He voted by absentee ballot in the 2014 general election.

(*Id.*)  Although he used a closed-circuit lighted machine that magnifies print to help him see, he mistakenly wrote the current date in the date-of-birth field.  (*Id.*)  His ballot was rejected, which he did not know until contacted as a result of this litigation.  He does not believe his vote should have been rejected due to an "obvious clerical error."  (*Id.*)

Kadar Hiir became a United States citizen in 2012.  (Doc. 672-9.)  He voted for the first time in the 2014 general election, by provisional ballot.  (*Id.*)  He mistakenly transposed the month and day of his birth on the provisional ballot affirmation form, which is customary both in Somalia, where he grew up, and in most parts of the world besides the United States.  (*Id.*)  His ballot was rejected, and he received no notice either of his mistake or of his ballot's rejection.  (*Id.*)

Elisabeth Hire is a Franklin county resident who voted in person in the 2014 general election.  (Doc. 672-10.)  She was told she had to vote provisionally, but she mistakenly wrote one digit of her Social Security number incorrectly.  (*Id.*)  She never received any notice about the error.  (*Id.*)

Gunther and Linda Lahm voted by absentee ballot in Franklin County in the 2014 general election.  (Docs. 672-13, 14.)  Mrs. Lahm filled out their ID envelopes but mistakenly mixed them up. She later fixed all of the mistakes except for the date-of-birth fields.  (*Id.*)  Their ballots were rejected, leaving them both "very angry."  (*Id.*)  They feel strongly that voting is very important—so strongly that both offered to fly back to Columbus from Florida to testify on the matter.  (*Id.*)

Courtney White, a college student in Toledo, voted by absentee ballot in Delaware County in the 2014 general election.  (Doc. 672-18.)  She provided her then-current college mailing address in the voting-residence field on the ID envelope.  (*Id.*)  She did not interpret

29

"voting residence" to mean the residence where she was registered.  Her ballot was rejected without notice, and she was unaware of the rejection until contacted as a result of this litigation. (*Id.*)

### 2. *Aggregate Data and Testimony from Board Officials*

Plaintiffs have produced many other examples of voters who failed to meet the information requirements of the forms, which indicates that the voters either disregarded or misunderstood what was being asked.  (*See* Pls.' Proposed Findings of Fact and Conclusions of Law, Doc. 687-2, Table A.)  In the 2014 general election, 4,734 of the 49,262 provisional ballots cast statewide were rejected.  (Provisional Ballot Report, 2014 General Election, P-19.)  Of those, 16 were for failure to print a full name on the provisional envelope, 188 were for failure to provide a current address, 59 were for missing or incorrect birth date, 163 were for failure to sign the provisional ballot envelope, and 173 were for failure to provide ID.  (*Id.*)  In the 2015 general election, 12,208 of the 79,414 provisional ballots cast were rejected.  (Provisional Ballot Report, 2015 General Election, P-20.)  Of those, 22 were for failure to print a full name on the provisional envelope, 310 were for failure to provide a current address, 63 were for missing or incorrect birth date, 263 were for failure to sign the provisional envelope, and 278 were for failure to provide ID.  (*Id.*)

As for absentee ballots, in the 2014 general election, 1,018 were rejected for missing or incorrect date of birth, 354 for different address on the identification envelope than on file with the Board, 633 for "voter ID envelope contains insufficient information," and 199 for lack of proper ID.  (P-17.)  In 2015, there were 236 rejections for missing or incorrect date of birth, 94 for different address on the identification envelope than on file with the Board, 436 for "voter ID envelope contains insufficient information," and 77 for lack of proper ID.   (P-18.)

Plaintiffs also submitted thousands of provisional and absentee voter forms from the 2014 and 2015 general elections that they obtained in discovery from twenty-four of the eighty-eight Boards in Ohio.  Many of the more than 3,100 rejected ballots that Plaintiffs obtained showed that ballots were rejected for reasons such as wrongly entering a mailing address instead of a registration address, leaving the date-of-birth field blank, leaving the field blank for identification or checking a box next to a form of identification but failing to fill it in, or writing a name in cursive instead of print (for provisional voters).  (*See* Doc. 687-2, Table A)

The Court also heard testimony from Board officials that missing one of the fields is fairly common, and that the required identification envelope has "a lot of wording, a lot of stuff crammed into that space."  (Test. of Zach Manifold, Tr., Vol. 3 at 57.)

As to the cure period, one Board official testified that before the challenged laws went into effect, voters did come in during the eighth, ninth and tenth days of the cure period after the election to cure their provisional and absentee ballots.  (Burke, Tr., Vol. 2 at 184.)  Moreover, there is evidence that because the Board can receive absentee ballots up until ten days after Election Day, yet the cure period is only seven days, some voters to whom the Board sends a Form 11-S notifying them of their need to cure their ballot will not receive it in time to do so. (*See* Test. of Eric Morgan, Tr., Vol. 4 at 97; Test. of Jocelyn Bucaro, Vol. 6 at 57-58.)

### 3.  Varied Board Practices

Testimony and other evidence from twenty-four Boards of Elections statewide likewise demonstrate that voters have been disenfranchised for failing to conform to the new requirements.  Concerning the address field, if, for example, on a provisional or absentee ballot form, the voter's street number is incorrect,[7] Adams, Allen, Carroll, Fayette, Harrison, Meigs,

---

[7] Per the Secretary's Directive, Ohio counties are now required to pre-print the voter's name and address on their absentee ballot identification envelopes.  (Damschroder Tr., Vol. 11 at 162.)

Noble, Paulding, and Wyandot Counties accept the ballot, while Butler, Cuyahoga, Franklin, Hamilton, Lawrence, Lorain, Lucas, Miami, Richland, Stark, and Summit Counties reject it. (Pls.' Proposed Findings of Fact and Conclusions of Law, Table C-3, Doc. 687-4.)  If the street name is missing or incorrect, voters will have their ballots accepted in Allen, Carroll, Fayette, Harrison, Meigs, Noble, Paulding, and Wyandot Counties, while they will have their ballots rejected in Cuyahoga, Delaware, Franklin, Hamilton, Lorain, Lucas, Stark and Summit Counties. (*Id.*, Table C-4, Doc. 687-4 at 7-8.)  In Butler County, the ballot may be accepted.  (*Id.* at 7.)  If voters write an address that is not subsequently confirmed by the Board, voters in Carroll and Wyandot Counties will have their votes counted, while those in Butler, Delaware, Fairfield, Franklin, Hamilton, Lorain, Lucas, Meigs, and Miami Counties will have their votes rejected. (*Id.*, Table C-1, Doc. 687-4.)  If the voter writes a commercial rather than a residential address, Boards in Cuyahoga, Delaware, Lawrence, and Montgomery Counties will reject the ballot, while those of Fairfield and Lucas might or might not accept it.  (*Id.*, Table C-2, Doc. 687-4.)

As to the date-of-birth-field requirement, if, for example, the voter fills in the wrong month or day but the correct year, her vote is accepted in Adams, Allen, Carroll, Fayette, Meigs, Noble, and Wyandot Counties, while it is rejected in Butler, Delaware, Fairfield, Franklin, Lawrence, Lorain, Miami, and Summit Counties.  (*Id.*, Table D-1, Doc 687-5.)  The votes might or might not be accepted in Cuyahoga or Harrison Counties.  (*Id.* at 2.)  If the voter accidentally provides the current date instead of her date of birth, Harrison, Meigs, Noble, and Wyandot Counties will accept the vote, while Butler, Cuyahoga, Delaware, Lawrence, Lorain, Lucas, Miami, Summit, and Warren Counties will not.  (*Id.*, Table D-3.)

**F.  Burden on Plaintiffs**

Plaintiffs seek relief from three portions of the challenged laws: (1) the requirement that voters accurately complete all five fields on the provisional ballot affirmation and absentee identification envelope before their ballots can be counted; (2) prohibitions against poll-worker assistance to voters; and (3) the reduction in the period to cure deficient ballots from ten to seven days after the election.

*1.  Information Requirements*

As noted in this Court's findings of fact in Section (III)(A)(1)(a), *supra*, the vast majority of NEOCH's individual homeless members plan to participate in the 2016 general election. (Davis Tr., Vol. 4 at 187-88, 192-93; *see also* NEOCH's Second Suppl. Resp. to Interrogs., P-1562 at 10.)  Many of CCH's members also plan to vote. (*See* CCH's Second Suppl. Resps. to Interrogs., P-1563 at 1.)  And as the Court found, many of the organization's members are illiterate, barely literate, and/or mentally ill.  The Court credits CCH's Strasser's testimony that "without assistance, a homeless person could [not] complete the entire form" and that due to the complexity and amount of print on the form, "some homeless people would just tear it up and say, you know, to hell with it."  (Strasser Tr., Vol. 7 at 24, 26-27.)

Demanding perfect, or near-perfect, adherence to the five-field requirement on ballots imposes a significant burden for homeless voters, who are some of society's most vulnerable members.  *See, e.g.*, *OOC*, slip op. at 81 ("The new requirements will especially burden voters with . . . low literacy.").  As demonstrated in Section III(E)(2), *supra*, forms that are, in the words of one Board official, "pretty complex," with "a lot of wording, a lot of stuff crammed into" them (Manifold Tr., Vol. 3 at 57; *see also* Strasser Tr., Vol. 7 at 23), can trip up even educated, literate voters.

33

### 2. Prohibition Against Poll-Worker Assistance

The prohibition against poll-worker assistance burdens persons with low literacy, particularly if they are embarrassed to reveal their illiteracy due to the stigma it entails. (Strasser Tr., Vol. 7 at 25; *see* Damschroder Tr., Vol. 12 at 26.) Plaintiffs have introduced ample evidence that many of their members fall into this category, and that illiteracy or low literacy levels are prevalent among the homeless. (Davis Tr., Vol. 4 at 196; Strasser Tr., Vol. 7 at 19.) Homeless voters suffer disproportionately from disabilities, including mental illness, which can also hamper their ability to fill out forms. (Davis Tr., Vol. 4 at 197.) About a third of the homeless individuals with whom NEOCH works have a mental disability, forty-five to fifty percent read at a fourth-grade level, and eight to ten percent are completely illiterate. (*Id.*) They may write poorly and have handwriting that is difficult to read or, due to mental illness, they struggle to focus on basic tasks without help. (Strasser Tr., Vol. 7 at 25-26.) All of these issues combine to create difficulties for homeless voters in filling out forms without assistance like the absentee ID envelope and the provisional ballot affirmation. (*Id.* at 29; Davis Tr., Vol. 4 at 195.) Moreover, Davis testified that in his experience with voter mobilization of homeless people in 2014, Board staff members were more hesitant to engage with voters and offer help when it appeared to be necessary, and that homeless voters have been more likely to make mistakes because of the lack of help. (*Id.* at 202.) Secretary Husted failed to conduct any review or testing of the effect of the provisional ballot affirmation or the absentee identification envelope on voters with low literacy, despite a suggestion to do so from the League of Women Voters. (Damschroder Tr., Vol. 11 at 211-12.)

In sum, many homeless people face vexing and profound obstacles in exercising the basic right to vote, and the prohibition against poll-worker assistance is likely to exacerbate the problem.

### 3. Reduction of the Cure Period

Reducing the cure period from ten days to seven inconveniences voters who would face logistical difficulties curing their ballots in a shorter time period. For provisional voters, the opportunity to cure their ballots is limited to providing ID that they failed to provide when they voted, but absentee voters have the ability to cure any problems with their identification envelope. (*See* Bloom Tr., Vol. 1 at 227; Terry Tr. Vol. 11 at 42.) Moreover, some absentee voters may not receive their Form 11-S notifying them of a deficiency with their ballot until close to or after the conclusion of the cure period. (Morgan Tr., Vol. 4 at 102.)

NEOCH and CCH represent voters whose means are much more limited than the average voter and who are less likely to be able to access transportation and more likely to suffer from residential instability. They are also less likely to be able to fill out their address correctly. (Davis Tr., Vol. 4 at 97.) Even to read the Form 11-S, which Boards mail when absentee identification envelopes are deficient, may require assistance for some illiterate or semi-literate homeless voters, and logically, a reduced cure period would give them less time to receive a Form 11-S, seek assistance in reading it, and bring it to the Board to cure the ballot.

### G. The State's Justifications for Enacting the Challenged Laws

### 1. Information Requirements

Defendant argues that standardization is one of the reasons for adding the new five-field requirement in SBs 205 and 216, contending that the new laws created rules that streamline and clarify absentee and provisional voting procedures. As to SB 205, Senator William Coley, the

bill's sponsor, testified, "Whether you reside in Lima or Lowell, Batavia or Bedford Heights, Hamilton or Hilliard, you should play by the same rules." (Sponsor Test., D-98 at 1.)

Defendant also offers administrative convenience as a rationale for the five-field requirement because the two additional fields give Boards more information with which they can identify voters, increasing the likelihood that Boards can identify voters and thus count more votes. (*See* Ward Tr., Vol. 11 at 52.) This is one of the reasons the bipartisan OAEO was "generally supportive" of these new information requirements. (Interested Party Test. of Aaron Ockerman, Executive Director of OAEO, D-95 at 1).

Defendant's next rationale, as to SB 216 only, is that the law aims to "reduce the number of provisional ballots cast in the State of Ohio," that is, to update address and name changes and register more voters who will then be able to cast regular ballots in future elections. (Sponsor Test. of Bill Seitz, D-101 at 1.) In Ohio, most provisional ballots rejections are due to the voter not being registered anywhere in the State, or being registered in the State but not in the precinct where the voter has shown up to vote on Election Day. (*See* D-13-17; Perlatti Tr., Vol. 2 at 143.) Before the bill's enactment, the front of the provisional ballot affirmation form, which required only a name, signature, and form of ID, did not include enough information with which Boards could register voters. (Poland Tr., Vol. 10 at 204-05.) The Secretary tried to address this issue by requiring Boards to include a separate registration form on the back of the affirmation form for the voter to fill out, although the testimony of Board officials differed as to whether a significant numbers of voters typically completed the form. (Damschroder Tr., Vol. 11 at 144; Poland Tr., Vol. 10 at 204; Terry Tr., Vol. 11 at 52-53; Test. of Lavera Scott, Tr., Vol. 6 at 242-43; Ward Tr., Vol. 7 at 211; Test. of Paula Sauter, Tr., Vol. 7 at 177.) Voters who had moved without updating their registration could cast a valid provisional ballot but, under the prior

system, where providing the new address was not mandatory, the ballot of a provisional voter who did not provide a current address would be rejected, because it would appear to Boards that the ballot was cast in the wrong precinct.  (Dir. 2012-54, D-106; Damschroder Tr., Vol. 11 at 143-45.).

Under the new law, Boards may use the provisional ballot forms with the newly required information fields to register voters who have filled out the fields correctly, in an attempt to decrease the number of provisional voters in future elections.  (*See, e.g.*, Poland, Vol. 10 at 206-07 (stating that in the 2014 election, 256 voters in Hamilton County had their provisional ballots rejected because they were not registered to vote, but the Board used the affirmations of 233 of them to register them); Ward Tr., Vol. 7 at 212-13 (testifying that in 2015, 156 of 158 previously unregistered voters are now registered thanks to the information provided on their provisional ballot affirmations).)

### 2.  *Prohibition Against Poll-Worker Assistance*

The State's proffered interests in preventing poll workers from completing voters' absentee and provisional ballot forms are twofold.  First, mistakes seem less likely because in most cases, only the voter knows her personal information.  (Damschroder Tr., Vol. 12 at 29-30.)  Second, the prohibition should minimize the burden on poll workers, who are temporary workers without significant expertise.  (Terry Tr., Vol. 11 at 39-40; Poland Tr., Vol. 10 at 185-86; Test. of Eben McNair, Tr., Vol. 2 at 40.)

### 3.  *Reduction in Cure Period*

The State's justification for reducing the cure period is to standardize the post-election processes and to provide a "workable stopping point before election officials must begin the official canvass" eleven days after Election Day.  (Def.'s Proposed Findings of Fact and

Conclusions of Law at 36-37 (citing Hood Tr., Vol. 10 at 23).)  As for SB 205, the State offered

the further justification that the law actually codified a seven-day cure period whereas the

previous ten-day cure period was authorized merely by directive.  (*Id.* at 49-50; Damschroder

Tr., Vol. 11 at 158.)

## H.  Disparate Impact

At trial, the Court heard testimony from one opinion witness for Plaintiffs and two for

Defendant about the impact of SBs 205 and 216 on African-American as compared to white

voters.

### *1.  Dr. Jeffrey Timberlake*

#### a.  Background and Methodology

Dr. Jeffrey Timberlake is a tenured Associate Professor of Sociology at the University of

Cincinnati.  (Test. of Jeffrey Timberlake, Tr., Vol. 5 at 4.)  He has published several scholarly

works involving original quantitative data analysis using secondary data sources, and the

statistical tool on which he has most relied is regression analysis.  (*Id.* at 7-8.)  Regression

analysis, a broad category of statistical methods, is a common tool to determine a statistical

numerical relationship between two sets of variables.  (*Id.* at 20, 22.)

Prior to trial, Dr. Timberlake prepared and submitted an expert report for a lawsuit

brought by state and local political parties against the Secretary that included similar claims to

those in the case *sub judice*, including allegations that recently enacted Ohio election laws have a

disparate impact on African-American voters.  (Compl., *OOC*, Case No. 2:15-cv-01802 (the

"*OOC* case"), Doc. 1 at 56.)  Dr. Timberlake grouped all Ohio counties into three categories

based on their percentages of minority residents and poverty rates: high minority, low

minority/high poverty, and low minority/low poverty.  (Timberlake Tr., Vol. 5 at 17; Timberlake

Rpt., P-1194 at PTF-00163.)  In that case, as here, the Secretary put on a rebuttal case to critique

Dr. Timberlake's methodology.  (Timberlake Tr., Vol. 5 at 17.)  The rebuttal expert faulted Dr.

Timberlake for not using a regression analysis, which is more sophisticated than the method he

used in the *OOC* case, and the court in that case ultimately agreed with the rebuttal expert that

Dr. Timberlake's opinion was entitled to little weight for that reason.  (*OOC*, slip op. at 8.)

Acknowledging the limitations of the other method, Dr. Timberlake conducted a regression

analysis for the report he presented in *this* trial.  (Timberlake Tr., Vol. 5 at 17.)

 A regression analysis is useful because Ohio does not record voters' race, making it

impossible to examine differential rates of voting among racial groups directly.  (*Id.* at 20-21.)

Dr. Timberlake compared the minority population share of each of Ohio's counties—the

independent variable—to the usage and rejection rates of absentee and provisional balloting in

each county—the dependent/explanatory variable—to discern whether SB 205 and SB 216 have

had a differential impact on African-American and white voters. (*Id.* at 20.)  The simplest

regression analysis here would have been an assessment of county minority population share and

the rate of absentee and provisional ballot use and rejection. (*Id.*)  But such an analysis runs into

a problem known as ecological inference; in other words, it does not account for other factors

that might be driving the disparity.  (*Id.* at 22-23.)  By controlling for such factors, the data tell a

clearer story regarding county-percent minority and the rates of absentee and provisional ballot

use and rejection.  (*Id.* at 23.)  Accordingly, Dr. Timberlake controlled for the following

variables: (1) whether the county is urban or rural; and (2) three characteristics of the county

white population: (i) its median age; (ii) its median income; and (iii) its percentage with a college

degree.  (*Id.*)  Dr. Timberlake controlled for these characteristics of the white population because

differences *among* whites across different counties, rather than *between* whites and minorities

within one county, could have explained the different results.  (*Id.* at 28.)  He explained that he

controlled for these four factors because research in the field reveals that age, income, and

education are "strongly predictive of all different kinds of voting."  (*Id.*)

b. <u>Conclusions Regarding Disparate Impact</u>

In the *OOC* case, Dr. Timberlake concluded that minority voters used provisional and

absentee balloting at higher rates and had their ballots rejected at higher rates than whites over

each of the several years for which he had data.  (*Id.* at 33.)  After controlling for the additional

demographic factors in *this* case, Dr. Timberlake's regression analysis led him to soften

somewhat, but not contradict, his finding of disparate impact compared with his findings in the

*OOC* case.  (*Id.* at 34.)  Most notably, he no longer concluded that minorities used absentee

balloting at higher rates than whites.  (*Id.*)  Dr. Timberlake's overall findings here were as

follows:

> [T]here is very little evidence that minority voters used absentee balloting at higher rates
> than whites do.  There is very strong evidence that minorities use provisional balloting at
> higher rates than whites do.  And there is pretty strong evidence that minority provisional
> ballots are rejected at higher rates [than those of whites].  And there is good, but not
> great, evidence that minority absentee ballots are rejected at higher rates.

(*Id.*)

As to absentee ballot usage, it appears from Dr. Timberlake's analysis that minority

voters actually use absentee balloting[8] at lower rates than white voters.  (*Id.* at 44.)  When Dr.

Timberlake conducted a regression analysis and controlled for the four variables discussed

above, his findings showed that minority voters probably cast proportionately fewer absentee

---

[8] Dr. Timberlake's findings did not break out early in-person voting and mail-in absentee voting
but rather included total absentee ballots cast.  (*Id.* at 44-45.)  Two other courts in this district
have found that African-American voters use early in-person voting more than white voters.  *See
OOC*, slip op. at 36-39 (S.D. Ohio May 24, 2016); *NAACP v. Husted*, 43 F. Supp. 3d 808, 851
(S.D. Ohio 2014), *vacated by* 2014 WL 10384647 (6th Cir. Oct. 1, 2014).

ballots than white voters in the 2012 and 2014 elections, although they cast slightly more than whites in 2008 and 2010. (*Id.* at 44.)

As to absentee ballot rejection, evidence suggests that in 2008 and 2012 (presidential election years), there was a positive relationship between minority population share and absentee ballot rejection. (*Id.* at 45.) This, according to Dr. Timberlake, shows that minorities' absentee ballots are rejected more often than whites', at least in presidential election years. (*Id.* at 47.) Dr. Timberlake did not have data on absentee ballot rejections for 2010, and he testified that in 2014 there was not a strong relationship between county-percent minority and the rejection of absentee ballots, leading him to conclude that the disparate impact was likely confined to presidential election years. (*Id.*) More specifically, Dr. Timberlake's data showed that for every 100,000 residents of voting age, an additional one percent minority population in a county led to an additional 15.9 absentee ballots rejected in 2008 and 4.6 rejected in 2012. (Timberlake Rpt., P-1194 at 7-8)

As to provisional ballot usage, Dr. Timberlake found a positive correlation between a county's minority population share and the number of provisional ballots cast for all years analyzed—i.e., 2008, 2010, 2012, and 2014. (Timberlake Tr., Vol. 5 at 48.) In 2008, for every 100,000 residents of voting age, an additional 58.6 provisional ballots were cast for each percent minority population in a county. (Timberlake Rpt., P-1194 at 9.) For 2010, 2012, and 2014, the corresponding numbers were 32.2, 50.7, and 7.2, respectively. (*Id.* at 9-10.)

As for provisional ballot rejections, "there [was] a higher rate of rejection of provisional ballots as the percent minority increases in all years except 2014." (Timberlake Tr., Vol. 5 at 48.) So in 2008, 2010, and 2012, "provisional ballots are rejected at higher rates as the percent minority gets higher in the county" although this trend did not hold true in 2014. (*Id.*) The

effect was more pronounced in presidential election years.  Specifically, for every 100,000

residents of voting age, an additional 17.7 provisional ballots were rejected in 2008, 4.4 in 2010,

9.3 in 2012, and 0.3 in 2014.  (Timberlake Rpt., P-1194 at 9-10.)

### 2.  Dr. Nolan McCarty

Dr. Nolan McCarty, an opinion witness for Defendant, served as a rebuttal witness to Dr.

Timberlake. Dr. McCarty is Professor of Politics and Public Affairs and Chair of the Politics

Department at Princeton University.  (Test. of Nolan McCarty, Tr., Vol. 8 at 4.)  He uses

quantitative and statistical methods, including regression analysis, to analyze electronic and

legislative voting data.  (*Id.* at 4-5.)  Dr. McCarty focused on evaluating what he characterized as

Dr. Timberlake's "claim[] that the new laws will enhance and increase racial disparities."  (*Id.* at

60.)  Dr. McCarty's testimony was two-fold: he criticized Dr. Timberlake's methods and

conclusions, and then offered his own approach.

Dr. McCarty opined that Dr. Timberlake's analysis suffered from two related problems:

aggregation bias and omitted variable bias.  (McCarty Rpt., D-11 at 6-7.)  Aggregation bias "is

the idea that we cannot infer things about individual-level behavior from aggregate data very

precisely." (McCarty Tr., Vol. 8 at 29.)  Because Dr. Timberlake relied on county-level data to

support his assertion that SBs 205 and 216 are likely to have a disparate impact on minority

voters, Dr. McCarty concluded that it is difficult to draw from any correlation between minority

population share and ballot rejection rates an *individual* relationship between race and rejection.

(*Id.* at 29.)  Such a relationship can only be certain when comparing data from two homogeneous

populations, which is not possible at the county level in Ohio because its county with the highest

minority population share is only about 30% minority and overall ballot rejection rates constitute

only one or two percent of the votes.  (*Id.* at 29-30.)

Aggregation bias is a subset of omitted variable bias.  (*Id.* at 41.)  Omitted variable bias arises when a regression analysis does not account for other variables that could be responsible for the statistical relationships observed.  (*Id.* at 33.)  Although he acknowledged that Dr. Timberlake did account for some omitted variables, Dr. McCarty testified that many other factors completely unrelated to race could have explained the results in part, including the number and competitiveness of local political races, voters' average distance from a polling location, and other factors.  (*Id.* at 33-34.)

Dr. McCarty also performed his own analysis of Dr. Timberlake's data, namely a "first-difference" analysis, or an analysis of changes in ballot rejection rates within a county over time. (*Id.* at 39.)  Specifically, Dr. McCarty compared provisional and absentee ballot usage and rejection rates across counties from 2010 (before the implementation of the challenged laws) to 2014 (after implementation).  (*Id.* at 40-41.)  According to Dr. McCarty, the first-difference analysis eliminates many concerns about omitted variable bias because one can assume that many other factors are consistent across two midterm election years in any given county.  (*Id.* at 40.)  From this analysis, Dr. McCarty concluded that the changes in the ballot-casting rejections rates from 2010 to 2014 "had no real relationship to the minority population share."  (*Id.* at 44.)

Although the Court recognizes and appreciates Dr. McCarty's expertise and perspective, in the Court's view, his criticism of Dr. Timberlake's analysis is largely irrelevant, and the submission of his own methods only slightly probative. Dr. McCarty's criticism of Dr. Timberlake's analysis is irrelevant because the criticism adds nothing to the Court's understanding of what Dr. Timberlake has already acknowledged, which is that the quantitative election data cannot definitively show an individual relationship between race and ballot usage and rejection because Ohio does not maintain data on the race of its voters.  (Timberlake Tr.,

Vol. 5 at 20-21.)  As to aggregation bias, the Court notes that Dr. Timberlake could not have

used precinct-level data rather than county-level data for his analysis of ballot rejection because

Ohio does not maintain rejection rates of provisional and absentee ballots at the precinct level.

Although Dr. Timberlake could have used precinct-level data to calculate absentee and

provisional ballot usage, he had no choice but to use the county-level data to analyze rejection

rate.  As to omitted variable bias, although the Court recognizes that, of course, there are always

more variables that could be included in a multivariable regression analysis, the factors that Dr.

Timberlake used tend to be highly predictive of voting behavior and, therefore, Dr. Timberlake's

analysis, if not perfect, is nevertheless probative of disparate impact.  (*Id.* at 28.)

　　　　Dr. McCarty's first-differences analysis is only slightly probative because, as he admits,

African-American voter turnout is lower—not only in absolute numbers, but relative to white

voters—in midterm elections than presidential elections.  (McCarty Tr., Vol. 8 at 62.)  Because

the Court finds Dr. Timberlake's conclusions regarding disparate impact to be especially

compelling in the presidential years of 2008 and 2012, Dr. McCarty's analysis of changes from

2010 to 2014 is mostly irrelevant to Dr. Timberlake's most persuasive findings of disparate

impact. Second, the Court finds that even in this first-differences analysis, which purports to

control for the important variables that contribute to the disparities between high-minority and

low-minority counties, there was an appreciable difference in the competitiveness of the 2010

and 2014 gubernatorial elections (*see* Timberlake Rebuttal Rpt., P-1195 at 3; McCarty Tr., Vol.

8 at 68-69[9]), and thus in voter turnout, and the Court finds that this factor, for which Dr. McCarty

has not accounted, could be somewhat probative of the difference in provisional ballot rejections

between the 2010 and the 2014 elections.

---

[9] Republican John Kasich won the hotly contested 2010 gubernatorial election with 49% of the
vote to Democrat Ted Strickland's 47%, yet Kasich defeated Democrat Ed Fitzgerald 64-33% in
2014.  (Timberlake Rebuttal Rpt., P-1195 at 3.)

### 3. Dr. M.V. "Trey" Hood, III

Defendant also called Dr. M.V. "Trey" Hood, III, as an opinion witness.[10]  Dr. Hood is a tenured professor of political science at the University of Georgia, and he teaches classes and has published articles on politics, including southern politics, racial politics, and election administration. (Test. of Trey Hood, Tr., Vol. 10 at 5-8.)

Dr. Hood criticized the methodology and conclusions of Dr. Timberlake's regression analysis.  He reiterated Dr. McCarty's concern about aggregate bias, a concern on which the Court has already explained it puts little weight.  (Hood Rebuttal Rpt., D-10 at 9-10).  The Court disagrees with Dr. Hood's opinion that no conclusion can be drawn from the provisional ballot usage and data and, as discussed above, finds that Dr. Timberlake's data and analysis paint a fairly compelling picture that minorities use provisional ballots more often than whites and that, in presidential years in particular, those ballots are rejected more often than the ballots of white voters.  The Court infers from Dr. Timberlake's analysis that in future presidential elections in which SB 205 and SB 216 are in place, minorities would be more likely to use provisional ballots and to have those ballots rejected.  Neither Dr. McCarty nor Dr. Hood has offered convincing reasons for the Court to infer otherwise.  (*See* McCarty Tr., Vol. 8 at 61.)

Dr. Hood also suggests that the rate of provisional ballot rejections has decreased over time, and relies on the post-implementation data from 2014 and 2015 in so concluding, but as Dr. Timberlake pointed out in his rebuttal report, the provisional ballot rejection rate actually increased from 2014 to 2015, from 9.6% to 15.4%.  (Timberlake Rebuttal Rpt., P-1195 at 4; *see also* McCarty Tr., Vol. 8 at 67.)  The Court also finds more useful Dr. Timberlake's calculations for provisional ballot rejections, which are calculated as a percentage of the provisional ballots

---

[10] Much of Dr. Hood's expert report and opinion testimony concerned Dr. Timberlake's discussion of the Senate factors, which will be discussed in Section III(*I*)(1), *infra*.

cast rather than Dr. Hood's calculations using the total number of ballots cast in that election. (Timberlake Rebuttal Rpt., P-1195 at 3-4.)  Using his own method, Dr. Timberlake found, contrary to Dr. Hood's conclusion, that the provisional ballot rate has, in fact, fluctuated over time and shows no clear pattern other than that it was higher during the last two presidential election years (19.3% in 2008 and 16.5% in 2012) than the last two midterm election years (11.2% in 2010 and 9.6% in 2014).  (Timberlake Rebuttal Rpt., P-1195 at 4.)  Given that the rejection rate most recently increased again in 2015, the Court concludes that the data shows that it would be premature to assume that the provisional ballot rejection rate is declining, much less to suggest that SB 216 has actually *caused* fewer rejections, as Defendant suggests.

Besides criticizing Dr. Timberlake's data, methodology, and opinions, Dr. Hood also testified as to what he considered to be valid reasons for enacting the new laws, notably improved election administration, including enabling Boards to identify voters more easily in a database and making it easier for voters to register if they cast a provisional ballot but were not properly registered in the appropriate county and precinct.  (Hood Tr., Vol. 10 at 21-22.)  He formed these opinions based on conversations with Assistant Secretary Damschroder and review of sworn statements by Board officials submitted in the *OOC* case.  (*Id.* at 26.)  Dr. Hood's testimony does not particularly add to the Court's understanding or interpretation of any of the testimony or submissions from representatives of the various Boards and Assistant Secretary Damschroder.  The Court gives little weight to Dr. Hood's opinion that the rejection of provisional ballots for trivial errors is unlikely to occur under the new law because the Boards review provisional and absentee ballots and "screen out" trivial errors from substantive errors, which he defines as errors that "preclude[] the Board from being able to identify who the voter is."  (Hood Rpt., D-8 at 4, 8; Hood Tr., Vol. 10 at 127.)  This proffered opinion carries no weight

because it assumes that Boards will not disenfranchise voters whom it can identify, even though the evidence before the Court suggests that Boards have disenfranchised such voters.

In sum, Dr. Hood's testimony and report were in large part irrelevant to the issues before the Court and also reflected methodological errors that undermine his conclusions. Other courts have found likewise.[11]  As such, the Court finds his contribution of limited value.

### 4. Conclusions from Expert Reports

The Court finds that Dr. Timberlake's methodology, given the limited data available on the race of voters, accounted for sufficient factors to address the concerns arising from aggregation bias and omitted variable bias.  For the reasons outlined above, the Court gives great weight to Dr. Timberlake's conclusions that across all even-numbered election years, minorities use provisional ballots more often than whites, and that in presidential election years, the absentee ballots and provisional ballots of minority voters are more likely to be rejected than those of white voters.

The Court gives little weight to Dr. McCarty's opinions, finding that they are irrelevant to Dr. Timberlake's findings or do not refute his most compelling conclusions.  The Court gives little to no weight to Dr. Hood's opinions.

---

[11] *See Veasey v. Perry*, 71 F. Supp. 3d 627, 663 (S.D. Tex. 2014) ("On cross-examination, Plaintiffs pointed out a multitude of errors, omissions, and inconsistencies in Dr. Hood's methodology, report, and rebuttal testimony, which Dr. Hood failed to adequately respond to or explain. The Court thus finds Dr. Hood's testimony and analysis unconvincing and gives it little weight.") (footnotes omitted); *Frank v. Walker*, 17 F. Supp. 3d 837, 881-84 (E.D. Wis. 2014) (discounting Dr. Hood's findings), *rev'd on other grounds*, 768 F.3d 744 (7th Cir. 2014); *Florida v. United States*, 885 F. Supp. 2d 299, 324 (D.D.C. 2012) ("In finding that African-American voters in the covered counties will be disproportionately affected by the reduction in early voting days under the new law, we reject the contrary opinions of Florida's expert witness, Professor Hood. We do so because the analysis underlying his conclusions suffers from a number of methodological flaws.") (footnotes omitted); *Common Cause/Georgia v. Billups*, No. 4:05-cv-0201, 2007 WL 7600409, at *14 (N.D. Ga. Sept. 6, 2007) (excluding Dr. Hood as an expert witness as to absentee voting analysis because his testimony was either unreliable or not relevant).

# I.  Racial Discrimination

## 1.  The Senate Factors

In addition to their testimony on potential disparate impact by race, Drs. Timberlake and Hood offered testimony and expert reports regarding the applicability of the Senate factors in this case.[12]  Senator Turner and Representative Clyde also offered lay testimony that is relevant to a consideration of the Senate factors.  Courts use these factors, which come from Senate Judiciary Committee recommendations issued in connection with the 1982 amendments to the VRA and were incorporated and expanded by the Supreme Court in *Thornburg v. Gingles*, to determine whether "the totality of circumstances" shows that minorities "have less opportunity than other members of the electorate to participate in the political process." 478 U.S. 30, 36 (1986) (citing 52 § U.S.C. 10301(b)).  The factors include:

> 1. the extent of any history of official [voting-related] discrimination in the state or political subdivision . . .
> 2. the extent to which voting in the elections of the state or political subdivision is racially polarized;
> 3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
> 4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;
> 5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
> 6. whether political campaigns have been characterized by overt or subtle racial appeals;
> 7. the extent to which members of the minority group have been elected to public office in the jurisdiction.
> [8.] whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group[;][and]

---

[12] Dr. Timberlake's expert report on the Senate factors was prepared for the *OOC* case and also admitted at trial here.

[9.] whether the policy underlying the state of political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Id.* at 36-37 (quoting S.Rep. No. 97-417, 97th Cong., 2d Sess., pages 28-29 (1982)).  The Court finds the following facts relevant to an assessment of the "social and historical conditions" faced by African-American voters in Ohio.  *Id.* at 47.  As the Court will explain in detail, it finds Dr. Timberlake's testimony regarding the Senate factors to be highly probative and gives little to no weight to Dr. Hood's analysis of the Senate factors.

### a.  Fifth Factor: Extent of Discrimination Hindering Participation in Political Process

It is neither surprising nor accidental that African-Americans comprise a disproportionate share of NEOCH's and CCH's constituent homeless members.  (*See* Davis Tr., Vol. 4 at 132, 186.)  Ohio's history of race-based discrimination has led to current racial disparities that are pervasive, profound, and deplorable.  After examining socioeconomic indicators across the categories of employment, housing, income, education, and health, Dr. Timberlake came to the "simple" conclusion that there is "pronounced racial inequality on *all* of these indicators in the state of Ohio."  (Timberlake Tr., Vol. 5 at 64) (emphasis added).  Indeed, "[r]ace-specific data from the Ohio subsample of the nationally representative American Community Survey ("ACS") reveals *substantial* and *entrenched* inequalities." (Timberlake Rpt., P-1194 at PTF-167) (emphasis added). For example, 34% of the African-American population in Ohio lives in poverty compared to 12% of the white population—a difference of nearly three to one. (Timberlake Tr., Vol. 5 at 69.)  The disparities between Ohio's African-American and white populations in family income and poverty are "stark." (Timberlake Rpt., P-1194 at PTF-178.) Household income of African-Americans in Ohio is about 60% of that of whites across all counties, and in counties with a higher percentage of minority residents, the inequality is even

worse.  In those high-minority counties—where three-quarters of Ohio minorities live—white household income is 84% greater than African-American household income.  (*Id.*)

Unemployment is significantly higher among working-age African-American Ohioans than white.  (*Id.* at 167.)  Job-level racial segregation has led to "the relegation of minority employees to lower-return and more precarious jobs, and ongoing minority vulnerability to discrimination in hiring, firing, promotion, demotion, and harassment." (*Id.* at 166-67).  Thirty-five percent of white Ohioans hold professional positions compared to 25% of African-Americans, while 53% of African-Americans hold service jobs compared to 41% of whites.  (*Id.* at 168.)  Because they are more likely to have professional positions, whites are more likely than African-Americans to have the greater job security, flexibility, earnings, and benefits that accompany those jobs.  (*Id.*)  Importantly, substantial research reveals that, even controlling for such factors as experience and education, significant disparities remain, indicating that discrimination plays a significant role in creating these employment disparities and job-level segregation, "especially when the disparities are as large as they are in Ohio."  (*Id.* at 169-70.)

Ohio also has pronounced race-based housing disparities.  According to one recent nationwide analysis, Cleveland, Cincinnati, and Columbus are the 8th, 12th, and 22nd most segregated cities in the United States.  (*Id.* at 171.)  Whites in Ohio are almost twice as likely to be homeowners as African-Americans and, relatedly, African-Americans are more likely to move in any given time period than whites. (*Id.* at 173.)  Indeed, over each year, 21.6% of African-American Ohioans move their residence compared to 13.1% of white Ohioans.  (*Id.*)  African-Americans live in substantially poorer neighborhoods than whites, the consequences of which include reliance on public transportation and lack of access to neighbors with resources such as cars, which could result in greater difficulties procuring transportation to places like

polling locations and Boards. (*Id.* at 174-75.) Research indicates that African-Americans prefer living in integrated, as opposed to segregated, communities, so self-selection cannot explain these disparities. (*Id.* at 176).

What can? A large part of the current problem of race-based housing disparities is structural and generational—"the result of a long history of discrimination at the federal, state, [and] local . . . levels." (*Id.* at 176.) For example, in the Great Depression, the United States government created the Home Owners Loan Corporation ("HOLC") and the Federal Housing Administration ("FHA") "to help families reclaim their homes from foreclosure and to foster homeownership among new generations of Americans." (*Id.* at 176-77.) Using federal dollars, these agencies engaged in "redlining" practices, refusing to issue loans to residents in African-American neighborhoods. (*Id.* at 177.) This practice was devastating for African-Americans in Ohio because they were "virtually shut out of the opportunity to buy or build homes" and languished in "older, decaying, segregated neighborhoods in central cities," while the federal government subsidized white families' exodus to the suburbs. (*Id.*) At the local level, Ohio municipalities have been found liable for discrimination against African-Americans under the Fair Housing Act. (*Id.*) As recently as last year, the Medina Metropolitan Housing Authority settled a housing discrimination suit brought by the United States Department of Housing and Urban Development ("HUD"). (*Id.*)

Along with the structural and generational roots of current racial disparities, there is also the problem of individual prejudice. African-Americans continue to experience longstanding discrimination at the hands of private landlords. For example, a HUD-funded study found that within the Cleveland suburban housing market, "African-American testers were more likely than white testers to receive poor treatment at the hands of real estate agents." (*Id.*)

51

Ohio also suffers racial disparities in educational opportunities and attainment.  (*Id.* at

178.)  Both Cleveland and Columbus were ordered by federal courts to take steps to desegregate

their schools in the late 1970s—more than 20 years after *Brown v. Board of Education*.  *See*

*Reed v. Rhodes*, 422 F. Supp. 708 (N.D. Ohio 1976); *Columbus Bd. of Educ. v. Penick*, 443 U.S.

449 (1979).  Even now, Ohio has three of the top 100 most segregated school districts in the

nation: Cleveland, Youngstown, and Cincinnati.  (Timberlake Rpt., P.-1194 at PTF-180.)

African-American children are also disproportionately clustered in schools with high poverty

rates. (*Id.* at 181.)  For example, the average African-American child in Toledo goes to a school

where four-fifths of her classmates live in poverty, compared to two-fifths for the average white

child.  (*Id.*)  This degree of school poverty is significant because it reinforces racial disparities.

Indeed, research suggests the following:

> the higher the concentration of poverty in a school, the more negative overall
> implications for peer associations and aspirations, school and classroom climate,
> extracurricular programming, school physical quality, safety and resources,
> curriculum availability, spending per pupil, and teacher quality and experience, all
> of which hold consequences for race-specific gaps in educational attainment and
> achievement. Thus, African American children in the State of Ohio are
> significantly hampered by persistent, contemporary school segregation and the
> resource and social inequalities that emanate from that.

(*Id.*)

Race-based disparities in education in Ohio are evinced by educational attainment at both

the low and high ends of the spectrum.  (Timberlake Rpt., P-1194 at PTF-183.)  At the most

basic levels, African-American Ohioans are disproportionately illiterate compared to white

Ohioans,[13] (Timberlake, Tr., Vol. 6 at 21, 73), and African-American dropout rates are 7% higher

---

[13] The court in the *OOC* case was unwilling to find that African-Americans have a lower literacy
rate than whites despite evidence of disproportionate lower standardized test scores and higher
high school dropout rates among African-Americans compared to whites. Reasonable minds
might disagree as to the prudence of that particular finding in those circumstances, but the record

than they are for whites. (Timberlake Rpt., P-1194 at PTF-183.) At the upper end, over a quarter of white adults in Ohio have attained a bachelor's degree or higher, compared to less than 15% of African-Americans. (*Id.*) In high-minority counties, these racial disparities are even greater. (*Id.*)

Negative health indicators are more common in adult African-Americans than whites in Ohio, including high blood pressure (37.5% to 26.2%); diabetes (12.3% to 9.2%); stroke (3.4% to 2.1%); and disability generally (19.3% to 15.6%). (*Id.* at 186.) Worse yet, 27.6% of African-American Ohioans are uninsured compared to 17.0% of whites. (*Id.*) African-American babies are twice as likely to be born with low birth weight, and the African-American infant mortality rate is 2.5 times that of the rate for whites. (*Id.*) Childhood asthma rates (19.5% for African-Americans versus 12.2% for whites), preventative dental care (87.9% to 95.7%) and treatment for those with mental illness (60% to 30%) demonstrate a current and widespread problem of racially disproportionate health disparities between African-American and white Ohioans. (*Id.*)

>    b. Voting-Related Discriminatory Processes
>    First and Third Factors: 

The history of Ohio's racially discriminatory voting laws goes back to its founding. In 1802, the new state constitution explicitly limited voting rights to white men. (*Id.* at 190.) The exclusion of African-Americans from the franchise "was seen as initially important owing to concerns that freed slaves would migrate en masse to the State." (*Id.*) Racial exclusion continued with the Ohio legislature's passage of "Black Codes" and "Black Laws" from 1804-1807. Those codes instituted the following racist practices:

- Requiring that "black or mulatto persons" have a court certificate validating that they were in fact free.

---

there, unlike here, included no evidence that literacy and race were related per se. (*OOC*, slip op. at 82.)

- Requiring that all "black or mulatto" adults and their children be registered with the county clerk's office at the cost of 12.5 cents per name.
- Imposing penalties for employers who employed "black or mulatto" persons without such certification.
- Imposing penalties for any individual harboring a "black or mulatto person."
- Requiring African-Americans to prove they were not slaves and to find at least two people who would guarantee a surety of five hundred dollars for an African-American's good behavior.
- Restricting interracial marriage and gun ownership among African-Americans.

(*Id.* at 190-91.)  Although the Ohio legislature eventually repealed the laws in 1849, the exclusion of African-Americans from the franchise continued long after.  (*Id.* at 191.)  In 1868, the Ohio General Assembly amended the Act to Preserve the Purity in Elections, granting election officials the right to question prospective voters whether they were of African descent.  (*Id.*)  The Supreme Court of Ohio ruled the amendment unconstitutional, concluding that male citizens "having a visible admixture of African blood, but in whom the white blood preponderates, are white male citizens within the meaning the constitution of Ohio, and have the same right to vote as citizens of pure white blood." *Monroe v. Collins*, 17 Ohio St. 665, 666 (1867).  A 1912 state referendum to remove the race-based voting restriction in its entirety was defeated. (Timberlake Rpt., P-1194 at PTF-191.)

It was not until passage of the 19th Amendment guaranteeing women's suffrage that "white" was removed from the Ohio Constitution, leaving it facially discriminatory long after the ratification of the Fifteenth Amendment.  (*Id.*)  Throughout most of Ohio's history, African-Americans had virtually no representation in elected office.  (*Id.*)  In 1962, in response to the United States Supreme Court's mandate in *Baker v. Carr*, 369 U.S. 186 (1962), Ohio and other states were required to craft congressional districts that accurately reflected the presence and concentration of certain voters, including African-Americans.  The Ohio Constitution was later amended in 1967 to ensure more clearly proportional representation statewide.  (*Id.*)

And more recently, voting practices and changes in Ohio continue to discriminate against minority voters.  Poll watching, for example, although ostensibly aimed at combatting voter fraud, has a pernicious history of intimidation of minority voters.  (*Id.* at 192.)  Groups such as True the Vote, an independent citizen group, were allowed to operate in some Ohio counties during the 2012 general election.  (*Id.*)  Franklin County banned the group's activity due to, among other concerns, disturbing "complaints and reports that the group trained volunteers 'to use cameras to intimidate voters when they entered the polling place, record their names on tablet computers and attempt to stop unquestionably qualified voters before they could get to a voting machine.'"  (*Id.* at 192) (citing Ed O'Keefe, *Tea Party-Linked Poll Watchers Rejected in Ohio County*, Wash. Post, Nov. 6, 2012).  True the Vote also furnished software to local citizen groups to monitor prospective voters, disparately targeting African-Americans and college students.  (*Id.*)

In 2006, Ohio passed a voter ID law requiring all voters to announce their full name and current address and provide proof of their identity.  (*Id.* at 194.)  Studies have shown that voter ID laws are most common in states with a high percentage of minority residents.  (*Id.*)

In response to the long lines and misallocation of voting machines that afflicted heavily minority precincts in the 2004 presidential election, Ohio expanded opportunities for early voting, including early-in person voting, which improved minority participation in the 2008 election.  (*Id.* at 193.)  Estimates from the Current Population Survey (CPS) Voting and Registration Supplement indicated that in 2008, 19.9% of African-Americans used early in-person voting compared to 6.2% of whites.  (*Id.*)

But after the gains in minority participation in the 2008 election, Ohio introduced legislation to restrict ballot access, including HB 194, which was subsequently repealed by the

General Assembly after citizens gathered signatures to place it on the ballot, and SB 238, which

cut early in-person voting hours and eliminated Golden Week but was later enjoined due to its

discriminatory effect.  (*Id.* at 194; *OOC*, slip op. at 120.)

Dr. Hood finds fault with Dr. Timberlake's analysis of historical discrimination because a

number of the examples on which he relies are more than 200 years old.  (Hood Rebuttal Rpt.,

D-10 at 5.)  True enough, but this critique fails to account for the most recent actions to restrict

voting rights, which Dr. Timberlake discusses in detail.  (*See* Timberlake Rpt., P-1194 at PTF-

192-94.)  And Dr. Hood's contention that Ohio does not have a history of official discrimination

simply because it was never covered under the preclearance provisions of Section 5 of the VRA

is misplaced.  (See Hood Rebuttal Rpt., D-10 at 5.)  *All* states are required to comply with

*Section 2* of the VRA.  As recently as last month, a court not only found that Ohio has a history

of official discrimination, but also found that Ohio's elimination of Golden Week violated

Section 2.  (*OOC*, slip op. at 102, 107-08.)  Finally, Dr. Hood's contention that Plaintiffs lack

evidence of the first and third Senate factors because African-American turnout rates were

roughly equivalent to white turnout rates in the two most recent presidential elections is, again,

not probative of evidence about how discriminatory practices "tend to enhance the opportunity

for discrimination against the minority group."  *Gingles*, 478 U.S. at 45.

c.  Second Factor: Racially Polarized Voting in Ohio

Racially polarized voting in Ohio is extensive. Exit polls from Ohio voters in the 2012

presidential election "suggest *significant and substantial* patterns of racially polarized voting."

(Timberlake Rpt., P-1194 at PTF-195.)  Approximately 41% of white voters and 96% of

African-American voters reported voting for President Barack Obama—an enormous

differential.  (*Id.*)  Other statewide races, including presidential, gubernatorial, and senatorial

races have yielded differentials of 40 to 60% or more.  (*Id.* at 196-97.)  And racially polarized

voting is also evident in primary contests, such as the 2008 Democratic primary contest, in which

38% of white Ohio Democrats voted for Senator Obama, compared to 89% of African-

Americans.  (*Id.* at 196.)  Dr. Hood does not respond to Dr. Timberlake's analysis of this factor

other than to comment that the candidate who was favored by African-American voters often

won the election (Hood Rebuttal Rpt., D-10 at 6), which is irrelevant to the question of whether

there was racial polarization.

### d. Sixth Factor: Racialized Appeals in Politics

Recent political campaigns in Ohio have suffered from both overt and subtle racialized

appeals, or "race codings."  (Timberlake Rpt., P-1194 at PTF-197.)  These appeals serve to

"discourage[e] or dissuad[e] minority voters and prospective candidates by reinforcing the

message that they simply do not belong in the political process and/or by mobilizing white voters

in a particular direction by playing on insidious, sometimes explicit and sometimes implicit,

stereotypes."  (*Id.*)  Political science research indicates that many political campaigns are

designed to invoke fears surrounding crime, welfare, and immigration to "play on white racial

stereotypes and to fuel animosity and mobilization," which "allow[s] for racial appeal without

the explicit appearance of race baiting."  (*Id.* at 197-98.)

Plaintiffs have introduced many examples of racialized appeals.  For instance, former

Senator Turner testified about racially charged political attack ads against her when she ran for

Ohio Secretary of State, including an Ohio Republican Party mail piece and television

commercial, both of which referred to her as a "slum landlord" and distorted her picture to make

her skin appear darker, which she interpreted as playing on pernicious stereotypes about African-

Americans.  (Turner Tr., Vol. 6 at 148-49, 151.)

Shortly before the 2012 presidential election, anonymous funders placed sixty "Voter Fraud" billboards in Cleveland and Columbus. Although voter fraud is a crime, there was little to no evidence that such fraud was taking place in Ohio. Tellingly, these billboards seemed to be strategically placed disproportionately in African-American and Latino neighborhoods in both cities, often within eyesight of large public housing communities. (Timberlake Rpt., P-1194 at PTF-198.)

During the same election season, the Tea Party Victory Fund aired a commercial featuring a shouting African-American woman claiming that President Obama gave her a cell phone and would take care of welfare recipients. (*Id.* at 199.) The commercial was an appeal to anti-welfare sentiment and, although it did not mention race explicitly, Dr. Timberlake wrote in his report that it nonetheless appeared to reinforce the stereotype that African-Americans are poor, lazy, and dependent on the government for handouts. (*Id.*)



In August 2012, Doug Preisse, Chairman of the Franklin County Republican Party, stated, "I guess I really actually feel we shouldn't contort the voting process to accommodate the urban—read African-American—voter turnout machine." This was not a slip of the tongue but, rather, a written response to a reporter's question. (*Id.* at 200.)

58

Dr. Hood takes issue with Dr. Timberlake's characterization of racialized appeals in Ohio politics because some of Dr. Timberlake's cited examples were not tied to a particular candidate—like Preisse's comment about the African-American voter turnout machine—or funded by a particular campaign, like the billboards, for which a private family foundation paid. (Hood Rebuttal Rpt., D-10 at 6.)  But the Court sees no reason why this distinction is relevant to an analysis of the presence of racialized appeals in politics more generally, given that the pertinent question is the *effect* of such appeals on minority voters, not the source.

e.  <u>Seventh Factor: Minority Representation</u>

Although Ohio has made "significant progress" in minority representation at the state and federal levels, African-Americans remain underrepresented in the most important and visible elected statewide posts.  (Timberlake Rpt., P-1194 at 203.)  For instance, despite comprising 12.4% of Ohio's population, African-Americans have filled the positions of Governor, Lieutenant Governor, Attorney General, Auditor, Secretary of State, and State Treasurer only five times in Ohio history—one lieutenant governor, one secretary of state, and three state treasurers. (*Id.* at 202.)  No African-American holds any of these positions currently.  (*Id.*)  Similarly, of the 156 justices on the Supreme Court of Ohio, only three have been African-American, and only one of the nineteen current members of the State Board of Education is African-American.  (*Id.*)  Until last year, and for the first time in sixty years, the Governor's twenty-six-person cabinet was entirely white.  (*Id.* at 203.)  In local offices and state legislative bodies, however, African-Americans hold elected office in numbers roughly proportional to their percentage in the population (e.g., the Ohio General Assembly) or even greater (e.g., the Columbus City Council).  (Hood Rebuttal Rpt., D-10 at 7-8.)

59

f.  Eighth Factor: Lack of Responsiveness

The primary evidence for Ohio's lack of responsiveness to the particularized needs of

African-American Ohioans is the extensive data and testimony concerning racial disparities in

employment, housing, income, education, and health.  (*See* Timberlake Rpt., P-1194 at 203.)

Nor have many of those socioeconomic disparities improved in recent years.  In 1989, for

example, the African-American poverty rate in Ohio was 32.3%, while in 2013, it was 33.6%.

(*Id.*)  Disparities in employment rates have remained steady over the last few decades too.  (*Id.* at

168; 203.)  Moreover, Ohio has a history of requiring federal intervention to protect minority

rights in the desegregation of its schools and housing.  (*Id.* at 203-04.)  Additionally, the

legislature's response to the increased minority access to the polls following the post-2004

election reforms has been to take repeated steps to limit such access, which suggests a lack of

responsiveness to African-Americans.  (*Id.* at 204.)  Senator Turner also testified that Secretary

Husted, to the best of her knowledge, never reached out to her or any other members of the Ohio

Legislative Black Caucus to ask for their input regarding how any of the voting procedures or

directives he has implemented might affect African-American voters.  (Turner Tr., Vol. 10 at

157-58.)

g.  Ninth Factor: Tenuousness

Defendant does not argue here, as he has in defending other election laws,[14] that SBs 205

and 216 are justified by cost savings or preventing voter fraud.  Defendant's primary justification

for the challenged laws is that they improve election administration, representing "the result of

more than a decade of efforts by legislators, boards of elections, and state elections officials to

continuously evaluate and improve Ohio's voting systems."  (Def.'s Proposed Findings of Fact

and Conclusions of Law, Doc. 686 at ¶ 18.)  But, given that the State's justifications are not

---

[14] *See NAACP*, 43 F. Supp. 3d at 818-19.

supported by evidence, *see infra*, Section IV(B)(1), and SB 216's sponsor, Senator Seitz, admitted in a news article to trying to "ratchet back" the post-2004 voting laws that expanded opportunities for voters, the justifications for SBs 205 and 216 appear tenuous.  (Timberlake Rpt., P-1194 at PTF-204.)

### 2.  *The Calculus of Voting*

In addition to his testimony on the Senate factors, Dr. Timberlake testified about how the Calculus of Voting could explain what causes the disparate impact he identified in absentee ballot rejection rates and provisional ballot usage and rejection rates. Developed from rational choice theory, the Calculus of Voting is a framework to assess the individual thought processes and social mechanisms that influence whether potential voters choose to vote.  (Timberlake Tr., Vol. 5 at 56-57.)  For example, in the *OOC* case, Dr. Timberlake considered voters' employment.  (*Id.* at 57.)  Voters with blue-collar jobs are more likely to have inflexible work schedules and to lack financial resources or access to a car and, therefore, might not vote because voting would pose too costly a burden to be justified by the result of those voters' ballots.  (*Id.*) In that case, the Calculus of Voting provided a basis to explain why, for example, African-Americans would use early in-person voting more frequently, namely because African-Americans are more likely to be wage workers than whites and early in-person voting is a more flexible way to vote.  (*Id.*)

Here, the Calculus of Voting helps explain why increasing the information required to be filled out correctly by voters might depress those illiterate voters' willingness to participate in elections. (*Id.* at 58.)  And because the challenged laws reduce the post-election cure period from ten days to seven, thus decreasing the flexibility afforded to voters to cure problems with their ballots, voters with less flexible schedules might be less able or likely to cure defects,

particularly since provisional voters must go to the Board in person to cure the ballots. (*Id.* at 59-60.)  Therefore, given the evidence of profound socioeconomic disparities between whites and African-Americans, the Calculus of Voting explains why African-Americans may be more likely to have their ballots thrown out for errors in the five fields due to their lower educational attainment levels (which are correlated with literacy rates) or may have more difficulty curing their provisional ballots because they are less likely to have the flexible work schedule and access to transportation to go to the Board.  (*Id.* at 61-62, 73.)

Dr. McCarty testified that he had no opinion on the usefulness of the Calculus of Voting framework or its applicability to this case.  (McCarty Tr., Vol. 8 at 81.)  Dr. Hood was not directly questioned about the Calculus of Voting but did acknowledge that factors like higher residential mobility could affect voter turnout and the provisional ballot casting rate.  (Hood Tr., Vol. 10 at 121, 124.)  The Court finds this method to be persuasive in offering an explanation for some of the causal factors that may influence the disparities in provisional ballot usage and absentee and provisional ballot rejection rates.

## IV.   CONCLUSIONS OF LAW

### A.  Standing

The Court has an "independent obligation to ensure [its] jurisdiction over a case."  *In re Cannon*, 277 F.3d 838, 852 (6th Cir. 2002).  Based on its factual findings and the relevant law, the Court concludes that Plaintiffs NEOCH, CCH, and ODP have constitutional and prudential standing to bring all of their claims.[15]

To establish constitutional standing, a plaintiff must show: (1) an "injury in fact" that is concrete and particularized and actual or imminent; (2) a causal connection between the injury

---

[15] The Court will address separately, in Section IV(C), the parties' arguments regarding Plaintiffs' statutory standing under the Voting Rights Act.

and the conduct complained of; and (3) a likelihood, rather than mere speculation, that the injury

will be redressed by a favorable decision.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61

(1992).

NEOCH, CCH, and ODP have both organizational and associational (or representational)

standing to bring this suit.  An organization may assert constitutional standing in one of two

ways: "(1) on its own behalf because it has suffered a palpable injury as a result of [a

defendant's] actions; or (2) as the representative of its members."  *MX Grp., Inc. v. City of

Covington*, 293 F.3d 326, 332-33 (6th Cir. 2002).  Additionally, NEOCH and CCH have third-

party standing to assert their members' interests.

### 1.  *Organizational Standing*

As to organizational standing, Plaintiffs have shown that the challenged laws have

created and will create "a drain on [the] organization[s'] resources," which "constitutes a

concrete and demonstrable injury for standing purposes."  *Miami Valley Fair Housing Ctr., Inc.*

*v. Connor Grp.*, 725 F.3d 571, 576 (6th Cir. 2013) (citing *Havens Realty Corp. v. Coleman*, 455

U.S. 363, 379 (1982)).  Here, the Court finds that NEOCH has diverted resources from its vote-

by-mail program to early in-person voter turnout due to its assessment that the challenged laws

will increase the likelihood that its members' ballots will be thrown out, and that in the 2016

election it will have to continue that diversion of resources.  Driving voters to the polls requires

more resources than NEOCH's vote-by-mail campaigns and will result in a greater drain on

NEOCH's resources, a drain that will be especially pronounced in 2016 because it is a

presidential year that requires turning out more voters.  CCH, in turn, must increase its voter-

education efforts by explaining new voting requirements to its homeless members and training

its members to educate other members about those requirements.  Finally, ODP must divert

resources from registering and educating new voters to educating other voters about the new

procedural requirements in the challenged laws.  This diversion of resources will prove even

more burdensome due to the FEC's requirement that GOTV activity be paid for from "hard"

dollars, which have more strict contribution limits and are thus harder to raise than "soft" dollars.

SB 205 and SB 216 have altered the course of Plaintiffs' "daily operations" and caused them

injury.  *See Am. Canoe Ass'n v. City of Louisa Water & Sewer Comm'n*, 389 F.3d 536, 546-47

(6th Cir. 2004) (finding organizational standing where the organizations' "daily operations are

stymied to the extent that they can no longer honor their own monitoring and reporting

obligations to their members").

The factual record supports the Court's conclusion that Plaintiffs, with their limited

organizational resources, have diverted and will continue to divert funds as a result of the

challenged laws.  *See Miami Valley*, 725 F.3d at 576; *cf. Fair Elections Ohio v. Husted*, 770 F.3d

456, 461 (6th Cir. 2014) (holding that the plaintiff lacked organizational standing because it

maintained only an "abstract social interest in maximizing voter turnout" as opposed to a

concrete financial interest in encouraging ballot access).  Although the Sixth Circuit held in *Fair

Elections Ohio* that an organization is not injured when it must "instruct election volunteers

about absentee voting procedures when the volunteers are being trained in voting procedures

already," the organizational plaintiff in that case asserted only that it would have to change its

training program and materials.  *Id.* at 459-60.  Here, on the other hand, Plaintiffs would be

compelled to revamp their entire get-out-the-vote strategy to focus on early in-person absentee

voting instead of vote-by-mail absentee voting due to the increased risk of error in the mail-in

absentee balloting process.  Because this new get-out-the-vote effort will be more costly and

time-consuming, NEOCH and CCH have shown a significantly greater injury than the *Fair Elections Ohio* plaintiff.

As to ODP, a showing that a political party would be "compell[ed] . . . to devote resources to getting to the polls those of its supporters who would otherwise be discouraged by the new law from bothering to vote" is sufficient to confer standing.  *Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007), *aff'd*, 553 U.S. 181, 189 n.7 (2008) ("We also agree with the unanimous view of [the Seventh Circuit panel] that the Democrats have standing to challenge the validity of [the voter ID law] and that there is no need to decide whether the other petitioners also have standing.").  And "[t]he fact that the added cost has not been estimated and may be slight does not affect standing, which requires only a minimal showing of injury."  *Id.* (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-84 (2000)).  Moreover, in *Fair Elections Ohio*, the panel majority explicitly observed that if "a political party can marshal its forces more effectively by winning its lawsuit, that ought to be enough for Article III" standing.  770 F.3d at 460 (contrasting political party's standing with "armchair observer[s] [who] decide[] that the government is violating the law").  *See also OOC*, slip op. at 24-28 (finding that ODP had standing to challenge election laws, some of which also are challenged here).

Here, the Court concludes that all three Plaintiffs' diversion of organizational resources constitutes an injury-in-fact.  Further, Plaintiffs have shown that the enactment of the challenged laws has caused the diversion of resources and that, absent the enforcement of these laws, they would not be required to divert these resources.

### 2. Associational or Representational Standing

Plaintiffs also have shown that they have associational standing, or standing to bring suit on behalf of their members.  An association has standing to bring suit on its members' behalf "when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Laidlaw*, 528 U.S. at 181 (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).  In *Sandusky County Democratic Party v. Blackwell*, the Sixth Circuit found that a state and local political party and three labor unions had associational standing to challenge the rejection of provisional ballots cast in the wrong precinct even though the plaintiffs had not "identified specific voters who will seek to vote at a polling place that will be deemed wrong by election workers."  387 F.3d 565, 574 (6th Cir. 2004) (per curiam).  The court reasoned that "by their nature, mistakes cannot be specifically identified in advance. . . .  It is inevitable, however, that there will be such mistakes." *Id.*  Therefore, the court concluded that the injury was not speculative, but real and imminent, and that the organizations had standing to assert "the rights of their members who will vote in the November 2004 election" even though they could not pinpoint which members would be harmed by having their names dropped from the voter rolls or listed in an incorrect precinct. *Id.* Similarly, Plaintiffs here have shown that their members are at risk of being disenfranchised in the 2016 general election due to a failure to fill out the five-field information correctly or cure their ballots within the allotted cure period.

Each organizational plaintiff has shown that the interests at stake are germane to the organization's purpose.  *See Laidlaw*, 528 U.S. at 181.  NEOCH and CCH both seek to encourage homeless people to advocate for their interests, an important component of which is to

register to vote and to vote.  ODP registers its members, educates them about voting procedures and requirements, and encourages them to vote for Democratic candidates.

Nor is there any doubt that individual members of NEOCH, CCH, and ODP would have standing to sue in their own right.  The individuals these organizations serve would have standing to challenge SB 205 and SB 216 in their own right because, as members of a highly transient population with low literacy rates, they stand at risk of being disenfranchised.

Finally, the participation of individual members in the lawsuit is unnecessary because Plaintiffs seek injunctive relief, which would affect all Ohio voters.  *See Hunt*, 432 U.S. at 344 (noting that a request for declaratory and injunctive relief does not require individualized proof and is thus "properly resolved in a group context"); *see also United Food and Commercial Workers Union 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996) (same).  Therefore, the Court concludes that Plaintiffs have associational standing to bring their claims.

### 3.  *Third-Party Standing*

Additionally, NEOCH and CCH have third-party standing to bring their claims. Generally, a party "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."  *Warth v. Seldin*, 422 U.S. 490, 499 (1975). A limited exception to this rule applies, however, where: (1) the party asserting the right has a "close" relationship with the person who possesses the right; and (2) the possessor of the right is hindered in her ability to protect her own interests.  *Kowalski v. Tesmer*, 543 U.S. 125, 129-30 (2004) (quoting *Powers v. Ohio*, 499 U.S. 400, 411 (1991)).  Whether a close relationship and hindrance exist are questions of fact.  *Singleton v. Wulff*, 428 U.S. 106, 114-15 (1976).

NEOCH and CCH have close relationships with homeless populations in Cuyahoga and Franklin Counties such that they are "fully, or very nearly, as effective a proponent of the right

as" homeless individuals themselves. *Id.* at 115. NEOCH and CCH regularly work with homeless individuals, advocate for their needs, connect them to necessary social services, and encourage their participation in civic life. The Supreme Court has recognized relationships between lawyers and clients or doctors and patients as sufficiently close to confer third-party standing and stressed that third-party standing may lie when the litigant has a relationship as an "advocate" for the third-party. *See Eisenstadt v. Baird*, 405 U.S. 438, 445-46 (1972); *see also Carey v. Population Servs., Int'l*, 431 U.S. 678, 683-84 (1977) (holding that retail seller of contraceptives had third-party standing on behalf of customers to challenge statute restricting the sale of contraceptives). Again, *Fair Elections Ohio* does not control because the plaintiff there, a federation of churches conducting voter outreach, had no particular connection to the individuals at risk of disenfranchisement—registered voters who were jailed after 6:00 p.m. on the Friday before Election Day and not released in time to cast their votes in person—and, therefore, these "unidentified, future late jailed voters" lacked a close relationship with the federation. 770 F.3d at 461.

As to hindrance, Plaintiffs have shown that NEOCH's and CCH's members, as some of the most vulnerable individuals in the state, suffer disproportionately from mental health problems, substance abuse, limited financial resources, and low levels of literacy and education. Due to these challenges, they often have difficulty navigating the court system, obtaining counsel, maintaining a consistent address and phone number, and obtaining ID that would allow them access to courtrooms. A right holder's hindrance need not be "insurmountable" but only "genuine." *Singleton*, 428 U.S. at 116-17. The homeless individuals served by NEOCH and CCH face exactly the kind of "practical obstacles" the Supreme Court has recognized as sufficient to confer third-party standing. *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467

U.S. 947, 956 (1984).  NEOCH and CCH have shown that they bear a close relationship to the homeless populations they serve, and that such individuals are hindered by numerous obstacles in their ability to protect their own interests.  Therefore, NEOCH and CCH have third-party standing to assert the claims of their members.

### B.  Constitutional Claims

#### 1.  Equal Protection: Undue Burden

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution guarantees that no State shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV.  This includes protecting a qualified citizen's right to vote, which is a right "of the most fundamental significance under our constitutional structure."  *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (quoting *Ill. Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979)). Undermining this right renders even the most basic of other rights "illusory."  *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964).  Restrictions on the franchise in presidential elections "implicate a uniquely important national interest" because only the President and Vice President represent all voters across the country and, accordingly, a state's restrictions "ha[ve] an impact beyond its own borders."  *Anderson v. Celebrezze*, 460 U.S. 780, 794-95 (1983).  The right includes both "the initial allocation of the franchise" and also "the manner of its exercise," *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 477 (6th Cir. 2008) (quoting *Bush v. Gore*, 531 U.S. 98, 104 (2000)), and one aspect of "the manner of its exercise" is when a State "places restrictions on the right to vote," as Ohio has done here, *Obama for Am. v. Husted*, 697 F.3d 423, 428 (6th Cir. 2012).

Balanced against a citizen's fundamental right to vote is the responsibility of the States to choose the "Times, Places and Manner of holding Elections," U.S. Const., Art. I § 4, cl. 1, which

gives them "the power to regulate their own elections," *Burdick*, 504 U.S. at 433.  The regulation

of elections is, of course, necessary to ensure that they are fair, orderly, and honest.  *Storer v.*

*Brown*, 415 U.S. 724, 730 (1974).

In conducting an equal-protection analysis, "[t]he precise character of the state's action

and the nature of the burden on voters will determine the appropriate equal protection standard."

*Obama for Am.*, 697 F.3d at 428-29.  This begins with an analysis of the regulations at issue.  *See*

*id.* (citing *Biener v. Calio*, 361 F.3d 206, 214 (3d Cir. 2004)).

In evaluating the constitutionality of laws that impose no burden on the fundamental right

to vote, courts apply rational basis review.  *Ne. Ohio Coal. For the Homeless v. Husted*, 696 F.3d

580, 592 (6th Cir. 2012) ("*NEOCH*").  On the other hand, a law that "'severely' burdens the

fundamental right to vote," such as a poll tax, triggers strict scrutiny, *Obama for Am.*, 697 F.3d at

429 (quoting *Burdick*, 504 U.S. at 434), and must be "narrowly drawn to advance a state interest

of compelling importance," *Norman v. Reed*, 502 U.S. 279, 289 (1992).  And "[fo]r the majority

of cases falling between these extremes, [courts] apply "the 'flexible' *Anderson-Burdick*

balancing test."  *NEOCH*, 696 F.3d at 592 (quoting *Burdick*, 504 U.S. at 434).  The *Anderson-*

*Burdick* test provides as follows:

> A court considering a challenge to a state election law must weigh "the character
> and magnitude of the asserted injury to the rights protected by the First and
> Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise
> interests put forward by the State as justifications for the burden imposed by its
> rule," taking into consideration "the extent to which those interests make it
> necessary to burden the plaintiffs' rights."

*Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789).

This balancing of interests is necessarily fact-intensive.  *See Obama for Am.*, 697 F.3d at

429.  There is no "'litmus test' that would neatly separate valid from invalid restrictions," so the

trial court must weigh the burden on voters against the state's asserted justifications and "make

70

the 'hard judgment' that our adversary system demands." *Crawford*, 553 U.S. at 190 (Stevens, J., plurality opinion). When the Court identifies any burden a state law places on the right to vote, "[h]owever slight that burden may appear, . . . it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Id.* at 191 (quoting *Norman*, 502 U.S. at 288-89).

Plaintiffs challenge three specific provisions in both SB 205 and SB 216: (1) the requirements that voters must accurately complete five fields on the provisional ballot affirmation and absentee identification envelope before their ballots can be counted; (2) the prohibitions against poll-worker assistance to voters; and (3) the reduction in the period to cure deficient ballots from ten to seven days after the election. Mindful that the Court's task is to balance the "'character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the *plaintiff* seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,'" *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789) (emphasis added), the Court will analyze the burden with particular attention to the record evidence regarding relevant characteristics of the homeless constituencies of Plaintiffs NEOCH and CCH.

This is in keeping with *Crawford*, where a plurality of the Supreme Court acknowledged that, although for most voters it is not a substantial burden to comply with a photo ID requirement, a "somewhat heavier burden may be placed on a limited number of persons . . . includ[ing] elderly persons born out of State, who may have difficulty obtaining a birth certificate[,] . . . homeless persons[,]" and others. 553 U.S. at 198-99. Although the *Crawford* Court rejected the plaintiffs' argument that the law should be enjoined on the basis of the burden to that smaller group of voters, it did so because the record in that case did not contain evidence

71

of the specific burdens imposed on those vulnerable groups.  *Id.* at 201-02.  Because the record

was virtually devoid of evidence that would have allowed the Court to measure the "magnitude

of the burden on this narrow class of voters or the portion of the burden imposed on them that is

fully justified," *id.* at 200, the Court considered only the burden on all Indiana voters, which it

determined was only "limited," *id.* at 203.[16]  Here, as this Court explains below, Plaintiffs have

introduced sufficient evidence to show a significant burden on NEOCH's and CCH's members

as to the three aspects of the challenged laws.

### a.  Information Requirements

Plaintiffs NEOCH and CCH argue that the challenged laws will impose a burden on the

right to vote of their illiterate and homeless members.  The Court agrees.  The weight of the

evidence presented at trial compels the Court to find that the information requirements impose a

significant burden on NEOCH and CCH because many illiterate and homeless voters have

difficulties filling out forms correctly, as discussed in the Court's findings of fact in Section

III(F)(1).  The Court now turns to whether the State's "precise interests" for maintaining the laws

are "sufficiently weighty" and "necessary" to justify the burden.  *See Obama for Am.*, 697 F.3d

at 433.

---

[16] Defendant cites Justice Scalia's concurrence in *Crawford* that stated "our precedents refute the view that individual impacts are relevant to determining the severity of the burden [the law] imposes." 553 U.S. at 205 (Scalia, J., concurring).  Justice Scalia, writing for three Justices, argued that rather than upholding the law on the basis that the record did not show a substantial burden on particular groups of vulnerable voters, the Court should not have taken into account the law's effects on any group but the electorate as a whole, characterizing the lead opinion as endorsing a "case-by-case approach [that] naturally encourages constant litigation." *Id.* at 208. The Sixth Circuit has declined to follow the concurring opinion's approach.  *Obama for Am.*, 697 F.3d 441 n.7.  This approach failed to garner support from a majority of the justices, as it was disfavored by the lead opinion and implicitly by the two dissents, both of which discussed the specific burdens the law would impose on poor, elderly, or disabled voters who would have difficulty procuring transportation to the Bureau of Motor Vehicles or obtaining the documents required to get the free voter ID.  *Crawford*, 553 U.S. at 220-22 (Souter, J., dissenting); *id.* at 238-39 (Breyer, J., dissenting).

The Court finds that the State has not offered explanations for the portions of the law disenfranchising voters who fail to conform to the new informational requirements that are sufficiently weighty to justify the significant burden on homeless voters who struggle to fill out the forms completely and accurately. Unlike in several other cases in which courts have scrutinized voting restrictions in Ohio,[17] Defendant has not offered combatting voter fraud as a justification for requiring the additional information, so the integrity of the process is not at issue. Boards are thus rejecting ballots from qualified voters for mere technical mistakes. Significantly, the OAEO did not support this portion of the law. Although otherwise generally supportive of many of the reforms, OAEO did not weigh in on whether the new requirements should cause ballots to be rejected for nonconformance. (Terry Tr., Vol. 11 at 96.) And Defendant's own election administration opinion witness, Dr. Hood, conceded that many of the errors causing ballots to be rejected are "trivial." (Hood Tr., Vol. 10 at 127.) In fact, Dr. Hood stated that the purpose of the five-field requirement was "to positively identify voters, not to disqualify ballots based on inconsequential errors on the part of voters," suggesting that he may not have even understood that ballots would be thrown out for non-conformity with the requirements, much less could he offer a significant state interest in doing so. (Hood Rpt., D-8 at 8 n.15.)

Defendant's justification that the new requirements give Boards more information for identifying and registering voters may be persuasive as a reason to *include* the five fields on the form, but it is unpersuasive as a rationale for *rejecting* ballots with missing or incomplete information. While giving Boards more information can certainly prove helpful for both identification and future registration, (*see, e.g.*, Ward Tr., Vol. 7 at 205, 234), Defendant has

---

[17] *See, e.g.*, *NEOCH*, 696 F.3d at 596; *Sandusky Cnty. Democratic Party*, 387 F.3d at 569; *NAACP*, 43 F. Supp. 3d at 844.

failed to prove in any way how disenfranchising voters who fail to conform to the requirements furthers that goal. Board officials have testified that they did not need all five fields to identify voters, and in most cases easily could identify voters before the new date-of-birth and address requirements. (Perlatti Tr., Vol. 2 at 73; Bucaro Tr., Vol. 6 at 41-42; Sauter Tr., Vol. 7 at 127-28) For absentee ballots, it is even easier for the Board to confirm a voter's identity because the identification envelopes in which voters return their absentee ballots have unique bar codes on them which, when returned to the Board, can be used to identify the voter.  (Burke Tr., Vol. 2 at 185; Manifold Tr., Vol. 3 at 97-99; Scott Tr., Vol. 6 at 223-24; Damschroder Tr., Vol. 11 at 211.) Moreover, because absentee voters have already provided the information in the five fields when completing their absentee-ballot application, the Board already has this information and it is unnecessary to have all five fields for identification; one piece of information would suffice.  *See* Ohio Rev. Code § 3509.03(A)-(E).

Because they can usually identify the voter with the bar code (for absentee ballots) and one or two fields (for provisional ballots), requiring Boards to spend additional time checking that each of the five fields is filled out completely and accurately before crediting it actually takes additional time for election officials, thus further undermining the State's purported administrative-convenience justification.  (Damschroder Tr., Vol. 11 at 203; Burke Tr., Vol. 2 at 191-92.)  In the case of absentee ballots, Boards are required to expend even more time and resources because when they receive incomplete or incorrect identification envelopes, rather than simply counting the ballots if they can identify the voters, they must send the Form 11-S notifying voters of the deficiency and giving them an opportunity to cure the errors or omissions. (*Id.* at 192.)

74

Additionally, there is nothing in the record to show why uniformity, standing alone, is a sufficiently weighty interest to justify the burden on Plaintiffs. And again, even if there is a uniformity interest—which Defendant characterizes as somewhat related to administrative convenience—in standardizing all the required types of absentee and provisional balloting forms, the Secretary offers no justification for why uniformity requires *rejecting* nonconforming ballots.

Finally, the Court finds it significant and telling that Assistant Secretary Damschroder expressed regret for not conducting literacy testing on the forms prior to their issuance for the sole reason that doing so would have avoided litigation. (Damshroder Tr., Vol. 12 at 31.) He prefaced this admission with "I don't intend this answer to sound flip," but irrespective of whether he meant it to be "flip," the answer raises a question about the motivation for this burden on voters' rights. This is the same witness who, just a day earlier, agreed that Defendant should do everything within reason to ensure that qualified voters are able to cast ballots that are counted. (Damschroder Tr., Vol. 11 at 179.) The State's interest in avoiding litigation certainly does not outweigh the burden on NEOCH's and CCH's members, some of our most vulnerable citizens.

Defendant characterizes one of the Sixth Circuit decisions in the related *SEIU* case as closely analogous to the issue of the five-field requirement here. *See NEOCH*, 696 F.3d at 599-600.[18] There, the Sixth Circuit affirmed in part and reversed in part a preliminary injunction granted by this Court, finding that the plaintiffs were unlikely to succeed on the merits of their challenge to the disqualification of deficient provisional ballot affirmation forms because the instructions on the provisional ballot form, which at the time included only fields for name, identification, and signature (with the signature field being optional), were "rather simple." *Id.* The Sixth Circuit faulted this Court's *Anderson-Burdick* analysis as both overstating the burden

---

[18] The *NEOCH* and *SEIU* cases were consolidated on appeal for purposes of that opinion.

to voters in compliance with this form and minimizing the "legitimate state interests" in "election oversight and fraud prevention." *Id.*  Based on the ample factual record at trial that detailed the obstacles faced by homeless and illiterate or semi-literate voters and the number of rejections for errors in the date-of-birth and address fields on the forms in question, the Court finds that the burden here is far from "minimal" and "unspecified."  *See id.* at 600.  Moreover, Defendant has not asserted fraud as a justification here and, most importantly, the other state interests, as the Court has explained exhaustively, provide *no* rationale for making the five fields mandatory, much less a "sufficiently weighty" one to "justify the limitation" on Plaintiffs' rights.  *Crawford*, 553 U.S. at 191 (quoting *Norman*, 502 U.S. at 288-89).  Accordingly, the Court finds that the five-field requirement violates Plaintiffs' equal-protection rights.

b. <u>Prohibition Against Poll-Worker Assistance</u>

The Court finds that prohibiting poll workers from assisting voters unless the voter declares her illiteracy or disability imposes a significant burden on NEOCH and CCH, because as discussed in the Court's findings of fact in Section III(F)(2), many of their members are illiterate, barely literate, or suffering from disability or mental illness, which limits their ability to complete basic voting-related tasks.  The Court then finds lacking the State's justifications for preventing poll workers from assisting voters who do not affirmatively ask for help because they are illiterate or disabled.

Although there is always a risk of poll-worker error, just as there is of voter error, poll workers are trained and certainly more skilled in filling out forms than homeless voters.  (*See* Terry Tr., Vol. 11 at 39-40.)  Particularly when missing or incomplete information is a problem—for instance, if a voter leaves a field completely blank or writes in a street number without an address—poll workers are much more likely to be able to help a voter than to create

an error. And Assistant Secretary Damschroder conceded that he was not aware of any other government workers who are explicitly barred from helping people fill out forms unless they specifically request assistance, which suggests that a restriction like this is not necessary to burden homeless voters' rights, given that many other government agencies also likely have an interest in avoiding creating errors on forms. (Damschroder Tr., Vol. 12 at 30; Clyde Tr., Vol. 1 at 50.) Because Plaintiffs' members require so much assistance—NEOCH fills out forms of all types for its members as a matter of course—the Court concludes that the State's interest in minimizing poll-worker error, although not completely unfounded like some of the other interests it has put forth, does not outweigh the magnitude of the burden in this case. *See Burdick*, 504 U.S. at 434.

### c. Reduction of the Cure Period

As discussed in Section III(F)(3), *supra*, NEOCH and CCH represent voters whose means are much more limited than the average voter. They are, for example, less likely to have access to reliable transportation and more likely to suffer from residential instability. As to absentee voters specifically, limiting the cure period would be especially burdensome for voters with low literacy who may need to seek assistance in reading the Form 11-S and filling it out before returning it to the Board. Limiting the window in which they may cure a deficient ballot imposes a significant burden on homeless, impoverished, and illiterate voters. The Court now turns to whether the State's interests are "sufficiently weighty to justify the limitation" on Plaintiffs' rights. *Norman*, 502 U.S. at 288-89.

The reduction of the post-election cure period to seven days does not survive any sort of heightened scrutiny. Of the twenty-one Board officials who testified at trial, not one indicated that he or she had experienced any inconvenience or increased cost during the pre-2014 ten-day

cure period, or stated that the county Board needed extra time between the conclusion of the cure period and the start of the canvass to address any particular matters. (*See, e.g.*, Burke Tr., Vol. 2 at 184-85; Terry Tr., Vol. 11 at 88-89.) Senator Seitz, one of the bills' sponsors, told Allen County Board of Elections Director Terry that the reduction was intended to prevent an influx of voters from coming into the Boards while election officials were preparing to conduct their canvass. (Terry Tr., Vol. 11 at 88.) Terry responded, "[t]hat doesn't happen." (*Id.*) Although the Court heard testimony from several Board officials that the few weeks immediately following the election were quite "busy" (Poland Tr., Vol. 10 at 231), there was no testimony that eliminating the cure period *actually* saves Boards any time or staff resources. And Assistant Secretary Damschroder's testimony that the three additional days gives the Boards time to "get everything ready for the Board to actually vote," or begin the canvass (Damschroder Tr., Vol. 12 at 41), is not substantiated by testimony from any of the actual Board officials who testified at trial, none of whom mentioned any specific tasks that needed to be conducted between the end of the cure period and the beginning of the canvass.

In *Obama for America*, the Sixth Circuit concluded that the State's proffered interest in reducing costs and administrative burdens did not justify the increased burden on voters of eliminating early voting the weekend before the election because there was "no evidence that local boards of elections have struggled to cope with early voting in the past [and] no evidence that they may struggle to do so during the November 2012 election." 697 F.3d at 434. Similarly here, although "the list of responsibilities of the boards of elections is long, . . . the State has shown no evidence indicating how this election will be more onerous than the numerous other elections that have been successfully administered in Ohio since" the ten-day cure period was in

place. *Id.* at 432-33. Therefore, the Court finds no evidence that the cure period would benefit the Boards by alleviating their administrative burden in any way.

In sum, the Court finds that the five-field requirement, the prohibition against poll-worker assistance to voters, and the seven-day cure period in both SB 205 and SB 216 violate Plaintiffs' equal-protection rights. The Court **ENTERS JUDGMENT FOR PLAINTIFFS** on this claim.

### 2. *Equal Protection: Disparate Treatment of Election-Day, Provisional, and Absentee Voters*

State law and election procedure "must not result in 'arbitrary and disparate treatment' of votes." *Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 234 (6th Cir. 2011). The Court considers Plaintiffs' equal-protection claim of arbitrary-and-disparate treatment under the *Anderson-Burdick* framework. *See Obama for Am.*, 697 F.3d at 430; *Jolivette v. Husted*, 694 F.3d 760, 771 (6th Cir. 2012) ("We examine [the plaintiff's] equal-protection challenges to the Ohio statutory framework using the same balancing framework as his First Amendment challenge.").

To prevail on an equal-protection claim, Plaintiffs must show that the government has "treat[ed] differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992); *see also Jolivette*, 694 F.3d at 771 ("[The plaintiff's] equal-protection claims do not get off the ground because independent candidates and partisan candidates are not similarly situated for purposes of election regulations."). It is possible for voters to be similarly situated in certain relevant respects—and thus an equal-protection claim would lie—even if they are not similarly situated in all respects. For instance, in *Obama for America*, the Sixth Circuit took note of this possibility:

> In many respects, absent military and overseas voters are not similarly situated to Ohio voters. Typically, their absence from the country is the factor that makes them distinct, and this is reflected in the exceptions and special accommodations afforded to these

voters under federal and state law.  With respect to in-person early voting, however, there is no relevant distinction between the two groups.

697 F.3d at 435.

Here, Plaintiffs asks the Court to find that the State has treated the following types of voters impermissibly: (1) provisional and absentee voters differently than Election Day voters, because Election Day voters are not required to fill out all five fields; (2) certain early-in person absentee voters and all vote-by-mail absentee voters differently than other early in-person absentee voters, by requiring the former two groups to fill out the absentee ballot identification form; and (3) treating wrong-location/wrong-precinct voters differently than right-location/wrong-precinct voters by rejecting the former group's ballots and counting the latter's. Plaintiffs fail to show any of these groups are similarly situated and, therefore, this claim fails as a threshold matter.  (Doc. 687 at ¶¶ 265-67.)

First, Election Day voters are not similarly situated to either provisional or absentee voters in "all relevant respects."  *Nordlinger*, 505 U.S. at 10.  Election Day voters show the poll worker their ID and sign the poll book in the presence of the poll worker.  (Damschroder Vol. 11 at 120-21.)  Vote-by-mail absentee voters, on the other hand, never interact with poll workers. Nor are provisional voters similarly situated, as the reason they are classified as provisional in the first place is that they are unable to cast a regular ballot and additional information may be needed to verify their eligibility.  *See* Ohio Rev. Code § 3505.181(A)(1).  Moreover, Election Day voters casting a regular ballot do not have the option of providing only their SSN-4 as an ID, as absentee and provisional voters do, a classification that actually cuts against Plaintiffs' argument that provisional and absentee voters are treated disparately.  (Davis Tr., Vol. 7 at 68-69.)

Nor are early-in-person voters who vote on DRE machines similarly situated to other absentee voters.  Evidence at trial suggests it would be virtually impossible for someone other than the voter who filled out the absentee ballot application to vote on a DRE machine.  (Test. of Susan Bloom, Tr., Vol. 1 at 269; Bucaro Tr., Vol. 6 at 67-68.)  The same cannot be said for an absentee voter who does not appear in person at the Board.  Although Plaintiffs may have a stronger argument that an early in-person voter who votes on a paper ballot is similarly situated to an early in-person DRE machine voter, Plaintiffs did not adduce evidence at trial to compare the circumstances of these groups of voters and thus the Court does not find that they are similarly situated.

As to wrong-location/wrong-precinct voters, when the related *SEIU* case was previously before the Sixth Circuit on a motion to stay the Court's preliminary injunction, which directed the Secretary to count provisional ballots that were cast at the wrong multi-precinct polling place due to poll-worker error, the Sixth Circuit granted the Secretary's motion for a stay.  *Service Emps. Int'l Union Local 1 v. Husted*, 698 F.3d 341, 343 (6th Cir. 2012) (per curiam).  The court found it highly likely that the Secretary would succeed on appeal and relied heavily on the fact that "[w]hile poll-worker error may contribute to the occurrence of wrong-place/wrong-precinct ballots, the burden on these *voters* certainly differs from the burden on right-place/wrong-precinct voters—and likely decreases—because the wrong-place/wrong-precinct voter took affirmative steps to arrive at the wrong polling location."  *Id.* at 344.  From this ruling the Court concludes that wrong-location/wrong-precinct voters are not similarly situated to right-location/wrong-precinct voters.  The Court **ENTERS JUDGMENT FOR DEFENDANT** on Plaintiffs' arbitrary-and-disparate treatment claim.

### 3.  Equal Protection: Lack of Uniform Standards

Plaintiffs' bring their next equal-protection claim, characterized as a challenge to Ohio's lack of uniform standards, under *Bush v. Gore*, 531 U.S. 98 (2000).  Plaintiffs allege that Boards used different standards and procedures, and arrived at different results, when determining whether to reject or count absentee and provisional ballots with a five-field error or omission in the 2014 and 2015 elections.  (Doc. 687 at ¶ 256.)

In *Bush*, the Supreme Court, although explicitly limiting its consideration "to the present circumstances," found that the Florida recount process lacked "adequate statewide standards for determining what is a legal vote, and practical procedures to implement them."  531 U.S. at 109-10.  The standard for counting ballots in that recount, as ordered by the Florida Supreme Court, was to consider "the intent of the voter," but the Supreme Court found fault with the "absence of specific standards to ensure [the] equal application" of this principle.  *Id.* at 105-06.

The *Bush* Court clarified that its holding did not implicate "whether local entities, in the exercise of their expertise, may develop different systems for implementing elections."  *Id.* at 109.  Instead, it suggested that "where a state court with the power to assure uniformity has ordered a statewide recount with minimal procedural safeguards," that court's remedy must contain "at least some assurance that the rudimentary requirements of equal treatment and fundamental fairness are satisfied."  *Id.*  Finding a number of procedural irregularities, such as one county changing its evaluative standards for a valid ballot in the middle of the counting process, *id.* at 106-07, the Florida Supreme Court's failure to specify who would recount the ballots in each county, *id.* at 109, and the inclusion of partial as well as full recounts in some counties, *id.* at 108, the United States Supreme Court found that the court-ordered recount violated Governor Bush's equal protection rights, *id.* at 110.

Although *Bush* was limited to its facts, the Sixth Circuit has recognized that *Bush* may apply to other situations where the state has failed to establish uniform standards and counties' treatment of voters varies in unreasonable ways. *See League of Women Voters of Ohio*, 548 F.3d at 477-78 (holding that the plaintiffs stated a *Bush v. Gore* claim when they alleged that voting machines were not allocated proportionately, long wait times caused voters to leave their polling places without casting a ballot, poll workers misdirected voters to the wrong polling place, touch-screen voting machines malfunctioned, and disabled voters were turned away from voting). The Sixth Circuit also has recognized that "[c]onstitutional concerns regarding the review of provisional ballots by local boards of elections are especially great" because "the review of provisional ballots occurs after the initial count of regular ballots is known." *Hunter*, 635 F.3d at 235.

Here, the Court finds that the Boards are "exercis[ing] . . . their expertise" in "develop[ing] different systems for implementing elections." *Bush*, 531 U.S. at 109. The standard that allows the Board to decide by a vote of three members whether to count a missing date-of-birth field does not rise to the level of the standard-less recount in *Bush*. The Boards are implementing the state's specific standards "for determining what is a legal vote," and the Ohio system does not approach the ambiguous "intent of the voter" Florida standard. *Id.* at 110.

The Court **ENTERS JUDGMENT FOR DEFENDANT** on this claim.

### 4. *Procedural Due Process*

Plaintiffs next allege that Defendant has deprived absentee and provisional voters of notice and an opportunity to be heard when their ballots were rejected. Plaintiffs challenge several aspects of SBs 205 and 216 that are relevant to notice and an opportunity to be heard. First, as to absentee voters, Plaintiffs take issue with the fact that the Form 11-S requires voters

83

to be literate and may arrive after the end of the cure period.  (Doc. 687 at ¶ 248.)  Second, as to

provisional voters, Plaintiffs charge that due process is not satisfied because provisional voters

receive no pre-deprivation process or opportunity to cure unless their error is lack of

identification, and an inadequate pre-deprivation notice and opportunity to cure a missing form

of identification.  (*Id.* at ¶ 246.)

In *Hunter v. Hamilton County*, another Ohio provisional voting case, a court considered a

claim from NEOCH, the ODP, and a judicial candidate that the Hamilton County Board of

Elections violated their procedural due process rights when it rejected provisional ballots cast in

the wrong precinct without providing voters with notice and an opportunity to be heard.  850 F.

Supp. 2d 795, 846 (S.D. Ohio 2012).  After a permanent injunction hearing, Judge Dlott entered

judgment for the plaintiffs on their equal-protection claim because the Board, in determining

whether provisional ballots were cast in the wrong precinct due to poll-worker error, considered

evidence of the location where the ballots were cast for some, but not all, provisional ballots,

thereby treating voters disparately.  *Id.* at 847.  The court ruled for the Board on the plaintiffs'

procedural due-process claim, however, explaining as follows:

> This claim fails because, in the Court's view, the harm that Plaintiffs allege is the direct
> result of the Ohio statutes in question, not the lack of process. Even if the Board had
> given provisional voters notice and an opportunity to explain the cause of their miscast
> ballots, Ohio law would have prevented the Board from counting those miscast ballots
> regardless of the explanation. Ohio law makes clear, as the Ohio Supreme Court held in
> *Painter*, that provisional ballots cast in the wrong precinct shall not be counted, even
> where the ballot is miscast due to poll-worker error. . . . Thus, Plaintiffs' proposed post-
> deprivation remedy is inextricably intertwined with the validity of Ohio's election laws.
> It would be superfluous for the Court to order the Board to provide provisional voters
> with notice and an opportunity to be heard if Ohio law prevents the Board from counting
> miscast ballots regardless of the voter's particular circumstance

*Id.* at 846-47 (citations and footnote omitted); *see also Davis v. Robert*, No. 15-cv-12076, 2016

WL 1084683, at *4 (E.D. Mich. Mar. 21, 2016) ("It is the statute . . .that has deprived him of

access to the document he seeks. . . . [T]he lack of adequate process has caused him no harm.")
(citing *Hunter*, 850 F. Supp. 2d at 846-47).  Similarly, here, the Court finds that Plaintiffs' harm
is caused by the portions of SBs 205 and SB 216 that impose a completion requirement for the
five fields, not the lack of process given when a ballot is rejected.  Accordingly, the Court
**ENTERS JUDGMENT FOR DEFENDANT** on Plaintiffs' procedural due-process claim.

### 5.   *Substantive Due Process*

Plaintiffs' substantive due-process claim also fails.  The Sixth Circuit has held that
substantive due process is implicated "in the exceptional case where a state's voting system is
fundamentally unfair." *Warf v. Bd. of Elections of Green, Cnty., Ky.*, 619 F.3d 553, 559 (6th Cir.
2010) (finding no due-process violation when a state court voided all 542 absentee ballots cast in
an election as tainted).  A voting system may be "fundamentally unfair" when "poll-worker error
cause[d] thousands of qualified voters to cast wrong-precinct ballots from the correct polling
locations," *NEOCH*, 696 F.3d at 597, and the state nevertheless "enforce[d ]its strict
disqualification rules without exception, despite the systemic poll-worker error identified in this
litigation and others," *id.* (affirming this Court's grant of preliminary injunction on the plaintiff's
substantive due-process claim). The evidence before the Court does not reveal that thousands of
ballots have been or will be rejected due to poll-worker error or that SB 205 and SB 216 have
resulted in "significant disenfranchisement and vote dilution."  *Warf*, 619 F.3d at 559 (citing
*League of Women Voters of Ohio*, 548 F.3d at 478).  The Court, therefore, cannot conclude that
Plaintiffs have shown a "fundamentally unfair" voting system.  *Id.*

The Court **ENTERS JUDGMENT FOR DEFENDANT** on Plaintiffs' substantive due-
process claim.

6.  *Race Discrimination Under the Fourteenth and Fifteenth Amendments*

Plaintiffs assert that SB 205 and SB 216 violate the Fourteenth and Fifteenth

Amendments because they were enacted with a discriminatory purpose.  To prevail on a

discriminatory intent claim, a plaintiff need not show that the discriminatory purpose was the

sole purpose or even the "dominant" or "primary" one.  *Vill. of Arlington Heights v. Metro.*

*Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977).  But the plaintiff must show that racial

discrimination was "a motivating factor in the decision."  *Id.* at 265-66.  The discriminatory

purpose need not be "express or appear on the face of the statute."  *Washington v. Davis*, 426

U.S. 229, 241 (1976).  Courts should inquire into both circumstantial and direct evidence of

intent to discern whether an invidious discriminatory purpose was a motivating factor.  *Arlington*

*Heights*, 429 U.S. at 266.

In *Arlington Heights*, the Supreme Court laid out several evidentiary sources relevant to

this inquiry:  the historical background of the decision, "particularly if it reveals a series of

official actions taken for invidious purposes"; the "specific sequence of events leading up [to] the

challenged decision"; "[d]epartures from the normal procedural sequence" of legislative

enactments; and the legislative or administrative history, "especially when there are

contemporary statements by members of the decisionmaking body, minutes of its meetings, or

reports."  *Id.* at 266-68.  The Supreme Court also stated that in rare cases the law's impact, or

whether it "bears more heavily on one race than another," may be probative, but only when "a

clear pattern, unexplainable on grounds other than race, emerges from the effect of the state

action even when the governing legislation appears neutral on its face."  *Id.* at 266 (internal

quotation marks omitted).  Recognizing that "discriminatory intent is so difficult to prove by

direct evidence, it is incumbent on a sensitive decisionmaker to analyze all of the surrounding

facts and circumstances to see if discriminatory intent can be reasonably inferred." *Grano v. Dep't of Dev. of Columbus*, 637 F.2d 1073, 1081 n.7 (6th Cir. 1980) (citing *Arlington Heights*, 429 U.S. at 252).

Having examined all of the surrounding facts and circumstances to the passage of the challenged laws, the Court cannot reasonably infer discriminatory intent. Plaintiffs ask the Court to infer such intent from the lead-up to the passage of SBs 205 and 216—namely, the multitude of proposed legislation in the previous legislative session which aimed to restrict voting rights— and the legislative history and debate surrounding the passage of SBs 205 and 216. No House or Senate representatives who voted in favor of the bill testified at trial, so the Plaintiffs ask the Court to find this discriminatory intent based mostly on the testimony of Representative Kathleen Clyde and former-Senator Nina Turner, Democrats and opponents of the challenged laws.

This is not the "rare" case described in *Arlington Heights*, where "a clear pattern, unexplainable on grounds other than race," requires a conclusion of discriminatory intent absent any other evidence of such intent. 429 U.S. at 266; *see Gomillion v. Lightfoot*, 364 U.S. 339, 341-42 (1960) (finding that plaintiff had stated a race-discrimination claim when the city of Tuskegee redrew its boundaries to remove from the city all but four or five of 400 African-American voters while not removing a single white voter). The Court turns, therefore, to the remaining *Arlington Heights* factors. Although the Court agrees, based on its discussion above regarding the Senate factors, that there is a history of discrimination surrounding voting in Ohio, particularly with regard to the 2004 election, the evidence Plaintiffs presented at trial does not show that the legislature departed from its normal procedural practices in passing the challenged

laws or that the legislative drafting history weighs in favor of a finding of discriminatory
purpose.

First, the procedural lead-up to the passage of this bill was not highly unusual.  Although
it may have been rare for only a few supporters to testify in favor of the bills in committee, or for
no data or studies to demonstrate the need for the bills, this does not counsel a finding of
discriminatory intent.  Likewise, the fact that Democratic amendments to the bills were defeated,
although revelatory of a highly polarized and partisan legislative session, is not evidence of
racial discrimination.  *See Moore v. Detroit Sch. Reform Bd.*, 293 F.3d 352, 369-70 (6th Cir.
2002) (noting that allegations of speedy passage of legislation, failure to analyze relevant
information before voting on the legislation, reliance on tenuous justifications, and rejection of
certain amendments "indicate a general dissatisfaction with the legislative process that preceded
the enactment of the [challenged law]" but were not evidence of discriminatory intent).  The
timelines for debate and passage through the House of Representatives, approximately four or
five months, was also not unusual.

Second, although Representative Clyde and Senator Turner testified that they and other
Democrats in the legislature raised concerns that the bills would have a disproportionate impact
on African-American voters, the only testimony in the record regarding comments about race by
a member of the legislature is Representative Clyde's description of Representative Huffman's
statement during committee debate, in which he asked: "[S]hould we really be making it easier
for those people who take the bus after church on Sunday to vote," which was a reference to
African-American voters.  (Clyde Tr., Vol. 1 at 82-83.)  Given that *Arlington Heights* endorses
the use of circumstantial as well as direct evidence, there is no bright-line rule that the record
must demonstrate the racial animus of a certain number of legislators in order to justify a finding

of discriminatory intent.  *See* 429 U.S. at 266.  But on this record, with its scarce evidence in support of the other *Arlington Heights* factors, the Court concludes that Representative Huffman's discriminatory intent—while patent on its face—cannot be imputed to the majority of the legislative body, which voted for passage of the bills.

Nor does evidence of Doug Preisse's statement and the billboard erected by a non-legislator, both of which the Court finds reprehensible, particularly given the history of racial discrimination in Ohio, allow the Court to strike down SBs 205 and 216 based on discriminatory motives of the legislature.  (*See* Clyde Tr., Vol. 1 at 40; Turner Tr., Vol. 6 at 142, 257.)

Make no mistake: the Court is deeply troubled by the flurry of voting-related legislation introduced during the time period in question, all of which sought to limit the precious right to the franchise in some manner, and most of which was a peripatetic solution in search of a problem.  The Court agrees, moreover, that the Republican-controlled General Assembly's frenetic pace of introducing such legislation reflects questionable motives, given the wealth of other problems facing the state which actually needed solutions.  If the dog whistles in the General Assembly continue to get louder, courts considering future challenges to voting restrictions in Ohio may very well find that intentional discrimination is afoot.  But when applying all of the *Arlington Heights* factors to the record before it today, the Court cannot infer that the General Assembly acted with racially discriminatory intent in the passage of SBs 205 and 216.

The Court **ENTERS JUDGMENT FOR DEFENDANT** on the intentional-discrimination claim.

89

### 7.  *Viewpoint Discrimination*

Plaintiffs cast their final constitutional claim as one of voter viewpoint discrimination under the First Amendment and the Equal Protection Clause.  They contend that the challenged laws intentionally discriminate against voters who support the Democratic Party, as evidenced by the intent of the legislature in enacting the laws as well as various actions and omissions of Defendant Husted including: failing to investigate discrimination against Democratic voters, ignoring objections and pleas for intervention from Democratic representatives, firing Democratic members of the Boards of Elections, and issuing directives intended to disenfranchise Democratic voters.  (Doc. 687 at ¶ 277-81.)

Defendant cites to Supreme Court precedent that "if a nondiscriminatory law is supported by valid neutral justifications, those justifications should not be disregarded simply because partisan interests may have provided one motivation for the votes of individual legislators." *Crawford*, 553 U.S. at 204.  But here Plaintiffs contend that the laws, although facially nondiscriminatory, were, in fact, enacted for a viewpoint-discriminatory purpose and are enforced as such, and they urge the Court to enjoin the laws in question because they burden voters based on the political party they support, which constitutes impermissible viewpoint discrimination under the First Amendment.

The Supreme Court has recognized that it is constitutionally impermissible to "'[f]enc[e] out' from the franchise a sector of the population because of the way they may vote." *Carrington v. Rash*, 380 U.S. 89, 94 (1965).  In *Vieth v. Jubelirer*, with Justice Scalia writing for a four-judge plurality, the Supreme Court held that "neither Article I, § 2, nor the Equal Protection Clause, nor (what appellants only fleetingly invoke) Article I, § 4, provides a judicially enforceable limit on the political considerations that the States and Congress may take

90

into account when districting."  541 U.S. 267, 305 (2004).  Concurring in the judgment, Justice

Kennedy wrote that in his view the arguments for finding cases of partisan gerrymandering

nonjusticiable "are not so compelling that they require us now to bar all future claims of injury

from a partisan gerrymander."  *Id.* at 309 (Kennedy, J., concurring).  Justice Kennedy noted that

a statute which declared "All future apportionment shall be drawn so as most to burden Party X's

rights to fair and effective representation, though still in accord with one-person, one-vote

principles" would undoubtedly be held unconstitutional. *Id.* at 312.  Justice Kennedy further

mused that:

> The First Amendment may be the more relevant constitutional provision in future cases
> that allege unconstitutional partisan gerrymandering.  After all, these allegations involve
> the First Amendment interest of not burdening or penalizing citizens because of their
> participation in the electoral process, their voting history, their association with a political
> party, or their expression of political views.

*Id.* at 314 (citing *Elrod v. Burns*, 427 U.S. 347 (1976) (plurality opinion)).  If a court found that a

state "did impose burdens and restrictions on groups or persons by reason of their views, there

would likely be a First Amendment violation, unless the state shows some compelling interest."

*Id.* at 315.  Justice Kennedy cautioned, however, that courts should be wary in "adopting a

standard that turns on whether the partisan interests in the redistricting process were excessive.

Excessiveness is not easily determined."  *Id.* at 316.

Here, Plaintiffs essentially propose that the Court apply such a First Amendment

standard, although they cite to no other court that has done so.  *See OOC*, slip op. at 118 (noting

that no courts have recognized a cause of action based on the concurrence in *Vieth*).  They argue

that there is sufficient evidence to justify the searching review required by strict scrutiny because

a discriminatory purpose behind the laws belies their facial neutrality.  Even if the Court adopts

Plaintiffs' standard, however, Plaintiffs have not put forth sufficient evidence of the General

Assembly's impermissible motive.  As the Court acknowledged when entering judgment for

Defendant on Plaintiffs' claim of intentional race discrimination, the racist comments of one

state legislator, coupled with the introduction of other bills limiting voting rights and a refusal to

consider Democratic amendments, come just short of a finding of intentional discrimination.

Therefore, even if the Court could identify a workable standard in this type of case to determine

whether the legislature has engaged in viewpoint discrimination, the Court's factual findings

compel a contrary conclusion on the first-order question.  Put simply, although "partisan interests

may have provided one motivation for the votes of individual legislators," *Crawford*, 553 U.S. at

204, there is insufficient evidence before the Court to show that the Ohio General Assembly

passed these laws with any more of an impermissible objective than the Indiana legislature that

passed the voter-ID statute in *Crawford*.  The Court **ENTERS JUDGMENT FOR**

**DEFENDANT** on Plaintiffs' viewpoint-discrimination claim.

### C.  Voting Rights Act Claims

#### 1.  Section 2

Section 2 of the Voting Rights Act provides, in relevant part:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure
shall be imposed or applied by any State or political subdivision in a manner which
results in a denial or abridgement of the right of any citizen of the United States to vote
on account of race or color . . . .

(b) A violation of subsection (a) is established if, based on the totality of circumstances, it
is shown that the political processes leading to nomination or election in the State or
political subdivision are not equally open to participation by members of a class of
citizens protected by subsection (a) in that its members have less opportunity than other
members of the electorate to participate in the political process and to elect
representatives of their choice. . . .

52 U.S.C. § 10301.

The Supreme Court has instructed that the Voting Rights Act "should be interpreted in a manner that provides 'the broadest possible scope' in combating racial discrimination." *Chisom v. Roemer*, 501 U.S. 380, 403 (1991) (quoting *Allen v. State Bd. of Elections*, 393 U.S. 544, 567 (1969)). After the 1982 amendments to the VRA, proof of intentional discrimination is not required for a plaintiff to prevail on a Section 2 claim. *Id.* at 394 n.21; *Moore*, 293 F.3d at 363. In vote-denial cases like this one, courts conduct a two-part analysis under the "results test" of § 10301(b). *OOC*, slip op. at 95; *see also League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 240 (4th Cir. 2014). First, a court determines whether a practice or procedure has a disparate impact on a minority group. *See Gingles*, 478 U.S. at 44 ("The 'right' question . . . is whether 'as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice . . . . In order to answer this question, a court must assess the impact of the contested structure or practice on minority electoral opportunities 'on the basis of objective factors.'") (internal citations omitted). Second, if it finds disparate impact, the court assesses whether the "electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Id.* at 47. In applying the results test, the Court considers "the totality of circumstances." 52 U.S.C. § 10301(b).

Defendant argues that Plaintiffs have failed to prove that the challenged laws harm African-Americans' right to vote, that the laws cause the right to vote to be denied, and that African-Americans lack meaningful access to the polls on account of race. (Doc. 686 at ¶ 232.) Essentially, Defendant's first argument relates to the Court's inquiry regarding disparate impact, and the second and third go to the Court's assessment of whether the challenged laws interact

with social and historical conditions in Ohio to create an inequality in the ability of African-American voters to participate in the democratic process as compared to whites.

a.  SB 205 and SB 216 Have a Disparate Impact on African-Americans

The evidence shows that SB 205 and SB 216 have a disproportionate impact on African-American voters in Ohio, creating greater risk of disenfranchisement of African-Americans than whites.  The burdens imposed on voters by the five-field requirement, the prohibition on pollworker assistance, and the reduced cure period fall more heavily on African-Americans than whites.

Dr. Timberlake's data on disparities in provisional and absentee ballot usage and rejection rates reveal that higher minority population share is correlated to higher rates of absentee ballot rejection and provisional ballot usage and rejection.  Although Dr. Hood, and implicitly Dr. McCarty, criticized Dr. Timberlake's analysis for relying on county-level rather than precinct-level data, and Dr. McCarty criticized the analysis for not controlling for enough other factors that could explain the disparities, the Court concludes that since Dr. Timberlake's multivariable regression analysis accounted for a variety of key factors besides race that were likely to explain disparities in rejection rates (including the median age, income, and educational attainment of the white voters in those counties as well as the urbanicity of the counties), Dr. Timberlake's data yield convincing evidence that restrictions on absentee and provisional balloting leads to higher rejection rates of minority voters' provisional and absentee ballots.

In particular, as noted above in its findings of fact, the Court credits Dr. Timberlake's findings that: (1) in the presidential election years of 2008 and 2012, where minority turnout was higher than during typical midterm elections, minorities' absentee ballots were rejected at a higher rate than whites'; (2) in 2008, 2010, 2012, and 2014, minorities cast provisional ballots at

94

a higher rate than whites;[19] and (3) in 2008, 2010, and 2012, minorities had higher rates of rejection of provisional ballots than whites.  The State makes much of the fact that the 2014 election did not reveal the same relationship between rates of provisional-ballot rejections and minority population share, asking the Court to draw the conclusion that the challenged laws were actually having the effect of *decreasing* provisional ballot rejections.  But Plaintiffs presented evidence that the gubernatorial election was significantly less competitive in 2014 than in 2010, that overall turnout was lower in 2014 than 2010, and that overall provisional ballot rejections increased in 2015.  It is premature, therefore, to conclude that overall provisional ballot rejection rates are decreasing or that African-American voters' provisional ballot rejection rates are decreasing.  And in presidential election years in particular, the evidence strongly suggests that provisional ballot and absentee ballot rejections fall disproportionately on African-American voters.

Defendant's argument that Plaintiffs have failed to show harm because they cannot identify an objective benchmark against which to assess the burdens of the challenged laws on African-American voters is unpersuasive.  Essentially, Defendant charges that Plaintiffs sought to use Ohio's pre-2014 election procedures as a benchmark, which improperly grafts a retrogression analysis—the inquiry for a Section 5 claim—onto a Section 2 claim.

The "purpose of § 5 has always been to insure that no voting-procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise."  *Beer v. United States*, 425 U.S. 130, 141 (1976).  In contrast, Section 2 has a "broader mandate" of barring all states and their political subdivisions from "maintaining any voting 'standard, practice or procedure' that 'results in a

---

[19] This finding is also corroborated by studies upon which Dr. Timberlake relied that showed that African-American voters use provisional ballots at a higher rate than white voters nationwide. (*See* Timberlake Rebuttal Rpt., P-1195 at PTF-243.)

denial or abridgment of the right . . . to vote on account of race or color.'" *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 479 (1997) ("*Bossier I*") (quoting 52 U.S.C. § 10301(a)). The Supreme Court has held that a benchmark is nevertheless required for Section 2 claims, noting that in the context of vote-dilution cases:

> It makes no sense to suggest that a voting practice "abridges" the right to vote without some baseline with which to compare the practice. In § 5 preclearance proceedings—which uniquely deal only and specifically with changes in voting procedures—the baseline is the status quo that is proposed to be changed . . . . In § 2 . . . proceedings, by contrast, which involve not only changes but (much more commonly) the status quo itself, the comparison must be made with a hypothetical alternative.

*Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 334 (2000) ("*Bossier II*").

In contrast to the Section 2 *vote dilution* cases such as those where the Supreme Court has addressed the benchmark requirement, however, the "hypothetical" benchmark here is more straightforward. *See, e.g.*, *Bossier II*, 528 U.S. at 334; *Holder v. Hall*, 512 U.S. 874, 884 (1994) (plurality opinion) ("[W]ith some voting practices, there in fact may be no appropriate benchmark to determine if an existing voting practice is dilutive under § 2."). This Court's relevant inquiry is whether African-American voters "have less opportunity than other members of the electorate to participate in the political process." 52 U.S.C. § 10301(b); *see also OOC*, slip op. at 97 ("[T]he relevant benchmark is inherently built into § 2 claims and is whether members of the minority have less opportunity than other members of the electorate to participate in the political process and elect representatives of their choice."). The benchmark, accordingly, is simply the ability of other groups of voters to participate in the political process compared to African-Americans' ability to do so.[20] The Court concludes for the reasons stated

---

[20] Defendant repeatedly attempts to compare Ohio's voting practices with respect to provisional and absentee balloting to those of other states but, as the Supreme Court made clear in *Gingles*, a court's Section 2 analysis is "an intensely local appraisal of the design and impact of" election administration "in the light of past and present reality, political and otherwise." 478 U.S. at 78 (quoting *White v. Regester*, 412 U.S. 755, 769-70 (1973)); *see also League of Women Voters of*

above that Dr. Timberlake's multivariable regression analysis provides convincing evidence that because of the passage of the challenged laws, African-American voters are more likely than white voters to have their absentee or provisional ballots rejected.[21]

Having found that Plaintiffs have shown that SB 205 and SB 216 have a disproportionate impact on African-Americans, the Court turns to the second part of the Section 2 results standard.

b. SB 205 and SB 216 Combine with the Effects of Past Discrimination to Interfere with the Voting Power of African-Americans

The second part of the results test[22] requires "a searching practical evaluation of the past and present reality" and a "'functional' view of the political process" to determine whether the

---

*N.C.*, 769 F.3d at 243 ("Section 2 . . . is local in nature."); *OOC*, slip op. at 97 (considering challenged statutes "as they are now, wholly within the State of Ohio (rather than comparing Ohio across other states)").

[21] To the extent Defendant argues that past voting practices have no relevance to the Section 2 analysis, he is mistaken. On its face, Section 2 requires a broad "totality of circumstances" review. 52 U.S.C. § 10301(b). There is no doubt that to analyze the totality of the circumstances requires attention to past practices, and neither the Supreme Court nor the Sixth Circuit has held that such an inquiry is improper. *See League of Women Voters of N.C.*, 769 F.3d at 241 ("Clearly, an eye toward past practices is part and parcel of the totality of the circumstances."); *Sanchez v. State of Colo.*, 97 F.3d 1303, 1325 (10th Cir. 1996) (quoting from the legislative history of the 1982 amendments to Section 2 that "[i]f [a challenged] procedure markedly departs from past practices or from practices elsewhere in the jurisdiction, that bears on the fairness of its impact") (quoting 1982 U.S.C.C.A.N. at 207, n.117). Further, as the Fourth Circuit noted in *League of Women Voters*, the Supreme Court has acknowledged that some parts of the Section 2 and Section 5 inquiries "may overlap," 769 F.3d at 241 (quoting *Georgia v. Ashcroft*, 539 U.S. 461, 478 (2003)). Moreover, "[b]oth Section 2 and Section 5 invite comparison by using the term 'abridge[ ].'" *Id.* *Compare* 52 U.S.C. § 10304(a) *and* 52 U.S.C. § 10301(a)).

[22] Courts have interpreted this second part of the test as a requirement for a "causal connection between the challenged electoral practice and the alleged discrimination that results in a denial or abridgement of the right to vote." *Ortiz v. City of Phila. Office of City Comm'rs Voter Registration Div.*, 28 F.3d 306, 310 (3d Cir. 1994); *see also Gingles*, 478 U.S. at 47 ("The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to *cause* an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives.") (emphasis added); *Wesley v. Collins*, 791 F.2d 1255, 1260-61 (6th Cir. 1986) ("[A] showing of disproportionate racial impact alone does not establish a *per se* violation of the Voting Rights Act. Rather, such a showing merely directs the court's inquiry into the interaction of the challenged legislation with those historical, social and

challenged laws diminish voting opportunities for African-American Ohioans.  *Gingles*, 478 U.S. at 45.  The Senate Judiciary Report accompanying the 1982 bill that amended Section 2 describes the "typical factors" that may be probative of a Section 2 violation, which the Supreme Court adopted in *Gingles*, 478 U.S. at 36.

The *Gingles*/Senate factors include: (1) a history of official discrimination that affected the right of members of a minority group to register, vote, or otherwise participate in the democratic process; (2) the extent to which voting is racially polarized; (3) the extent to which the state has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination; (4) denial of access to a candidate slating process; (5) the extent to which members of the minority group bear the effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate in the political process; (6) whether political campaigns have been characterized by overt or subtle racial appeals; (7) the extent to which members of the minority group have been elected to public office; (8) whether there is significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and (9) whether the policy underlying the state's use of the voting qualification, prerequisite to voting, or practice or procedure is tenuous.  *Id.* at 36-37.  The plaintiff need not prove "any particular number of factors . . . [nor] that a majority of them point one way or the other."  *Id.* at 45 (citation and internal quotation marks omitted).

---

political factors generally probative of dilution.") (internal quotation marks and citation omitted); *Irby v. Va. State Bd. of Elections*, 889 F.2d 1352, 1358-59 (4th Cir. 1989) (finding no causal link between a system of appointing school board members and African-American underrepresentation because there was evidence that African-American residents were not seeking school board seats in numbers commensurate with their share of the population).

Although the Senate Report indicated that "the enumerated factors will often be pertinent to certain types of § 2 violations, particularly to vote dilution claims," and the claim at issue in *Gingles* itself was a vote-dilution claim, neither the Report nor the *Gingles* Court suggested that the factors should be considered *only* in vote-dilution cases.[23]  *See Gingles*, 478 U.S. at 45. Several circuits have expressly adopted the Senate factors to analyze vote-denial claims.  *See, e.g.*, *League of Women Voters of N.C.*, 769 F.3d at 239-40; *Johnson v. Governor of State of Fla.*, 405 F.3d 1214, 1227 n.26 (11th Cir. 2005) (en banc); *Smith v. Salt River Project Agric. Improvement & Power Dist.*, 109 F.3d 586, 596 (9th Cir. 1997).  Moreover, "the principles that make vote dilution objectionable under the Voting Rights Act logically extend to vote denial" and "[v]ote denial is simply a more extreme form of the same pernicious violation" of vote dilution.  *League of Women Voters of N.C.*, 769 F.3d at 239.

The Court finds that all the Senate factors except the fourth weigh in favor of a finding that SBs 205 and 216 interact with social and historical conditions to decrease African-Americans' access to the electoral process.

*Factor One: History of Official Discrimination*.  The evidence at trial showed that Ohio has a long history of official discrimination against African-American voters, as another court in this district recently concluded.  *See OOC*, slip op. at 102 ("Plaintiffs have provided evidence that Ohio had facially discriminatory voting laws between 1802 and 1923.").  Also relevant here, however, is recent discrimination against African-American voters, including the unequal allocation of voting machines in the 2004 election that led to hours-long waits for voters in predominantly African-American urban neighborhoods, as well as repeated attempts by the General Assembly—some of which passed, others that did not or were blocked by the courts—to

---

[23] In their proposed findings of fact and conclusions of law, Defendant obliquely suggests that the Senate factors are not useful in the vote-denial, as opposed to the vote-dilution, context and thus the Court has chosen to address this argument.  (Doc. 686 at ¶ 237.)

roll back election administration changes made after 2004 that expanded voting opportunities. *See, e.g.*, *Obama for Am.*, 697 F.3d at 425; *NAACP v. Husted*, 43 F. Supp. 3d 808 (S.D. Ohio 2014), *vacated by* 2014 WL 10384647 (6th Cir. Oct. 1, 2014). (Clyde Tr. Vol. 1 at 55, 57, 60-61.) This recent onslaught of attempts to limit voter registration and turnout, coupled with the numerous earlier laws on the books that Ohio used to disenfranchise African-Americans, suggests that the disparate impact is linked to social and historical conditions of discrimination against African-American voters.

*Factor Two: Racially Polarized Voting*. African-Americans tend to vote overwhelmingly for Democratic candidates and the majority of whites in most parts of the state vote for Republicans. This pattern holds true across different races and election cycles and indicates stark polarization. *See also NAACP*, 43 F. Supp. 3d at 849 (noting the "polarized nature of recent elections in Ohio"); *United States v. City of Euclid*, 580 F. Supp. 2d 584, 607 (N.D. Ohio 2008) (finding that the City of Euclid had a pattern of racially polarized voting where "racial bloc voting occurred in seven of the eight elections since 1995 involving African-American candidates").

*Factor Three*: *Voting Practices that Enhance the Opportunity for Discrimination*. Like the first factor, this factor weighs in favor of a finding of discriminatory result. As noted above, of particular concern to the Court is that after the expansion of early voting opportunities following the disastrous 2004 election—which was plagued by long lines in predominantly African-American precincts—the Ohio General Assembly has moved so doggedly to roll back the expansion of the franchise. Indeed, two others courts in this district have explicitly found that "minority voters are disproportionately affected by the elimination of those early voting days." *Obama for Am. v. Husted*, 888 F. Supp. 2d 897, 906-07 (S.D. Ohio 2012) (noting that the

state had submitted no studies or evidence to counter plaintiffs' argument in this regard); *see also OOC*, slip op. at 98.

Factor Five: *Effects of Discrimination in Education, Employment, and Health on Political Participation*. As discussed at length above, African-Americans have suffered discrimination in housing, education, and health and suffer from higher poverty rates, acute residential segregation, and lower educational attainment. These socioeconomic disparities have undoubtedly hindered their ability to participate in the political process. Inflexible hourly-wage jobs, health problems, and limited access to transportation also make it logistically more difficult to show up to vote. *See OOC*, slip op. at 104 ("[African Americans] are more likely to be transient than whites and are more likely than whites to rely on public transportation. The Court finds this discrimination hinders African Americans' ability to participate effectively in the political process."). Lower educational attainment also poses challenges in navigating the registration and voting process. *See City of Euclid*, 580 F. Supp. 2d at 609 ("[T]he social science literature on voter participation makes clear that educational achievement is strongly and directly correlated with voter registration and turnout."). This factor weighs strongly in favor of a finding of discriminatory results.

Factor Six: *Overt or Subtle Racial Appeals in Campaigns*. From an email from a top Republican Party official denigrating the "urban—read African-American—voter turnout machine" to racist appeals like the "Obama phone lady" ad, Ohio has seen both overt and subtle racial appeals in campaigns over the last several years. Moreover, the targeting of minority communities for anti-voter fraud efforts, including with billboards, is an indication that voter suppression tactics have not disappeared but are now merely cloaked in ostensibly race-neutral language. Old dogs, it seems, *can* learn new tricks.

101

*Factor Seven: Proportional Representation*. Although African-American candidates have won elected office in recent years at the local level (and in Ohio's delegation to the United States House of Representatives) in numbers roughly proportional to their percentage of the state's population, they have not enjoyed similar success at the state level or in districts where the electorate is predominantly white. Due to the lack of representation on the statewide level, this factor weighs somewhat in favor of finding a discriminatory result.

*Factor Eight: Lack of Legislative Responsiveness to Minority Needs*. State elected officials have often overlooked the needs of minority constituents. The Court finds that this factor weighs in favor of finding a discriminatory result because the state government has repeatedly and vigorously taken action to roll back the much-needed post-2004 voting reforms that led to an increase in African-American turnout rates, and because the state has also shown a lack of interest in intervention to address many of the longstanding, entrenched problems that plague Ohio's minority communities, including educational inequality and segregation, as well as poverty, infant mortality, and other negative health and economic outcomes. Federal or court intervention has often been required to address these problems.

*Factor Nine: Tenuousness*. Although the State's purported rationale for the challenged laws is to improve election administration, the Court finds that this rationale is weak. As discussed above, improving election administration and making it easier for Boards to identify voters does not justify throwing out the ballots of voters whom the Boards *can* and *have* identified. And given Senator Seitz's statement that he hoped SB 216 would help "ratchet back" the post-2004 reforms that expanded electoral opportunities for Ohio voters, especially African-American voters (*see* Timberlake Rpt., P-1194 at PTF-204), the Court finds that the State's justifications are tenuous.

Defendant offers little response to Plaintiffs' evidence regarding the Senate factors. He does contend, however, that Plaintiffs cannot show that African-American voters lack meaningful access to the polls because voter registration and turnout numbers, as introduced through the testimony of Dr. Hood, show that African-American and white voters are currently on equal footing with regard to these important metrics. According to Defendant, then, no matter what historical and social conditions exist, it is impossible to conclude that the challenged laws deny African-Americans the opportunity to participate in the electoral process any less than whites. But this is both an overbroad and under-broad interpretation of the factors. Registration and turnout numbers in presidential election years do not tell the entire story of a group's access to the polls. Additionally, the purpose of the Senate factors is to examine the context of "social and historical conditions" to determine whether they interact with the disparate impact the Court has identified, not to consider turnout rates in isolation. It may be useful to consider turnout and registration rates as one component of the "functional view of the political process." *Gingles*, 478 U.S. at 45 (internal quotation marks omitted). But other factors enter the Court's consideration when looking at these turnout and registration numbers in context, such as the opportunity to elect (and re-elect) the nation's first African-American President, which may have had a positive effect on registration and turnout numbers among African-American voters in 2008 and 2012.[24] Moreover, as Dr. McCarty acknowledged at trial, although turnout of voters from all demographic groups is lower in midterm elections than presidential elections, African-American turnout drops more than white turnout in midterm elections. (McCarty Tr., Vol. 8 at 62.)

---

[24] *See Veasey v. Perry*, 71 F. Supp. 3d 627, 655 (S.D. Tex. 2014), *vacated in part on other grounds by Veasey v. Abbott*, 796 F.3d 487 (5th Cir. 2015), *reh'g en banc granted*, 815 F.3d 958 (5th Cir. 2016) (noting that Dr. Hood testified in that case that "he linked the 2008 increased voter turnout to the unprecedented Obama campaign").

Because other factors likely had an effect on turnout and registration numbers in the 2008 and 2012 elections, and because other evidence regarding the Senate factors weighs strongly in favor of a finding of discriminatory result, the Court concludes that the challenged laws interact with the effects of discrimination against minority voters to create inequality in the electoral opportunities enjoyed by African-American voters as compared to white voters. *Gingles*, 478 U.S. at 47. When considering the relevant "social and historical conditions" in Ohio, *id.*, the Court finds that this case is a classic example of a Section 2 vote denial claim, akin to the hypothetical that Justice Scalia laid out in *Chisom*:

> If, for example, a county permitted voter registration for only three hours one day a week, and that made it more difficult for blacks to register than whites, blacks would have less opportunity "*to participate* in the political process" than whites, and [Section] 2 would therefore be violated . . . .

501 U.S. at 408 (emphasis in original); *see also League of Women Voters of N.C.*, 769 F.3d at 246. The Court finds that the Calculus of Voting, as described by Dr. Timberlake, explains the interaction between the challenged laws and the effects of discrimination against African-Americans. As Dr. Timberlake stated, voters must

> understand the rules that they must follow to register and vote successfully, they must have the time available to register and vote, either in person or by absentee ballot, and in many cases they must have the financial wherewithal to go to the polls. Because of these resource requirements, poor, uneducated, and minority voters are most at risk of not having the capacity to cast ballots.

(Timberlake Rpt., P-1194 at PTF-206.)

Evidence of the fifth Senate factor shows that African-Americans are less likely to own a car or have access to child care, more likely to be employed in hourly-wage, inflexible jobs, and more likely to suffer health problems. (*Id.* at 168, 179, 185, 188.) African-Americans also move more frequently than whites, and such a move requires a change in voter-registration address under Ohio law. (*Id.* at 173.) Finally, African-Americans have lower levels of educational

attainment than whites, and low literacy is correlated to substandard educational opportunities and attainment.  (*Id.* at 183-85; Timberlake Tr., Vol. 5 at 73.)

The Court agrees with Dr. Timberlake that these inequalities, rooted in historical discrimination against African-Americans, have "significant and far-reaching" effects with "specific and direct consequences for voting."  (Timberlake Rpt., P-1195 at PTF-187.)  Because low literacy levels are also correlated with substandard education (Timberlake Tr., Vol. 5 at 73), and the Court has credited Dr. Timberlake's findings that African-Americans suffer from lower educational attainment than whites in Ohio, the Court concludes that African-Americans would also suffer from higher costs associated with the five-field requirement and the prohibition on poll-worker assistance because they would face disproportionately more challenges filling out the forms.  Because African-Americans move more frequently than whites, they may be more likely to be forced to vote provisionally.  (*Id.* at 67-68; *see also* Hood Tr., Vol. 10 at 121, 124.) They are also more likely to be homeless.  (Davis Tr., Vol. 4 at 186.)  And because they are more likely to have inflexible schedules or lack access to a car, they are more likely to be burdened by a shorter cure period for absentee and provisional ballots.  (Timberlake Tr., Vol. 5 at 61-62.)  All of these effects of discrimination against African-Americans combine to create an inequality in their opportunities to participate in the political process.  *Gingles*, 478 U.S. at 47.

The Ohio General Assembly took action after the disastrous 2004 election to expand voters' access to absentee and provisional balloting, and the rollback of these improvements will disproportionately harm African-American voters.  Due to the General Assembly's retrenchment and the social and historical conditions affecting African-American Ohioans, SBs 205 and 216 have a discriminatory impact on African-Americans.

SB 205 and SB 216 violate Section 2 of the Voting Rights Act.  The Court **ENTERS JUDGMENT FOR PLAINTIFFS** on their Section 2 claim.

### 2.  *Materiality Provision*

Section 1971 of the Voting Rights Act provides that no person acting under color of law shall "deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election."  52 U.S.C. § 10101(a)(2)(B).  In *McKay v. Thompson*, the Sixth Circuit held that Section 1971 is enforceable only by the Attorney General, not by private citizens.  226 F.3d 752, 756 (6th Cir. 2000).  In so stating, the Sixth Circuit cited to the section of the statute that provides that when any person is deprived of a right or privilege to include § 10101(a)(2)(B), "the Attorney General may institute for the United States, or in the name of the United States, a civil action . . . ."  52 U.S.C. § 10101(c).  The only other authority the court cited was a case from the Eastern District of Michigan holding that there was no private right of action under the materiality provision.  *See Willing v. Lake Orion Cmty. Sch. Bd. of Trs.*, 924 F. Supp. 815, 820 (E.D. Mich. 1996).  The Sixth Circuit offered no explanation for why § 10101(c), which *allows* for an action by the Attorney General, necessarily *bars* a private right of action.

The Eleventh Circuit has subsequently examined this issue in depth and found that a private right of action does exist, reasoning that the Supreme Court has found that other sections of the Voting Rights Act, 42 U.S.C. §§ 1973c and 1973h, could be enforced by a private right of action, even though those sections also explicitly provide for enforcement by the Attorney General but not by individuals.  *Schwier v. Cox*, 340 F.3d 1284, 1294-95 (11th Cir. 2003).  The Eleventh Circuit also relied on legislative history during the debate over whether to add the

provision giving the Attorney General the power to bring a civil suit, before which time individual plaintiffs could and did enforce the provisions of Section 1971 under Section 1983, namely that the House Judiciary Committee stated that the bill's purpose was "to provide means of *further* securing and protecting the civil rights of persons." *Id.* at 1295.

Plaintiffs have indicated that they seek to challenge the holding of *McKay* on appeal, but regardless of the thorough reasoning in *Schwier*, this Court remains bound by *McKay* and finds that Plaintiffs lack standing to bring a claim under the materiality provision of the VRA. The Court **ENTERS JUDGMENT FOR DEFENDANT** on this claim.

### 3. *Literacy Test*

Section 1973aa of the Voting Rights Act provides that no citizen shall be denied the right to vote "because of his failure to comply with any test or device." 52 U.S.C. § 10501(a). The statute defines "test or device" as:

> any requirement that a person as a prerequisite for voting or registration for voting (1) demonstrate the ability to read, write, understand, or interpret any matter, (2) demonstrate any educational achievement or his knowledge of any particular subject, (3) possess good moral character, or (4) prove his qualifications by the voucher of registered voters or members of any other class.

*Id.* § 10501(b).

As a threshold matter, Defendant contends that because the Sixth Circuit has found that Congress did not create a private right of action under Section 1971 of the VRA, *see McKay*, 226 F.3d at 756, an issue on which there is a circuit split, *see Schwier*, 340 F.3d at 1296, there is likewise no private right of action under Section 1973aa. Defendant points to 52 U.S.C. § 10504, which provides that "[w]henever the Attorney General has reason to believe that a State or political subdivision . . . has enacted or is seeking to administer any test or device as a prerequisite to voting . . . he may institute for the United States, or in the name of the United

States, an action in a district court of the United States . . . ."  This section, the Secretary asserts, closely mirrors the language of the statute that the Sixth Circuit held to prohibit a private right of action to enforce the materiality provision of the VRA.

But the Court has found no case, in the Sixth Circuit or elsewhere, squarely holding that there is no private right of action under Section 1973aa, and numerous courts have found standing under this section of the VRA either explicitly or implicitly.  *See, e.g.*, *Greater Birmingham Ministries v. State*, No. 2:15-cv-2193, 2016 WL 627709, at *7 (N.D. Ala. Feb. 17, 2016); *Diaz v. Cobb*, 435 F. Supp. 2d 1206, 1215 (S.D. Fla. 2006).  *But see Jennerjahn v. City of Los Angeles*, No. 15-cv-263, 2015 WL 5138671, at *5 (C.D. Cal. July 27, 2015) (dismissing complaint for failure to state a claim but also stating that "[Plaintiff] should consider whether the ordinance falls within the statutory definition of a 'test or device' and whether he has authority to sue for any such violation").

Further, the Supreme Court has read an implied private right of action into other sections of the VRA, including the prohibition against poll taxes under 52 U.S.C. § 10306, *see Morse v. Republican Party of Va.*, 517 U.S. 186, 233-34 (1996) (plurality opinion), and *id.* at 240 (Breyer, J., concurring) (agreeing with plurality opinion that a private right of action lies under § 10306), and the provision allowing for declaratory judgments that a new state enactment is subject to the preclearance requirements of Section 5 of the Act under 52 U.S.C. § 10304, *see Allen v. State Bd. of Elections*, 393 U.S. 544, 560 (1969).  In light of these sections of the VRA, which contain similar language empowering the Attorney General to bring suit, the Court concludes that a private right of action also lies under Section 1973aa, and Plaintiffs thus have standing to bring their literacy-test claim.

That said, the Court concludes that the challenged laws do not violate Section 1973aa of the VRA. Requiring voters to fill out absentee and provisional ballot forms with their birth date and address does not constitute a requirement to "comply with [a] test or device." 52 U.S.C. § 10501(a). Although Plaintiffs object that filling out the form requires illiterate or semi-literate voters to demonstrate "the ability to read, write, understand, or interpret any matter," *id.* § 10501(b), other plaintiffs have used the statute to vindicate their rights when required to read very complex forms or forms written only in a language they do not speak. *See, e.g.*, *Puerto Rican Org. for Political Action v. Kusper*, 490 F.2d 575, 580 (7th Cir. 1973) (upholding a preliminary injunction requiring election commissioners to provide voting assistance in Spanish to Spanish-speaking voters).

Moreover, although the Court has discussed the difficulties homeless and illiterate voters face in filling out forms in the context of the *Anderson-Burdick* burden analysis, the Court is not persuaded that a plaintiff can prevail on a VRA literacy-test claim when a state statute explicitly provides for assistance to illiterate voters, as the Ohio Revised Code does. *See* Ohio Rev. Code § 3505.24; Ohio Rev. Code § 3505.181(F). *See also Diaz*, 435 F. Supp. 2d at 1215 (holding that a requirement that voters check a box reading "I affirm that I have not been adjudicated mentally incapacitated with respect to voting or, if I have, my competency has been restored," did not violate Section 1973aa because "applicants are free to request and receive (and others free to offer and provide) assistance in completing the application"). *Cf. United States v. Louisiana*, 265 F. Supp. 703, 708 (E.D. La. 1966) (invalidating a state law prohibiting illiterate voters from receiving assistance at the polls); *United States v. Mississippi*, 256 F. Supp. 344, 348 (S.D. Miss. 1966) (requiring state to provide assistance to illiterate voters).

Although Plaintiffs point to testimony from the House Report on the VRA, they offer no response to Defendant's argument that literacy is not a requirement of the challenged laws because Ohio law allows for assistance to illiterate or blind voters.  Because Ohio law so allows, Plaintiffs' claim must fail.  The Court **ENTERS JUDGMENT FOR DEFENDANT** on the Section 1973aa claim.

## V.    CONCLUSION

The Court enters **JUDGMENT** for Plaintiffs on their Fourteenth Amendment undue-burden claim and Section 2 VRA claim.  The Court enters **JUDGMENT** for Defendant on all other claims.

Accordingly, the Court **PERMANENTLY ENJOINS** the enforcement of the amendments from SB 205 and SB 216 to the Ohio Revised Code as follows:

Ohio Revised Code §§ 3509.06 and 3509.07 are enjoined to the extent they require full and accurate completion of absentee-ballot identification envelopes before an otherwise qualified elector's ballot may be counted;

Ohio Revised Code §§ 3509.06 and 3509.07 are enjoined to the extent they provide for only seven days for voters to correct absentee-ballot identification envelopes, and the ten-day period provided by Secretary of State directive is restored;

Ohio Revised Code §§ 3505.181, 3505.182, and 3505.183 are enjoined to the extent they require full and accurate completion of provisional-ballot affirmation forms, and require a printed name, before an otherwise qualified elector's ballot may be counted;

Ohio Revised Code §§ 3505.181, 3505.182, and 3505.183 are enjoined to the extent they provide for only seven days for voters to correct provisional-ballot affirmation forms rather than ten days;

110

Ohio Revised Code §§ 3509.03, 3509.04, and 3505.181(F) are enjoined to the extent they prohibit poll workers from completing voters' absentee or provisional ballot forms unless voters provide a specific reason for seeking assistance.

**IT IS SO ORDERED.**

**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED: June 7, 2016**

111