**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **THE NORTHEAST OHIO COALITION** | : | |
| **FOR THE HOMELESS**, *et al.*, | : | |
| | : | |
| **Plaintiffs,** | : | **Case No. 2:06-CV-896** |
| | : | |
| **v.** | : | **JUDGE ALGENON L. MARBLEY** |
| | : | |
| **JON HUSTED, in his official capacity as** | : | **Magistrate Judge Terence P. Kemp** |
| **Secretary of the State of Ohio**, *et al.*, | : | |
| | : | |
| **Defendants.** | : | |

## <u>OPINION & ORDER</u>

This matter is before the Court on the Motion to Extend the April 19, 2010 Consent

Decree by Plaintiffs Northeast Ohio Coalition for the Homeless ("NEOCH"), Columbus

Coalition for the Homeless ("CCH"), and Ohio Democratic Party ("ODP"). (Doc. 802.)

Defendants oppose the Motion. (Doc. 805.) On April 7, 2017, the Court held arguments on the

Motion, which, for the reasons stated below, the Court **DENIES**.

## I. BACKGROUND

### A. Background to the Motion

The history of this litigation has been discussed by this Court and the Sixth Circuit

numerous times over the years. A brief summary of the highlights will suffice. Plaintiffs

include, *inter alia*, two coalitions advocating for the rights of homeless and indigent voters,

NEOCH, and CCH. Plaintiffs originally filed this lawsuit in 2006 against former Secretary of

State Kenneth Blackwell to challenge to Ohio's voter-identification laws. ODP joined as an

Intervenor-Plaintiff, and the State of Ohio entered the case as an Intervenor-Defendant. Over

years of litigation, the Court has dismissed a number of claims. In 2010, the parties, including

Jennifer Brunner, as successor Secretary of State to Kenneth Blackwell, agreed to the entry of the Consent Decree. The parties agreed that the Consent Decree did not "constitute an adjudication or finding on the merits" of Plaintiffs' claims in the case and that it was not to "be construed as an admission by Defendants of any wrongdoing or violation of any applicable federal or state law or regulation." (Consent Decree, Doc. 210, at 2.) The parties agreed that "[t]he purposes of this Decree [we]re to ensure that:

   a. The fundamental right to vote is fully protected for registered and qualified voters who lack the identification required by the Ohio Voter ID laws, including indigent and homeless voters—such as the Individual Plaintiffs and certain members of the Coalitions—who do not have a current address and cannot readily purchase a State of Ohio ID Card;

   b. These voters are not required to purchase identification as a condition to exercising their fundamental right to vote and have their vote be counted;

   c. The legal votes cast by these voters will be counted even if they are cast by provisional ballot on Election Day;

   d. These voters will not be deprived of their fundamental right to vote because of differing interpretations and applications of the Provisional Ballot Laws by Ohio's 88 Boards of Elections;

   e. These voters will not be deprived of their fundamental right to vote because of failures by poll workers to follow Ohio law. For purposes of this Decree poll worker error will not be presumed, but must be demonstrated by evidence; and

   f. All legal votes that are cast by indigent and homeless voters on Election Day will be counted."

(*Id.*, § I(1)). The remaining provisions sought to effectuate these purposes. The key provision, enumerated in Section III, ordered the Secretary of State to instruct Ohio's eighty-eight Boards of Elections to "count the provisional ballot cast by a voter using only the last four digits of his or her social security number" (an "SSN-4 voter"), subject to a number of other conditions. (*Id.*, § III(a).) The Consent Decree also set a number of rules for Boards of Elections in processing provisional ballots and determining their validity. For example, if a Board delegates some

aspects of the processing and counting of provisional ballots to board staff, "[s]uch processing must be done in bipartisan teams," and only *after* the Board adopts a policy for processing provisional ballots. (*Id.*, § III(c)(ii) and (iii).) As for implementation, the Consent Decree requires the Secretary of State to "issue a Directive to all Boards of Elections that sets forth the text of the injunctive relief described above," to "remind Boards of Elections that they must comply with the injunctive relief," to "distribute the text of the injunctive relief to all Board Members, Directors and Deputy Directors" and to "post a notice in a conspicuous place that contains the text of the injunctive relief described above in large, capitalized and bolded type." (*Id.* § IV.)

The Consent Decree was set to expire on June 30, 2013, and to be automatically amended to include statutory changes to the Ohio Voter ID laws or Provisional Ballot Laws. (*Id.* § V.) It also states that "[a]ny of the parties may file a motion with the Court to modify, extend or terminate this Decree for good cause shown." (*Id.*)

The Consent Decree stayed in effect during the 2010 midterm election and the 2012 presidential election, surviving Defendants' motion to terminate it in 2012. In the meantime, Jon Husted replaced Jennifer Brunner as Secretary of State. (Docs. 254, 307.) On June 10, 2013, Plaintiffs moved to extend the Consent Decree "indefinitely" beyond its expiration date of June 30, 2013. (Doc. 362.) The Court extended the Consent Decree until December 31, 2016. (Doc. 383.)

In 2014, Ohio enacted Senate Bills ("SB") 205 and 216, and, on September 24, 2014, the State provided notice to the Court that SB 216 would amend portions of the Notice required under Article IV, Section 8 of the Consent Decree. (Doc. 425.)

On October 30, 2014, Plaintiffs challenged SB 205 and 216 through a Second

Supplemental Complaint. (Doc. 453.) The Second Supplemental Complaint alleged that

portions of SB 205 and SB 216 abridged, burdened, and/or denied voting rights, in violation of

the Due Process and Equal Protection Clauses of the Fourteenth Amendment, as well as the First

and Fifteenth Amendments. (*Id.* at 31-41.) Plaintiffs also claimed that the challenged laws

violated Section 2 of the Voting Rights Act. (*Id.* at 36-40.) The case proceeded to a twelve-day

bench trial that concluded on March 31, 2016. The Court issued its Final Judgment on June 7,

2016, and enjoined certain portions of SB 205 and SB 216. (Doc. 691.) Both Plaintiffs and

Defendants appealed the Final Judgment to the Sixth Circuit. (Docs. 693, 697.)

On September 13, 2016, the Sixth Circuit affirmed "the entry of judgment for the

plaintiffs on their equal-protection undue-burden claim as it relates to the requirement that

boards of elections reject mail-in and in-person absentee ballots for failure to complete the

identification envelope's address and birthdate fields with technical precision." *NEOCH v.*

*Husted*, 837 F.3d 612, 637 (6th Cir. 2016). In other words, the Sixth Circuit affirmed the Court's

"permanent injunction of the portions of SB 205 that amend Sections 3509.06(D) and 3509.07 of

the Ohio Revised Code." *Id.* In all other respects, the Sixth Circuit upheld the challenged

portions of SB 205 and SB 216. *Id.* at 637-38.

On December 5, 2016, Plaintiffs filed this Motion to extend the Consent Decree until

March 31, 2025. (Doc. 802.) Defendants oppose the Motion, and the Court conducted oral

argument on April 7, 2017. Per the parties' agreement, the Court granted an extended briefing

schedule and extended the Consent Decree until March 31, 2017. (Doc. 804.) To provide

sufficient time to hold oral argument and to adjudicate the Motion, the Court temporarily

extended the Consent Decree until April 30, 2017.  (Doc. 809.)  The Motion is now fully briefed and ripe for review.

## B.  Findings of Fact

In the Sixth Circuit, "modification of a Consent Decree requires a complete hearing and findings of fact." *Vanguards of Cleveland*, 23 F.3d 1013, 1017 (6th Cir. 1994).  The Court held oral argument on the Motion on April 7, 2017.  Upon review of the parties' briefing and exhibits, as well as the transcript of the April 7, 2017 argument, the Court finds as follows.

The parties entered into the Consent Decree for the purposes enumerated in that Decree, as re-stated above.

The Court extended the Consent Decree in 2013.  At that time, the Court found that "Ohio's election laws d[id] not contain any provision which explicitly allows a vote, or provisional ballot, to be cast by a SSN-4 voter who does not have an accepted ID, but has and provides the last four digits of her SSN."  (Doc. 383 at 4.)  The Court also found that Ohio Revised Code §§ 3505.18 and 3505.181 "are susceptible to the interpretation that boards of election need not count a ballot by a SSN-4 voter who does not have an accepted ID, but has and provides the last four digits of her SSN."  (*Id.* at 17-18.)  The Court "d[id] not find that the Consent Decree required, or purported to require, Ohio to pass new voting legislation [because] [s]uch a requirement would have been an impermissible infringement upon Ohio's rights as a state."  (*Id.* at 18.)  The Court did, however, find significant changed circumstances since the parties entered into the Consent Decree because the Decree "ha[d] not achieved the stated purposes which the parties expected it to achieve," namely, "to ensure the counting of ballots cast by SSN-4 voters."  (*Id.* at 19.)  Consequently, the Court extended the Consent Decree until December 31, 2016, finding this limited extension "suitably tailored to the changed

circumstances." (*Id.* at 19-21 (citing *Rufo v. Inmates of Suffolk Cnty Jail*, 502 U.S. 367, 383 (1992)).)

In 2014, Ohio passed SB 205 and SB 216, which affected absentee and provisional voting, respectively. Boards of Elections are required to follow these statutes, as well as "the rules, directives, or advisories of the secretary of state." Ohio Rev. Code §§ 3501.05(B), 3501.11(P). Other statutes and directives also touch on the ability of a SSN-4 voter to cast a vote or provisional ballot. The Court will review each of these statutes and directives in turn.

### 1. Senate Bill 205: Absentee Voting Procedures

SB 205 changed Ohio law regarding absentee voting. To apply for an absentee ballot, an eligible voter must provide a name, signature, registration address, date of birth, and a form of identification. Ohio Rev. Code. § 3509.03(B). Acceptable forms of identification include a driver's license number, the last four digits of a social security number, or a copy of a valid photo ID, valid military ID, current utility bill, bank statement, government check, paycheck, or other government document, excluding a voting registration notice, that shows the voter's name and address. *Id.* § 3509.03(B)(5). Voters can provide a mailing address to request an absentee ballot through the mail. *Id.* § 3509.03(B)(9). If the voter's county does not provide for early, in-person voting, an absentee ballot must contain, along with the voter's ballot, an "identification envelope" containing fields for the voter's name, signature, voting residence, and birthdate. *Id.* § 3509.04(B).

Section 3509.06 imposes a completeness requirement for absentee ballot identification envelopes, mandating that such an envelope is considered incomplete if the voter fails to fill out the five fields of required information: name; residence address; date of birth;[1] signature; and a

---

[1] Ohio law makes an exception for a voter who fills in an incorrect birth date, provided that the voter filled in the field, and: (1) filled in the correct month and day; (2) the statewide voter registration database

form of ID, which may include all types of ID required for the absentee ballot application form.

*Id.* § 3509.06(D)(3)(a).  Additionally, the ballot is considered incomplete if the information does

not conform to the information contained in the statewide voter registration database.  *Id.*

§ 3509.06(D)(3)(b).  If the ballot is considered incomplete:

> the election officials shall mail a written notice to the voter, informing the voter of
> the nature of the defect.  The notice shall inform the voter that in order for the
> voter's ballot to be counted, the voter must provide the necessary information to
> the board of elections in writing and on a form prescribed by the secretary of state
> not later than the seventh day after the day of the election.  The voter may deliver
> the form to the office of the board in person or by mail.  If the voter provides the
> necessary information to the board of elections not later than the seventh day after
> the day of the election and the ballot is not successfully challenged on another
> basis, the voter's ballot shall be counted in accordance with this section.

*Id.*  Before enactment of SB 205, Boards of Elections had some discretion to count ballots if

some of the information requested in the five fields (name, address, date of birth, identification,

and signature) was missing or incorrect.  Section 3509.07, by contrast, *requires* that voters

complete the five fields, or election officials "shall not" accept or count the ballot unless the

prospective voter provides the required information no later than the seventh day after the

election.  *See* Ohio Rev. Code § 3509.07(A).[2]

The Sixth Circuit upheld the challenged portions of SB 205, except that it affirmed the

Court's "permanent injunction of the portions of SB 205 that amend Sections 3509.06(D) and

3509.07" to require Boards of Elections to "reject mail-in and in-person absentee ballots for

failure to complete the identification envelope's address and birthdate fields with technical

precision."  *NEOCH*, 837 F.3d at 637.

---

lists the voter's birthday as January 1, 1800; or (3) by a vote of at least three members the Board finds that
the voter has met the requirements of the other four fields.  Ohio Rev. Code § 3509.06(D)(3)(a)(iii)(III).
[2] Before SB 205, the period in which to cure deficiencies was ten days.  Directive 2010-68 at 6.

<u>2. Senate Bill 216: Provisional Voting Procedures</u>

SB 216, codified in Ohio Revised Code §§ 3501.22 and 3505.181-83, concerns provisional voting. Under SB 216, provisional voters must complete and execute the provisional ballot affirmation, which requires the following fields: printed name, date of birth, current address, signature, and proof of identity.[3] Ohio Rev. Code § 3505.181(B)(2). Two of these fields—date of birth[4] and current address—are new. *Id.* § 3503.183(B)(1)(a). SB 216 also requires voters to *print*, rather than simply include, their names on the provisional ballot envelope. *Id.* Unlike SB 205, SB 216 does not create additional completeness requirements for the five fields, because § 3505.182(F) already contained such a requirement.

If a provisional ballot is missing a driver's license number, SSN-4 or valid ID on Election Day, the voter may go to the Board for a period of seven (reduced from ten) days to correct the error. *Id.* § 3505.181(B)(7). Voters with other errors on their affirmation forms may not correct their ballots. *Id.* The Board is not required to notify a provisional voter before the end of the cure period if the information on the provisional ballot is incomplete or defective. *See id.* § 3505.181.

The Sixth Circuit upheld the challenged portions of SB 216. *NEOCH*, 837 F.3d at 637-38.

---

[3] Proof of identity may include SSN-4, an Ohio driver's license number, a form of unexpired government ID containing the voter's name and current address (or former address if an Ohio driver's license or ID), a military ID card, a current utility bill, bank statement, government check, paycheck, or other government document that contains the voter's name and address, other than a notice of voter registration mailed by a Board. *Id.* § 3505.182(A)-(D).

[4] Ohio law contains the same exceptions for an incorrect birth date as it does for absentee ballots. *Id.* § 3505.183(B)(3)(e).

### 3.  Other Applicable Statutes and Directives

Other statutes and directives touch on the ability of a SSN-4 voter to cast a vote or provisional ballot.  Relevant here are Ohio Revised Code § 3503.02(I), Directive 2008-80, Permanent Directive 2015-25, Permanent Directive 2015-28, Permanent Directive 2016-23, and Directive 2016-38.  In 2015, Secretary of State Husted created a "manual of permanent directives" called the Election Official Manual.  (Damschroder Decl., Doc. 805-9, at ¶ 5.)  The Election Official Manual incorporates Directive 2008-80, Permanent Directive 2015-25, Permanent Directive 2015-28, and Permanent Directive 2016-23.

#### (a) Ohio Revised Code Section 3503.02(I)

Ohio Revised Code § 3503.02(I) provides that "[i]f a person does not have a fixed place of habitation, but has a shelter or other location at which the person has been a consistent or regular inhabitant and to which the person has the intention of returning, that shelter or other location shall be deemed the person's residence for the purpose of registering to vote."

#### (b) Directive 2008-80

Directive 2008-80 has been incorporated into the Consent Decree, and it is in the Resources section of the permanent directives that form the Election Official Manual. (Damschroder Decl., Doc. 805-9, at ¶ 5; Election Official Manual, Doc. 805-7, at 16-14 – 16-30.)  Among other things, Directive 2008-80 clarifies terms such as "current" ID, driver's license "number," "utility bill," "bank statement," and "government document."  (Election Official Manual, Doc. 805-7, at 16-15 – 16-19.)  Of particular import is the definition of "government document," which Directive 2008-80 defines, nonexclusively, as follows:

> a document that is issued by a government office and that bears the name and current address of the voter presenting it for identification.  The name and address of the voter that appears on the government document must conform to the voter's name and address in the record of the board of elections, including the poll list or signature poll book and must be current as defined in this directive.  "Government

office" includes any local (including county, city, township, and village governments), state, or federal (United States) government office, branch, agency, department, division, or other similar component, including a board, commission, public college or university or public community college, whether or not in Ohio. By way of example, this may include, but is not limited to, letters; bills for taxes and other similar obligations; hunting, fishing and marine equipment operators' licenses; license renewal notices and other notices; filing receipts; court papers; grade reports; or transcripts.

(*Id.* at 16-19.)  The Secretary of State "has no intention of rescinding Directive 2008-80 when the Consent Decree expires."  (Damschroder Decl., Doc. 805-9, at ¶ 8; Kuruk Decl. ¶ 22.)

### (c) Permanent Directive 2015-25

Permanent Directive 2015-25, which has been incorporated into the Election Official Manual as Chapter 3, describes, among other things, the residency requirements for Ohio voters. Specifically, a voter's

voting residence is the location that person considers to be a permanent, not a temporary, residence.  That person's voting residence is the place in which the voter's habitation is fixed and to which, whenever the voter is absent, the voter intends to return.  If the voter does not have a fixed place of habitation, but is a consistent or regular inhabitant of a shelter or other location to which the voter intends to return, that voter may use that shelter or other location as the voter's residence for purposes of registering to vote.

(Election Official Manual, Doc. 805-7, at 3-5 – 3-6.)  The Directive clarifies that the voting residence of a homeless person need not be a house or an apartment.  (*Id.* at 3-7.)  The homeless person may instead register to vote using a "shelter or other location" at which he or she has been a "consistent or regular inhabitant."  (*Id.*)  The Court finds that the term "shelter or other location" does *not* limit addresses to locations tied to buildings.

### (d) Permanent Directive 2015-28

Permanent Directive 2015-28, which resides in the Election Official Manual as Chapter 6, covers provisional voting.  To file a provisional ballot, a voter must complete and sign the

Provisional Ballot affirmation statement.  (Election Official Manual, Doc. 805-7, at 6-5.)  This affirmation must include, among other items, "[a]n acceptable form of identification."  (*Id.*)  An acceptable form of identification may include "[t]he last four digits of the voter's Social Security number."  (*Id.* at 6-7; (*see also id.* at 6-12, directing officials to "[d]etermine whether the provisional voter . . . provided at least one of the following on the affirmation statement: [t]he last four digits of the voter's Social Security number[.]").)  Permanent Directive 2015-28 points readers to Directive 2008-80 and Directive 2016-23 for "additional information and definitions on acceptable identification for voting purposes."  (*Id.* at 6-8.)

In processing provisional ballots, "[b]oard staff, working in bipartisan teams, may begin examining provisional ballot envelopes the day after the election, as long as the board has adopted a provisional ballot policy allowing its staff to do so.  The bipartisan teams may categorize provisional ballots into groups of like ballots (e.g., ballots that have been verified and eligible to be counted, provisional affirmations that are missing the voter's signature, etc.) for the board to consider."  (*Id.* at 6-9.)  Only board members may "determine the validity of each provisional ballot.  The board must, by a majority vote, determine whether to accept and count – or whether to reject and not count – each and every provisional ballot in a properly-noticed, public meeting."  (*Id.* at 6-10.)  Board members must vote on the eligibility of each provisional ballot before opening or counting any of them.  (*Id.*)

The secretary "has no intent to rescind the guidance within SOS Directive 2015-28, including § 1.03, when the Consent Decree expires."  (Kuruc Decl., Doc. 805-1, at ¶ 18.)

*(e) Permanent Directive 2016-23*

Permanent Directive 2016-23, reproduced in the Election Official Manual as Chapter Seven, "is a permanent directive that addresses Election Day voting procedures, including acceptable identification for non-provisional voters."  (Kuruc Decl., Doc. 805-1, at ¶ 18.)

Permanent Directive 2016-23 addresses, among other topics, voter identification.  It states that

"Ohio law requires that every voter, upon appearing at the polling place to vote on Election Day,

must announce his or her full name and current address and provide proof of identity."  (Election

Official Manual, Doc. 805-7, at 7-11.)  The Permanent Directive then lists forms of identification

that a voter may use on Election Day.  These forms of identification may include:

- An unexpired Ohio driver's license or state identification card with present or former address . . . ;

- A military identification; . . .

- A photo identification issued by the United States government or the State of Ohio, that contains the voter's name and current address and that has an expiration date that has not passed; . . .

- An original or copy of a current utility bill with the voter's name and present address; . . .

- An original or copy of a current bank statement with the voter's name and present address;

- An original or copy of a current government check with the voter's name and present address;

- An original or copy of a current paycheck with the voter's name and present address; or

- An original or copy of a current other government document (other than a notice of voter registration mailed by a board of elections) that shows the voter's name and present address.

- For utility bills, bank statements, government checks, paychecks, and other government documents, "current" is defined as within the last 12 months.  "Other government document" includes license renewal and other notices, fishing and marine equipment operator's license, court papers, or grade reports or transcripts. "Government office" includes any local (including county, city, township, school district and village), state or federal (United States) government office, branch, agency, commission, public college or university or public community college, whether or not in Ohio.

(*Id.* at 7-11 – 7-13.)

Permanent Directive 2016-23 does not list every category of "Other Government Document" that is found in Directive 2008-80. For example, Permanent Directive 2016-23 does not include the broad, non-exclusive description of "Other Government Document" contained in Directive 2008-80—namely, that it "includes, but is not limited, to a document that is issued by a government office and that bears the name and current address of the voter presenting it for identification." (Compare *id.* at 7-13 with *id.* at 16-19.) Nor does it include "department, division, or other similar component, including a board" in the definition of "Government office." (Compare *id.* at 7-13 with *id.* at 16-19.) Finally, it does not include "letters; bills for taxes and other similar obligations; hunting . . . licenses" or "filing receipts." (Compare *id.* at 7-13 with *id.* at 16-19.) It does, however, direct the reader to Directive 2008-80 "[f]or additional information on voter identification." Therefore, the Court finds that Permanent Directive 2016-23 includes the additional categories and the non-exclusivity of the definitions of "Other Government Document" contained in Directive 2008-80. (*See also* Kuruc Decl., Doc. 805-1, at ¶ 21.)

### *(f) Directive 2016-38*

Directive 2016-38 is titled "Review of Voter-Identifying Fields on Absentee Ballot Identification Statements and Provisional Ballot Affirmations," and it contains a section on "Identification" that directs Boards of Elections to Directive 2008-80 for issues related to voter identification. (Doc. 805-8 at 1, 3; *see also* Kuruc Decl., Doc. 805-1, at ¶ 23.) The secretary does not intend to rescind Directive 2016-38. (Kuruc Decl., Doc. 805-1, at ¶ 23.)

## II. LEGAL STANDARD FOR MODIFYING CONSENT DECREE

The Consent Decree provides that "[a]ny of the parties may file a motion with the Court to modify, extend or terminate this Decree for good cause shown." (Consent Decree at V(11).) Although a Consent Decree "embodies an agreement of the parties and thus in some respects is

contractual in nature," it remains "a judicial decree that is subject to the rules generally applicable to other judgments and decrees." *NEOCH v. Husted*, 696 F.3d 580, 601 (6th Cir. 2012). For that reason, Federal Rule of Civil Procedure 60(b) governs whether the Consent Decree may (or may not) be modified. *Id.* at 601-02.

The Supreme Court has articulated the legal standard this Court must apply when deciding a motion to modify a Consent Decree under Rule 60(b) as follows: "a party seeking modification of a Consent Decree bears the burden of establishing [1] that a significant change in circumstances warrants revision of the decree. [2] If the moving party meets this standard, the court should consider whether the proposed modification is suitably tailored to the changed circumstance." *Rufo*, 502 U.S. 367, 383 (1992). A significant change in circumstances, in this context, may include: "[a] when changed factual conditions make compliance with the decree substantially more onerous. . . . [b] when a decree proves to be unworkable because of unforeseen obstacles . . . or [c] when enforcement of the decree without modification would be detrimental to the public interest." *Id.* at 384. In applying this standard to the facts of this case, "the district court properly focuse[s] on the goal of the Consent Decree." *Vanguards*, 23 F.3d at 1020.

### III. ANALYSIS

#### A. *Rufo* Step 1: Significant Changed Circumstances

##### 1. 2013 Extension of the Consent Decree

The Court extended the Consent Decree in 2013, finding that the parties' failure to reach the goal of the Consent Decree constituted significant changed circumstances under *Rufo.* (Doc. 383 at 16-19, *citing Vanguards*, 23 F.3d at 1020.) In particular, the Court found that the Consent Decree had "failed to achieve the purposes for which both parties agreed it was designed when they entered it, namely, to ensure valid ballots cast by SSN-4 votes [we]re counted." (Doc. 383

14

at 17.)  Before the Consent Decree, Ohio's law that mandated the counting of these ballots was not uniformly applied.  (*Id.*)  And by the time Plaintiffs moved to extend the Decree in 2013, Ohio had failed to pass legislation addressing these problems.  (*Id.* at 18-19.)  Without the Consent Decree, then, the Court found, "there [wa]s nothing to prevent boards of election from returning to those haphazard and, in some cases, illegal practices, which previously resulted in the invalidation of validly cast ballots from registered voters."  (*Id.*)  The law, as it stood before the Consent Decree, was susceptible to the interpretation that a Board of Elections need not count a ballot cast by an SSN-4 voter who had no accepted ID, but who provided the last four digits of her social security number.  (*Id.* at 17-18.)

Although both parties anticipated that Ohio would pass legislation solving the SSN-4 voter problems, the failure of this legislation's passage itself did not justify modifying the Consent Decree in 2013.  (*Id.* at 18-19.)  But because, at the time of entry into the Consent Decree, "the parties did not foresee that at the time of its termination, the enfranchisement of those voters would not be ensured," the Court found a significant change in circumstances.  (*Id.* at 19.)  Therefore, the Court found that Plaintiffs had met the first part of the *Rufo* standard.  (*Id.*)

### 2.  Now

Plaintiffs argue that "good cause" and "significant changed circumstances" require an additional extension of the Consent Decree, because "to end certain provisions without statutory incorporation neither was what the parties expected nor is in the public interest."  (Doc. 802 at 16.)  Plaintiffs identify, and seek the extension of, three Consent Decree provisions that have not been incorporated into statute: (a) the annexation of Directive 2008-80 as an Order of this Court; (b) the provisions prohibiting Boards from rejecting ballots with homeless addresses or otherwise

indicating homelessness; and (c) the rules regarding Boards' delegation of provisional-ballot counting. (*Id.* at 16-24.)[5]

Defendants argue that these provisions have all been incorporated into Ohio law or the Secretary of State's Directives, and that, consequently, NEOCH has failed to meet its burden to justify another extension of the Consent Decree, which has limited remaining effect. (Doc. 805 at 21-29; Kuruc Decl., Doc. 805-1, at ¶ 5.) Defendants also argue that further extension of the temporary relief granted by the Consent Decree "would upset the fundamental agreement between the parties." (Doc. 805 at 16-17.) The Court will address each argument in turn.[6]

### *(a) Directive 2008-80*

Plaintiffs seek extension of the Consent Decree because Directive 2008-80 has not been enacted into law. As the Court described in section (I)(B)(3)(b), *supra*, Directive 2008-80 lists acceptable forms of documents for registration and voting. Defendants counter that this directive

---

[5] Plaintiffs' primary evidence is as follows: (a) during the 2016 general election, twenty-eight provisional ballots were accepted by the Franklin County Board of Elections pursuant to the Consent Decree (Decl. of Donald McTigue, Doc. 802-2, at ¶ 3); (b) a registered, homeless Cuyahoga county voter tried to fill out a provisional ballot without his ID in the 2016 election, and was turned away by one set of volunteers and allowed to proceed by a second set of volunteers (Decl. of Ray Oldham, Doc. 802-3); (c) NEOCH assists more than 23,000 homeless voters in Cleveland annually, approximately twenty percent of whom do not have any form of state identification (Decl. of Brian Davis, Doc. 802-1, at ¶ 6); (d) thousands of homeless people have registered to vote using their SSN-4 (*id.* at ¶ 11); and (e) homeless people are likely to have "government documents," like social security checks and letters, to show as ID (*id.* at ¶ 12).

Plaintiffs also attach to their reply brief: (f) a provisional ballot report for the November 8, 2016 election (Doc. 808-1); (g) a House Bill that would impose a documentary ID requirement for in-person early voting (Doc. 808-2); (h) news articles suggesting that the bill's sponsor may run for Secretary of State (Docs. 808-3 and 808-4); (i) Secretary of State Directive 2015-23, which announces the enactment of the Election Official Manual (Doc. 808-5); (j) a declaration from Brian Davis, Executive Director of NEOCH, that documentary-ID requirements imposed for in-person early voting would deter homeless people from voting and require those who wish to vote early in person and lack ID to file a provisional ballot (Doc. 808-6); (k) Advisory 2011, which advises Boards of Election to disregard Directive 2010-97 (Doc. 808-7); (l) a copy of a 2009 version of Ohio Revised Code Section 3503.02(I) (Doc. 808-8); and (m) responses from Butler County, Licking County, Preble County, and Franklin County to NEOCH's inquiries regarding "NEOCH provisional ballots counted in connection with the 2016 general election." (Docs. 808-9, 808-10, 808-11, & 808-12.)

[6] While this Motion has been extensively briefed, the Court declines to address arguments that are not necessary to this Opinion & Order.

16

is cross-referenced within Directives 2015-28, 2016-23, and 2016-38, and that it forms part of the resource materials of the Ohio Election Official Manual.  (Doc. 805 at 25.)  Defendants also declare that the Secretary of State does not intend to rescind Directive 2008-80, and that Permanent Directive 2016-23 "also details acceptable forms of identification."  (*Id.*)

While Plaintiffs are correct that Directive 2008-80 has not yet been incorporated into Ohio statute, Defendants are correct that it forms an integral part of Ohio's voting procedures. The Election Official Manual, which the state has declared to the Court is a manual of "permanent" directives, includes Directive 2008-80.  Moreover, the Court has found that Permanent Directive 2016-23, which directs Boards to Directive 2008-80 "[f]or additional information on voter identification," includes the additional categories and the non-exclusivity of the definitions of "Other Government Document" contained in Directive 2008-80.  (*Supra*, Sec. (I)(B)(3)(e).)  In addition, Directive 2016-38 and Permanent Directive 2015-28 direct Boards to Directive 2008-80 for issues and/or additional information related to voter identification.  (*Supra*, Sec. (I)(B)(3)(f).)  Although, of course, Directives may be rescinded, the Defendants have assured the Court that the Secretary does not intend to rescind Directive 2008-80, Permanent Directive 2016-38, or Permanent Directive 2015-28.  Therefore, existing Directives, including Directive 2008-80, include and embrace the definitions Plaintiffs seek to preserve.

*(b) Ballots with Nonbuilding Addresses*

Plaintiffs seek extension of the Consent Decree because they claim that it is more specific than Ohio law in describing non-building locations as acceptable addresses for casting provisional ballots.  (Doc. 802 at 21-23; Draft Transcript Apr. 7, 2017, at 8.)  For example, the Consent Decree enumerates as acceptable "street corner," "alley" or "highway overpass." (Consent Decree, Doc. 210, at (III)(5)(b)(iii).)

Defendants point to Ohio Revised Code § 3503.02(I) and Permanent Directive 2015-25 to argue that Ohio law already encompasses these protections.  (Doc. 805 at 26.)  Indeed, Ohio Revised Code § 3503.02(I) provides, "[i]f a person does not have a fixed place of habitation, but has a **shelter or other location** at which the person has been a consistent or regular inhabitant and to which the person has the intention of returning, that shelter or other location shall be deemed the person's residence for the purpose of registering to vote."  (emphasis added.)  Permanent Directive 2015-25 echoes Section 3503.02(I).

Plaintiffs fear that these provisions may be read to exclude an address that is a "street corner, alley or highway overpass." (*Id.* at 22 (citing Ohio Rev. Code § 3503.02(I))).  The Court disagrees, having found the term "shelter or other location" *not* to limit voters to building addresses.  Therefore, though Revised Code § 3503.02(I) and Permanent Directive 2015-25 do not explicitly state that an address may be tied to a location other than a building, the Court finds that they encompass non-building addresses.[7]

### (c) Delegation of Provisional Ballot Counting

Third, Plaintiffs seek an extension of the Consent Decree because certain guidelines regarding the counting of provisional ballots reside in Permanent Directive 2015-28 rather than in statute.  (Doc. 802 at 24-25; Doc. 808 at 18-19.)  Because Permanent Directives may be rescinded, Plaintiffs argue that "without the Decree, the Boards are at risk of returning to the previous state of affairs where boards of election administered provisional-ballot counting unequally and inconsistently."  (Doc. 802 at 25; Doc. 808 at 19.)

---

[7] Plaintiffs also argue that Section 3503.02 is insufficient to protect the interests of homeless voters because it was enacted before the Consent Decree.  Plaintiffs fail to show any evidence, however, that votes would not have been counted but for the specific examples of nonbuilding locations contained in the Consent Decree.

18

The Court made clear, however, when it extended the Consent Decree in 2013, that the it did not "require[ ], or purport[ ] to require, Ohio to pass new voting *legislation*." (Doc. 383 at 18 (emphasis added).) "Such a requirement would have been an impermissible infringement upon Ohio's rights as a state." (*Id.*) Therefore, the Court may not extend the Consent Decree for Ohio's having failed to pass legislation that codifies the procedures laid out in Permanent Directive 2015-28.

### *(d) Altering the Parties' Bargain*

Defendants argue that an additional extension of the Consent Decree would fundamentally alter the parties' bargain. (Doc. 805 at 16.) Plaintiffs counter that the bargain was for Ohio to pass *legislation* incorporating each element of the Consent Decree. (Doc. 802 at 21.) The Court agrees with Defendants and disagrees with Plaintiffs.

In 2013, Plaintiffs sought an "indefinite" extension of the Consent Decree, which would have converted the temporary Consent Decree into a permanent injunction without a full adjudication on the merits. (Doc. 383 at 19.) Such a result, the Court found, was neither supported by law, nor contemplated by Defendants when they entered into the Consent Decree. (*Id.*) Defendants had entered into the Consent Decree with the understanding that they would not be bound permanently. (*Id.*) The Court had found that "[t]o bind Defendants by the Consent Decree permanently would fundamentally alter the bargain reached by the parties." (*Id.*) So too with an extension of two presidential cycles—the extension sought here. (*Id.* at 20; Doc. 802 at 26.)

In 2013, however, the Court was faced with a dilemma. After the Consent Decree had been in place for its full anticipated term of three years, it had "failed to achieve the purposes for which both parties agreed it was designed when they entered it, namely, to ensure valid ballots cast by SSN-4 votes [we]re counted." (Doc. 383 at 17.) By 2013, the enfranchisement of those

voters had not been ensured, thus justifying a temporary extension.  To be clear, the Consent

Decree did not "require[ ], or purport[ ] to require, Ohio to pass new voting legislation" because

"[s]uch a requirement would have been an impermissible infringement upon Ohio's rights as a

state."  (Doc. 383 at 18.)

In 2013, then, the Court found that an extension of roughly three and one-half years,

through one additional presidential election, was "suitably tailored to address the failures of

Defendants to ensure the counting of valid SSN-4 votes" while also maintaining the original

bargain.  (Doc. 383 at 20.)  While the Court left open the possibility of a further extension "if

Plaintiffs prove further failures of Defendants to count valid SSN-4 ballots in subsequent

elections," (*id.* at 21), Plaintiffs have not shown any such failures.

Now, as in 2013, the Court must recognize the bargain struck by the parties.  Extending a

Consent Decree from three, to seven, to fifteen years wreaks havoc on that bargain, especially

without any evidence that Defendants failed to count valid SSN-4 ballots in subsequent elections.

And now, we have a dramatically different legal landscape.

Defendants are correct when they characterize the goal of the Consent Decree as

"*systematic*; to create a *process* for counting otherwise valid SSN-4 provisional ballots."  ((Doc.

805 at 20) (emphasis in original).)  In 2014, Ohio passed laws that clarified that voters may rely

on their SSN-4 as identification when casting provisional and absentee ballots.  SB 205; SB 216.

In other words, Ohio created a process by which SSN-4 voters may cast their ballots, and by

which those ballots, if valid, will be counted.  Plaintiffs tested this process, in this Court and in

the Sixth Circuit.[8]  The Sixth Circuit recently upheld these laws against Plaintiffs' attacks.

*NEOCH*, 837 F.3d at 637-38.  In so doing, the Sixth Circuit held that, "[d]espite differences in

_____

[8] Plaintiffs also filed a petition for a writ of certiorari which is pending with the Supreme Court of the
United States.  (Doc. 810.)

the local application of provisions concerning ballot rejection, the elections boards are guided by clear prescriptive statewide rules that apply equally to all voters." *Id.* at 636.

Plaintiffs' argument that extending the Decree would not burden Defendants because it would not impose onerous obligations on Defendants, (Doc. 808 at 2-3), misses the point. Plaintiffs have not shown the significant changed circumstances necessary to further distort the bargain made seven years ago.

In sum, the Court finds that statutes and directives address the three extant pieces of the Consent Decree. The Court reiterates that the Consent Decree did not require the incorporation of its terms by statute. Moreover, Plaintiffs have not shown at this juncture that Defendants have failed to count the valid votes of homeless and indigent voters. Should infringement on voting rights arise in the future, Plaintiffs are not barred from seeking protection from the courts, including this one. The Court finds that Plaintiffs have failed to meet the first *Rufo* factor.

## B. *Rufo* Step 2: Suitably Tailored Modification

The second part of *Rufo* requires the Court to determine whether the modification Plaintiffs seek "is suitably tailored to the changed circumstance." *Rufo*, 502 U.S. at 383. Because the Court has determined that modification of the Consent Decree is not warranted by significant changed circumstances, the Court need not reach whether the requested extension is suitably tailored to the changed circumstance.

## IV. CONCLUSION

For these reasons, the Court declines to further extend the Consent Decree, and **DENIES** Plaintiffs' Motion to Extend the Consent Decree. (Doc. 802.) The Consent Decree will expire effective on the date of this Opinion & Order. Plaintiffs' Motion to Temporarily Extend the Consent Decree until Court Rules on Plaintiffs' December 5, 2016 Motion to Extend (Doc. 811) is **DENIED** as moot.

**IT IS SO ORDERED.**

<u>    s/Algenon L. Marbley</u>
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT COURT**

**Dated: April 28, 2017**